No. 25-2904

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellant,*

v.

STATE OF ILLINOIS, et al.,
                    *Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:25-cv-01285
(Judge Lindsay C. Jenkins)

## BRIEF FOR PLAINTIFF-APPELLANT

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney
  General*

MARK R. FREEMAN
DANIEL TENNY
MICHAEL E. TALENT
J. KAIN DAY
  *Attorneys
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-8976*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION ........................................ 3

STATEMENT OF THE ISSUES ............................................. 4

PERTINENT STATUTES ........................................................ 4

STATEMENT OF THE CASE ................................................. 5

I. Relevant Immigration Laws And Regulations ................. 5

II. The Sanctuary Policies ...................................................... 10

III. The Complaint .................................................................... 12

IV. The District Court Dismisses The Case ......................... 13

SUMMARY OF ARGUMENT .............................................. 19

STANDARD OF REVIEW .................................................... 26

ARGUMENT ........................................................................... 27

I. The Sanctuary Policies Are Preempted ......................... 29

    A. The Sanctuary Policies conflict with federal law and are expressly preempted ............................................. 30

    B. The district court's reasons for rejecting preemption are not persuasive ................................................................. 42

II.     The Sanctuary Policies Impermissibly Discriminate Against The Federal Government ...................................................................... 47

III.    The Tenth Amendment Is Not Implicated By Finding The Sanctuary Policies Invalid .......................................................... 50

        A.      The INA does not regulate states ......................................... 51

        B.      Sections 1373(a) and 1644 do not regulate states ................ 59

        C.      Alternatively, Sections 1373(a) and 1644 are valid mandates that states share information ............................................... 62

        D.      States cannot use the anti-commandeering doctrine to justify discrimination against the federal government ................... 65

CONCLUSION ........................................................................................ 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF RULE 30 COMPLIANCE

ADDENDUM

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Arizona v. United States,*
  567 U.S. 387 (2012) .......................................... 5, 31, 32, 35, 36, 41, 54

*Bilek v. Federal Ins. Co.,*
  8 F.4th 581 (7th Cir. 2021) ............................................... 26

*Buckman Co. v. Plaintiffs' Legal Committee,*
  531 U.S. 341 (2001) ..................................................... 56

*C.Y. Wholesale, Inc. v. Holcomb,*
  965 F.3d 541 (7th Cir. 2020) ........................................... 30

*Carbo v. United States,*
  364 U.S. 611 (1961) ................................................. 45, 58

*City of Chicago v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ........................................... 51

*City of Chicago v. Sessions,*
  888 F.3d 272 (7th Cir. 2018), *rehearing en banc granted in part,*
  *vacated in part,* 2018 WL 4268817 (7th Cir. June 4, 2018),
  *vacated,* 2018 WL 4268814 (7th Cir. Aug. 10, 2018) ........................ 42

*City of El Cenizo v. Texas,*
  890 F.3d 164 (5th Cir. 2018) ........................................... 60

*City of New York v. United States,*
  179 F.3d 29 (2d Cir. 1999) ............................................. 60

*Coleman v. Labor & Indus. Rev. Comm'n,*
  860 F.3d 461 (7th Cir. 2017) ........................................... 38

*Coventry Health Care of Mo., Inc. v. Nevils,*
  581 U.S. 87 (2017) ..................................................... 38

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ....................................... 30, 43, 45, 61

*Dernis v. United States,*
  136 F.4th 714 (7th Cir. 2025) .......................................... 26

*Edye v. Robertson (Head Money Cases),*
    112 U.S. 580 (1884) ............................................................ 28

*Effex Cap., LLC v. National Futures Ass'n,*
    933 F.3d 882 (7th Cir. 2019) ........................................... 29

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ........................................................... 27

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) ........................................................... 28

*Galvan v. Press,*
    347 U.S. 522 (1954) ........................................................... 28

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ................................................ 3

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ..................................... 25, 63, 64, 65

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ..................................................... 16, 27

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ........................................................... 53

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) ........................................................... 37

*Loughrin v. United States,*
    573 U.S. 351 (2014) ........................................................... 38

*McHenry County v. Raoul,*
    44 F.4th 581 (7th Cir. 2022) ................... 16, 41, 43, 46, 50

*M'Culloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) .......................................... 66

*Murphy v. NCAA,*
    584 U.S. 453 (2018) ................... 15, 52, 53, 54, 56, 57, 59, 66

*Neagle, In re,*
    135 U.S. 1 (1890) ............................................................... 27

iv

*New York v. Department of Justice,*
  951 F.3d 84 (2d Cir. 2020) ................................. 60

*New York v. United States,*
  505 U.S. 144 (1992) .............................. 52, 56, 66

*Nielsen v. Preap,*
  586 U.S. 392 (2019) .................................... 6, 7

*North Dakota v. United States,*
  495 U.S. 423 (1990) ..................................... 49

*Ocean Cty. Bd. of Comm'rs v. Attorney Gen.,*
  8 F.4th 176 (3d Cir. 2021) ............................... 60

*Ping v. United States (Chinese Exclusion Case),*
  130 U.S. 581 (1889) ..................................... 28

*Printz v. United States,*
  521 U.S. 898 (1997) ......................... 52, 57, 58, 62

*Savage v. Jones,*
  225 U.S. 501 (1912) ................................. 30, 61

*Siebold, Ex parte,*
  100 U.S. 371 (1879) ..................................... 27

*Tennessee v. Davis,*
  100 U.S. 257 (1879) ..................................... 27

*United States v. Belmont,*
  301 U.S. 324 (1937) ..................................... 56

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............ 18, 35, 41, 42, 65

*United States v. King County,*
  122 F.4th 740 (9th Cir. 2024) ........................... 47

*United States v. Kraemer,*
  933 F.3d 675 (7th Cir. 2019) ............................ 38

*United States v. Texas,*
  599 U.S. 670 (2023) .................................... 6-7

*United States v. Washington,*
   596 U.S. 832 (2022) ............................................... 3, 29, 47

*Virginia Uranium, Inc. v. Warren,*
   587 U.S. 761 (2019) ...................................................... 62

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.,*
   475 U.S. 282 (1986) ...................................................... 44

**U.S. Constitution:**

Art. I, § 8, cl. 4 .......................................................... 27

Art. VI, cl. 2 ......................................................... 3, 66

**Federal Statutes:**

Act of June 18, 1798, ch. 54, 1 Stat. 566............................... 65

Act of July 6, 1798, ch. 66, 1 Stat. 577................................. 58

Interstate Agreement on Detainers Act,
   Pub. L. No. 91-538, 84 Stat. 1397 (1970)........................... 45

8 U.S.C. § 1103(a)(11)(B) ............................................. 46

8 U.S.C. § 1182(a)(2) ................................................. 31

8 U.S.C. § 1182(a)(6)(A) ............................................... 9

8 U.S.C. § 1182(a)(6)(C) ............................................... 9

8 U.S.C. § 1182(a)(7) .................................................. 9

8 U.S.C. § 1226(a) .......................................... 5, 31, 33, 35

8 U.S.C. § 1226(a)(1) .................................................. 6

8 U.S.C. § 1226(c) ................................................. 31, 35

8 U.S.C. § 1226(c)(1) ............................................... 7, 8

8 U.S.C. § 1226(c)(3) ....................................................... 8, 9, 34

8 U.S.C. § 1226(d)(1)(A) .................................................... 9

8 U.S.C. § 1226(d)(1)(B) .................................................... 9

8 U.S.C. § 1226(f) .......................................................... 7

8 U.S.C. § 1227(a)(2) ....................................................... 31

8 U.S.C. § 1231(a)(1)(A) .................................................. 35, 37

8 U.S.C. § 1231(a)(1)(B) .................................................. 35

8 U.S.C. § 1231(a)(1)(B)(iii) ............................................. 8, 31

8 U.S.C. § 1231(a)(2) ................................................ 7, 8, 31, 35

8 U.S.C. § 1231(a)(2)(A) ................................................. 37

8 U.S.C. § 1231(a)(4)(A) .............................................. 8, 31, 37, 54

8 U.S.C. § 1231(a)(6) ...................................................... 7

8 U.S.C. § 1231(g)(2) .................................................. 46

8 U.S.C. § 1305 ......................................................... 37

8 U.S.C. § 1306(b) ...................................................... 37

8 U.S.C. § 1357(d) ....................................................... 8

8 U.S.C. § 1373 .................................................. 12, 25, 40, 55

8 U.S.C. § 1373(a) .............................. 14, 21, 29, 32, 35, 38, 59, 63-64

8 U.S.C. § 1373(b) ...................................................... 32

8 U.S.C. § 1373(c) ................................................... 9, 32, 38

8 U.S.C. § 1644 .................... 10, 14, 21, 29, 32, 36, 38, 40, 55, 59

28 U.S.C. § 1291 ......................................................... 4

28 U.S.C. § 1331 ................................................... 3

28 U.S.C. § 1361 ................................................... 3

34 U.S.C. § 41307 ................................................ 62

42 U.S.C. § 5779(a) .............................................. 62

49 U.S.C. app. § 1305(a)(1) (1988) ................... 59

**State Statutes:**

TRUST Act:
  5 Ill. Comp. Stat. 805/1 *et seq.* ........................... 10
    5 Ill. Comp. Stat. § 805/5 ..................................... 12, 40
    5 Ill. Comp. Stat. § 805/15(a) .............................. 11
    5 Ill. Comp. Stat. § 805/15(h) .............................. 48
    5 Ill. Comp. Stat. § 805/15(h)(1) ......................... 11, 34
    5 Ill. Comp. Stat. § 805/15(h)(3) ......................... 11, 33
    5 Ill. Comp. Stat. § 805/15(h)(6) ......................... 12
    5 Ill. Comp. Stat. § 805/15(h)(6)-(7) ................... 34
    5 Ill. Comp. Stat. § 805/15(h)(7) ......................... 12
    5 Ill. Comp. Stat. § 805/15(i) ............................... 49

**Local Ordinances:**

Ordinance No. 11-O-73, codified at Cook County, Ill.,
  Code of Ordinances § 46-37 ................................ 10
    pmbl. ....................................................................... 41, 48
    § 46-37(a) .............................................................. 11
    § 46-37(b) .............................................................. 11, 33, 34, 48
    § 46-37(b)-(c) ....................................................... 12

Welcoming City Ordinance, codified at Mun. Code of Chi.
  chp. 2-173 .............................................................. 10
    § 2-173-020(a) ...................................................... 11, 34

§ 2-173-020(a)(2)(A) ............................................................. 48
§ 2-173-020(a)(3) ...................................................... 12, 34, 48
§ 2-173-020(a)(5) ........................................................... 11, 33
§ 2-173-030 .......................................................................... 34
§ 2-173-030(a)(1) ............................................................... 12

## Regulations:

8 C.F.R. § 245.1(d)(1)(v) ....................................................... 37

8 C.F.R. § 287.7(a) ......................................................... 8, 9, 12

## Rules:

Fed. R. App. P. 4(a)(1)(B) ......................................................... 4

Ill. Cts., *Supreme Court Rule Forms*, art. IV, r. 452,
   https://www.illinoiscourts.gov
   /documents-and-forms/ (last visited Jan. 21, 2026) ............................ 64

## Legislative Materials:

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) ................................. 39-40, 40

S. Rep. No. 104-249 (1996) ..................................................... 40

## Other Authority:

U.S. ICE, Policy No. 10074.2, *Issuance of Immigration
   Detainers by ICE Immigration Officers* (Mar. 24, 2017),
   https://perma.cc/D8QE-RTWM ..................................................... 6

# INTRODUCTION

The State of Illinois, Cook County, and the City of Chicago have each enacted laws or ordinances to establish their jurisdictions as "sanctuaries" against federal immigration enforcement (Sanctuary Policies). The Sanctuary Policies are directed at federal immigration enforcement, and they function by preventing federal immigration officials from using the means Congress authorized them to use to fulfill Congress's goal that criminal aliens released from state custody be immediately taken into federal custody. The Policies accomplish this by barring the transfer of criminal aliens from state to federal custody absent a judicial warrant—notwithstanding that Congress has expressly authorized federal immigration officials to use administrative warrants—and by prohibiting defendants' officers and employees from sharing information that federal officials need to take aliens into custody quickly and efficiently—such as the date aliens are to be released from state custody. The Sanctuary Policies represent an open assault on the federal government's plenary authority over immigration. They are invalid for two independent reasons.

First, the Sanctuary Policies are preempted as obstacles to Congress's purposes and objectives as set out in the Immigration and Nationality Act (INA), and—as to the prohibitions on information-sharing—expressly preempted. The Policies reject the federal system of immigration enforcement in favor of one defendants created. Instead of engaging in a routine transfer of prisoners from state custody to federal custody, defendants force the federal government to seek out and re-arrest individuals who, under federal law, must be detained at the conclusion of state custody. And instead of sharing information, defendants have imposed a communications blackout, so that the federal government will not even know when criminal aliens will be released or how to locate them. The result is that aliens Congress dictated should be taken into federal custody instead go free or are arrested in the streets at enhanced danger to the alien, law enforcement, and the public, and that the federal-state cooperation Congress expressly envisioned is destroyed.

Second, the Sanctuary Policies by their terms single out federal immigration officials. Their restrictions on state and local cooperation apply only where the individual seeking that cooperation is a federal

official.  It is well established that a state law cannot "discriminate[]" against the Federal Government" by singling it out for "less favorable treatment."  *United States v. Washington*, 596 U.S. 832, 839 (2022) (quotations omitted).  Laws whose *only* application is to federal immigration enforcement certainly fit the bill.

In concluding otherwise, the district court misapplied those core principles and the anti-commandeering doctrine as well.  The errors in its analysis become clear by considering the question at issue here: whether states, when they take aliens into custody, can do so subject to policies whose purpose and effect is to undermine the means by which Congress has directed federal officials to take custody of and detain those aliens.  "[T]he framers of our constitution foresaw this . . . and provided for it" by mandating that the acts of Congress are "supreme" and that state laws which "interfere with" them "must yield."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210-211 (1824).

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361.  It raised claims that under the Supremacy Clause, U.S. Const. art. VI, cl. 2, certain provisions of Illinois law, of Cook

County's ordinances, and of the City of Chicago's ordinances are preempted by federal immigration law and constitute unlawful discrimination and regulation of the federal government.  GA36-38.[1]

On August 26, 2025, the district court entered a final judgment dismissing the United States's claims.  SA106.  The United States timely filed its notice of appeal on October 24, 2025.  GA42; *see* Fed. R. App. P. 4(a)(1)(B) (allowing 60 days for filing the notice of appeal if one of the parties is the United States).  Appellate jurisdiction is appropriate under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in dismissing the United States's preemption claims on the ground that the Sanctuary Policies are not preempted.

2.    Whether the district court erred in dismissing the United States's intergovernmental immunity claim on the ground that the Sanctuary Policies do not discriminate against the federal government.

## PERTINENT STATUTES

Pertinent laws are reproduced in the addendum to this brief.

---

[1]    "GA" references the separate appendix filed with this brief. "SA" references the short appendix attached to this brief.

## STATEMENT OF THE CASE

## I.  Relevant Immigration Laws And Regulations

Congress and the Executive have developed a highly reticulated statutory and regulatory scheme governing the detention and removal of criminal aliens.  The core of this scheme is the INA and its amendments and implementing regulations, which make up the framework for the "governance of immigration and alien status."  *Arizona v. United States*, 567 U.S. 387, 395 (2012).  Relevant here are the portions of the INA, and its related laws and regulations, establishing how the Department of Homeland Security (DHS)—mainly through its component agency, Immigration and Customs Enforcement (ICE)—enforces those provisions and arrests and detains criminal aliens who are, or may be, subject to removal.

Congress provided DHS with several tools to vindicate the federal interest of removing criminal aliens.  The keystone of its authority to arrest and detain aliens is the law's authorization for ICE agents to rely on so-called administrative warrants, which are issued by the Executive Branch rather than a judicial officer.  *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the [Secretary of Homeland Security], an alien may be

arrested and detained pending a decision on whether the alien is to be removed from the United States.").[2]  But such warrants are not "administrative" in the sense that they may be issued at will; to the contrary, to acquire such a warrant, an ICE immigration officer "must establish probable cause to believe that the subject is an alien who is removable from the United States."  U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* § 2.4 (Mar. 24, 2017), https://perma.cc/D8QE-RTWM.

Aliens who are, or who are suspected of being, removable are subject to detention pending a determination of their removability or until they are removed.  As a general matter, the Secretary of Homeland Security has discretion about whether to detain an alien pending resolution of his removability.  8 U.S.C. § 1226(a)(1).  But where an alien is inadmissible for a statutorily listed reason, and has been charged, arrested, or convicted of at least one of a list of specific crimes, the Secretary "shall"—subject to resource constraints and traditional exercises of prosecutorial discretion, *see United States v. Texas*, 599 U.S.

---

[2]    *See Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (explaining that Congress transferred enforcement of certain provisions of the INA from the Attorney General to the DHS Secretary).

670, 680 (2023)—take him into custody. 8 U.S.C. § 1226(c)(1). The mandatory language of this provision was implemented to address congressional concerns "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (quotations omitted). Congress has reinforced this requirement by giving statutory standing to certain state officials if the Attorney General or the Secretary of DHS "release[s] any alien or grant[s] bond or parole to any alien that harms" the state or its residents. 8 U.S.C. § 1226(f). And where an alien has been adjudged removable, he is subject to detention—either "[d]uring the removal period" or, in certain circumstances, beyond. *Id.* § 1231(a)(2), (6).

In sum, the INA expects—and often mandates—that federal officials will arrest and detain aliens who have committed crimes and thus either may be, or are, removable. At the same time, those aliens *have* committed crimes—often state crimes—and Congress recognized that states have an important interest in punishing them. Thus, the INA privileges state prosecutions and carceral punishment over immediate removal. The law provides that DHS must take an alien who is

"convicted of" certain crimes into custody, but only "when the alien is released." 8 U.S.C. § 1226(c)(1); *accord id.* § 1226(c)(3); *see also id.* § 1357(d) (authorizing immigration officials to take custody of an alien who violated "any law relating to controlled substances" if the "alien is not otherwise detained by . . . State[] or local officials"). Furthermore, an alien cannot be removed "until [he] is released" from state or local custody. *Id.* § 1231(a)(4)(A). Indeed, an alien with a final order of removal cannot even be detained before his release from state custody. The Attorney General "shall detain" an alien with an order of removal "[d]uring the removal period," but that only starts for an alien who "is detained or confined" by state authorities when "the alien is released." *Id.* § 1231(a)(1)(B)(iii), (2).

To bridge the gap between the end of custody by state or local officials and the beginning of federal custody, DHS officials may issue an "immigration detainer" to advise a state agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate

physical custody is either impracticable or impossible." *Id.* In certain circumstances, such as when an alien has committed a listed crime and is inadmissible under 8 U.S.C. § 1182(a)(6)(A), (C), or (7), DHS "shall issue a detainer" and when the alien is no longer "detained by . . . State[] or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3).

As detainers illustrate, sharing information is a key part of ensuring that federal authorities can fulfill their duties under the INA. For example, the federal government must make resources available to state and local authorities to aid them in determining whether individuals they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the federal government to designate liaisons to "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." *Id.* § 1226(d)(1)(B). And if state or local officials seek "to verify or ascertain the citizenship or immigration status of any individual," the federal government must share the requested information. *Id.* § 1373(c).

At the same time, the INA ensures that state and local officials cannot block federal officials from receiving information pertinent to their immigration duties.  Section 1373(a) provides that no federal, state, or local "entity or official may . . . prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *See also* 8 U.S.C. § 1644 (similar).

## II.    The Sanctuary Policies

At issue are the Sanctuary Policies of Illinois (embodied in the TRUST Act, as amended, *see* 5 Ill. Comp. Stat. 805/1 *et seq.*), Cook County (embodied in Ordinance No. 11-O-73, codified at Cook County, Ill., Code of Ordinances § 46-37[3] (in text, the "Cook County Ordinance")), and the City of Chicago (embodied in the Welcoming City Ordinance, codified at Mun. Code of Chi. chp. 2-173[4] (in text, the "Chicago Ordinance")).  While there are some differences in the particulars, the features at issue here

---

[3]    Available at https://library.municode.com/il/cook_county/codes/code_of_ordinances?nodeId=PTIGEOR_CH46LAEN_ARTIISH_DIV1GE_SDIINGE_S46-37POREICDE.

[4]    Available at https://codelibrary.amlegal.com/codes/chicago/latest/chicago_il/0-0-0-2605237.

are broadly the same.  The Policies generally "prohibit[] [state and local officers] from taking any action in response to an administrative warrant or immigration detainer," SA44, and prohibit "sharing with ICE any person's custody status, release date, or contact information," SA50.

To accomplish that, the Sanctuary Policies include a broad bar on officers and employees "comply[ing] with an immigration detainer or civil immigration warrant," 5 Ill. Comp. Stat. § 805/15(a); *see also id.* § 805/15(h)(1), or participating or assisting in "the civil enforcement of federal immigration law," *see* Mun. Code of Chi. § 2-173-020(a).  *Accord* Cook County, Ill., Code of Ordinances § 46-37(a).  The Policies also contain specific prohibitions.  No officer or employee of these entities can, for instance, "transfer any person into an immigration agent's custody" absent "a federal criminal warrant."  5 Ill. Comp. Stat. § 805/15(h)(3); *see* Cook County, Ill., Code of Ordinances § 46-37(b); Mun. Code of Chi. § 2-173-020(a)(5).

The Sanctuary Policies also prohibit sharing information about criminal aliens with federal immigration authorities.  That is inherent in provisions barring compliance with federal immigration detainers, which request that the receiving "agency advise" DHS "prior to release of the

alien" about the alien's release. 8 C.F.R. § 287.7(a). And it is expressed elsewhere in the Policies in provisions that prohibit providing "information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody," 5 Ill. Comp. Stat. § 805/15(h)(6), or an alien's "release or contact information," *id.* § 805/15(h)(7). *See* Cook County, Ill., Code of Ordinances § 46-37(b)-(c) (prohibiting the use of "time" and "resources or effort" to respond "to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates while on duty" or "to comply with an ICE detainer"); *see also* Mun. Code of Chi. § 2-173-020(a)(3) (similar).

The TRUST Act purports to permit disclosures pursuant to 8 U.S.C. §§ 1373 and 1644. 5 Ill. Comp. Stat. § 805/5. By contrast, in barring the sharing of information about "the citizenship or immigration status" of a detained person, Mun. Code of Chi. § 2-173-030(a)(1), Chicago's Ordinance "runs headlong into §§ 1373 and 1644," SA29. But in the main, the pertinent features of the Sanctuary Policies are the same.

## III.   The Complaint

On February 6, 2025, the United States filed this suit, alleging that the Sanctuary Policies are preempted and violate the principle of

intergovernmental immunity. *See* GA36-38. The complaint names as defendants the State of Illinois, Cook County, the City of Chicago, and various officials of those entities in their official capacities. GA23.

As pertinent for this appeal, the United States alleged that the Sanctuary Policies "constitute and create obstacles to the enforcement of federal immigration law," "undermine federal immigration law's protections," and are, as a result, "preempted under both express and conflict preemption principles." GA36 (Count One). Likewise, by singling "out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment," the Policies are inconsistent with the doctrine of intergovernmental immunity. GA37 (Count Two).

## IV. The District Court Dismisses The Case

1. Defendants filed motions to dismiss for want of jurisdiction and for failure to state a claim. *See* SA1. On July 25, 2025, the district court granted the motions holding, as relevant here, that the Sanctuary Policies were not preempted and did not impermissibly discriminate against the United States.[5]

---

[5] The district court also held that the United States lacked standing to sue the individual defendants in their official capacities, SA13-15, and that the Sanctuary Policies do not directly regulate the

*Continued on next page.*

a.    The district court first analyzed whether 8 U.S.C. §§ 1373(a) and 1644 expressly preempted the Sanctuary Policies.  SA20-41.  It started by determining the scope of Section 1373(a), "and § 1644 by extension," SA29, by determining what constitutes "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a).  *See* SA22-29.  The court concluded that the phrase "only pertains to information regarding a person's legal classification under federal law," SA29, and not the "information the United States seeks—noncitizens' contact information, custody status, and release dates," SA24.  Because the TRUST Act, Cook County Ordinance, and most of the Chicago Ordinance "do not restrict [state or local officials] from sharing [the] kind of information" the district court held that Section 1373(a) covers, there was no express preemption.  SA29.

The district court recognized that § 2-173-030(a)(1) of the Chicago Ordinance "runs headlong into §§ 1373 and 1644" because it expressly bars sharing "the citizenship or immigration status of any person."  SA29

---

federal government, SA60-61.  The United States does not challenge those rulings but instead maintains its claims of preemption and intergovernmental immunity based on discrimination against the remaining defendants.

(emphasis and quotations omitted). Yet there was still no preemption problem, the court concluded. Pointing to the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453, 477 (2018), the district court reasoned "that for a federal statute to preempt state law it must 'be best read as one that regulates private actors' rather than government entities or officials." SA31. The court concluded that "Section 1373(a) . . . doesn't regulate private actors in language or effect," just "State and local government entities and officials, prohibiting restrictions on their ability to share certain immigration-related information with DHS." SA33. The court thus concluded that "it cannot be preemptive." SA37. And, while resting its conclusion on that ground, the court also noted that by attempting to issue directives to states and localities, Sections 1373(a) and 1644 are "in tension with the Tenth Amendment" and raise anticommandeering concerns. SA37; *see* SA37-41.

b. The district court then rejected the argument that the Sanctuary Policies are "obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress." SA41 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see* SA41-57.

The district court started by reviewing the relevant INA provisions, noting that they reflect a statutory intent "that immigration officers be able to use administrative warrants and issue immigration detainers." SA43. It also observed that "[t]he INA . . . envisions some collaboration between federal immigration authorities and state or local police." SA43; *see* SA43-44 (citing statutes). Nevertheless, the court concluded that the Sanctuary Policies did not pose an obstacle to accomplishing the goals of the INA.

First, the district court rejected the argument that the Sanctuary Policies are an obstacle to the INA's goal of detaining removable aliens. *See* SA44-50. Relying on this Court's decision in *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), the court concluded that the INA provided states with "the option [of] assist[ing] in civil immigration enforcement," SA48, but did not "require[] a State to take any action in response to" an immigration detainer, SA49. The court therefore determined that there was no conflict between the Sanctuary Policies and the INA because defendants, in enacting the Policies, were simply exercising "an option offered by a federal statute," which "cannot create a conflict for preemption purposes." SA49.

The district court next concluded that the Sanctuary Policies did not pose an obstacle to the INA's goals of providing federal immigration officials with information about criminal aliens and access to them for purposes of detaining and removing them. *See* SA50-54. The court viewed the United States's argument as advancing a *quid pro quo* understanding of the INA—the law permits states to punish aliens who commit crimes and, in return, "expect[s them] . . . [to] facilitate detention of criminal aliens by federal immigration authorities . . . by sharing information and permitting ICE access to detainees." SA51-52 (alterations and citation omitted) (quoting GA32-33).

The district court disagreed with that view, reasoning that while the INA "directs immigration officers to wait to take a person into custody until after their criminal custody concludes," it did not "*require* States to do anything." SA52. "Because any collaboration under the INA is permissive, not mandatory," the court concluded, "there is no hook for the United States's preemption argument with respect to maintaining or sharing information about people in custody (including maintaining detainer requests in individuals' criminal case files) and providing access

to individuals in detention for state and local offenses to facilitate ICE interviews." SA54.

Finally, as with its express preemption analysis, the district court perceived that viewing the Sanctuary Policies as conflict preempted would raise anticommandeering issues. *See* SA54-57. In its view, if the INA did preempt the Policies, "[i]t would transform a statutory provision giving States 'the right of refusal' into a provision requiring state action." SA54 (quoting *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019)).

c. The district court also held, as relevant here, that the Sanctuary Policies did not discriminate against the federal government and so run afoul of principles of intergovernmental immunity. SA58-60. The court faulted the government for not providing a similarly situated comparator, thus rendering—in its view—the United States's claim to be only that "[t]he challenged policies . . . affect the federal government," which it held was not enough to make out a discrimination claim. *See* SA58-59. The court also noted that the harms involved here—"eas[ing] the burden of civil immigration enforcement by permitting state and local government agents to assist" federal officials—did not "impose a burden

on the federal government in the way the intergovernmental immunity doctrine considers problematic." SA60.

The district court also concluded that here, too, "the anticommandeering doctrine is at play." SA63. "Finding that these same Policy provisions constitute discrimination . . . would provide an end-run around the Tenth Amendment." SA63.

2. The district court thus granted defendants' motions to dismiss. SA64. It gave the United States until August 22, 2025, to file an amended complaint before the dismissal converted to one with prejudice. SA64; GA40. The United States did not file an amended complaint, and thus the dismissal converted to one with prejudice, GA41, and judgment was entered on August 26, 2025, SA65.

The United States filed its notice of appeal on October 24, 2025. GA42.

## SUMMARY OF ARGUMENT

I. The Sanctuary Policies are preempted and thus invalid under the Supremacy Clause.

A. First, the Sanctuary Policies are preempted because they are obstacles to the accomplishment of Congress's purposes, set out in the

INA, that federal officials must take custody of, and then detain, criminal aliens during their removal proceedings after the aliens have been released from state custody.

The INA sets out in detail when aliens must be taken into federal custody, detained, and removed. Where the alien has committed a state criminal offense, Congress dictated that he is to be taken into custody and detained after he has completed his state sentence—and authorized federal immigration officials to use administrative warrants to accomplish that. The provisions governing custody and detention work in conjunction with additional laws governing the sharing of information between federal and state officials.

Altogether, these provisions reflect a comprehensive, cooperative scheme governing the regulation of aliens who may be of interest both to states under their criminal laws and to the federal government under the immigration laws. States are entitled to detain and prosecute such aliens, notwithstanding their eligibility for removal under federal law, if they elect to do so. And Congress contemplated that once the period of state custody concludes, the individual would be transferred to federal custody. That process requires a certain degree of coordination between

state and federal officials, including the free flow of information that is also expressly required by federal law.

The Sanctuary Policies frustrate that scheme and are thus preempted. The Policies obstruct the transfer of criminal aliens from state to federal custody set out in the INA by requiring federal officials to receive a judicial warrant instead of an administrative one and by directing state and local officials to withhold information necessary for federal immigration officials to fulfill their duties. The result is that instead of being transferred to federal custody, criminal aliens are released from state custody and live in the community at large—all contrary to the congressional purpose manifest in the INA.

Second, the Sanctuary Policies are expressly preempted insofar as they restrict the sharing of certain information with federal immigration officials. Federal law provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1644 (similar). And the information the Policies bar from release—specifically an alien's release

date and certain personal information—constitutes information regarding immigration status because it is relevant to whether an alien can—and, in some cases, must—be removed from the United States or whether the removal is prohibited.

Section 1373(a)'s use of the term "regarding"—which broadens the scope of information the law covers beyond just an alien's immigration status—underscores that conclusion. Likewise, the absence of the word "regarding" in Section 1373(c), and Section 1373's legislative history, affirm the breadth of Subsection (a).

B. The district court's contrary preemption analysis is unpersuasive. The lynchpin of the court's analysis is that the INA does not mandate that states and localities transfer criminal aliens to federal custody or collaborate with federal officials. But that is question-begging—simply because defendants have flexibility in the degree to which they assist federal immigration officials does not establish that the Sanctuary Policies represent a permissible exercise of their discretion. It strains credulity to believe that while Congress carefully crafted the detention and cooperation provisions of the INA, it implicitly endorsed states and localities thwarting those provisions by refusing to allow the

routine and safe transfer of custody of criminal aliens when effectuated by means Congress expressly authorized.

II.    The district court improperly dismissed the United States's intergovernmental immunity claim.   There is no dispute that the Sanctuary Policies single out federal immigration officials and treat them differently from other, non-federal law enforcement personnel.   These Policies operate only when federal immigration officials seek the transfer of criminal aliens or information pertaining to such an alien.   By their terms the Policies impose a unique burden on the federal government, and thus there was no need to find a specific comparator as the district court believed.   And, in any event, Illinois's TRUST Act provides a ready comparator, as it excludes all other law enforcement officials from the Act's provisions.

III.    The district court incorrectly believed that the United States's position would implicate anticommandeering concerns.

A.    The   INA—including   the   provisions   at   issue—does   not regulate states.   That is clear from the United States's issue with the Sanctuary Policies.   The issue is not that the Policies block state or local officials from participating in immigration enforcement but rather that

they obstruct federal implementation of the INA because when state and local officials carry out their own laws, they do so in a way that impedes federal immigration enforcement.

Preemption is thus entirely consistent with the Tenth Amendment. Under the INA, Congress has enacted immigration laws that impose restrictions on criminal aliens by delineating when they are subject to federal custody and detention and that also set the procedures by which criminal aliens are taken into federal custody, detained, and removed. The Sanctuary Policies also confer rights and restrictions on those same aliens by creating different, and conflicting, procedures for their detention. The Policies are thus preempted because they regulate aliens' interaction with the state criminal-justice system in a way that conflicts with the federal scheme—and indeed facilitates evasion of federal enforcement.

Indeed, the INA's system for detaining aliens operates like a cooperative federalism program. Under cooperative federalism, Congress may require particular forms of state participation as a condition of the state's voluntary choice to participate in a federal program. Because the United States has plenary authority over the

presence of aliens in the country, Congress could have directed that all criminal aliens be removed—regardless of whether they have served their state criminal sentence. It did not do so, instead allowing states to punish these aliens but on the condition that the states do not obstruct federal immigration enforcement. That is not commandeering, but a valid exercise of congressional power.

Lastly, the principles underlying the anticommandeering doctrine and historical practice support the obvious conclusion here: state laws undermining the transfer of criminal aliens to federal custody are constitutionally preempted.

B. The district court incorrectly suggested that 8 U.S.C. §§ 1373 and 1644 regulate states. Those statutes are part of the way the INA regulates private parties and thus are properly viewed as doing just that.

C. In any event, there is no anti-commandeering issue with federal statutes that require the provision of information to the federal government. That is especially so because many of the records that 8 U.S.C. §§ 1373 and 1644 cover are likely court records. As the Supreme Court recently held in *Haaland v. Brackeen*, 599 U.S. 255 (2023), and as

is consistent with early historical practice, there is no constitutional issue with requiring states to provide court records to the federal government.

D.    For similar reasons, the district court erred in perceiving an anti-commandeering issue with the United States's intergovernmental immunity argument.   The INA does not regulate states—it regulates private individuals.   To allow states to discriminate against the federal government, as defendants do, flips the Supremacy Clause on its head. By contrast, finding the Sanctuary Policies invalid for singling out the federal government and its officials for unfavorable treatment vindicates the vertical separation of powers.

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of a complaint for failure to state a claim de novo.  *Dernis v. United States*, 136 F.4th 714, 716 (7th Cir. 2025).   In doing so, it treats "the allegations in the . . . complaint as true and draw[s] all reasonable inferences in plaintiff's favor."  *Bilek v. Federal Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021).

# ARGUMENT

Ever since the creation of the Union, it has been "an incontrovertible principle[] that the government of the United States may . . . execute on every foot of American soil the powers and functions that belong to it." *Ex parte Siebold*, 100 U.S. 371, 395 (1879). "The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States." *In re Neagle*, 135 U.S. 1, 62 (1890) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)). Though "limited in the number of its powers, so far as its sovereignty extends[,] it is supreme." *Id.* (quoting *Davis*, 100 U.S. at 263).

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). It is manifest in Congress's authority to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, implicit in provisions

like the Foreign Commerce Clause, *see Edye v. Robertson* (*Head Money Cases*), 112 U.S. 580, 591-592 (1884), and inherent in the status of the United States as a sovereign, *see*, *e.g.*, *Ping v. United States* (*Chinese Exclusion Case*), 130 U.S. 581, 604 (1889).  It is a "national matter[] . . . entrusted to the government of the Union."  *Id.* at 605-606.  As a result, "Congress[] ha[s] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and likewise "has undoubtedly the right . . . to take all proper means to carry out the system which it provides."  *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see*, *e.g.*, *Galvan v. Press*, 347 U.S. 522, 530 (1954) ("The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security.").

The Sanctuary Policies flout those principles and undermine the means by which the Executive enforces Congress's determination that certain aliens must be taken into custody, detained, and removed.  Thus, the Sanctuary Policies are invalid under the Supremacy Clause for two reasons.  First, they are preempted.  They stand as obstacles "to the accomplishment and execution of the full purposes and objectives of

Congress," which are reflected in laws directing DHS to take custody of criminal aliens after their state custody ends, detain them as necessary or required, and remove them if found removable, and because the Policies are, to the extent they prohibit sharing certain information, expressly preempted by 8 U.S.C. §§ 1373(a) and 1644. *See Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 893 (7th Cir. 2019) (quotations omitted). Second, the Sanctuary Policies "discriminate against the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022) (alterations and quotations omitted).

## I.    The Sanctuary Policies Are Preempted

The Sanctuary Policies interfere with the scheme Congress established for detaining and removing criminal aliens. In particular, the Policies bar the orderly transfer of criminal aliens to federal custody under the terms that Congress contemplated and go even further to deprive federal officials of the information they need to obtain custody themselves at the appropriate time. The district court erred in concluding otherwise.

**A.     The Sanctuary Policies conflict with federal law and are expressly preempted**

1.     State law is in conflict with federal law—and thus preempted—where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotations omitted).  "What is a sufficient obstacle [to establish conflict preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.*  Where, as here, "the question is whether a Federal act overrides a state law, the entire scheme of the statute must . . . be considered and that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912).  "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power."  *Id.*; *see*, *e.g.*, *Crosby*, 530 U.S. at 373 (citing *Savage*, 225 U.S. at 533); *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) ("The challenger must show that applying

the state law would do major damage to clear and substantial federal interests.") (quotations omitted).

In this case, the federal scheme at issue is Congress's "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona v. United States*, 567 U.S. 387, 395 (2012). Congress has set out mandatory provisions governing the detention and removal of aliens who have been convicted of specified crimes—including state crimes. *Id.* at 396; *see* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). If a criminal alien has not yet been ordered removed, federal law obligates federal officials to take him into federal custody "when . . . released" from state or local confinement. 8 U.S.C. § 1226(c). That alien is subject to detention. *Id.* § 1226(a). If the alien has already been ordered removed, he is to be detained "[d]uring the removal period," *id.* § 1231(a)(2), which starts for an alien in state or local custody on "the date the alien is released," *id.* § 1231(a)(1)(B)(iii). And Congress specified that removal must occur within 90 days after the alien is "released from imprisonment," but cannot occur before the alien is released from imprisonment. *Id.* § 1231(a)(4)(A). To allow federal officials to detain removable aliens, or aliens that DHS may or must take into custody

pending adjudication of their removal proceedings, Congress authorized federal officers to issue a warrant without involving a court. *Id.* § 1226(a); *see Arizona*, 567 U.S. at 407.

Those provisions work in conjunction with laws governing the sharing of information between federal and state officials relating to immigration enforcement. States cannot "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *accord id.* § 1644; *see also id.* § 1373(b) (persons or agencies may not "prohibit, or in any way restrict, a Federal, State, or local government entity" from sending information regarding immigration status to DHS, requesting or receiving such information from DHS, maintaining such information, or exchanging such information with other government entities). Similarly, federal officials must provide information relating to immigration status to state officials upon request. *Id.* § 1373(c).

Altogether, these provisions reflect a comprehensive, cooperative scheme governing the regulation of aliens who may be of interest both to states under their criminal laws and to the federal government under the

immigration laws. States are entitled to detain and prosecute such aliens, notwithstanding their eligibility for removal under federal law, if they elect to do so. And Congress contemplated that once the period of state custody concluded, the alien would be transferred to federal custody. That process requires a certain degree of coordination between state and federal officials, including the free flow of information that is also expressly required by federal law.

The Sanctuary Policies fundamentally undermine that scheme. Illinois, Chicago, and Cook County contemplate that, upon the completion of a period of state or local custody, aliens will *not* be transferred to federal custody in the orderly manner that Congress contemplated. In particular, state and local officials will not transfer custody to Congress unless the federal government obtains a judicial warrant that Congress did not require. *Compare* 5 Ill. Comp. Stat. § 805/15(h)(3), *and* Cook County, Ill., Code of Ordinances § 46-37(b), *and* Mun. Code of Chi. § 2-173-020(a)(5), *with* 8 U.S.C. § 1226(a). Thus, even when federal officials follow the procedures that Congress laid out and acquire administrative warrants, state and local officials will *still* release aliens, forcing federal officials to track down those individuals and

effectuate an arrest on the street, needlessly endangering the alien, federal officers, and the public. *See* GA35 (explaining the Sanctuary Policies force immigration "to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody"). Moreover, in some circumstances, federal officers may not be able to locate the alien, and thus may be entirely unable to effectuate the detention and removal that Congress has authorized and, in many circumstances, mandated.

To make matters worse, the Sanctuary Policies direct state officials to withhold basic information necessary for agents to fulfill their duties, such as information "relating to an individual's release or contact information," or, indeed, any information whatsoever. 5 Ill. Comp. Stat. § 805/15(h)(6)-(7); *see* Cook County, Ill., Code of Ordinances § 46-37(b); Mun. Code of Chi. § 2-173-020(a)(3); *see also* 5 Ill. Comp. Stat § 805/15(h)(1) (prohibiting participation, "support," or assistance "with an immigration agent's enforcement operations"); Mun. Code of Chi. § 2-173-020(a) (similar); *id.* § 2-173-030 (prohibiting sharing "the citizenship or immigration status of any person"). Thus, federal officials may not even know that an alien—including aliens who must be taken into custody, *see*, *e.g.*, 8 U.S.C. § 1226(c)(3), or whose removal must, under

federal law, be effectuated with 90 days of release from state custody, *id.* § 1231(a)(1)(A), (B)—is about to be released from state or local custody. Because it is expensive and unsustainable for the federal government to continuously stake out Illinois jails—as even courts who have upheld laws like the Sanctuary Policies admit, *see United States v. California*, 921 F.3d 865, 887-888 (9th Cir. 2019)—the inevitable consequence of the Policies is that aliens who federal law says must be taken into custody and are subject to detention, or must be detained, will leave defendants' custody and live in the community until they can be arrested.

The Sanctuary Policies' practical effect is thus the release of aliens that Congress has determined must, or can, be placed in federal custody and subject to detention pending removal proceedings, *see* 8 U.S.C. § 1226(a), (c), or their removal, *id.* § 1231(a)(2), and a complete breakdown of the federal-state cooperation that Congress envisioned and mandated, *see*, *e.g.*, *id.* § 1373(a). Plainly, "[t]his is not the system Congress created." *Arizona*, 567 U.S. at 408. The Sanctuary Policies usurp the role of Congress and the Executive, "violat[ing] the principle that the removal process is entrusted to the discretion of the Federal Government"—a process which includes determining "whether it is

appropriate to allow a foreign national to continue living in the United States." *Id.* at 409. Denying the validity of administrative warrants and barring state and local officials from communicating with DHS means that defendants allow at least some aliens who would otherwise be in federal custody to "continue living in the United States." Thus, by rejecting Congress's scheme for how federal officials take custody of and detain aliens—and affirmatively obstructing that process by blocking communications with DHS—the Sanctuary Policies create "an obstacle to the full purposes and objectives of Congress." *Id.* at 410.

2.    In addition to being incompatible with the federal scheme regarding apprehension and removal, the information-sharing prohibitions in the Sanctuary Policies violate express federal law. Section 1373(a) provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See also* 8 U.S.C. § 1644 (similar). The features of the federal immigration scheme make clear that the information defendants

seek to shield constitutes "information regarding . . . immigration status." *Contra* SA22-29.

An alien's release date from state or local custody illustrates the point. The INA provides that an alien with a final order of removal cannot be removed "until [he] is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). That is, such an alien is a removable alien but is authorized to be present in the country in a state or local prison. But upon his release date, that authorization terminates and his right to stay in the country changes—he can no longer stay in the United States and must be detained by the Attorney General while his removal is being effectuated. *See id.* § 1231(a)(1)(A), (2)(A). It is analogous to parole, which is relevant in determining whether an alien is in lawful immigration status. *See* 8 C.F.R. § 245.1(d)(1)(v) (defining "lawful immigration status" for purposes of adjustment of status). Likewise, other information at issue here is relevant to whether an alien's presence is lawful or whether he is subject to removal. *See* 8 U.S.C. § 1306(b) (failing to notify the federal government of a new address, *see id.* § 1305, subjects an alien to mandatory detention and removal).

A piece of information that governs whether and when an alien is subject to removal from the United States is plainly "information regarding . . . immigration status," especially because words such as "regarding" "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). When Congress uses them—as it did in 8 U.S.C. §§ 1373(a) and 1644—it intends "to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates." *United States v. Kraemer*, 933 F.3d 675, 679 (7th Cir. 2019) (quoting *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting another source)) (discussing the related phrase "relating to").

Driving the point home, in another subsection of Section 1373 Congress requires DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in Subsection (c) underscores the need to give effect to the breadth the word carries in Subsection (a). *See Coleman v. Labor & Indus. Rev. Comm'n*, 860 F.3d 461, 473 (7th Cir. 2017) (citing *Loughrin v. United States*, 573

U.S. 351, 358 (2014)) (observing that when Congress uses two different phrases in the same statute, courts should give effect to the differences). That is, Section 1373(a) covers more information than Section 1373(c), which makes sense. As the district court acknowledged, "the actors providing information under § 1373(a)"—which includes state and local officials—"may not have access to information that directly indicates citizenship or immigration status" while DHS, who is the source of the information in Section 1373(c), may. SA27. As such, Congress may "have . . . drafted [Section 1373(a)] to sweep in more sources of information needed to verify a person's status." SA27. The district court's unduly narrow interpretation of Section 1373(c) cannot be reconciled with its own analysis in this regard.

The proper interpretation of Section 1373(c) is confirmed by the provision's legislative history. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R.

Rep. No. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (The provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report accompanying Section 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996).

As a result, the Sanctuary Policies' prohibition on state and local employees providing to ICE information like an alien's release date or certain personal information is expressly preempted.[6]

* * *

In sum, the Sanctuary Policies interfere with the purpose and the express text of the federal immigration laws. And defendants have identified no legitimate state interest in their policy of rejecting the

---

[6] Alternatively, because the TRUST Act has a savings clause excluding from its reach information that falls within 8 U.S.C. §§ 1373 and 1644, the information must be provided as a matter of state law. *See* 5 Ill. Comp. Stat. § 805/5.

federal immigration scheme.  Indeed, Cook County frankly admitted that its ordinance was motivated by hostility to federal immigration enforcement.  *See* Cook County, Ill., Ordinance 11-O-73 pmbl. (claiming "ICE detainers are generally issued before a finding of probable cause that an individual is deportable, and have even been imposed on U.S. Citizens by mistake" and that they "encourage racial profiling and harassment").  States and localities have no authority to second-guess federal determinations about the removability of aliens; to the contrary, "the removal process is entrusted to the discretion of the Federal Government."  *Arizona*, 567 U.S. at 409.  The Sanctuary Policies seek to interfere with the federal government's right to carry out the federal immigration scheme and are preempted.[7]

---

[7]     The district court cited the Ninth Circuit's decision in *California*, 921 F.3d at 886-893, in analyzing preemption and anticommandeering.  *See* SA23-28, 53-56.  Whatever its value in cases where states and the federal government may enter into cooperative arrangements, but a state law bars such cooperation, *see McHenry County v. Raoul*, 44 F.4th 581, 591-592 (7th Cir. 2022) (discussing *California*, 921 F.3d 865), its analysis of the particular issues in this case is flawed for reasons set forth here.  It is not binding, and the Court should decline to follow it.

## B. The district court's reasons for rejecting preemption are not persuasive

The district court accepted that the Sanctuary Policies make it harder for federal officials to detain aliens and receive information relevant to their duties. *See* SA49 (acknowledging the Sanctuary Policies make it harder to enforce the law); *see also* SA51. But the court concluded there was no preemption issue because the INA does not mandate that states and localities transfer criminal aliens to federal custody—that is, "[d]etainers are requests, not requirements," SA48—and because state collaboration "is permissible under the INA, not mandatory," SA53. *See also California*, 921 F.3d at 887-888 (relying on similar reasoning to reject a similar preemption argument).[8]  The court concluded that it

---

[8]     This Court, in the context of analyzing a grant condition, described the Chicago Ordinance as not involving "any interference whatsoever with federal immigration authorities" but instead involving "the refusal of the local law enforcement to aid in civil immigration enforcement." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *rehearing en banc granted in part, vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The Court, however, "focus[ed] narrowly on the dispositive question" in that case (the statutory authority to condition a grant on cooperating with immigration authorities) instead of addressing "broader policy considerations" or the Tenth Amendment issue implicated here. *Id.  Sessions* therefore does not control—and the district court properly did not rely on it. Moreover, whether the Sanctuary Policies involve affirmative interference does not address whether the defendants can,

*Continued on next page.*

would "make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." SA53 (alterations omitted) (quoting *McHenry County v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022)).

That conclusion entirely begs the question. There is no dispute that states have some flexibility in the degree to which they assist federal officials in enforcing the immigration laws, but the question in this case is whether the Sanctuary Policies are compatible with the federal scheme. In particular, states and localities have latitude in the degree to which they want to enforce their own criminal laws against aliens, and in whether they are prepared to prolong the detention of aliens who would otherwise be subject to release under state law to give federal officials sufficient time to obtain custody. But that does not mean that states and localities have free rein to thwart the federal system entirely. A grant of discretion does not imply that all exercises of that discretion are permissible. *See, e.g., Crosby*, 530 U.S. at 366 (finding a statute

---

consistent with the Supremacy Clause, undermine federal immigration law by rejecting the validity of administrative warrants, refusing to transfer prisoners, and prohibiting communications with federal immigration officials.

limiting who state agencies can contract with preempted); *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 283 (1986) (similar).

The district court's analysis renders the federal scheme incoherent. The court did not dispute that Congress authorized states and localities to detain aliens, to the exclusion of federal officials, under their criminal laws. It also recognized that Congress expected the federal government to be able to assume custody once the period of state custody had concluded—and, indeed, in some circumstances required the federal government to do so. *See* SA45 (Detainers and administrative warrants "reflect Congress's intent that removable noncitizens be deported quickly and efficiently."); SA49 ("[T]he INA requires agents to issue detainers in some situations."). And the district court recognized that "[t]here's no doubt" the Sanctuary Policies impede the federal government's ability to carry out its congressionally mandated responsibilities. SA49.

It blinks reality to believe that Congress, when it expressly delineated how (via administrative warrants and detainers) and when (after release) aliens should be taken into federal custody and detained, also contemplated that states could impede the implementation of that

system. To the contrary, it probably would not have occurred to the Congress that enacted the relevant provisions of federal law that state or local officials would thwart federal officials in this fashion, as states and the federal government routinely communicate regarding individuals in whom they both have an interest and transfer custody as appropriate. *See* Interstate Agreement on Detainers Act, Pub. L. No. 91-538, 84 Stat. 1397 (1970) (joining the Interstate Agreement on Detainers, which allows the United States to request custody of a state prisoner for trial); *Carbo v. United States*, 364 U.S. 611, 621 & n.20 (1961). Alternatively, Congress's "failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply." *See Crosby*, 530 U.S. at 387-388. Either way, it is not plausible that Congress intended that states could force federal officers to stake out state and local jails or to chase aliens down the street and effectuate public arrests of individuals who had been in state custody a short time before when it expressly provided federal immigration officials tools to effectuate a quick transfer from state to federal custody.

The district court's reliance on *McHenry County*, *see* SA47-49, 53-54, underscores the error in its analysis. That case concerned a state

enactment "prohibiting State agencies and political subdivisions from contracting with the federal government to house immigration detainees." *McHenry County*, 44 F.4th at 585. Although Congress expected the federal government to explore the possibility of entering into cooperative agreements to use such facilities, *see* 8 U.S.C. §§ 1231(g)(2), 1103(a)(11)(B), it did not require the federal government to do so. *See McHenry County*, 44 F.4th at 591-92. A state could therefore decline to provide assistance to the federal government without interfering with the operation of the federal scheme. *See id.*

The factors that led this Court to the result in *McHenry County* counsel the opposite conclusion here. Here, Congress has directed federal officials to take custody of aliens at the termination of a period of state or local custody, and Illinois and its subdivisions are interfering with that effort. By taking criminal aliens into custody and then interfering with the federal government's ability to assume custody as contemplated by Congress, defendants are not choosing to "refrain from participation" in the federal system of alien detention and removal. *McHenry County*, 44 F.4th at 592 (quotations omitted). Rather, they participate in it—but only on terms they set with the purpose and effect of subverting and

undermining DHS's performance of federal functions.  In doing so, they present an obstacle to the accomplishment of Congress's purposes.

## II.	The Sanctuary Policies Impermissibly Discriminate Against The Federal Government

In addition to preempting conflicting state laws, the Supremacy Clause also prohibits "states laws that . . . discriminate against the Federal Government or those with whom it deals."  *United States v. Washington*, 596 U.S. 832, 838 (2022) (alteration and quotations omitted).  "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status."  *Id.* at 839 (alteration, citation, and quotations omitted).

In this case, the Sanctuary Policies "explicitly treat[]" federal immigration agents "differently from" other law enforcement personnel.  *United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024) (quotations omitted).  Specifically, the Policies unlawfully discriminate against the federal government by singling out federal immigration enforcement for unfavorable treatment.

The Cook County and Chicago Ordinances facially target ICE and only ICE, denying ICE agents access to detainees, state and local

facilities, and information absent a criminal warrant.  *See* Cook County, Ill., Code of Ordinances § 46-37(b) ("ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews" and "County personnel shall not expend their time responding to ICE inquiries"); Mun. Code of Chi. § 2-173-020(a)(2)(A), (3) (providing that no city officer shall "permit ICE agents . . . access" to detainees or "expend their time responding to ICE inquiries").  Indeed, the Cook County Ordinance admits on its face that it is a response to DHS actions and perceived deficiencies in federal immigration enforcement operations in general.  *See* Cook County, Ill., Ordinance No. 11-O-73 pmbl.  The Illinois TRUST Act similarly targets "immigration agents" and provides that state and local officers may not give such agents access to detainees or provide them any information that is not otherwise publicly available.  *See* 5 Ill. Comp. Stat. § 805/15(h).

These provisions therefore treat ICE and federal immigration agents less favorably than the general public and other law enforcement agencies.   Outside of federal immigration officials enforcing civil warrants, the prohibitions in the Sanctuary Policies do not apply to any other member of the public or law enforcement agency.  Indeed, the

TRUST Act expressly states that other law enforcement officials are treated better than federal immigrations officials; "[n]othing in" the Act "shall preclude a law enforcement official from otherwise executing that official's duties in investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies." 5 Ill. Comp. Stat. § 805/15(i).

To reach the contrary conclusion, the district court claimed that the United States failed to put forth a comparator. *See* SA58-60. But that ignores the salient point: the Sanctuary Policies apply *only* to federal immigration enforcement agents. There is therefore no need to look for comparators; by their terms, the Policies impose a burden unique to the federal government based on the "status" of federal immigration officials as federal immigration officials. *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality opinion). And again, the district court's analysis ignores that Illinois expressly excludes its *own* law enforcement officials from the strictures of the TRUST Act if they are involved in an investigation with "other law enforcement agencies" besides ICE officers enforcing immigration law. 5 Ill. Comp. Stat. § 805/15(i). Thus, even if

a comparator were needed, it would be supplied on the face of the law: any other law enforcement agency.

The district court also relied on its view that all defendants were doing is declining to assist the federal government, something it claimed is "contemplated by the" INA. SA60 (quoting *McHenry County*, 44 F.4th at 594 n.7). But that simply repeats the same error described above. Defendants are not merely refusing to cooperate. By taking custody of criminal aliens, but then not respecting administrative warrants or sharing information, defendants are undermining the system Congress created to ensure the transfer of criminal aliens to federal custody and their subsequent detention and removal. And they do that by refusing to transfer aliens or information to *federal* agents. That refusal impermissibly singles "out the Federal Government for unfavorable treatment." *McHenry County*, 44 F.4th at 593 (quotations omitted).

## III. The Tenth Amendment Is Not Implicated By Finding The Sanctuary Policies Invalid

Throughout its decision, the district court constantly pointed to the Tenth Amendment and the anti-commandeering doctrine for support. *See* SA37-40, 54-57, 63. But the Tenth Amendment's prohibition on commandeering has no application here. As discussed above, defendants

are interfering with a comprehensive scheme governing the federal detention of criminal aliens. That has precisely the preemptive effect that the Supreme Court has explained remains unaffected by commandeering cases.[9] By the same token, there is no anti-commandeering issue with holding invalid state laws that discriminate against the federal government.

## A. The INA does not regulate states

The INA—including the provisions at issue—does not regulate states. That is clear from the United States's issue with the Sanctuary Policies. The issue is not that the Policies block state or local officials from participating in immigration enforcement but rather that they obstruct federal implementation of the INA because when state and local officials carry out their own laws, they do so in a way that impedes federal immigration enforcement. When the federal government and states and localities seek to regulate the same individuals, preventing states and their political subdivisions from implementing their policies in a way that

---

[9] Although this Court suggested that a district court analysis similar to the one at issue here was "compelling," it expressly declined to "address" this issue, *City of Chicago v. Barr*, 961 F.3d 882, 898 (7th Cir. 2020), which means it remains open for this Court to decide on full briefing in this case.

deliberately thwarts the federal scheme does not constitute prohibited commandeering. It does not require jurisdictions to regulate in a particular area by enacting or repealing a particular law, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. NCAA*, 584 U.S. 453 (2018). Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997).

The Supreme Court made this distinction clear in *Murphy*. Although the provision at issue there sought to require states to impose their own regulatory burdens, the Court contrasted that impermissible commandeering with permissible preemption of state law, which occurs when "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence." 584 U.S. at 477. Here, Congress has enacted immigration laws that "impose[] restrictions or confer[] rights on private actors," *id.*— specifically, laws defining which aliens are subject to federal custody and detention (removable and criminal aliens) and the procedures by which federal officials are to take them into custody (via information-sharing and administrative warrants). The Sanctuary Policies also "confer[]

rights or impose[] restrictions," *id.*, on the same private actors by subjecting them to the state's criminal-justice system and then adopting different—and conflicting—procedures for their detention and release (release without transfer to federal officials absent a judicial warrant and without the sharing of information to facilitate federal arrest).

The Sanctuary Policies are thus preempted because they regulate aliens' interaction with the state criminal-justice system in a way that conflicts with the federal scheme—and indeed facilitates evasion of federal enforcement.  The Tenth Amendment does not give the states the right to enact such provisions.  *See Murphy*, 584 U.S. at 479; *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-290 (1981) (explaining that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities").  It is unimaginable that the anti-commandeering doctrine would allow a state to adopt measures to shield from federal law enforcement individuals who have violated federal statutes prohibiting environmental degradation, labor violations, international drug trafficking, terrorism, espionage, or any other area of

particular federal concern. There is no immigration exception to that principle.

Indeed, the INA's system for detaining aliens is akin to a cooperative federalism program. Under cooperative federalism, Congress may require particular forms of state participation as a condition of the state's voluntary choice to participate in a federal program. *See Murphy*, 584 U.S. at 476 (describing precedents upholding such "cooperative federalism" programs).

The federal immigration framework at issue here fits within that paradigm. As previously noted, the federal government has exclusive authority over the presence of aliens in the United States, including "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Congress thus could have directed that any removable alien convicted or even arrested by a state should be removed immediately by federal authorities while their location is known. But Congress instead decided to allow states to subject aliens to their criminal-justice systems, at least insofar as they face imprisonment. *See* 8 U.S.C. § 1231(a)(4)(A) (providing that federal authorities "may not remove an alien who is sentenced to imprisonment

until the alien is released from imprisonment").  In allowing states to do so, Congress imposed certain conditions, including that states not use their criminal-justice systems to obstruct federal immigration enforcement.  If Congress had expressly required that states assume custody of removable aliens only upon agreeing to certain requirements, there would be no plausible claim of commandeering.  The Tenth Amendment analysis does not change merely because, except in the case of information sharing, *see id.* §§ 1373, 1644, the preemption is implicit in the federal scheme rather than express.

Simply put, Congress presented states and their political subdivisions with a choice:  (1) subject aliens to their criminal-justice systems in a way that does not obstruct federal immigration enforcement or (2) do not subject aliens to their criminal-justice system at all.  Rather than choosing one of those two options, however, Illinois, Cook County, and Chicago are trying to have it both ways:  subjecting aliens to their criminal-justice systems while simultaneously obstructing federal immigration enforcement.  The Constitution does not give them that choice.

There are no other reasons to find commandeering problems here. The three "significant" reasons why "adherence to the anticommandeering principle is important" do not suggest there is an issue. *Murphy*, 584 U.S. at 473. To start, *preemption* maintains the "balance of power between the States and the Federal Government." *Id.* (quoting *New York*, 505 U.S. at 181). As detailed above, when "the Constitution divide[d] authority between federal and state governments for the protection of individuals," *id.* (quoting *New York*, 505 U.S. at 181), it placed authority over the admission and exclusion of aliens, and related processes, in the federal government, *see supra* pp. 27-28, 35-36. To allow the Sanctuary Policies to thwart the efficacy of federal policies governing the detention and removal of aliens upsets that balance. That the presumption against preemption does not apply in cases that do not involve areas traditionally regulated by the states, *see Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347 (2001), relatedly suggests there is no commandeering problem where, as here, a case involves an area of primarily federal concern and power over the matter "is vested exclusively in the national government," *United States v. Belmont*, 301 U.S. 324, 330 (1937).

At the same time, prohibiting states from actively thwarting federal immigration policy by categorically refusing to transfer criminal aliens to federal officials and by refusing to provide federal officials with information does not undermine political accountability or shift the costs of removing criminal aliens to the states. *Murphy*, 584 U.S. at 473-474. The latter point is obvious. By taking custody of and detaining a criminal alien, the federal government is bearing the costs of the subsequent detention and removal. Removing barriers to immigration authorities' ability to perform that duty thus concentrates costs for immigration enforcement where they should be concentrated—in the federal government.

As to the former, the federal government "will be blamed" for any error in detaining a criminal alien (for example, the person turning out not to be removable or not to be an alien), and if the costs of detaining and deporting criminal aliens is exorbitant, the federal government will be "in the position of taking the blame for [the] burdensomeness and . . . defects." *Printz*, 521 U.S. at 930. Telling states they cannot stop the federal government from onboarding those burdens in no way

commandeers them to implement a federal regulatory scheme.  It, in fact, does the opposite.

Finally, there is historical practice.  History is important in this context "[b]ecause there is no constitutional text speaking to" the precise question of commandeering.  *Printz*, 521 U.S. at 905.  As a result, "historical understanding and practice" is an important tool in determining whether a particular federal scheme constitutes impermissible commandeering.  *Id.*  It has long been understood, dating back to the Founding, that an orderly transfer of prisoners from state to federal custody would occur when the same individuals were subject to regulation by both sovereigns, *see Carbo*, 364 U.S. at 620 (noting the long pedigree of the use of the writ of *habeas corpus prosequendum* to allow federal prosecution of state prisoners), and that understanding extended to the removal of aliens.  In 1798, Congress passed a law authorizing state courts to issue orders to "apprehend[]" potentially deportable enemy aliens and adjudicate their deportability but required a federal marshal to execute the removal—something that would have required an orderly transfer of the alien to federal custody.  *See* Act of July 6, 1798, ch. 66, §§ 2-3, 1 Stat. 577, 577-578.  It is therefore the Sanctuary Policies'

interference with the transfer of custody of aliens, and the failure to follow through on baseline cooperation between sovereigns, that defies historical practice and understanding—so it, not the preemptive effect of the INA, is constitutionally invalid.

## B.    Sections 1373(a) and 1644 do not regulate states

As discussed above, 8 U.S.C. § 1373(a) and 8 U.S.C. § 1644 constitute part of a comprehensive regulatory scheme that preempts state law in a way that raises no commandeering concern.  The district court's contrary conclusion with regard to these provisions ignores the Supreme Court's admonition in *Murphy* that "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevents the states from obstructing federal regulation of private parties.  584 U.S. at 478; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)).  In substance, and considering their place in the broader statutory scheme, Sections 1373(a) and 1644 are part of the INA's regulation of the detention and removal of aliens—a regulatory system "which certainly confers rights and places restrictions on large

numbers of private persons." *New York v. Department of Justice*, 951 F.3d 84, 114 n.27 (2d Cir. 2020).

The Second Circuit thus correctly rejected the district court's reasoning in *City of New York v. United States*, 179 F.3d 29, 33-35 (1999). That case involved a New York City ordinance restricting local officials "from transmitting information regarding the immigration status of any individual to federal immigration authorities." *Id.* at 31. To avoid the preemptive effect of Section 1373(a), the city argued it violated the anti-commandeering doctrine. *Id.* at 33. The court of appeals rejected that claim, explaining that "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs" cannot be converted "into a sword allowing states and localities to . . . frustrate[] federal programs." *Id.* at 35.[10]

---

[10] The Third Circuit has held that Sections 1373 and 1644 are not preemptive because they regulate states. *See Ocean Cty. Bd. of Comm'rs v. Attorney Gen.*, 8 F.4th 176, 181-182 (3d Cir. 2021); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 180-181 (5th Cir. 2018) (suggesting "Congress could not compel local entities to" follow Section 1373). The court of appeals' analysis is cursory and relies solely on the text of the two laws, so it makes the same errors as the district court. Moreover, the court did not conclude that the statutes violate the anticommandeering doctrine, though it noted "that courts addressing this issue have found one or both laws unconstitutional." *Ocean Cty.*, 8 F.4th at 182 n.4.

So too here. That Congress cannot command state officials to enforce federal immigration laws does mean that state officials can undermine federal immigration enforcement truly directed at individual aliens and claim the Tenth Amendment permits them to do so.

Indeed, it makes no sense to view Sections 1373(a) and 1644 as regulating states—and thus as lacking preemptive force—because in their absence, the Sanctuary Policies' prohibitions on sharing information would still be obstacle preempted, and thus invalid. To illustrate, even if defendants allowed the transfer of criminal aliens based on an administrative warrant, that would do DHS little good if defendants did not also allow for the communication of key information. Release times are the most obvious example—an ability to transfer an alien from state to federal custody is worthless if federal officials do not know *when* they can take the alien into custody. Because "that which needs must be implied is of no less force than that which is expressed," *Crosby*, 530 U.S. at 373 (quoting *Savage*, 225 U.S. at 533), the implied need for information to accomplish the transfer would mean the Sanctuary Policies' bars on providing that information would be obstacle preempted. There is no sound reason for reaching a different conclusion

simply because Congress made that fact express. *Cf. Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (opinion of Gorsuch, J.) (acknowledging that the preemption categories "are not rigidly distinct") (quotations omitted).

## C. Alternatively, Sections 1373(a) and 1644 are valid mandates that states share information

Even if that were all incorrect and Sections 1373(a) and 1644 regulated states, there would still be no commandeering problem. All Sections 1373(a) and 1644 do is require "the provision of information to the Federal Government." *Printz*, 521 U.S. at 918. That, the Supreme Court has recognized, does "not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Id.* In short, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a) (transferred to 34 U.S.C. § 41307)).

That is all the more the case because the type of information Section 1373(a) covers is, in many cases, related to court proceedings and can be

found in court records. In *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Supreme Court upheld, against a commandeering challenge, a provision of the Indian Child Welfare Act (ICWA) that required states "to maintain a record evidencing the efforts to comply with the order of preference [for placement] specified by ICWA." *Id.* at 287 (alteration and quotations omitted). Those records had to "be made available at any time" to, as pertinent here, the Secretary of the Interior. *Id.* at 287-288 (quotations omitted). The Supreme Court explained that, since "[t]he early Congresses," the federal government had imposed "recordkeeping and reporting requirements on state courts." *Id.* at 288. And thus "Congress may impose ancillary recordkeeping requirements related to state-court proceedings without violating the Tenth Amendment." *Id.* at 291. The recordkeeping requirements in ICWA, which included making information available to the Secretary of Interior, fell within that historical practice. *See id.*

That reasoning applies to Sections 1373(a) and 1644, at least with respect to aliens in state or local custody for committing crimes. Those laws require states to make available information "regarding the citizenship or immigration status . . . of any individual." 8 U.S.C.

§ 1373(a).  That information includes, as noted above, certain personal information and the alien's release date.  *See supra* Part I.A.  For aliens in state or local criminal custody, that information is surely "related to state-court proceedings" involving the alien's crimes.  *Haaland*, 599 U.S. at 291.  For example, the sentencing order form the Illinois Supreme Court has approved lists the sentence a criminal defendant must serve— thus, the release date is related to that judicial proceeding.  *See* Ill. Cts., *Supreme Court Rule Forms*, art. IV, r. 452, https://www.illinoiscourts.gov /documents-and-forms/ (last visited Jan. 21, 2026).  And it would be odd if, in the course of adjudicating a state crime, the defendant's address was not put into the record.

All Sections 1373(a) and 1644 do is require that those records be made available to federal officials—in the sense that no state or local factotum can prohibit or restrict federal officials from receiving that information from state or local employees.  *See Haaland*, 599 U.S. at 288 n.7 (noting which entity possesses judicial records "does not transform the documents into something other than a court record").  That is similar to—and indeed, less burdensome than—the recordkeeping law at issue in *Haaland*, which required the compilation of specific information as

well as requiring that it be made available to federal officials. *See id.* at 287-288. It is also consistent with early congressional enactments, which mandated the transfer of certain information relating to aliens from state courts to the federal government. *See* Act of June 18, 1798, ch. 54, §§ 2, 3, 1 Stat. 566, 567. So, even if Sections 1373(a) and 1644 regulate state officials, they are a permissible form of regulation.

## D. States cannot use the anti-commandeering doctrine to justify discrimination against the federal government

The district court believed that finding that the Sanctuary Policies impermissibly discriminate against the federal government "would allow the federal government to commandeer States" because it would force defendants into "enforcing immigration law." SA63; *see California*, 921 F.3d at 891 ("A finding that SB 54 violates the doctrine of intergovernmental immunity would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule.").

However, as noted above, the INA does no such thing. The law regulates private individuals. Thus here, even more than in the preemption context, holding the Sanctuary Policies invalid because they

discriminate against the federal government maintains the "balance of power between the States and the Federal Government." *Murphy*, 584 U.S. at 473 (quoting *New York*, 505 U.S. at 181). Federal law is the supreme law of the land. U.S. Const. art. VI, cl. 2. To allow states to discriminate against the federal government, as defendants do with the Sanctuary Policies, would "transfer the supremacy . . . to the states." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 432 (1819). The only "end-run," SA63, here is the district court's decision that defendants can do just that.

## CONCLUSION

The Court should reverse the district court's dismissal of the United States's complaint.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney
General*

MARK R. FREEMAN
DANIEL TENNY
MICHAEL E. TALENT
J. KAIN DAY

*/s/ Michael E. Talent*
Michael E. Talent
*Attorneys
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-8976
Michael.Talent@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32 because it contains 12,828 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Michael E. Talent*
Michael E. Talent

# CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

*/s/ Michael E. Talent*
Michael E. Talent

## CERTIFICATE OF RULE 30 COMPLIANCE

The appendix and short appendix include the materials required by Circuit Rule 30(a) and (b).

/s/ Michael E. Talent

Michael E. Talent

# ADDENDUM

# TABLE OF CONTENTS

8 U.S.C. § 1373 ........................................................................ A1

8 U.S.C. § 1644 ........................................................................ A2

5 Ill. Comp. Stat. § 805/15 .................................................... A3

Cook County, Ill., Code of Ordinances § 46-37 ..................... A6

Mun. Code of Chi. § 2-173-020 ............................................. A7

Mun. Code of Chi. § 2-173-030 ............................................. A9

## 8 U.S.C. § 1373

**(a) In general**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

## 8 U.S.C. § 1644

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**5 Ill. Comp. Stat. § 805/15**

§ 15. Prohibition on enforcing federal civil immigration laws.

(a) A law enforcement agency or law enforcement official shall not detain or continue to detain any individual solely on the basis of any immigration detainer or civil immigration warrant or otherwise comply with an immigration detainer or civil immigration warrant.

(b) A law enforcement agency or law enforcement official shall not stop, arrest, search, detain, or continue to detain a person solely based on an individual's citizenship or immigration status.

(c) (Blank).

(d) A law enforcement agency or law enforcement official acting in good faith in compliance with this Section who releases a person subject to an immigration detainer or civil immigration warrant shall have immunity from any civil or criminal liability that might otherwise occur as a result of making the release, with the exception of willful or wanton misconduct.

(e) A law enforcement agency or law enforcement official may not inquire about or investigate the citizenship or immigration status or place of birth of any individual in the agency or official's custody or who has otherwise been stopped or detained by the agency or official. Nothing in this subsection shall be construed to limit the ability of a law enforcement agency or law enforcement official, pursuant to State or federal law, to notify a person in the law enforcement agency's custody about that person's right to communicate with consular officers from that person's country of nationality, or facilitate such communication, in accordance with the Vienna Convention on Consular Relations or other bilateral agreements. Nothing in this subsection shall be construed to limit the ability of a law enforcement agency or law enforcement official to request evidence of citizenship or immigration status pursuant to the Firearm Owners Identification Card Act, the Firearm Concealed Carry Act,

Article 24 of the Criminal Code of 2012, or 18 United States Code Sections 921 through 931.

(f) Unless otherwise limited by federal law, a law enforcement agency or law enforcement official may not deny services, benefits, privileges, or opportunities to an individual in custody or under probation status, including, but not limited to, eligibility for or placement in a lower custody classification, educational, rehabilitative, or diversionary programs, on the basis of the individual's citizenship or immigration status, the issuance of an immigration detainer or civil immigration warrant against the individual, or the individual being in immigration removal proceedings.

(g)(1) No law enforcement agency, law enforcement official, or any unit of State or local government may enter into or renew any contract, intergovernmental service agreement, or any other agreement to house or detain individuals for federal civil immigration violations.

(2) Any law enforcement agency, law enforcement official, or unit of State or local government with an existing contract, intergovernmental agreement, or other agreement, whether in whole or in part, that is utilized to house or detain individuals for civil immigration violations shall exercise the termination provision in the agreement as applied to housing or detaining individuals for civil immigration violations no later than January 1, 2022.

(h) Unless presented with a federal criminal warrant, or otherwise required by federal law, a law enforcement agency or official may not:

(1) participate, support, or assist in any capacity with an immigration agent's enforcement operations, including any collateral assistance such as coordinating an arrest in a courthouse or other public facility, providing use of any equipment, transporting any individuals, or establishing a security or traffic

perimeter surrounding such operations, or any other on-site support;

(2) give any immigration agent access, including by telephone, to any individual who is in that agency's custody;

(3) transfer any person into an immigration agent's custody;

(4) permit immigration agents use of agency facilities or equipment, including any agency electronic databases not available to the public, for investigative interviews or other investigative or immigration enforcement purpose;

(5) enter into or maintain any agreement regarding direct access to any electronic database or other data-sharing platform maintained by any law enforcement agency, or otherwise provide such direct access to the U.S. Immigration and Customs Enforcement, United States Customs and Border Protection or any other federal entity enforcing civil immigration violations;

(6) provide information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody; or

(7) provide to any immigration agent information not otherwise available to the public relating to an individual's release or contact information, or otherwise facilitate for an immigration agent to apprehend or question an individual for immigration enforcement.

(i) Nothing in this Section shall preclude a law enforcement official from otherwise executing that official's duties in investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies (including criminal investigations conducted by federal Homeland Security Investigations (HSI)) in order to ensure public safety.

## Cook County, Ill., Code of Ordinances § 46-37

(a)  The Sheriff of Cook County shall decline ICE detainer requests unless there is a written agreement with the federal government by which all costs incurred by Cook County in complying with the ICE detainer shall be reimbursed.

(b)  Unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews or other purposes, and County personnel shall not expend their time responding

(c)  There being no legal authority upon which the federal government may compel an expenditure of County resources to comply with an ICE detainer issued pursuant to 8 U.S.C. § 1226 or 8 U.S.C. § 1357(d), there shall be no expenditure of any County resources or effort by on-duty County personnel for this purpose, except as expressly provided within this section.

(d)  Any person who alleges a violation of this section may file a written complaint for investigation with the Cook County Sheriff's Office of Professional Review.

**Mun. Code of Chi. § 2-173-020**

(a) No agent or agency shall participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law, unless required to disclose information as addressed in Section 2-173-030(a). Specifically, no agency or agent shall:

    (1) stop, arrest, detain, or continue to detain a person

        (A) solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation.

        (B) based upon an administrative warrant, including, but not limited to, those entered into the Federal Bureau of Investigation's National Crime Information Center database, or successor or similar database maintained by the United States.

        (C) based upon an immigration detainer.

    (2) permit ICE agents

        (A) access, including by telephone, to a person being detained by, or in the custody of, the agency or agent.

        (B) use of agency facilities for investigative interviews or other investigative purpose.

(3) expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information. An agency or agent is authorized to communicate with ICE in order to determine whether any matter involves enforcement based solely on a violation of a civil immigration law.

(4) enter into an agreement under Section 1357(g) of Title 8 of the United States Code or any other provision of federal law that

permits state or local governmental entities to enforce federal civil immigration law.

(5) transfer any person into ICE custody for the sole purpose of civil immigration enforcement.

(6) set up a traffic perimeter or provide on-site support to assist a civil immigration enforcement operation.

(b) If CPD receives a request from ICE, HSI, CBP, or another successor agency to provide assistance with a civil immigration enforcement operation, a CPD supervising officer shall determine whether such request is to assist in the enforcement of civil immigration law. If the supervisor determines that the request is to assist in the enforcement of civil immigration law, the supervisor shall decline the request. The supervisor shall also notify the Office of Emergency Management and Communications with an identifier that indicates that the event is a request for assistance with civil immigration enforcement.

(c) The Corporation Counsel, in consultation with appropriate stakeholders, shall develop model policies for public libraries, community mental health centers, administrative hearing facilities, and any other appropriate public facilities administered or operated by the City to ensure that all such facilities remain safe and accessible to all Chicago residents, regardless of immigration status. All such facilities shall establish public policies that limit immigration enforcement operations on their premises to the fullest extent possible consistent with federal and state law. The Corporation Counsel shall review such policies when immigration law changes such that the policies may need to be changed. The City shall also make such policies available to facilities operated by Sister Agencies, including public schools and park district facilities.

## Mun. Code of Chi. § 2-173-030

(a)  Unless required to do so by statute, federal regulation, court order, or a lawfully issued judicial warrant,

> (1)  no agent or agency shall request, maintain, or share the citizenship or immigration status of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian. Notwithstanding this provision, the Corporation Counsel may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding in which the City is or may be a party.

> (2)  no applications, questionnaires, or interview forms used in relation to City of Chicago benefits, opportunities, or services shall contain questions regarding citizenship or immigration status. Departments shall annually review such materials and amend them to conform with the requirements of this subsection.

(b)  No agency or agent shall enter into or renew any agreement providing direct access to any electronic database or other data-sharing platform maintained by any agency, or otherwise provide direct access to such database, to any federal agency, if the agency or agent determines that the purpose of such access is for the enforcement of civil immigration law.

# SHORT APPENDIX

## TABLE OF CONTENTS

Memorandum Opinion and Order, Dkt. 86 (July 25, 2025) ...............SA1

Judgment, Dkt. 88 (August 26, 2025)..............................................SA65

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| United States of America, | |
| *Plaintiff,* | No. 25 CV 1285 |
| v. | Judge Lindsay C. Jenkins |
| State of Illinois, *et al.*, | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

The United States filed suit against Illinois, Cook County, the Cook County Board of Commissioners, the City of Chicago, and individual officials alleging that their Sanctuary Policies are preempted by federal law and violate the intergovernmental immunity doctrine. Defendants moved to dismiss for lack of jurisdiction and failure to state a claim. [Dkts. 24, 27, 29, 31, 33.][1] For the reasons below, the motions are granted.

## I. Background

### A. Statutory Framework

"Underlying this case are the sometimes-clashing interests between those of the federal government in enforcing its laws and those of the state or local government in policing and protecting its communities." *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018), *reh'g en banc granted in part*, *vacated in part*, 2018 WL 4268817, *vacated to same extent*, 2018 WL 4268814. The federal government "has

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). That authority, arising from the "constitutional power to 'establish an uniform Rule of Naturalization,'" *id.* at 421 (Scalia, J., concurring in part) (quoting Art. I, § 8, cl. 4), led to the enactment and subsequent revision of the Immigration and Nationality Act ("INA"), *Kansas v. Garcia*, 589 U.S. 191, 195 (2020).

The INA "sets out the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Kansas*, 589 U.S. at 195 (citation and internal quotation marks omitted). "Agencies in the Department of Homeland Security [("DHS")] play a major role in enforcing" those laws. *Arizona*, 567 U.S. at 397. Among them, Customs and Border Protection ("CBP") "is responsible for determining the admissibility of aliens and securing the country's borders," while Immigration and Customs Enforcement ("ICE") "conducts criminal investigations involving the enforcement of immigration-related statutes." *Id.* (citation and internal quotation marks omitted); *see also City of Chicago v. Barr* (*City of Chicago II*), 961 F.3d 882, 888 n.1 (7th Cir. 2020).

Provisions of the INA relevant to this case fall into two broad categories: (1) use of immigration detainers and administrative warrants and (2) collaboration between federal and state or local governments. The statutory provisions require federal immigration officers to detain individuals who are in the United States unlawfully. *See, e.g.*, 8 U.S.C. § 1226(a), (c). To do so, the INA gives federal immigration officers the ability to use administrative warrants to detain noncitizens. *Id.* at § 1226(a). In

the event the noncitizen is in state or local custody, immigration officials can issue immigration detainers—"a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody . . . ." 8 C.F.R. § 287.7(a).

Other provisions reinforce Congress's expectation that state and local law enforcement work collaboratively with federal immigration agents in various ways. Two statutes, 8 U.S.C. §§ 1373 and 1644, reflect Congress's intent to encourage open channels of communication between federal, state, and local governments to share information about individuals' citizenship or immigration status. The anticipated collaboration evident from the INA includes entering into agreements with States so that their officers or employees may perform the functions of an immigration officer related to the "investigation, apprehension, or detention of aliens in the United States." § 1357(g)(1); *Arizona*, 567 U.S. at 410 (discussing voluntary "cooperation under federal law" as including "where States participate in a joint task force with federal officers, provide operational support in executing a warrant, [and] allow federal immigration officials to gain access to detainees held in state facilities.")

Illinois, Cook County, and Chicago all passed laws commonly referred to as Sanctuary Policies, a misnomer recognized by the Seventh Circuit. While "[t]he term signifies a place of refuge or protection," "presence in such localities will not immunize anyone to the reach of the federal government." *City of Chicago*, 888 F.3d at 281. Viewed together, as the court will in general, the Policies—the Illinois Way Forward

3

SA3

Act ("WFA") (5 ILCS 805/15)[2], the Cook County Ordinance establishing a Policy for Responding to ICE Detainers ("CCO") (Cook County Code of Ordinances 11-O-73 § 46-37), and the Welcoming City Ordinance ("WCO") (§ 2-173)—prohibit state and local government support of civil immigration activities. This includes complying with detainers, communicating with immigration agents before releasing noncitizens, providing immigration agents access to noncitizens in custody, and giving immigration agents information (such as contact information and release dates) about noncitizens.

While they use slightly different language, the Policies largely mirror each other. One of the few relevant differences is that the WCO prohibits requesting, maintaining, or sharing "the citizenship or immigration status of any person," WCO § 2-173-030(a)(1), while the other two Policies only prohibit sharing release dates, and/or incarceration status and contact information, 5 ILCS 805/15(h)(7); CCO § 46-37(b). Still, all the Policies include exceptions if immigration agents present a federal criminal warrant. 5 ILCS 805/15(h); CCO § 46-37(b); WCO § 2-173-030(a)(1).

### B. Factual Overview

This case springs from President Trump's declaration of a "national emergency . . . at the southern border of the United States." [Dkt. 1, ¶ 1.][3] That declaration was

---

[2]    The WFA, passed in 2021, *see* Illinois Public Act 102-234 (eff. Aug. 2, 2021), amended Illinois's TRUST Act, which was originally enacted in 2017 under Illinois Governor Bruce Rauner, *see* Illinois Public Act 100-463 (eff. Aug. 28, 2017). For ease of reference, the court will refer to the law and its constituent provisions as the WFA.

[3]    The following factual allegations are taken from the United States's complaint. The court views the complaint in a light most favorable to the United States and well-pled facts are accepted as true for purposes of the motions. *Gash v. Rosalind Franklin Univ.*, 117 F.4th

soon followed by Congress's passage of the Laken Riley Act. [*Id.*, ¶ 4.] The Act amended 8 U.S.C. § 1226(c) by expanding the categories of noncitizens whom the Attorney General is required to detain. It now includes those "accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury." [*Id.*] Citing national security and public safety threats posed by noncitizens, the Administration focused (as it did previously) on Sanctuary Policies. [*Id.*, ¶ 1.] It sued Illinois, Cook County, and Chicago seeking to enjoin their enforcement of the Sanctuary Policies under which noncitizens allegedly "find safe haven[] from federal law enforcement detection." [*Id.*, ¶¶ 1, 3.] According to the United States, those Policies "are designed to and in fact interfere with . . . the Federal Government's enforcement of federal immigration law in violation of the Supremacy Clause of the United States Constitution." [*Id.*, ¶ 3.] They also allegedly discriminate against the United States and regulate it in violation of the intergovernmental immunity doctrine. [*Id.*, ¶¶ 73–75.]

The Policies' information and access restrictions cause federal immigration officers "to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby." [*Id.*, ¶ 70.] Furthermore, the United States argues that by restricting local law enforcement's ability to respond to administrative warrants, the Policies also "facilitate the release of dangerous criminals in the community." [*Id.*, ¶ 11.] Over a period of years, "countless criminals . . . who should

---

957, 961 (7th Cir. 2024). Though the court treats the allegations as true, it "do[es] not vouch for their objective truth." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 549 (7th Cir. 2023).

have been held for immigration removal" were "released into Chicago." [*Id.*, ¶ 7.] The United States attributes this to "officials in Chicago and Illinois minimally enforcing—and oftentimes affirmatively thwarting—federal immigration laws." [*Id.*]

Although the Policies permit local officers to respond to inquiries and requests accompanied by a criminal warrant, the United States contends that the Policies obstruct Congress's "explicit policy choice" that "removals can be effectuated by *civil* arrest warrants." [*Id.*, ¶ 11.] The Policies also prohibit law enforcement from complying with immigration detainers: requests for local law enforcement to advise immigration agents prior to releasing the noncitizen from local custody so ICE can arrange to assume custody. [*Id.*, ¶ 33.] The United States argues that this jeopardizes safety because, rather than being released into federal immigration custody, noncitizens are released in the community, only to reoffend. [*Id.*, ¶¶ 12, 57.] If local law enforcement responded to detainer requests, "the commission of numerous crimes likely would have been averted." [*Id.*]

In addition to the Policies prohibiting compliance with detainers, the United States asserts on information and belief that neither Illinois, Cook County, nor Chicago permit their employees to place a detainer or administrative warrant in a noncitizen's file or a government database; as a result, if the noncitizen is transferred to another agency, that agency is unable to act on the detainer. [*Id.*, ¶ 72.]

To redress these injuries, the United States asserts three constitutional claims against Illinois, Cook County, the Cook County Board of Commissioners, Chicago, and individual officials associated with each: first, that the Sanctuary Policies are

6

SA6

preempted by federal law under the Supremacy Clause of the Constitution (Count I); second, that the Policies unconstitutionally discriminate against the federal government (Count II); and third, that the Policies unconstitutionally regulate the federal government (Count III). It seeks declaratory and injunctive relief, as well as costs and fees. [*Id.* at 22.] The Defendants all moved to dismiss for lack of standing or failure to state a claim. [Dkts. 24, 27, 29, 31, 33.]

## II. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) challenges the court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. In both cases, the court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826–27 (7th Cir. 2023).

"To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (citation and internal quotation marks omitted). This occurs when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 999 (N.D. Ill. 2021) (quoting *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018)).

7

## III.    Analysis

Before evaluating the legal sufficiency of the United States's claims, the court considers standing as to each Defendant. Federal courts have an "ongoing obligation" to assure themselves of their jurisdiction, so the court begins there. *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022).

### A.    Standing

Article III "standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To maintain a case in federal court, a plaintiff must demonstrate that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the pleading stage, a plaintiff must allege facts that demonstrate each element of standing. *Id.* The court takes the factual allegations as true and draws reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[S]tanding is not dispensed in gross." *TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021). Instead, a plaintiff "'must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431).

### 1.    Government Defendants

The court begins by evaluating the United States's standing to sue the Government Defendants. Only Cook County challenges standing, but the same analysis also applies to Illinois and Chicago.

8

An injury in fact is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation and internal quotation marks omitted). Relevant here, "actual or threatened interference with the performance of . . . proper governmental functions" qualifies as a concrete harm. *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984); *see United States v. West Virginia*, 295 U.S. 463, 473 (1935) (finding no standing where there was "no case of an actual or threatened interference with the authority of the United States"); *United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States. Whether the United States is entitled to relief from that injury is a question on the merits of the dispute.").

Because the United States seeks injunctive relief, it must "demonstrate that [it] faces a 'real and immediate' threat of future injury; 'a past injury alone is insufficient.'" *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019) (quoting *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017)); *see also Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692 (7th Cir. 2015) ("Allegations of future harm can establish Article III standing if that harm is 'certainly impending,' but 'allegations of possible future injury are not sufficient.'" (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013))). [4]

---

[4]     Cook County correctly notes that the United States's request for declaratory judgment and fees alone cannot support standing. [Dkt. 28 at 9.] *See California v. Texas*, 593 U.S. 659, 673 (2021); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

9

Cook County takes issue with the injury prong of standing, arguing that the United States has not sufficiently alleged a risk of future injury to warrant injunctive relief because the complaint only references prior injuries—for example, the United States alleges instances in which detainers were not honored, but does not name a specific person currently detained about whom it seeks information or has submitted a detainer request. [Dkt. 28 at 10–11; *see, e.g., id.* at 10 ("At most, all that can be inferred from the United States'[s] complaint is that it anticipates it will some day submit a detainer request . . . .").] The standing inquiry is the same for Illinois, Cook County, and Chicago, so the court analyzes them as one.[5]

The United States has alleged enough plausible facts to show that there is a real and imminent threat that it will be injured through the Sanctuary Policies' continued implementation. The challenged Policies explicitly prohibit state and local law enforcement from complying with detainers and administrative warrants, providing information about noncitizens, and granting federal immigration authorities access to detainees in state custody. [Dkt 1, ¶¶ 8–10.] Not only are these laws on the books, but the complaint illustrates concrete injuries arising from Defendants' repeated implementation of the Sanctuary Policies over several years.

---

[5]     The Cook County Board of Commissioners separately, and correctly, argues that it cannot be sued. [Dkt. 30 at 2.] The Board is "not a suable entity under Illinois law because 'its powers are coextensive with the county.'" *Ryder v. Cook Cnty. Dep't of Pub. Health*, 2023 WL 2745679, at *3 (N.D. Ill. Mar. 31, 2023) (quoting *Wright v. Bd. of Cnty. Comm'rs of Cook Cnty.*, 1999 WL 1249313, at *3 (N.D. Ill. 1999)), *aff'd sub nom. Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001). Consequently, "the proper defendant in this cause of action is Cook County itself, not its Board." *Wright*, 1999 WL 1249313, at *3.

For instance, it alleges that Defendants' refusal to honor detainer requests or provide information about noncitizens' release dates from state or local custody makes it more difficult and dangerous for federal officials to quickly apprehend removable noncitizens, as contemplated by the INA. [*Id.*, ¶¶ 11, 63, 70.] By not responding to administrative warrants, Defendants also allegedly withhold a tool of immigration enforcement specifically provided by the INA. [*Id.*, ¶ 11.] Defendants have allegedly been implementing these policies over at least the last decade. The complaint alleges that there have been numerous instances since April 2024 where Cook County has not honored detainer requests. [*Id.*, ¶ 57.] Although this allegation is made on information and belief, the complaint elsewhere cites a specific instance in which a detainer was not honored and a noncitizen released from Cook County jail was subsequently criminally charged. [*Id.*, ¶ 12.] And it cites federal statistics from 2016 to 2025 on noncitizens who have been arrested and criminally charged.[6] [*Id.*, ¶ 7.] These allegations add color the United States's claim that the Sanctuary Policies

---

[6]     Cook County takes issue with the fact that many of the United States's allegations concerning the CCO are pled on information and belief. [Dkt. 28 at 10 n.1.] Generally, "information and belief" pleading is used in fraud cases and allows a plaintiff to allege facts necessary to meet that heightened pleading standard where the information is not in their possession. *See, e.g.*, *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018); *Nat'l Prods. Inc. v. Gamber-Johnson LLC*, 2022 WL 2176335, at *2 (W.D. Wis. June 16, 2022). In a case like this one, all that matters is whether the United States's allegations make standing plausible. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015)). They do, so Cook County's argument fails.

make it more difficult for federal immigration agents "to comply with their mission to enforce the immigration laws."[7] [*Id.*, ¶¶ 70, 74.]

Given the period over which Defendants have enforced their Sanctuary Policies, it is plausible to consider their implementation a continuing threat to federal immigration policy. It is of course theoretically possible that Defendants abruptly change course and cease implementing their long-held Sanctuary Policies the next time federal immigration authorities issue a detainer request or seek information about a person in state or local custody. It is also possible the United States ceases issuing detainers, administrative warrants, or requests for information about noncitizens in state and local custody. But both possibilities are remote based on the Policies, their track record of enforcement, and the United States's assertion that it wishes to use tools conferred by Congress to conduct civil immigration enforcement. Consequently, the threat of injury from future policy implementation is not unduly speculative. *Cf. Clapper*, 568 U.S. at 412 (finding no standing where risk of enforcement was purely speculative since plaintiffs had no reason to believe the Government would target their phone conversations).

---

[7]    The court declines to factor one allegation into its standing analysis: that Cook County employees remove detainers from noncitizens' permanent criminal files. [Dkt. 1, ¶ 58.] As a result, detainers don't follow them if they are transferred to "long-term state incarceration." [*Id.*] As Cook County points out, nothing in the CCO requires employees to remove detainer information from files, and indeed, doing so would violate county law. [Dkt. 28 at 11 (citing § 2-441 *et seq.*).] Since the CCO doesn't allow for the alleged removal of detainer requests, injunctive relief wouldn't redress the harm. Even if county employees were removing detainer information from files, "a clear misuse of a law does not provide a basis for a federal court to explore [a] law's facial constitutionality." *Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010). This allegation is also not well-pled. Apart from the fact that it doesn't reflect the law, it conflicts with the United States's separate allegation that detainer information is not saved in individuals' files to begin with. [*See* Dkt. 1, ¶¶ 58, 72.]

The injuries alleged are also traceable to the Sanctuary Policies—without them, state and local law enforcement would be free to cooperate with federal immigration authorities. Enjoining the Policies would redress the alleged harm by removing definitive impediments to federal immigration policy.[8] This would provide tangible relief beyond mere "psychic satisfaction." *Steel Co.*, 523 U.S. at 107. Thus, the United States's allegations are sufficient to establish standing to seek injunctive relief against Illinois, Cook County, and Chicago.

### 2.    Individually Named Defendants

The United States's standing to sue Illinois, Cook County, and Chicago does not automatically extend to the individually named defendants: Illinois Governor J.B. Pritzker, Cook County Board of Commissioners President Toni Preckwinkle, Cook County Sheriff Thomas Dart, Chicago Police Department ("CPD") Superintendent Larry Snelling, and Chicago Mayor Brandon Johnson. *Murthy*, 603 U.S. at 61 (explaining that "plaintiffs must demonstrate standing for each claim that they press against each defendant" (citation modified)).

"[A]n official-capacity suit is . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Yet when an individual is named, a complaint must still allege injuries traceable to that individual defendant. *See Wright*, 1999 WL 1249313 at *3; *Marie O. v. Edgar,* 157 F.R.D. 433, 437 (N.D. Ill. 1994).

---

[8]    Although enjoining the Sanctuary Policies would not guarantee state and local cooperation with federal immigration authorities, providing state and local officials the option would at least partially redress the United States's alleged injuries. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))).

Here, the United States fails to allege that Governor Pritzker plays any role in enforcing the WFA, meaning that it has not established that injuries caused by the Act are traceable to him. To this point, the WFA vests enforcement power in the Illinois Attorney General, not the Governor. 5 ILCS 805/30. The complaint's only substantive allegation about Pritzker concerns a media appearance in which he "profess[ed] a shared interest with the Federal Government in enforcing immigration laws," which is contrary to the alleged purpose of the Sanctuary Policies. [Dkt. 1, ¶ 5.][9] Because Governor Pritzker has no enforcement power, the relief sought—an injunction prohibiting him from enforcing the challenged Policies—would have no practical effect and could not redress the injuries alleged. The United States openly concedes this point. [Dkt. 50 at 28.] Since the United States has not shown traceability or redressability, the court grants the motion to dismiss for lack of jurisdiction as to Governor Pritzker.

The United States fails to show standing as to either Board President Preckwinkle or Sheriff Dart for similar reasons. Preckwinkle argues that she has no power independent of her official role as President of the Cook County Board of Commissioners and correctly observes that the complaint makes no allegations demonstrating traceability or redressability related to her role. [Dkt. 30 at 3–4.]

---

[9]      In its opposition brief, the United States alleges that Governor Pritzker established an office to implement the WFA. [Dkt. 50 at 29.] It's axiomatic that a plaintiff cannot amend his complaint through briefing. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). Even if the court considered this allegation, the United States fails to establish traceability between Pritzker's actions and the WFA, which makes this case different from cases like *Marie O.,* where the Governor's statutory enforcement responsibility made the traceability inquiry more straightforward. 157 F.R.D. at 437.

Sheriff Dart also challenges redressability, arguing that "[t]he United States does not seek an injunction as to any particular activity it would like for the Sheriff to take or eschew," so it is not clear if or how an injunction would impact him. [Dkt. 32 at 3.] The United States makes no argument to the contrary and concedes that "any relief entered against Cook County" would redress its injuries because it "would run to the appropriate County Officers and entities." [Dkt. 50 at 30 n.7.] Therefore, all claims against Board President Preckwinkle and Sheriff Dart are also dismissed.

Finally, the United States fails to plead facts showing that it has standing to sue either CPD Superintendent Snelling or Mayor Johnson. The complaint references Snelling exactly once—in an allegation that identifies him as the Superintendent of CPD. [Dkt. 1, ¶ 23.] It references Mayor Johnson twice: once to identify him as Mayor of Chicago and once to allege that he and Governor Pritzker "profess a shared interest with the Federal Government in enforcing immigration laws." [Dkt. 1, ¶¶ 5, 22.] These allegations are insufficient to show that the alleged injuries are traceable to Snelling or Johnson. All claims against them are dismissed.

Because the United States has not demonstrated standing as to the Cook County Board of Commissioners or any individual defendant, all claims against them are accordingly dismissed without prejudice. *White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021) (dismissal for lack of Article III standing is necessarily without prejudice).

### B.     Constitutional Principles

The court next considers whether the United States has stated legal claims against the remaining defendants: Illinois, Cook County, and Chicago.

15

SA15

The United States alleges that federal immigration law preempts the Sanctuary Policies expressly and because they obstruct the accomplishment of federal objectives. The collective thrust of Defendants' response is that the INA provisions indicated have no preemptive effect, do not preempt the Sanctuary Policies, and indeed cannot be found to preempt them without running afoul of the Tenth Amendment. The heart of the United States's claims implicates our federalist system of government and warrants some table-setting of the doctrines and principles at issue. Accordingly, the court begins with the origins of dual sovereignty and two doctrines that derive from it: preemption and anticommandeering.

### 1.    Dual Sovereignty

When this nation was governed by the Articles of Confederation, it was afflicted by an infamously ineffective central government and fiercely independent union of states. Among the nation's many ills—inability to coordinate, to speak with one voice in foreign affairs, and work towards common national goals—the central government had no ability to regulate individuals directly. *See* Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1448–49 (1987) ("The Articles of Confederation . . . failed because there was insufficient gravitational pull from the center to counter the centrifugal tendencies of each state.").

The Constitution rectified these defects by crafting a federalist system that would strengthen the federal government by allowing it to legislate upon individuals while preserving the sovereignty of States. *See New York v. United States*, 505 U.S. 144, 163–66 (1992). "Thus, both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual

16

sovereignty.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (citation omitted); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) ("[O]ur Constitution 'spli[t] the atom of sovereignty.'" (second alteration in original) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999))). The careful balance of power between dual sovereigns offers "double security" against abuse of power by either, while drawing on the advantages of both—namely a strong central government and a decentralized state system "more sensitive to the diverse needs of a heterogenous society." *Gregory v. Ashcroft*, 501 U.S. 452, 458–59 (1991).

Dual sovereignty is enshrined in the Constitution's text and structure. It "indirectly restricts the States by granting" Congress certain legislative powers, *Murphy*, 584 U.S. at 471; *see* Art. I, and the Supremacy Clause provides that federal law is the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," Art. VI, cl. 2. In elevating federal law, the Supremacy Clause provides a rule of decision: when federal and state law conflict, federal law prevails.

Congress's powers are undoubtedly vast, as reflected by its prerogative to make all other laws "necessary and proper" to the execution of powers granted to the federal government. Art. I, § 8, cl. 18; *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) ("Although the [Necessary and Proper] Clause gives Congress authority to 'legislate on that vast mass of incidental powers which must be involved in the constitution,' it does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." (second alteration in

17

original) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 411 (1819))). But its powers are not unlimited, for the Tenth Amendment reserves to the States any powers not delegated to Congress, except certain sovereign functions explicitly prohibited or held to be implicitly restricted. Art. I, § 10; *Murphy*, 584 U.S. at 470–71; *see also New York*, 505 U.S. at 156 ("[T]he Tenth Amendment 'states but a truism that all is retained which has not been surrendered.'" (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941))).

### 2.    Preemption

Federal law can preempt state law in three ways: express preemption, conflict preemption, or field preemption. *Murphy*, 584 U.S. at 477. Each type of preemption works the same way: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*

Certain rules of preemption flow from federalism. First, given Congress's limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not "some brooding federal interest." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019); *see also Kansas*, 589 U.S. at 202.

Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States. *Murphy*, 584 U.S. at 477–78. This is so because Congress may *only* legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their

deliberate rejection of a plan that would have allowed Congress to legislate on States. *See New York*, 505 U.S. at 164–66.

Third, courts assume that Congress does not preempt lightly. *Gregory*, 501 U.S. at 460. Although Congress may legislate in areas traditionally regulated by States, preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

### 3. Anticommandeering

Federal preemption is also bounded by the anticommandeering doctrine. Although recognized long after the Founding Era, anticommandeering "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470. Centered on the principle of voluntariness, the anticommandeering doctrine holds that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. Nor can it conscript state or local officers directly, *Printz v. United States*, 521 U.S. 898, 935 (1997), or coerce States to action through improper influence, *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578. This holds true no matter how strong the federal interest at play. *New York*, 505 U.S. at 178. Therefore, while Congress has many enumerated powers, and may even overtake state law, it may not wield States as federal tools. In this way, anticommandeering is a bulwark against abuse of government power. It also promotes political accountability by enabling voters to distinguish which sovereign is responsible for a specific policy, and "prevents

19

Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473–74.

With these principles in mind, the court turns to the claims at issue.

## C.  Express Preemption Challenge

The first question is whether the INA expressly preempts the Sanctuary Policies. "Express preemption applies when Congress clearly declares its intention to preempt state law" and thereby "presents a question of statutory interpretation." *Nelson v. Great Lakes Edu. Loan Servs., Inc.*, 928 F.3d 639, 646–47 (7th Cir. 2019). "The purpose of Congress is the ultimate touchstone" in every preemption case. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). While "the plain wording of [an express preemption] clause . . . necessarily contains the best evidence of Congress' pre-emptive intent," *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016), "the structure and purpose of the statute as a whole" may also be relevant where the plain text is ambiguous or fails to define the scope of preemption, *Medtronic,* 518 U.S. at 486 (citation and internal quotation marks omitted); *see N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Nelson*, 928 F.3d at 647.

The United States contends that 8 U.S.C. §§ 1373(a) and 1644 expressly preempt information sharing and maintenance provisions in the WFA (5 ILCS 805/15(h)(6)–(7)), CCO (§ 46-37(b)), and WCO (§§ 2-173-020(a)(3), 030(a)(1)). [Dkt. 1, ¶¶ 76–80.]

Section 1373(a) provides that:

20

SA20

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful of any individual.

8 U.S.C. § 1373(a). As § 1644 contains nearly identical language, and the parties treat the two statutory provisions as coextensive, the court analyzes them as one.[10] *See, e.g.*, *City of Chicago II*, 961 F.3d at 888–89 (treating §§ 1373 and 1644 as equivalent); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 371 n.13 (D.N.J. 2020), *aff'd sub nom. Ocean County Bd. of Comm'rs v. Att'y Gen. of New Jersey*, 8 F.4th 176 (3d Cir. 2021) (same).

### 1. Statutory Interpretation

The court begins with the parties' statutory arguments before reaching Defendants' argument on preemptive effect. Three of the four challenged Sanctuary Policy provisions similarly restrict government entities and officials from providing information about a criminally detained individual's contact information, custody status, and/or release date to immigration authorities. The court analyzes these provisions together.

Illinois's WFA provides that:

> Unless presented with a federal criminal warrant, or otherwise required by federal law, a law enforcement agency or official may not: . . . (6) provide *information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody*;

---

[10]    8 U.S.C. § 1644 provides:
> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States.

or (7) provide to any immigration agent *information not otherwise available to the public relating to an individual's release or contact information*, or otherwise facilitate for an immigration agent to apprehend or question an individual for immigration enforcement.

5 ILCS 805/15(h)(6)–(7) (emphasis added).

The Cook County Ordinance similarly provides:

Unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws . . . County personnel shall not expend their time responding to ICE inquiries or communicating with ICE *regarding individuals' incarceration status or release dates* while on duty.

CCO § 46-37(b) (emphasis added).

Finally, Section 2-173-020(a)(3) of the WCO provides:

No agent or agency shall participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law, unless required to disclose information as addressed in Section 2-173-030(a). Specifically, no agency or agent shall: . . . (3) expend their time responding to ICE inquiries or communicating with ICE *regarding a person's custody status, release date, or contact information*. An agency or agent is authorized to communicate with ICE in order to determine whether any matter involves enforcement based solely on a violation of a civil immigration law.

WCO § 2-173-020(a)(3) (emphasis added).

The express preemption challenge turns on the scope of § 1373. Section 1373 restricts prohibitions on sharing information "regarding" an individual's "citizenship or immigration status," while the challenged Sanctuary Policies identify other kinds of information without reference to "citizenship or immigration status." At first blush then, § 1373 doesn't speak to the information covered by the Sanctuary Policies.

22

The United States urges an expansive reading of § 1373, arguing that the word "regarding" broadens the scope of information covered by § 1373 to all "matters relating to that subject," including contact information, custody status, and release date. [Dkt. 50 at 46–47.] Defendants advance a narrower interpretation of § 1373 that only encompasses information about "a person's legal classification under federal law," which the Sanctuary Policies do not restrict. [Dkt. 76 at 18.]

This issue has been treated extensively by other courts. Without exception, each has rejected the United States's capacious reading of § 1373. *See, e.g.*, *City & County of San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022); *City and County of San Francisco v. Barr*, 965 F.3d 753, 763 (9th Cir. 2020); *United States v. California (California II)*, 921 F.3d 865, 891 (9th Cir. 2019); *County of Ocean*, 475 F. Supp. 3d at 373–76 (collecting cases); *City of Philadelphia v. Sessions,* 309 F. Supp. 3d 289, 331–32 (E.D. Pa. 2018)*, aff'd in part, vacated in part on other grounds sub nom. City of Philadelphia v. Att'y Gen. of United States,* 916 F.3d 276, 291 (3d Cir. 2019). That conclusion is amply supported by the text, structure, and history of § 1373.

Begin with the text of § 1373. The parties do not dispute that the phrase "citizenship or immigration status" means the legal classification of a person located in the United States.[11] The United States relies on *Lamar* to argue that the modifier

---

[11]     As *City of Philadelphia* aptly described it, "[t]he phrase 'citizenship or immigration status,' plainly means an individual's category of presence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country." 309 F. Supp. 3d at 333; *accord California II*, 921 F.3d at 891.

"regarding" expands information about "citizenship or immigration status" beyond the plain scope of that category. [Dkt. 50 at 46–47 (citing *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018)).] *Lamar* interpreted a provision of the Bankruptcy Code that referenced a "statement respecting the debtor's financial condition." *Lamar*, 584 U.S. at 712. In interpreting the effect of "respecting" on the kinds of statements covered by the provision, *Lamar* observed that "respecting" and related modifiers (e.g., "about," "concerning," "regarding") "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 717.

Even if "regarding" might extend § 1373 beyond a bare statement of citizenship or immigrations status, to read it as broadly as the United States does "would impermissibly expand the scope of these statutes to sweep in *any* information, including personal identifying data, concerning an alien in the United States," not just information directly concerning their citizenship or immigration status. *County of Ocean*, 475 F. Supp. 3d at 375.

For starters, the court is not persuaded that the information the United States seeks—noncitizens' contact information, custody status, and release dates—is linked to their status such that it is within the scope of even a slightly broader reading of § 1373. First, the United States argues that contact information "directly bears on" a noncitizen's immigration status because it reveals whether the noncitizen has complied with an INA provision requiring them to notify the government of any change of address. [Dkt. 50 at 48.] Compliance, in turn, "dictates whether the alien

24

is subject to detention and removal." [*Id.* (citing 8 U.S.C. §§ 1305–06).] An address itself, however, says nothing about a person's citizenship or immigration status. Even the failure to report a new address doesn't necessarily affect immigration status. Section 1306(b) only mandates detention and removal if the noncitizen has not reported a new address *and* cannot show that their failure to report was "reasonably excusable and was not willful." At most then, sharing a noncitizen's contact information with DHS might initiate a process that could lead to a change in their immigration status. But the address itself reveals nothing. If such attenuated information fell within the scope of information "regarding" citizenship or immigration status, it's difficult to see where it would end. "[P]reemption would never run its course, for [r]eally, universally, relations stop nowhere.'" *California II*, 921 F.3d at 892 (second alteration in original) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. at 655).

Second, release date information: The United States directs the court to 8 U.S.C. § 1231(a)(4)(A), which provides that the federal government may not remove a convicted noncitizen who is in state custody until they are released. Based on this provision, it argues that the "release date . . . dictates when . . . an alien must be detained and removed from the Unites States," which is "directly related" to the noncitizen's "immigration status." [Dkt. 50 at 48.] But § 1231(a)(4)(A) only specifies *when* a noncitizen who has already been deemed removable may be removed. It doesn't concern their immigration *status*, i.e., "an individual's category of presence in the United States." *City of Philadelphia*, 309 F. Supp. 3d at 333. When an individual

25

will be released from a particular facility cannot be considered "information regarding" their immigration status. *Id*. Whatever the scope of § 1373, there is no basis to conclude that it encompasses the information covered in the challenged Sanctuary Policies because neither contact information, custody status, nor release date is directly related to citizenship or immigration status.[12] This is apparent from the face of § 1373.

The structure and legislative history of § 1373 support the same conclusion. As to structure, the United States argues that § 1373(c) confirms the wide sweep of information "regarding" citizenship or immigration status. Section § 1373(c) requires DHS to respond to government inquiries "seeking to verify or ascertain the citizenship or immigration status of any individual . . . by providing the requested verification or status information." The United States argues that the inclusion of the phrase "regarding" in § 1373(a) as juxtaposed with its omission in § 1373(c) shows that § 1373(a) covers a much wider swath of information. [Dkt. 50 at 48–49.] The court disagrees.

Section 1373(c) is structured differently than § 1373(a) and the omission of "regarding" doesn't illuminate what the information might fall under it. Whereas § 1373(a) refers directly to information that may be requested (information "regarding" citizenship or immigration status), § 1373(c) primarily refers to the reasons for which information might be sought (to ascertain citizenship or

---

[12]     The United States didn't present any argument to link custody status to citizenship or immigration status, nor is it obviously related, so the court does not find that § 1373 includes this information. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (holding that the party advocating preemption bears the burden of proof).

immigration status) and goes on to require [DHS] to provide the "verification or status information." In the court's estimation, there is too little daylight between "[immigration] status information" and information "regarding" immigration status to interpret this semantic difference as sanctioning the United States's broad reading of § 1373(a). *See also California II*, 921 F.3d at 892 ("[T]he fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach as well.").

Even if § 1373(a) and (c) refer to different ranges of information, the difference is likely slight and explained by common sense. As one court has observed, the actors providing information under § 1373(a) may not have access to information that directly indicates citizenship or immigration status, while DHS, which responds to inquiries under § 1373(c), does. Consequently, § 1373(a) may have been drafted to sweep in more sources of information needed to verify a person's status. *United States v. California (California I)*, 314 F. Supp. 3d 1077, 1103–04 (E.D. Cal. 2018*), aff'd in part*, *rev'd in part on other grounds and remanded*, *California II*, 921 F.3d 865 ("[Section 1373(a)] is directed toward government entities and their officers, who might possess information pertaining to an individual's immigration status but not hold an official record" while under § 1373(c), "an official record of a person's citizenship or immigration status is presumably within [DHS's] control."). Either way, both logically concern only information that directly bears on citizenship or immigration status.

Finally, the United States invokes § 1373's legislative history. It cites a congressional report stating that § 1373 aims to ensure state and local officials can "communicate with [federal immigration authorities] regarding the *presence, whereabouts, or activities* of illegal aliens," not merely their legal classification. H.R. Rep. No. 104-725, at 383 (1996) (emphasis added). The United States argues that "presence, whereabouts" and "activities" should be considered within the scope of § 1373 since they are core to the communicative aims of § 1373. [Dkt. 50 at 47–48.] A closer read of the report suggests the opposite. It states that "no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the [federal government] information regarding the immigration status of an alien *or* the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (emphasis added). As one circuit has noted, "the fact that the report distinguished between the two categories" suggests that they are non-overlapping. *California II*, 921 F.3d at 892 n.18. Only after referring to these distinct categories ("immigration status" and "presence, whereabouts, or activities") does the report state that it aims to facilitate communication about the "presence, whereabouts, or activities" of noncitizens. H.R. Rep. No. 104-725, at 383. It notably omits "immigration status."

Furthermore, "presence, whereabouts" and "activities" do not necessarily bear on immigration status. Including a noncitizen's "presence, whereabouts" and "activities" in § 1373 would therefore eviscerate the limitation it clearly spells out: that information must at least relate to citizenship or immigration status. *See Steinle*

28

*v. City & County of San Francisco*, 919 F.3d 1154, 1164 n.11 (9th Cir. 2019) ("[T]he plain and unambiguous statutory text [of § 1373] simply does not accomplish what the Conference Report says it was designed to accomplish."). When the plain text of a statute conflicts with its legislative history, "the statutory text, not the legislative history," controls. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005); *Owner–Operator Indep. Drivers Ass'n v. Mayflower Transit, LLC*, 615 F.3d 790, 792 (7th Cir. 2010) (same).

In sum, the best reading of § 1373 (and § 1644 by extension) is that it only pertains to information regarding a person's legal classification under federal law. The WFA (5 ILCS 805/15(h)(6)–(7)), CCO (§ 46-37(b)), and WCO (§ 2-173-020(a)(3)) do not restrict employees from sharing this kind of information. Consequently, §§ 1373 and 1644 do not expressly preempt them.[13]

Section 2-173-030(a)(1) of the WCO, however, runs headlong into §§ 1373 and 1644. It states that:

> [N]o agent or agency shall request, maintain, or share *the citizenship or immigration status* of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian . . . .

---

[13]     As Illinois points out, the WFA also contains a broad savings clause that would negate preemption if it applied:

> This Act shall not be construed to prohibit or restrict any entity from sending to, or receiving from, the United States Department of Homeland Security or other federal, State, or local government entity information regarding the citizenship or immigration status of any individual under Sections 1373 and 1644 of Title 8 of the United States Code.

5 ILCS 805/5. The United States didn't respond to this argument, and the savings clause plainly insulates § 805/15 from preemption by requiring compliance with §§ 1373 and 1644.

WCO § 2-173-030(a)(1) (emphasis added). Unlike the provisions the court finds are not expressly preempted, § 2-173-030(a)(1) restricts sharing the precise kind of information that § 1373 prohibits restrictions on: information pertaining to the "citizenship or immigration status" of a person.

The City of Chicago argues that § 1373 must yield to the savings clause in § 2-173-030(a), which provides that "[u]nless required to do so by statute," the restrictions in § 2-173-030(a)(1) apply. [Dkt. 35 at 27.] This construction, however, doesn't negate § 1373 because § 1373 doesn't require information sharing—it merely restricts prohibitions on it, leaving the ultimate decision to implementing officials. *See infra* Part C.2. In other words, the two provisions talk past each other. While statutes should be construed to avoid constitutional questions where possible, *Arizona*, 567 U.S. at 415, the plain text of the savings clause as compared to § 1373(a) doesn't allow any other reading. Consequently, the court concludes that § 1373(a) (and § 1644 by extension) would expressly preempt § 2-173-030(a)(1), but for the City's additional arguments below.

### 2. Preemptive Effect and Anticommandeering

Given that § 1373(a)'s text would expressly preempt WCO § 2-173-020(a)(3), the court must further interrogate its preemptive effect. [*See* Dkt. 35 at 22–24 (arguing that §§ 1373 and 1644 do not qualify as preemptive provisions).] Many courts have been able to avoid this issue. *See, e.g.*, *City & County of San Francisco*, 42 F.4th at 1086 (holding that facial challenges to § 1373 were not ripe because the challenged laws complied with federal law); *New York v. U.S. Dep't of Just.*, 951 F.3d

84, 114 n.27 (2d Cir. 2020) (declining to conclusively address preemptive effect of § 1373 because federal law did not expressly preempt state law); *see also McHenry County v. Raoul*, 44 F.4th 581, 587–88 (7th Cir. 2022) (declining to address whether certain provisions of the INA were preemption provisions because plaintiffs' preemption arguments failed). Those that have not, or that chose to address it, have uniformly found that § 1373 is not a preemptive provision. *See, e.g.*, *City of Chicago v. Sessions* (*City of Chicago I*), 321 F. Supp. 3d 855, 868–69, 872 (N.D. Ill. 2018), *aff'd sub nom City of Chicago II*, 961 F.3d 882; *Ocean County Bd. of Comm'rs*, 8 F.4th at 181–82; *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019), *aff'd in part, vacated in part, remanded sub nom. City & County of San Francisco*, 42 F.4th 1078; *City of Philadelphia*, 309 F. Supp. 3d at 329–31. This court now joins them.

The Supreme Court made clear in *Murphy* that for a federal statute to preempt state law it must "be best read as one that regulates private actors" rather than government entities or officials. 584 U.S. at 477; *see also McHenry County*, 44 F.4th at 588 ("[W]e are reluctant to endorse the[] argument that *Murphy* did not really mean what it said . . . The Court said at least three times . . . that a valid preemption provision is one that regulates private actors."). This includes laws that regulate only private actors, and those that "evenhandedly regulate[] an activity in which both States and private actors engage." *Murphy*, 584 U.S. at 475–76; *see also Haaland v. Brackeen*, 599 U.S. 255, 284–85 (2023) ("When a federal statute applies on its face to both private and state actors, a commandeering argument is a heavy lift . . . ."). This pronouncement derives from the Constitution, which "confers upon Congress the

power to regulate individuals, not States." *New York*, 505 U.S. at 166. It also reinforces the anticommandeering doctrine, which preserves dual sovereignty by prohibiting federal command of States as sovereigns (rather than market participants).

To determine whether a federal law regulates private actors, courts must "look beyond the phrasing employed" and interrogate whether the law in substance affects the rights of private actors. *Murphy*, 584 U.S. at 478 ("[L]anguage might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased."). *Murphy* illustrated this point using *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374 (1992). *Morales* considered the Airline Deregulation Act of 1978, which lifted certain federal airline regulations. *Id.* at 378. The Act provided that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." *Murphy*, 584 U.S. at 478 (alteration in original) (quoting 49 U.S.C. App. § 1305(a)(1) (1988 ed.)). Although the plain text of the provision only acted upon States and thus appeared to lack preemptive effect, *Murphy* observed that it was preemptive because it conferred on "private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints" by prohibiting States from constraining covered carriers. *Id.* at 478–79; *see also ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 225–26 (S.D.N.Y. 2019) (holding that federal law prohibiting States and political subdivisions from denying requests for modifications

32

to certain telecommunications equipment regulated private individuals because it conferred on telecommunications companies the right to make such modifications).

In a more recent example, *Brackeen* considered a provision of the federal Indian Child Welfare Act that referred to "[a]ny party who initiates an involuntary proceeding . . . to place an Indian child in foster care or terminate parental rights." 599 U.S. at 266 (alteration in original) (citation and internal quotation marks omitted). Although the literal phrase "any party" would include private actors, the Court considered the argument that "any party" should be read to refer only to States because States institute most involuntary proceedings. *Id.* at 281–82. The Court ultimately rejected this argument due to the lack of evidence but nevertheless looked beyond the text to test it. *Id.* ("Examples of private suits are not hard to find . . . .").

Section 1373(a) is not a preemptive provision because it doesn't regulate private actors in language or effect. The plain text of § 1373 only operates on State and local government entities and officials, prohibiting restrictions on their ability to share certain immigration-related information with DHS. As a provision that addresses information sharing between government actors, § 1373 doesn't create or restrict the rights of any private actor—it impacts how information "regarding citizenship or immigration status" of a private individual might be distributed between governments. This is distinct from the statute at issue in *Morales*, whose direct effect in prohibiting State and local regulation of covered carriers was to explicitly carve out space for those carriers to operate within federal constraints.

33

By contrast, § 1373 doesn't alter what private individuals can or cannot do or affect their citizenship or immigration status. Although sharing information about an individual's status may facilitate federal implementation of other INA provisions that *do* regulate private persons, § 1373 is not one of them. Many courts that have considered the issue post-*Murphy* have reached the same conclusion. *See, e.g.*, *County of Ocean*, 475 F. Supp. 3d at 372; *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059–60 (D. Colo. 2020); *Oregon*, 406 F. Supp. 3d at 972; *City of Philadelphia*, 309 F. Supp. 3d at 330–31; *see also California II*, 921 F.3d at 890 (distinguishing a state law restricting information sharing with federal authorities from *Reno*, explaining that the former concerned "the state's responsibility to help enforce federal law, and not conduct engaged in by both state and private actors" as in *Reno*).[14]

The United States asserts that § 1373 does regulate private actors, namely noncitizens. [Dkt. 50 at 35.] It doesn't explain how § 1373 can be read in this way, an important omission given that the text and effect of § 1373 suggest otherwise. But the claim might imply two approaches to express preemption analysis, neither of which is correct. First, it might suggest that a court should look to the entire statutory scheme (here the INA) to determine whether a specific provision regulates private actors. But this method would allow Congress to smuggle unconstitutional commands

---

[14]    The complaint also cites 8 U.S.C. § 1373(b), which is nearly identical to § 1373(a) but provides that "no *person or agency*" may restrict sharing information about "immigration status" of an individual with DHS. § 1373(b) (emphasis added); [*see* Dkt. 1, ¶¶ 37, 64.]. The parties did not address § 1373(b) in their briefs, but the court finds that § 1373(b) does not regulate private actors for the same reasons that § 1373(a) does not. *See City of Chicago I*, 321 F. Supp. 3d at 868–69 ("Subsection (b) does not meaningfully expand the statute's scope by including 'person[s]': Who but a government actor can restrict the activities of a government entity or official?" (alteration in original)).

to States into specific provisions of a broader statute, and then rely on separate provisions for cover, even as its directives generate all the concerns associated with anticommandeering. *See Murphy*, 584 U.S. at 470–74. This would mark an end run on the Tenth Amendment and cannot be the right approach. Nor did the Court in *Murphy* explain preemption this way; instead, it confined its analysis of both the law at hand and *Morales* to the specific federal provisions at issue without reference to other sections of the statutes in which they were found. *See id.* at 478–80 ("[W]e recognize that a closely related provision of [the statute] *does* restrict private conduct, but that is not the provision challenged by petitioners.").

Second, the United States might mean that a court should consider a federal provision's downstream effects on private actors to determine whether it can be preemptive. For example, while intragovernmental sharing of information about an individual's immigration status doesn't directly affect private rights, it might generate more immediate immigration consequences. But such an effect is too attenuated from what § 1373 requires to conclude that § 1373 itself regulates private individuals. *See County of Ocean*, 475 F. Supp. 3d at 372 (rejecting this approach as "inconsistent with, and too attenuated from, the principles set forth by *Murphy*"). Indeed, it's difficult to conceive of a valid law that doesn't have at least a secondary effect on private individuals. If incidental effects drove preemption analyses, the line *Murphy* drew between preemptive and non-preemptive statutes would have no meaning.

In short, there is no way to read § 1373 as regulating anyone other than States and their political subdivisions. This not only nullifies § 1373 as a preemption provision but also evokes significant anticommandeering concerns. Indeed, *Murphy*'s rule for assessing preemptive effect is closely related to anticommandeering. Prior to *Murphy*, preemption and anticommandeering were distinguished by how a statute was phrased: a negative command was considered permissible preemption while an affirmative command was unconstitutional commandeering. *Murphy*, 584 U.S. at 480. But preemption and anticommandeering lived in tension, because a statute that in effect commandeered state legislative processes could survive and have preemptive force if it were phrased just so. Preemption thus threatened to nullify the Tenth Amendment's protections. *See* Hartnett, Distinguishing Permissible Preemption from Unconstitutional Commandeering, 96 Notre Dame L. Rev. 351, 351–56 (2020).

*Murphy* redrew the line. It noted that the "command-versus-proscription dichotomy," *City of Chicago I*, 321 F. Supp. 3d at 869, turned on arbitrary phrasing and disregarded commandeering concerns, *Murphy*, 584 U.S. at 474–75 ("Th[e] distinction is empty. It was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures— applies in either event."). Instead, *Murphy* held that a law's preemptive effect turns on the object of regulation—States or private actors. 584 U.S. at 471. As the Constitution only allows Congress to regulate private actors, this new rule brought preemption analysis into closer alignment with the anticommandeering doctrine. *See*

*id.* ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."); *see also* Hartnett at 351–56.

Section 1373 regulates States and only States (and their political subdivisions), so it cannot be preemptive. By the same token, the directives issued in § 1373 are in tension with the Tenth Amendment. Although it is not necessary to (and so the court does not) decide whether § 1373 is constitutional, it is impossible to ignore the state sovereignty concerns that would arise if § 1373 overtook state and local law. The court notes just a few.

First, § 1373 issues "direct orders" to state and local legislatures in providing that they "may not" pass laws that "prohibit or in any way restrict" officials from sharing an individual's citizenship or immigration status with federal authorities. § 1373(a). Although § 1373 doesn't *require* information sharing—line officials may ultimately choose not to share information with the federal government—this negative proscription could be read as a command because it requires "the States to govern according to Congress'[s] instructions." *New York*, 505 U.S. at 162; *see also City of Chicago I*, 321 F. Supp. 3d at 869 (observing that § 1373 was likely drafted "as a prohibition on, rather than a directive to, state employees" to avoid running afoul of the Tenth Amendment but that this construction doesn't survive *Murphy*). This "constrain[t] on local rule-making" is antithetical to State sovereignty and prevents the passage of "locally-preferred policies which run counter to Section 1373." *City of Chicago I*, 321 F. Supp. 3d at 869. If elected officials cannot translate voter preferences into policy, some of federalism's most celebrated features also suffer:

"citizen involvement in democratic processes" and "innovation and experimentation in government." *Gregory*, 501 U.S. at 458.

Section 1373 also inverts the structure of state and local governance. Instead of legislatures prescribing regulations for government employees to implement, § 1373 "strip[s] [decision-making] from local policymakers and install[s] it instead in line-level employees who may decide whether or not to communicate with [DHS]." *City of Chicago I*, 321 F. Supp. 3d at 870. This too denigrates state autonomy by denying a State control over its own employees. "A state's ability to control its officers and employees lies at the heart of state sovereignty." *Id.* at 869; *see also Printz*, 521 U.S. at 935 (holding that anticommandeering applies to state employees); *see also Gregory*, 501 U.S. at 460 (holding that a State's ability to determine the qualifications of its employees is "essential to the independence of States" (quoting *Taylor v. Beckham*, 178 U.S. 548, 570 (1900))).

Finally, if the State, County, and City cannot control whether and how their employees share information with the federal government, they cannot affirmatively opt-out of enforcing federal immigration laws. This conflicts with the guiding principle of anticommandeering: knowing and voluntary cooperation. *Murphy*, 584 U.S. at 472; *cf. Hodel v. Va. Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264 (1981) (upholding a federal law as permissible cooperative federalism because it offered States a choice of either implementing a federal program or yielding to a federally administered regulatory program).

38

In defense, the United States asserts that § 1373 does not implicate the Tenth Amendment at all because it merely concerns information-sharing. [Dkt. 50 at 46.] It argues that *Printz* provided a carve-out for statutes that "require only the provision of information to the Federal Government" because they do not involve "the forced participation" of States "in the actual administration of a federal program." 521 U.S. at 917–18; [Dkt. 50 at 46.] Even assuming § 1373 is properly categorized as only an information-sharing law, *see City of Chicago I*, 321 F. Supp. 3d at 872, *Printz's* brief mention of information-sharing laws didn't recognize them as an exception, 521 U.S. at 918. Rather, the Court observed that information-sharing statutes were unlike the statute at issue and declined to consider whether that difference was constitutionally significant. *Printz*, 521 U.S. at 918 ("We of course do not address these or other currently operative enactments that are not before us; it will be time enough to do so if and when their validity is challenged in a proper case.").

The United States also cites *Reno* for the proposition that federal laws that "regulate[] the States as the owners of data bases" rather than as sovereigns are valid. [Dkt. 50 at 46 (quoting *Reno v. Condon*, 528 U.S. 141, 151 (2000)).] But this misstates *Reno*, which held that a generally applicable federal law restricting the disclosure of personal information in driver's license applications did not violate the Tenth Amendment. 528 U.S. at 151. Contrary to the United States's assertion, *Reno's* holding was not motivated by the information-sharing nature of the statute at hand. Rather, as explained by *Murphy* and is apparent from *Reno* itself, the Court upheld the law because it regulated both States and private actors as mutual "suppliers to

39

SA39

the market for motor vehicle information." *Id.*; *see Murphy*, 584 U.S. at 475–76 ("The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage. That principle formed the basis for the Court's decision in [*Reno*]."); *see also County of Ocean*, 475 F. Supp. 3d at 378 n.21 (stating that neither *Printz* nor *Reno* recognizes an information-sharing exception to the Tenth Amendment); *City of Philadelphia*, 309 F. Supp. 3d at 330–31 (same); *City of Chicago I*, 321 F. Supp. 3d at 871–72 (same); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018), *aff'd in part*, *vacated in part sub nom. City & County of San Francisco v. Barr*, 965 F.3d 753 (9th 2020) (same); *see also New York*, 951 F.3d at 115 ("[T]he Supreme Court has not decided whether a federal law imposing 'purely ministerial reporting requirements' on the States violates the Tenth Amendment.")

Whether information-sharing statutes should be an exception to anticommandeering is, at best, an open question. The United States has not pointed to any case recognizing such an exception. Nor has it proffered a reason to think that such an exception should be adopted.[15] Consequently, the Tenth Amendment likely applies to §§ 1373 and 1644 as it would to any other federal law.

---

[15]    Some courts have concluded that even if there were an information-sharing exception to the Tenth Amendment, § 1373 would not fall into it because it does more than require information-sharing—it "directly tells states and state actors that they must refrain from enacting certain state laws." *City of Philadelphia*, 309 F. Supp. 36 at 330–31; *see also City of Chicago I*, 321 F. Supp. 3d at 872; *County of Ocean*, 475 F. Supp. 3d at 378 n.21.

\* \* \* \* \* \*

In sum, the United States's express preemption challenge in Count I fails as to each Defendant. Sections 1373 and 1644 do not expressly preempt the information-sharing restrictions in the WFA, CCO, or WCO § 2-173-020(a)(3). Count I independently fails against all challenged provisions because §§ 1373 and 1644 are not valid preemptive provisions, as they regulate States and local governments, but not private actors. The Constitution does not allow Congress to legislate on States in this way, and §§ 1373 and 1644 do just that.

### D. Conflict Preemption Challenge

The United States next argues that the Sanctuary Policies are "invalid as a matter of conflict preemption." *McHenry County*, 44 F.4th at 591. "That doctrine includes 'cases where compliance with both federal and state regulations is a physical impossibility,'" *id.* (quoting *Arizona*, 567 U.S. at 399), and where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Like in *McHenry County*, "physical impossibility" is not at issue in this case; the question is whether the Sanctuary Policies "obstruct[] congressional purposes." 44 F.4th at 591.

Courts must use their judgment, "informed by examining the federal statute as a whole and identifying its purpose and intended effects," to determine whether a state statute is conflict preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). The text is the north star when interpreting statutes. "Extrinsic materials" like legislative history "have a role in statutory interpretation only to the

41

extent that they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil*, 545 U.S. at 568.

Courts find that state laws pose an obstacle only where "applying the state law would do major damage to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (citation and internal quotation marks omitted). "It is not . . . a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a pre-existing right of (state) sovereignty." *Goldstein v. California*, 412 U.S. 546, 554–55 (1973) (alteration in original) (citing The Federalist No. 32, p. 243 (B. Wright ed. 1961)). "In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (citation and internal quotation marks omitted). Where "the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend" those subject to removal, the state law "does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." *County of Ocean*, 475 F. Supp. 3d at 382.

### 1.    Relevant INA Provisions

To understand the purpose of the INA, the court considers "the entire scheme." *Hines*, 312 U.S. at 67 n.20 (citation omitted). Since the INA provisions relevant to this dispute are unambiguous, the court has no need to venture beyond their text. *See, e.g.*, *Exxon Mobil*, 545 U.S. at 568.

The INA provisions reflect Congress's intent that immigration officers be able to use administrative warrants and issue immigration detainers. Congress authorized the Attorney General to issue and use administrative warrants to detain noncitizens. 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained . . . ."). As the name indicates, administrative warrants—Form I-200 (Warrant for Arrest of Alien) or Form I-205 (Warrant of Removal/Deportation)—are executed by an ICE officer, not a judge. U.S. Immigr. & Customs Enf't, Policy No. 10074.2, Issuance of Immigration Detainers by ICE Immigration Officers, § 2.4 (Mar. 24, 2017); [Dkt. 50 at 16.] Where a noncitizen commits a criminal offense, the INA directs the Attorney General to take them into custody once they are released from state or local custody. § 1226(c). Then, if "an alien is ordered removed, the Attorney General" is obligated to remove them "within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

Immigration officers are also empowered to issue detainers: requests that a state or local law enforcement agency advise ICE before releasing noncitizens whom ICE wishes to detain so ICE can arrange to assume custody of them. 8 C.F.R. § 287.7(a). The INA directs the Secretary of Homeland Security to issue detainers for certain categories of individuals and, if they are not otherwise detained, "effectively and expeditiously take [them into] custody." § 1226(c)(3); *see also* § 1357(d).

The INA also envisions some collaboration between federal immigration authorities and state or local police. The Attorney General is permitted to enter into agreements with States so that state officers can perform immigration enforcement

43

tasks, including the "investigation, apprehension, or detention of aliens." § 1357(g)(1). The Attorney General is authorized to arrange for places to detain noncitizens pending removal or pending a decision on removal. *Id.* § 1231(g)(1). That includes entering into agreements with States and localities to use their existing facilities in exchange for payment. *Id.* at §§ 1231(g)(2), 1103(a)(11). However, the INA provides that no separate written agreement is necessary for state and local officers "to communicate with the Attorney General regarding the immigration status of any individual" or to otherwise "cooperate" concerning "the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* at § 1357(g)(10). For its part, the federal government makes resources and information available to the States, particularly where States inquire about individuals' immigration status. *See, e.g.*, 8 U.S.C. §§ 1226(d)(1)(A), (d)(1)(B), 1373(c).

\* \* \* \* \* \*

The United States argues the Sanctuary Policies pose an obstacle to three goals of the INA: (1) detention of individuals for commission of civil immigration violations, (2) access to individuals in state or local custody, and (3) obtaining information about those same individuals. The court reviews the corresponding provisions of the Sanctuary Policies in turn to determine if any pose an obstacle to the INA.

## 2. Detainers and Administrative Warrants

Each Sanctuary Policy prohibits its corresponding governmental unit from taking any action in response to an administrative warrant or immigration detainer. *See* 5 ILCS 805/15(a); CCO 11-O-73 § 46-37(a), (b); WCO § 2-173-020(a)(1)(B), (C), (a)(5). The United States argues that Congress gave immigration officers tools—

44

principally detainers and administrative warrants—to expeditiously discharge their obligations, including, for example, the obligation to remove "alien[s] from the United States within a period of 90 days" from when they are "ordered removed." 8 U.S.C. § 1231(a)(1). Those tools reflect Congress's intent that removable noncitizens be deported quickly and efficiently. By prohibiting compliance with administrative warrants and immigration detainers, the United States argues that the Policies stand as an obstacle to Congress's intent that "the detention and removal process . . . be an expedited procedure." [Dkt. 50 at 32.] According to the United States, the Sanctuary Policies frustrate the purpose of the INA by making the federal government's job more difficult, even "nearly impossible." [*Id.* at 32–33.]

State laws pose an impermissible obstacle to a federal statutory scheme where they frustrate its purpose. When cases like *Crosby* and *Arizona* discuss frustration of purpose, they refer to state statutes that "upset[] the balance struck" by the federal statute, *Arizona*, 567 U.S. at 403, or undermine the authority granted by the federal statutory scheme. For example, in *Arizona*, the State believed federal immigration enforcement was too lax and, suffering from the effects, sought to impose its own penalties. *Id.* at 397–98, 416. Some of Arizona's laws added state penalties for conduct already proscribed by federal law, *id.* at 400, while others created entirely new prohibitions, *id.* at 403.

The Supreme Court struck down one of Arizona's laws making it a crime for "an unauthorized alien to knowingly apply for work, solicit work . . . or perform work" in the State, holding it was conflict preempted by the Immigration Reform and

Control Act ("IRCA"). *Id.* at 403, 406–07. In passing IRCA, Congress determined it was "inappropriate" to penalize employees, instead imposing penalties only on employers. *Id.* at 406. While Arizona's law "attempt[ed] to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involve[d] a conflict in the method of enforcement." *Id.* It undercut Congress's decision that the goal was best advanced through criminal penalties on employers. *Id.* Because of that, the Court concluded that Arizona's law could not stand because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens" and would "disrupt[] . . . the system Congress erected." *Id.*

Similarly, in *Crosby*, the Supreme Court found that a Massachusetts law prohibiting its agencies from purchasing goods or services from companies doing business with Burma frustrated federal statutory objectives. 530 U.S. at 366. The state law was conflict preempted by a federal statute that "impos[ed] a set of mandatory and conditional sanctions on Burma" and gave the President the flexibility to impose additional sanctions and "develop a comprehensive, multilateral strategy to bring democracy to . . . Burma." *Id.* at 368–69, 388. The Court reasoned that the Massachusetts law posed an obstacle to Congress's clear intent that "the federal Act . . . provide the President with flexible and effective authority over economic sanctions against Burma." *Id.* at 374. In that way, the state law undermined the President's authority under the statute: "the President [would have] less to offer and less economic and diplomatic leverage." *Id.* at 377.

In both *Crosby* and *Arizona*, the state statutes undercut Congress's exercise of authority by "affirmatively disrupt[ing] federal operations." *California II*, 921 F.3d at 888 (discussing *Crosby* and *Arizona* among other cases). Rather than affirmative disruption, the issue in this case is inaction on the part of Illinois, Cook County, and Chicago; crucially, inaction *permitted* by the INA. *Cf. id.* at 888–89 (explaining that a state statute instituting a regulatory scheme by omission may run afoul of the preemption doctrine where it "demand[s] inaction that directly conflict[s] with federal requirements").

The Seventh Circuit addressed the question of conflict preemption under similar circumstances in *McHenry County*. In that case, two counties that "had agreements with the federal government to house persons detained by federal immigration authorities" sued Illinois over its Sanctuary Policy, which prohibited those agreements. 44 F.4th at 586. *McHenry County* addressed INA provisions directing the Attorney General to arrange "'appropriate places of detention' for immigration detainees," and directing ICE to consider the possibility of entering into contracts to use existing facilities. *Id.* at 585 (citing 8 U.S.C. § 1231(g)). Relying on § 1103(a)(11)(B), which authorizes cooperative agreements with States and local entities for immigration detention, the Counties argued that the INA preempted a provision of Illinois's TRUST Act (the precursor to the WFA) that prohibits state and local governments from contracting with the federal government "to house or detain individuals for federal civil immigration violations." *Id.* at 586, 591.

47

The Seventh Circuit rejected the argument that the INA reflected a "congressional purpose[]" of "using local detention facilities" that was contravened by the TRUST Act. *Id.* at 591. Rather, it held that § 1231(g) "demonstrate[d] at most a general preference to use existing [state or local] facilities when they are available." *Id.* That was not enough to "preempt a State (or local) government's choice to make certain facilities unavailable." *Id.* While the INA may reflect Congress's "hope[] or expect[ation] that States would cooperate," the Seventh Circuit held that "States are not bound by that hope or expectation." *Id.* at 592.

In arguing that the INA reflects Congress's intent that States extend reciprocal comity to the United States, [Dkt. 1, ¶ 36], the United States runs into the same roadblock as in *McHenry County*. The INA provisions in question impose requirements on federal immigration officials and give them the ability to use certain tools, such as detainers. They also reflect Congress's desire that States have the option to assist in civil immigration enforcement. But "neither an administrative warrant issued by federal authorities nor any other provision of law identified by the United States *compels* any action by a state or local official." *California II*, 921 F.3d at 887. Detainers are requests, not requirements. 8 C.F.R. § 287.7(a); 8 U.S.C. § 1226(c)(3); *Prim v. Raoul*, 2021 WL 214641, at *3 (N.D. Ill. Jan. 21, 2021) (explaining that the Code of Federal Regulations explicitly and unambiguously "provides that ICE detainers are not compulsory"); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 802 (N.D. Ill. 2014) ("[E]very federal court of appeals that has considered the nature of ICE detainers characterizes them as 'requests' that impose

48

no mandatory obligation on the part of the detainer's recipient."). The United States admits as much. [Dkt. 1, ¶ 33.]

While the INA requires agents to issue detainers in some situations, *see* § 1226(c)(3), no provision of the INA requires a State to take any action in response to one. [*See, e.g.*, Dkt. 1, ¶ 34.] That makes the INA substantively different from the statute in *Crosby*, which imbued the President with complete authority over sanctions against Burma. 530 U.S. at 388. That statute didn't condition the President's authority on the agreement of any other actor. By contrast, detainers reflect a bilateral relationship. The INA directs the actions of federal agents, but goes no further, implicitly acknowledging that a State's response to detainers is outside of its control. That makes this case more similar to *McHenry County*. Even if the INA evinces Congress's hope, expectation, or "brooding . . . interest" "that States would cooperate with . . . requests from the Attorney General" and act in accordance with the detainer request, that is not, as a legal matter, sufficient for obstacle preemption. *McHenry County*, 44 F.4th at 591–92. Declining an option offered by a federal statute cannot create a conflict for preemption purposes. *Id.* at 592.

There's no doubt—particularly at the motion to dismiss stage where well-pleaded allegations are presumed true—that, absent the Policies, it might be easier for immigration agents to discharge their obligations under the INA. Some line agents might choose to assist the United States in its civil immigration enforcement efforts. But because the INA merely offers States the opportunity to assist in civil immigration enforcement, the Polices don't make ICE's job more *difficult*; they just

don't make it *easier*. *See, e.g.*, *United States v. New Jersey*, 2021 WL 252270, at *7 (D.N.J. Jan. 26, 2021) ("While it may very well be easier for federal law enforcement to effect removals if it has states' assistance, that does not change the clear command of sections 1226 and 1231(a)(1), which place the burden of complying with the INA on the federal government, not state and local authorities." (citing *County of Ocean*, 475 F. Supp. 3d at 382)); [Dkt. 50 at 32–33.]

Courts must "distinguish between expectations and requirements" manifested in federal statutes. *McHenry County*, 44 F.4th at 592. All the United States has alleged is Congress's anticipation of States participating in civil immigration enforcement. Following *McHenry County*'s guidance, the court concludes that the Policies' provisions concerning administrative warrants and immigration detainers do not pose an obstacle to the INA.

### 3. Access and Information

While phrased in different ways, the Sanctuary Policies prohibit their corresponding governmental units from sharing with ICE any person's custody status, release date, or contact information. 5 ILCS 805/15(h)(7); CCO § 46-37(b); WCO § 2-173-020(a)(3).[16] As explained, the WCO goes further, prohibiting sharing the citizenship or immigration status of any person. WCO § 2-173-030(a)(1). *See supra* Part I.A. Unlike the other policies, the WCO also prohibits agents and agencies from "maintain[ing] . . . citizenship or immigration status" information. *Id.* All the Policies prohibit state and local law enforcement from giving ICE access to

---

[16]     Illinois's policy prohibits sharing release or contact information "not otherwise available to the public." 5 ILCS 805/15(h)(7).

individuals in custody and allowing ICE to use local facilities for investigative interviews. 5 ILCS 805/15(h)(1)–(2); CCO § 46-37(b); WCO § 2-173-020(a)(2).

Dovetailing with its argument concerning detainers, the United States argues that these prohibitions make it "nearly impossible" for it to detain removable individuals with the expediency required by the INA. [Dkt. 50 at 33.] "[E]ven if federal agents could stake out Illinois jail facilities to try to independently stage arrests," the Sanctuary Policies bar federal agents from learning "their target['s] . . . release date." [*Id.*][17] As a result, the United States argues that the Policies "obstruct[] and impair[] the efficiency of the federal process in a way that is inconsistent with the Congressional design." [*Id.* at 32.]

With respect to information and access, the United States makes essentially the same argument as it did about administrative warrants and detainers. It argues that the INA reflects Congress's intent to "codify comity" and, by stanching the flow of information and inhibiting access to noncitizens, the Policies pose an obstacle to that goal. [Dkt. 1, ¶ 36.][18] According to the United States, "Congress, in comity to

---

[17]     The United States argues in its opposition brief that the Policies deny it information necessary to "satisfy the heightened standard for a judicial warrant." [Dkt. 50 at 33.] The complaint lacks assertions supporting such a claim; therefore, the court does not consider it. *See Iqbal*, 556 U.S. at 678 (A complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement." (citation modified)).

[18]     The United States repeatedly conflates the INA's "codification of comity," [Dkt. 1, ¶ 36], with a *requirement* that States facilitate federal immigration enforcement. This is incorrect. Comity by definition is not a legal requirement. *See Hilton v. Guyot*, 159 U.S. 113, 163–64  (1895);    *Comity*,    Merriam-Webster,    https://www.merriam-webster.com/dictionary/comity ("[T]he informal and voluntary recognition by courts of one jurisdiction of the laws and judicial decisions of another."). The INA provides avenues for States to work with the federal government on immigration enforcement but uses voluntary language to confirm that any assistance States may provide is their choice. *See, e.g.*, 8 C.F.R. 287.7(a) (referring to detainers as "requests").

States, permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to removal." [*Id.*, ¶ 62.] Congress, so the argument goes, "granted this permission expecting that States would then facilitate . . . detention of criminal aliens by federal immigration authorities." [*Id.*, ¶ 63.] It anticipated that States would extend reciprocal comity by sharing information and permitting ICE access to detainees. [Dkt. 50 at 35–36.] That expectation is thwarted by the Policies.

The text of the INA does not support that argument. The INA directs immigration officers to wait to take a person into custody until after their criminal custody concludes. *See, e.g.*, 8 U.S.C. § 1226(c) (directing the Attorney General to take certain noncitizens into custody "when . . . [they are] released"); *id.* at § 1231(a)(4)(A) ("[T]he Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment."). But any intention on the part of Congress to *require* States to do anything in response is not reflected in the text of the provisions before the court.[19]

To be sure, the INA reflects Congress's intent to allow States to enter into agreements with the federal government so that state officers can perform the

---

[19]     That's also why the United States's assertion that Defendants help noncitizens evade ICE arrest by "asserting criminal custody over [them]" finds no support in the INA. [Dkt. 50 at 35.] First, exercising custody over criminals is part of Defendants' core police powers, *California*, 92 F.3d at 887 n.11, and immigration officers' obligation to permit state custody to conclude before exercising jurisdiction is just that—a statutory obligation, not part of a *quid pro quo*. In the same way, Defendants enforcing their criminal laws against individuals (regardless of their immigration status) doesn't suggest they are "actively facilitating [noncitizens'] evasion of federal law" where the INA expressly endorses that scheme. [Dkt. 50 at 35.] Second, the United States's assertion is unsupported. No allegations in the complaint support the contention that Defendants' policies "affirmatively thwart[]" immigration laws, [Dkt. 1, ¶ 7], or constitute harboring under 8 U.S.C. § 1324(a)(1)(A)(iii).

functions of immigration officers. 8 U.S.C. § 1357(g)(1). That collaboration may include "allow[ing] federal immigration officials access to detainees held in state facilities." *Arizona*, 567 U.S. at 410. But once again, such assistance is permissible under the INA, not mandatory. Even § 1357(g)(10) does not mandate any state action. It disclaims the need for a formal agreement before state officials "communicate with the Attorney General regarding the immigration status of any individual." *Id.* at 412. It "leaves room" for State action, as the Supreme Court recognized in *Arizona*. *Id.* at 413. Ultimately, like the other INA provisions discussed, § 1357(g)(10) reflects only Congress's hope that States participate in immigration enforcement.

The Ninth Circuit heard a similar dispute over California's sanctuary policy, the California Values Act, and found it was not preempted by the INA. *California II*, 921 F.3d at 887–88. Like the Sanctuary Policies in this case, the Act limited cooperation with immigration authorities by, among other things, prohibiting sharing information about a person's release date. *Id.* at 876. The United States made many of the same arguments as it does in this case, including that California's policy, which resulted in ICE needing to "stake out a jail . . . to make a public arrest," ran contrary to Congress's intention in permitting "state detention [to] proceed first" before immigration detention. *Id.* at 888. The Ninth Circuit agreed with the district court that "refusing to help is not the same as impeding." *Id.* As the Seventh Circuit explained in *McHenry County*, agreeing with the Ninth Circuit's reasoning in *California II*, it "make[s] no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *McHenry County*,

44 F.4th at 592. "[T]he choice of a state," reflected here in the Sanctuary Policies, "to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *Id.* (quoting *California II*, 921 F.3d at 890).

Because any collaboration under the INA is permissive, not mandatory, there is no hook for the United States's preemption argument with respect to maintaining or sharing information about people in custody (including maintaining detainer requests in individuals' criminal case files) and providing access to individuals in detention for state and local offenses to facilitate ICE interviews. It does not matter whether some or all of the information the United States seeks is made available to the public. [Dkt. 28 at 22; Dkt. 50 at 33–34.] Because the INA gives States the option to share information, but does not require it, the Sanctuary Policies do not pose an obstacle.

### 4. Anticommandeering

Even if the Sanctuary Policies "obstruct[] federal immigration enforcement, the United States'[s] position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule." *California II*, 921 F.3d at 888. "Extending conflict or obstacle preemption to [the Sanctuary Policies] would, in effect, 'dictate what a state legislature may and may not do.'" *Id.* at 890 (citation modified) (quoting *Murphy*, 584 U.S. at 474). It would transform a statutory provision giving States "the right of refusal" into a provision requiring state action. *Id.* As explained, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925.

54

"It is no more compatible with [the State's] independence and autonomy that their officers be 'dragooned' . . . into administering federal law, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for execution of state laws." *Id.* at 928.

True, the INA supports extremely important federal goals that are "most efficiently administered" with state support. *Printz*, 521 U.S. at 931–32. That was also the case in *Printz* where the United States argued the Brady Act served very important purposes most efficiently administered by local law enforcement. *Id.* But a "'balancing' analysis is inappropriate" where the provisions at issue, if interpreted as the United States urges, would "direct the functioning of the state executive." *Id.* at 932 ("It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."); *Murphy*, 584 U.S. at 472 ("[N]o Member of the Court had ever suggested that even a particularly strong federal interest would enable Congress to command a state government to enact *state* regulation." (citation modified) (quoting *New York*, 505 U.S. at 178)).

For their part, Defendants believe their Sanctuary Policies further their own important goals. [*See, e.g.*, Dkt. 35 at 7.] As *amici* explain, that includes increasing the safety of all residents and focusing officers' limited time and resources on preventing and responding to crime. [Dkt. 49 at 10–12, 14.] Those goals are inextricably bound up in the Defendants' core police powers. *California II*, 921 F.3d at 887 n.11 ("A state's ability to regulate its internal law enforcement activities is a

quintessential police power." (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000))). This connects with a key harm the anticommandeering doctrine is intended to prevent—that the federal government could shift the "credit or blame" associated with its civil immigration enforcement agenda onto Illinois, Cook County, or Chicago. *Murphy*, 584 U.S. at 473–74. As the Supreme Court recognized in *Murphy*, if the Constitution permitted the federal government to saddle States with the obligation to impose regulations, "responsibility [would be] blurred." *Id.*

Beyond ensuring that residents and voters know which sovereign to associate with which policies, anticommandeering "prevents Congress from shifting the costs of regulation to the States." *Id.* at 474. If the federal government could avoid the cost of implementing its desired programs by demanding States administer them, it would be less likely to weigh costs and benefits to ensure efficient use of resources. *Id.* In addition to eliminating front-end costs by withdrawing local government support from civil immigration enforcement, *amici* explain that the Policies also limit Defendants' exposure to liability emanating from participation in the United States's removal efforts. [Dkt. 49 at 19 (explaining that, as of March 31, 2025, there were 31 lawsuits pending against ICE and DHS for alleged constitutional violations arising from removal efforts).] It is not the court's role to evaluate the relative merits of any of these policies. *City of Chicago*, 888 F.3d at 277. But in this case, it falls to the court to determine whether the Defendants' Sanctuary Policies are protected by the Tenth

56

Amendment. That is true, even if those policies frustrate the federal government's civil immigration enforcement efforts.[20]

In sum, the United States has failed to plead conflict preemption as to any challenged Sanctuary Policy. Count I is dismissed for failure to state a claim.

### E. Intergovernmental Immunity

Defendants' final claims concern intergovernmental immunity. Rooted in the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, the intergovernmental immunity doctrine traces back to the Supreme Court's foundational federalism decision in *McCulloch v. Maryland*, 17 U.S. at 436. There, the Supreme Court found Maryland's attempt to tax the Bank of the United States unconstitutional where Maryland imposed no comparable tax on other banks within the State *Id.* at 436–37. Over time, the intergovernmental immunity doctrine came to be understood as prohibiting state laws that "*either* regulate the United States directly *or* discriminate against the Federal Government" or those with whom it deals (*e.g.,* contractors).

---

[20] The United States's final conflict preemption argument harnesses the Constitution's Extradition Clause to no avail. [Dkt. 50 at 36–37.] That Clause, by its text, allows one State to direct the executive of another State to extradite a fugitive back to the State with jurisdiction over the crime. Art. IV, § 2. It guards against one State becoming a safe haven for fugitives of another State. *California v. Super. Ct. of Cal.*, 482 U.S. 400, 406 (1987). The Extradition Clause says nothing about the federal government's power to demand extradition by a State. That omission makes sense. States lack jurisdiction outside their own borders, making extradition necessary, but federal law enforcement has jurisdiction to operate nationally. As the United States admits in its complaint, ICE has arrested tens of thousands of people in Illinois. [Dkt. 1, ¶¶ 7, 40.] Even if the Extradition Clause applied to the federal government, each policy includes exceptions for federal criminal warrants. *See* 5 ILCS 805/15(h), CCO § 46-37(b), WCO § 2-173-030(a)(1). In that way, they leave room to respond to ICE demands with respect to noncitizens accused of crimes. The Extradition Clause provides no support for the United States's arguments and cannot overcome the Tenth Amendment's prohibition on commandeering.

*United States v. Washington*, 596 U.S. 832, 838 (2022) (emphasis added) (citing *North Dakota v. United States*, 495 U.S. 423, 435 (1990)).

The United States argues that the Sanctuary Policies both discriminate against (Count II) and directly regulate the federal government (Count III). [Dkt. 1 at 21–22.] Neither argument is persuasive.

### 1. Discriminatory Treatment

State law may not discriminate against the federal government by setting it apart for less favorable treatment based on its federal governmental status. *Washington*, 596 U.S. at 839. "A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees," *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 763 (9th Cir. 2025) (citing *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019)), and "no significant differences between the two classes justify the differential treatment," *Dawson*, 586 U.S. at 175 (citation and internal quotation marks omitted); *see also McHenry County*, 44 F.4th at 594 ("Differential treatment is critical . . . ."). However, a comparator is necessary; "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry County*, 44 F.4th at 594.

That is where the United States's claim fails. The challenged policies certainly affect the federal government as the primary enforcer of civil immigration law; some call out ICE specifically or refer to "immigration agents." *See* 5 ILCS 805/15(g)(1); CCO § 46-37; WCO 2-173-020(a)(2). But the United States never identifies a comparator. The closest the complaint comes is in claiming that: (1) "Cook County

58

SA58

does not impose these restrictions on other forms of information sharing or other law enforcement agencies;" (2) the "challenged provisions single out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated; and (3) provisions of the WFA don't "preclude a state law enforcement official from cooperating with other federal agencies . . . in investigating criminal violations." [Dkt. 1, ¶¶ 46, 59, 83.]

The first two assertions gesture generally at all non-federal law enforcement, but neither identifies any specific law enforcement agency or explains how it is similarly situated to ICE. It is doubtful that a comparator exists, for the United States concedes that only the federal government enforces civil immigration law. [Dkt. 50 at 31.] Under *McHenry County*, the fact that a law affects an exclusively federal domain is not evidence of discrimination, and failure to identify a comparator ends the inquiry. 44 F.4th at 594; *see also County of Ocean*, 475 F. Supp. 3d at 385 ("Nor has the United States suggested that New Jersey permits its law enforcement to share nonpublic personal identifying information or inmate's release dates with any similarly situated law enforcement agency.")

The United States argues that the third allegation shows the WFA is discriminatory because it "treat[s] federal immigration agents worse than even other federal law enforcement agents." [Dkt. 50 at 41.] This misapprehends the standard for discrimination. For a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and *non-federal* employees differently, not different classes of federal employees. *Washington*, 596

59

U.S. at 839; *Nwauzor*, 127 F.4th at 763. In other words, the discrimination must be based on governmental status. The WFA's criminal investigation exception discriminates based on the enforcement context (civil immigration versus criminal law), not governmental status.

The complaint also fails to allege that the Policies impose a burden on the federal government in the way the intergovernmental immunity doctrine considers problematic. Unlike most discrimination cases in which a State affirmatively levies a tax or cost on the federal government, *see, e.g.*, *Washington*, 596 U.S. at 838–39, the Policies here simply decline to ease the burden of civil immigration enforcement by permitting state and local government agents to assist. "The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." *McHenry County*, 44 F.4th at 594 n.7; *California I*, 314 F. Supp. 3d at 1111 ("[T]he purported 'burden' here is California's decision not to help the Federal government implement its immigration enforcement regime. The State retains the power to make this choice and the concerns that led California to adopt this policy justify any differential treatment that results.").

As a result, the court grants Defendants' motions to dismiss Count II.

### 2. Direct Regulation

In addition to prohibiting discriminatory treatment, the intergovernmental immunity doctrine bars States from directly regulating the federal government. *McHenry County*, 44 F.4th at 592. Direct regulation can take many forms, including taxing the federal government or prohibiting the federal government from taking a

particular action. *Id.* The crux of the inquiry, however, is whether the state law directly regulates the federal government. *Id.*; *see also New Jersey*, 2021 WL 252270, at *13 (finding no intergovernmental immunity violation where "the Directive regulates only state and local law enforcement agencies"); *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) ("[T]he key question is whether state law seeks to improperly 'control' the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets.'" (quoting *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920))).

*McHenry County* again controls. Evaluating the TRUST Act, the Seventh Circuit recognized that "[t]o be sure, a consequence of the Act—*the* intended consequence of the Act—is that the federal government will not be able to use cooperative agreements to house immigration detainees in Illinois State or County facilities." 44 F.4th at 593. Yet, the Court found that the "Act directly regulate[d] only State and local entities and law enforcement—not the federal government" and thus did not run afoul of the intergovernmental immunity doctrine. *Id.* The same goes for the Sanctuary Policies. While they indirectly affect ICE's operations in Illinois, they directly regulate only state and local law enforcement entities.

The United States alleges that "[b]y refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions." [Dkt. 1, ¶ 87.] It argues that the Sanctuary Policies "improperly regulate [it] by

requiring ICE agents to procure criminal warrants to access detainees." [Dkt. 50 at 38.] But each Policy controls the actions of its own agents and agencies. For example, the Policies prohibit employees from responding to immigration detainers, providing release date information, or giving immigration agents access to persons in custody unless presented with a criminal warrant. 5 ILCS 805/15; CCO § 46-37; WCO § 2-173-020(a). All dictate what local workers may and may not do. None of the Policies impose "direct regulation on any federal official or agency." *McHenry County*, 44 F.4th at 593.

Each case the United States cites is factually distinct and involves local governments acting as review boards overseeing federal decisions. *GEO Group, Inc. v. Newsom* concerned a California law barring private detention facilities in the State, which "requir[ed] ICE to entirely transform its approach to detention in the state or else abandon its California facilities" and gave "California a virtual power of review over ICE's detention decisions." 50 F.4th 745, 750–51 (9th Cir. 2022) (citation and internal quotation marks omitted). Similarly, the County executive order at issue in *United States v. King County* barred contractors from working with ICE to transport and remove noncitizen detainees, which the court found "effectively grants King County the 'power to control' ICE's deportation operations." 122 F.4th 740, 756 (9th Cir. 2024) (quoting *GEO Grp. Inc.*, 50 F.4th at 757). Contrary to the United States's arguments, the Sanctuary Policies here do not comparably regulate ICE operations or meddle with the contractual rights of private individuals working with ICE. Importantly, they leave open ICE's ability to obtain and present a criminal warrant,

thereby receiving the assistance and information it seeks. Following *McHenry County*, the court grants Defendants' motions to dismiss as to Count III.

* * * * * *

Once again, the anticommandeering doctrine is at play. As explained, the Sanctuary Policies reflect Defendants' decision to not participate in enforcing civil immigration law—a decision protected by the Tenth Amendment and not preempted by the INA. Finding that these same Policy provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment. It would allow the federal government to commandeer States under the guise of intergovernmental immunity—the exact type of direct regulation of states barred by the Tenth Amendment. *See California II*, 921 F.3d at 891; *McHenry County v. Raoul*, 574 F. Supp. 3d 571, 582 (N.D. Ill. 2021), *aff'd sub nom. McHenry County*, 44 F.4th 581; *New Jersey*, 2021 WL 252270, at *13. The intergovernmental immunity doctrine cannot be used to circumvent the Constitution in such a way. Because the Tenth Amendment protects Defendants' Sanctuary Policies, those Policies cannot be found to discriminate against or regulate the federal government.

## VI.    Conclusion

Defendants' motions to dismiss are granted. The individual defendants are dismissed because the United States lacks standing to sue them with respect to the Sanctuary Policies; Cook County Board of Commissioners is dismissed because it is not a suable entity separate from Cook County. Cook County's Rule 12(b)(1) motion is denied, but the remaining motions to dismiss under Rule 12(b)(6) are granted. The United States's complaint [Dkt. 1] is dismissed in its entirety without prejudice. If it wishes to do so, the United States may amend its complaint. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). If no amended pleading is filed by the date the court separately provides, the dismissal will convert to one with prejudice.

Enter: 25-cv-1285
Date: July 25, 2025

_____
Lindsay C. Jenkins
United States District Court Judge

64

SA64

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

United States of America,

Plaintiff(s),

v.

State of Illinois et al,

Defendant(s).

Case No.  25 C 1285
Judge Lindsay C. Jenkins

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

         which ☐ includes    pre–judgment interest.
               ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: Judgment is entered in favor of Defendants State of Illinois, et al., and against Plaintiff USA.  This case is closed.

---

This action was *(check one)*:

☐ tried by a jury with Judge Lindsay C. Jenkins presiding, and the jury has rendered a verdict.
☐ tried by Judge Lindsay C. Jenkins without a jury and the above decision was reached.
☒ decided by Judge Lindsay C. Jenkins.

Date:   8/26/2025

Thomas G. Bruton, Clerk of Court

Jackie Deanes, Deputy Clerk

SA65