No. 25-2904

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF ILLINOIS, *et al.*,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 25-cv-01285
The Honorable Lindsay C. Jenkins, Judge Presiding

————

**BRIEF OF DEFENDANT-APPELLEE CITY OF CHICAGO**

————

MARY B. RICHARDSON-LOWRY
Corporation Counsel
 of the City of Chicago
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 742-0115

MYRIAM ZRECZNY KASPER
 Deputy Corporation Counsel
SUZANNE M. LOOSE
 Chief Assistant Corporation Counsel
STEPHEN G. COLLINS
 Assistant Corporation Counsel Supervisor

## TABLE OF CONTENTS

—————

**Page**

TABLE OF AUTHORITIES ......................................................................iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF THE CASE .................................................................. 1

SUMMARY OF ARGUMENT ................................................................... 9

ARGUMENT .......................................................................................... 10

I.     The INA Does Not Preempt the Ordinance. ............................... 11

     A.    The Ordinance does not conflict with the INA. ........................... 12

          1.    The INA does not require the City to take part in civil immigration enforcement. ...................................... 12

          2.    Any reading of the INA that requires the City to assist with federal enforcement would violate the Tenth Amendment. .......................................................... 18

          3.    Plaintiff's arguments for conflict preemption lack merit. ........................................................................... 19

     B.    Plaintiff's express preemption claim against the City fails. ..... 30

          1.    Section 1373 is invalid and regardless does not expressly preempt the Ordinance. ......................... 31

          2.    Even if section 1373 were valid, it would not expressly preempt the Ordinance. ......................... 33

          3.    Plaintiff's arguments in defense of section 1373 as a preemption provision have no merit. ............... 35

II.    The District Court Correctly Dismissed Plaintiff's Claim That the Ordinance Discriminates Against the Federal Government. ............. 41

**CONCLUSION** ................................................................................................. 44

# TABLE OF AUTHORITIES

———

**CASES** **Page(s)**

*Andree v. Ashland County*,
    818 F.2d 1306 (7th Cir. 1987)......................................................................... 11

*Arizona v. United States*,
    567 U.S. 387 (2012).............................................................................. 11, 21

*City & County of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020)........................................................................ 34

*City & County of San Francisco v. Garland*,
    42 F.4th 1078 (9th Cir. 2022) ..................................................................... 34

*City of Chicago v. Barr*,
    405 F. Supp. 3d 748 (N.D. Ill. 2019) ............................................................ 32

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020)....................................................... 13, 18, 26, 32

*City of Chicago v. Barr*,
    513 F. Supp. 3d 828 (N.D. Ill. 2021)............................................................. 32

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ................................................................. 15, 16

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018)....................................................... 32, 40

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018)................................................................. 14, 19

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999) .......................................................................... 35

*Colorado v. United States Department of Justice*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) .......................................................... 31

*County of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020)................................................................ 16

iii

*County of Riverside v. McLaughlin*,
  500 U.S. 44 (1991) .................................................................. 23

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) ........................................................... 23, 24

*Engle v. Isaac*,
  456 U.S. 107 (1982) ................................................................ 23

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) ................................................ 15, 19

*Gerstein v. Pugh*,
  420 U.S. 103 (1975) ................................................................ 23

*Gonzalez v. United States Immigration & Customs Enforcement*,
  975 F.3d 788 (9th Cir. 2020) .................................................. 23

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ................................................................ 40

*Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*,
  452 U.S. 264 (1981) ........................................................... 27, 28

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ................................................................ 24

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ................................................................ 37

*McHenry County v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) ............................................*passim*

*Murphy v. National Collegiate Athletic Association*,
  584 U.S. 453 (2018) ..........................................................*passim*

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................ 27

*North Dakota v. United States*,
  495 U.S. 423 (1990) ................................................................ 43

*Ocean County Board of Commissioners v. Attorney General of New Jersey*,
  8 F.4th 176 (3d Cir. 2021) ...................................................... 31

iv

*Orr v. Shicker,*
     147 F.4th 734 (7th Cir. 2025) .......................................................... 11

*Patriotic Veterans, Inc. v. Indiana,*
     736 F.3d 1041 (7th Cir. 2013) ............................................. 12, 13, 23

*Petr Trustee for BWGS, LLC v. BMO Harris Bank N.A.,*
     95 F.4th 1090 (7th Cir. 2024) .......................................................... 39

*Printz v. United States,*
     521 U.S. 898 (1997) .............................................. 18, 21, 30, 39

*Virginia Uranium, Inc. v. Warren,*
     587 U.S. 761 (2019) ...................................................................... 13, 25

*United States v. California,*
     921 F.3d 865 (9th Cir. 2019) ..................................................*passim*

*United States v. King County,*
     122 F.4th 740 (9th Cir. 2024) .......................................................... 43

*United States v. Morrison,*
     529 U.S. 598 (2000) ........................................................................ 22

*United States v. Washington,*
     596 U.S. 832 (2022) .................................................................. 41, 43

*Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.,*
     475 U.S. 282 (1986) ........................................................................ 24

## STATUTES AND OTHER AUTHORITIES

U.S. Const. art. VI, cl. 2 ......................................................................... 1

U.S. Const. amend. X ............................................................................ 18

8 U.S.C. § 1101 ...................................................................................... 1

8 U.S.C. § 1103(a)(11)(B) ..................................................................... 17

8 U.S.C. § 1226(a) .................................................................................. 4

8 U.S.C. § 1182(a)(2) .............................................................................. 4

8 U.S.C. § 1226(c)(1) ................................................................... 4, 13, 14

8 U.S.C. § 1227(a)(2) ................................................................................. 4

8 U.S.C. § 1231 ......................................................................................... 36

8 U.S.C. § 1231(a) ................................................................................... 14

8 U.S.C. § 1231(a)(1)(A) ........................................................................... 4

8 U.S.C. § 1231(a)(1)(B)(iii) ............................................................... 4, 14

8 U.S.C. § 1231(a)(4)(A) ..................................................................... 4, 36

8 U.S.C. § 1305 ......................................................................................... 37

8 U.S.C. § 1306(b) ................................................................................... 37

8 U.S.C. § 1357(g)(1) ........................................................................... 5, 14

8 U.S.C. § 1357(g)(9) ........................................................................... 5, 14

8 U.S.C. § 1357(g)(10)(B) .......................................................................... 5

8 U.S.C. § 1360(a) ................................................................................... 39

8 U.S.C. § 1373(a) ................................................................. 5, 30, 33, 38

8 U.S.C. § 1373(c) ................................................................................... 38

8 U.S.C. § 1644 ..................................................................................... 5, 31

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1345 ........................................................................................ 1

8 C.F.R. § 287.7(a) ................................................................................ 5, 15

Cal. Gov't Code § 7284.6(a)(4) ............................................................... 16

5 ILCS 805/15(g)(1) ................................................................................ 17

Or. Rev. Stat. § 180.805(4)(a) ................................................................ 34

Municipal Code of Chicago, Ill. § 2-173-005 ................................................... 1, 2, 3, 22

Municipal Code of Chicago, Ill. § 2-173-010 ................................................................ 3

Municipal Code of Chicago, Ill. § 2-173-020(a) ......................................................... 44

Municipal Code of Chicago, Ill. § 2-173-020(a)(1) ..................................................... 44

Municipal Code of Chicago, Ill. § 2-173-020(a)(1)(B) ................................................... 7

Municipal Code of Chicago, Ill. § 2-173-020(a)(1)(C) ................................................... 7

Municipal Code of Chicago, Ill. § 2-173-020(a)(2)(A) ................................................... 3

Municipal Code of Chicago, Ill. § 2-173-020(a)(3) ........................................... 3, 6, 8, 33

Municipal Code of Chicago, Ill. § 2-173-020(a)(5) ....................................................... 3

Municipal Code of Chicago, Ill. § 2-173-030(a) ................................................... 3, 6, 8

Municipal Code of Chicago, Ill. § 2-173-030(a)(1) ............................................... 3, 6, 8

S.F., Cal., Admin. Code ch. 12H, § 12H.2 ................................................................ 34

Journal of the Proceedings of the City Council of the City of Chicago, Ill, p. 33043
(Sept. 12, 2012) .............................................................................................................. 2

## JURISDICTIONAL STATEMENT

The jurisdictional statement of plaintiff-appellant, the United States of America, is not complete and correct.

Plaintiff's complaint asserted claims for declaratory and injunctive relief under the Supremacy Clause, U.S. Const. art. VI, cl. 2, against the State of Illinois, Cook County, and the City of Chicago, R. 1 at 20-22. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345. The court dismissed the complaint without prejudice, R. 86 at 64, and by operation of a separate order, R. 85, the dismissal converted to one with prejudice when the United States elected not to file an amended complaint. On August 26, 2025, the district court entered judgment in favor of defendants. R. 88. The United States filed a notice of appeal on October 24, 2025. R. 91. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, preempts the City's Welcoming City Ordinance, Municipal Code of Chicago, Ill. § 2-173-005 *et seq.*

2.    Whether the Welcoming City Ordinance unlawfully discriminates against the federal government.

## STATEMENT OF THE CASE

This case concerns the interplay between the Welcoming City Ordinance and

the INA.  We begin with an overview of those enactments, and then summarize the district court proceedings.

**The Welcoming City Ordinance**

In 1985, the Mayor of Chicago issued an executive order that generally barred City officials from investigating a person's citizenship or sharing that information with others.  R. 35 at 35.  In 2006, the Chicago City Council codified and expanded this policy in the Municipal Code.  R. 35 at 41.  In so doing, the City Council cited concerns about "a chilling effect on crime prevention and solving if both witnesses and victims are called upon to weigh a need to cooperate with local authorities against a fear of deportation."  R. 35 at 43.  City Council also sought to avoid "undermining long-standing efforts to engender trust and cooperation between law enforcement officials and immigrant communities."  R. 35 at 43.

This section of the Municipal Code was named the Welcoming City Ordinance in 2012, Journal of the Proceedings of the City Council of the City of Chicago, Ill, p. 33043 (Sept. 12, 2012), and the City Council refined it in subsequent years.  In its current form, the Ordinance includes a finding "that the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems."  Municipal Code of Chicago, Ill. § 2-173-005.  And given "the City's limited resources" and "the clear need to foster the trust of and cooperation from the public," the Ordinance seeks to "establish the City's procedures concerning immigration status and enforcement of federal civil immigration laws and to

2

identify conduct that City employees may not engage in when interacting with community members." Municipal Code of Chicago, Ill. § 2-173-005.

Pertinent here, the Ordinance provides that City personnel may not "stop, arrest, detain, or continue to detain a person" pursuant to an administrative warrant or immigration detainer. Municipal Code of Chicago, Ill. §§ 2-173-020(a)(1)(B)-(C). An administrative warrant is any "document that can form the basis for an individual's arrest or detention for a civil immigration enforcement purpose," and excludes judicial warrants. Municipal Code of Chicago, Ill. § 2-173-010. An immigration detainer is a request "to provide notice of release or maintain custody of an individual based on an alleged violation of a civil immigration law." Municipal Code of Chicago, Ill. § 2-173-010. Additionally, City personnel may not give agents from Immigration and Customs Enforcement ("ICE") access to people in City custody or "transfer any person into ICE custody for the sole purpose of civil immigration enforcement." Municipal Code of Chicago, Ill. §§ 2-173-020(a)(2)(A), (5). Nor may City officials "expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information." Municipal Code of Chicago, Ill. § 2-173-020(a)(3). The Ordinance also generally bars City officials from "shar[ing] the citizenship or immigration status of any person." Municipal Code of Chicago, Ill. § 2-173-030(a)(1). This restriction does not apply if a "statute, federal regulation, court order, or a lawfully issued judicial warrant" requires otherwise. Municipal Code of Chicago, Ill. § 2-173-030(a).

Additionally, Chicago Police Department regulations provide that nothing in the Ordinance "preclude[s] members from responding and taking police action should a contemporaneous public safety concern arise or in response to alleged violations of the Illinois Complied Statutes or Municipal Code of Chicago." R. 35 at 49. And if a police officer learns that a person is the subject of a criminal warrant, the officer must take the person into custody. R. 35 at 50.

**The INA**

The INA sets forth categories of noncitizens who are "inadmissible," 8 U.S.C. § 1182(a)(2), or "deportable," 8 U.S.C. § 1227(a)(2), because they committed various kinds of criminal offenses. Under the Act, federal officials are directed to take many of these individuals into custody once the person is released from state or local custody. 8 U.S.C. § 1226(c)(1). Additionally, if a person has been "ordered removed," the federal government must "remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). In situations where a final order of removal has been issued while an "alien is detained or confined (except under an immigration process)," the 90-day period begins to run from "the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B)(iii). A person generally may not be removed until he is "released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA also gives federal immigration officers the option to "arres[t] and detai[n]" aliens "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Federal officials may issue administrative warrants to effectuate such arrests. 8 U.S.C. § 1226(a).

4

Regulations promulgated under the INA provide for the use of immigration detainers, which "serv[e] to advise another law enforcement agency that the Department [of Homeland Security] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). The regulations characterize detainers as "request[s] that" state or local law enforcement inform Homeland Security before releasing a person so that a transfer of custody can be arranged. 8 C.F.R. § 287.7(a).

The INA also gives States and localities the option of "enter[ing] into a written agreement" with the federal government to engage in "the investigation, apprehension, or detention of aliens." 8 U.S.C. § 1357(g)(1). The Act specifies that States and local governments are not required to enter into such agreements. 8 U.S.C. § 1357(g)(9). And an agreement is not required for States and localities "to cooperate . . . in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

Additionally, the INA includes a provision stating that no unit of government – including States and localities – may "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 (similarly barring any prohibition on the sharing of information about a person's immigration status by States and local governments).

5

**District Court Proceedings**

The United States brought this action seeking to have the Welcoming City Ordinance declared invalid and to enjoin the City from enforcing it, and likewise challenged similar laws of the State of Illinois and Cook County. R. 1 at 22. Plaintiff alleged that Congress enacted the INA with the "expect[ation] that States would . . . facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities." R. 1 at 16-17. The United States further alleged that the INA "contemplates that" the Department of Homeland Security "will be able to inspect all applicants for admission, and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution." R. 1 at 17.

Plaintiff claimed that the Ordinance "directly conflict[s]" with the INA in various ways. R. 1 at 17. The Ordinance allegedly "runs directly afoul of 8 U.S.C. § 1373 by forbidding City officers from 'expend[ing] their time responding to ICE inquiries . . . regarding a person's custody status, release date, or contact information'" and by prohibiting the sharing of any person's "'immigration status.'" R. 1 at 17 (quoting Municipal Code of Chicago, Ill. §§ 2-173-020(a)(3) and 2-173-030(a)(1)). The complaint claimed that these Ordinance provisions "prohibit[t] the activities that federal law expressly contemplates States will do." R. 1 at 18. Plaintiff further alleged that the Ordinance's "failure to provide exceptions to its prohibition on cooperation with federal immigration agents conflicts with federal law governing what constitutes a predicate for inadmissibility or removability."

6

R. 1 at 18.

The complaint went on to allege that defendants' "restrictions on providing ICE access to removable aliens in their custody . . . conflict with" the INA because the statute provides for immigration enforcement based on administrative warrants rather than judicial warrants.  R. 1 at 18.  Plaintiff asserted that because of defendants' laws, it cannot "readily obtain from local law enforcement the release dates of aliens" it believes are removable, or "access . . . such aliens to facilitate the transfer of custody."  R. 1 at 18.  Defendants' laws, the complaint alleged, "are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement," and defendants' restrictions on information sharing "expressly violate 8 U.S.C. § 1373."  R. 1 at 19-20.[1]

Each defendant moved to dismiss the claims against it.  R. 24; R. 27; R. 33.  The City argued that the Welcoming City Ordinance does not conflict with the INA because the INA generally does not require the City to participate in immigration enforcement.  R. 35 at 15-19.  Moreover, if the INA were construed to require state and local participation, that would violate anticommandeering principles inherent in the Tenth Amendment.  R. 35 at 19-21.  Sections 1373 and 1644, which purport to bar the City from prohibiting the sharing of information regarding a person's immigration status, violate the Tenth Amendment and are not valid preemption provisions.  R. 35 at 22-26.  And if they are valid, they do not cover the City's

---

[1]  Plaintiff also alleged that defendants' laws "constitute unlawful direct regulation of the Federal Government," R. 1 at 20, but has abandoned this theory on appeal, United States Br. 13-14, and we do not address it further.

prohibition on sharing "a person's custody status, release date, or contact information," Municipal Code of Chicago, Ill. § 2-173-020(a)(3), because none of that information concerns a person's immigration status, R. 35 at 26-27. The Ordinance also avoids preemption because its savings clause, Municipal Code of Chicago, Ill. § 2-173-030(a), provides that the Ordinance's prohibition against sharing a person's immigration status, Municipal Code of Chicago, Ill. § 2-173-030(a)(1), gives way if "required . . . by statute," R. 35 at 27-28. Finally, the claim that the City unlawfully discriminates against the federal government fails because no entity that is similarly situated to plaintiff receives better treatment under the Ordinance. R. 35 at 29.

The district court granted defendants' motions. R. 86 at 64. With respect to the express preemption claims, the court determined that section 1373's reference to "information regarding" a person's "citizenship or immigration status" did not extend to defendants' prohibitions against sharing a person's "contact information, custody status, and release date." R. 86 at 23-29. Accordingly, those prohibitions were not expressly preempted. R. 86 at 29. Regarding the Welcoming City Ordinance's additional prohibition against sharing a person's immigration status, the court stated that this restriction "r[an] headlong" against section 1373. R. 86 at 29. The court also ruled that the Ordinance's savings clause did not apply because that clause refers to statutes that "requir[e]" the City to do something, whereas "§ 1373 doesn't require information sharing – it merely restricts prohibitions on it." R. 86 at 30. Nevertheless, the court concluded that section 1373 does not preempt

8

this aspect of the Ordinance because that statute "is not a preemptive provision," in that "it doesn't regulate private actors." R. 86 at 33. And if the statute did prevent state and local governments from enacting certain laws, that would be "in tension with the Tenth Amendment." R. 86 at 37.

The district court also rejected plaintiff's conflict preemption claims. R. 86 at 41-63. The court reasoned that defendants' laws do not conflict with the INA because the federal statute does not compel States and localities to take any action upon receiving a detainer or administrative warrant. R. 86 at 48-50. Nor does the INA require States or local governments to facilitate the transfer of noncitizens into federal custody. R. 86 at 52-54. A contrary reading of the INA would commandeer States and localities in violation of the Tenth Amendment. R. 86 at 54-57.

Finally, the district court determined that plaintiff's claims of unlawful discrimination fail because no comparable non-federal actor receives better treatment under defendants' enactments. R. 86 at 58-60. Plaintiff appeals.

## SUMMARY OF ARGUMENT

The district court correctly dismissed plaintiff's claims against the City. To begin, no theory of preemption supports plaintiff's challenge to the Welcoming City Ordinance. Under the INA, States and local governments retain the option to participate in federal immigration enforcement. That means that the City's decision to withhold assistance to plaintiff in the enforcement of the INA does not support a claim of conflict preemption. Plaintiff's express preemption claim fails as well. Although the INA includes provisions that purport to bar States and localities

9

from prohibiting the sharing of information about a person's immigration status, they are not valid preemption provisions because they do not regulate private conduct. And moreover, any reading of the INA that would require States and localities to assist immigration enforcement efforts would violate the Tenth Amendment's prohibition on commandeering.

Additionally, the district court correctly rejected plaintiff's claim that the Ordinance unlawfully discriminates against the federal government. No non-federal entity in a similar position to plaintiff receives better treatment under the Ordinance. Nor does the Ordinance bar cooperation with all federal actors – only those engaged in immigration enforcement. Accordingly, this court should affirm the dismissal of plaintiff's claims against the City.

## ARGUMENT

The City chooses not to use its law enforcement resources to enforce civil immigration law. The City's policy choice is lawful. The INA does not require the City to support plaintiff's immigration enforcement efforts. Plaintiff's contrary reading of the statute would commandeer state and local law enforcement officers in the execution of a federal program in violation of the Tenth Amendment. Accordingly, the district court properly rejected plaintiff's claims of conflict and express preemption under the INA.

Plaintiff's alternative theory, that the Ordinance unlawfully discriminates against the federal government, fares no better. To prevail on this claim, plaintiff must point to a non-federal entity that receives more favorable treatment under the

10

Ordinance, and plaintiff cannot make such a showing; indeed, there is no unit of government – federal, state, or otherwise – with which the City cooperates on civil immigration enforcement.  Moreover, the Ordinance does not purport to bar cooperation with federal officials altogether, but rather concerns only those engaged in the enforcement of civil immigration law.

This court reviews a dismissal for failure to state a claim de novo.  *Orr v. Shicker*, 147 F.4th 734, 739 (7th Cir. 2025).  Additionally, "[a]s a general matter, state statutes and municipal ordinances are entitled to a presumption of constitutionality."  *Andree v. Ashland County*, 818 F.2d 1306, 1313 (7th Cir. 1987).  Under these standards, the dismissal of plaintiff's claims against the City should be affirmed.

## I.      The INA Does Not Preempt the Ordinance.

Plaintiff cannot prevail on its preemption claims against the City.  The Supreme Court "ha[s] identified three different types of preemption – 'conflict,' 'express,' and 'field.'"  *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 477 (2018).  Here, plaintiff invokes conflict and express preemption.  R. 1 at 20.  Conflict preemption occurs "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks omitted).  Express preemption, by contrast, occurs where "Congress . . . withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision."  *Id.*  Regardless of the label, all preemption doctrines "work

11

in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. As we now explain, both of plaintiff's preemption theories fail.

### A.    The Ordinance does not conflict with the INA.

The City's decision to opt out of immigration enforcement does not conflict with the INA because the statute does not mandate the City's participation. And any reading of the INA that would require the City to help the federal government enforce the statute would unlawfully commandeer City officials in violation of the Tenth Amendment. The district court thus properly rejected plaintiff's conflict preemption claim against the City, and plaintiff's arguments to the contrary are meritless.

### 1.    The INA does not require the City to take part in civil immigration enforcement.

Conflict preemption arises where the state or local law "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) (internal quotation marks omitted). But an assertion of conflict preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *Id.* (internal quotation marks omitted). Nor may conflict preemption be rooted in "some brooding federal

12

interest or . . . a judicial policy preference." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). Rather, "a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Id.* (internal quotation marks omitted).

The standard for establishing a claim of conflict preemption is especially exacting where, as here, the challenger seeks to displace a state or local law that is within that jurisdiction's police powers. "[G]iven the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise." *Patriotic Veterans*, 736 F.3d at 1046. And as this court has recognized, the City "exercis[es] its police power" by "deciding that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences." *City of Chicago v. Barr*, 961 F.3d 882, 891-92 (7th Cir. 2020).

Plaintiff seeks defendants' cooperation in the civil detention and transfer of noncitizens to federal custody. *E.g.*, United States Br. 33. But by its terms, the INA does not express a purpose to require States and local governments to assist the federal government in these ways. The INA provisions governing the arrest, detention, and removal of noncitizens bind federal officials, not state or local actors. For example, when a noncitizen has committed certain crimes but has not yet been ordered removed, the INA directs federal officials to take the person into custody. 8 U.S.C. § 1226(c)(1). In those situations, the statute requires federal custody "when

13

the alien is released" from state or local custody. *Id.* And in cases where a person has been ordered removed, the statute directs federal officials to detain and then remove the person within a certain amount of time. *Id.* § 1231(a). If the person ordered removed is presently in state or local custody, the time for the "removal period" starts to run upon the person's release. *Id.* § 1231(a)(1)(B)(iii). These provisions do not require anything of state or local officials.

To further illustrate that state and local participation in immigration enforcement is not required, another INA provision provides that the Attorney General may enter into agreements with States and localities whereby they "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). The INA further specifies that States and local governments have no obligation to enter into such agreements. *Id.* § 1357(g)(9). Citing section 1357, the Fifth Circuit has explained that "[f]ederal law does not suggest the intent – let alone a clear and manifest one – to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (internal quotation marks omitted). The Ordinance, which expresses the City's choice not to participate in immigration enforcement, presents no conflict with the statute.

Federal regulations governing the use of immigration detainers further reinforce that the INA does not require state and local participation in immigration enforcement. The federal government uses immigration detainers "to advise

14

another law enforcement agency that the Department [of Homeland Security] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Under the regulations, a "detainer is a *request* that such agency advise the Department" before releasing a noncitizen, if an immediate transfer of custody cannot be arranged. *Id.* (emphasis added). The fact that detainers are, by definition, "requests" shows that they are "not mandatory." *Galarza v. Szalczyk*, 745 F.3d 634, 642 (3d Cir. 2014).

Nor can plaintiff meet its burden of establishing that the Ordinance poses an obstacle to achieving the objectives of the INA. This court has already held that the City's non-participation in federal immigration enforcement cannot be construed as impeding federal enforcement efforts. Nine years ago, the United States attempted to withhold federal grant funding unless the City certified that it would assist with immigration enforcement in ways that contravened the Ordinance. *City of Chicago v. Sessions*, 888 F.3d 272, 279 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part on other grounds,* No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated on other grounds,* No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). This court observed that the federal government "repeatedly characterize[d] the issue as whether localities can be allowed to thwart federal law enforcement." *Id.* at 282. This was "a red herring" because the City's choice not to devote its "resources to aid in federal immigration efforts" does not amount to "affirmative *interference* with federal law enforcement at all." *Id.* The court further observed that "[t]he federal government can and does freely operate" in the City to

enforce civil immigration law. *Id.* at 281. The City's non-participation does not interfere with the federal government's enforcement efforts.

Other courts have upheld similar state and local laws against conflict preemption challenges under the INA. For instance, the Ninth Circuit rejected a challenge to a California law that, like the Ordinance, barred local law enforcement from transferring a person to federal immigration authorities absent a judicial warrant. *United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019) (citing Cal. Gov't Code § 7284.6(a)(4)). In that case, the court rejected the argument that "California prevents federal officers from obtaining custody through a safe and peaceful transfer." *Id.* at 886 (internal quotation marks omitted). The court explained that the California law did "not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments, because federal law does not actually mandate any state action." *Id.* at 887. Accordingly, invalidating the California law "would not prevent obstruction of the federal government's activities, because the INA does not require any particular action on the part of California or its political subdivisions." *Id.* at 889 (emphasis omitted). Rather, the INA "provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities." *Id.*; *accord County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 381 (D.N.J. 2020) ("There is no indication that Congress, in enacting the INA, sought to usurp [the] power" of a State "to regulate the conduct of its own law enforcement agencies.").

This court agreed and reached the same conclusion in a case involving a

16

different provision of the INA. *McHenry County v. Raoul*, 44 F.4th 581, 591-92 (7th Cir. 2022). *McHenry County*, which the district court relied on here, R. 86 at 47-50, concerned the INA's grant of authority to the Attorney General to contract with States and localities to house immigration detainees. *Id.* at 585 (citing 8 U.S.C. § 1103(a)(11)(B)). The Illinois Way Forward Act bars such contracts. *Id.* at 586 (citing 5 ILCS 805/15(g)(1)). Relying on *California*, this court held that the INA did not support a claim of conflict preemption against the Illinois law. *Id.* at 592. As this court pointedly explained, "[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *Id.* Here, the district court correctly followed *McHenry County* and concluded that the Welcoming City Ordinance is not conflict preempted. R. 86 at 50.

Plaintiff urges this court not to follow *California* here, even though this court already followed it in *McHenry County*, because the present case does not involve the "cooperative arrangements" to house immigration detainees that were at issue in *McHenry County*. United States Br. 41 n.7. But that factual distinction is immaterial and provides no basis to reverse course from *McHenry County*. The point is that the federal law does not require state and local governments to take part in immigration enforcement. Indeed, if anything, *California* applies with even more force in this case than in *McHenry County* because *California* involved the same sections of the INA that plaintiff principally relies on here: sections 1226 and 1231. 921 F.3d at 887; United States Br. 31-32.

### 2. Any reading of the INA that requires the City to assist with federal enforcement would violate the Tenth Amendment.

The district court also correctly determined that plaintiff's conflict preemption claim, if successful, would unlawfully commandeer City officials.  R. 86 at 54-57.  Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  The Amendment "confirms" that all "legislative power" beyond that which is enumerated for Congress in the Constitution "is reserved for the States."  *Murphy*, 584 U.S. at 471.  "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."  *Id.*  The rule against commandeering States and localities expresses this "limit on congressional authority."  *Id.*  Under the anticommandeering rule, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997).

Federal courts have long recognized that commandeering problems arise when the federal government attempts to compel cities and States to participate in immigration enforcement.  When the United States sought to make grant funding contingent on the City's assistance with immigration enforcement, this court admonished that "[t]he federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government."  *Barr*,

18

961 F.3d at 892.  Later, in *McHenry County*, this court determined that interpreting the INA to grant the Attorney General the authority "to order State and local governments to house immigration detainees" would raise "constitutional questions under the anticommandeering doctrine."  44 F.4th at 590, 590 n.4 (emphasis omitted).  For support, this court cited favorably to *California*, and *City of El Cenizo*, both of which noted that compulsory participation in immigration enforcement would amount to unconstitutional commandeering of state and local governments.  *Id.* at 590 n.4 (citing *California*, 921 F.3d at 891; *City of El Cenizo*, 890 F.3d at 178).  The Third Circuit, too, has held that "[u]nder the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens subject to removal" so that federal officials can arrange to take custody of the person.  *Galarza*, 745 F.3d at 643.

Such anticommandeering concerns are equally palpable here.  Congress may not require the City to expend its resources helping the federal government enforce immigration law.  Plaintiff's conflict preemption claim, which would compel the City to participate in immigration enforcement, should be rejected on this basis as well.

### 3.     Plaintiff's arguments for conflict preemption lack merit.

Plaintiff advances contradictory positions: first, that the INA limits the City's ability to control the conduct of City employees, United States Br. 29-41; and second, that its reading of the statute would not unlawfully commandeer City personnel, *id.* at 51-62.  Neither of these arguments is correct.

To start, plaintiff observes that the INA allows States "to detain and

19

prosecute" noncitizens prior to their removal and argues that "Congress contemplated that once the period of state custody concluded, the alien would be transferred to federal custody." United States Br. 33. Plaintiff advances an argument this court has already rejected. This court has held that a mere hope or expectation of state cooperation with federal immigration enforcement does not support a claim for conflict preemption. *McHenry County*, 44 F.4th at 592. And that is obviously correct; hopes and expectations do not have the force of law. Along similar lines, plaintiff wrongly asserts that the City has "reject[ed] Congress's scheme for how federal officials take custody of and detain aliens." United States Br. 36. The City's inaction with respect to immigration enforcement is entirely consistent with the statutory scheme, which does not require States and local governments to help with immigration enforcement. Indeed, as much as the INA "contemplates" that States and localities might assist, it equally contemplates that they might not. There is no conflict between the Ordinance and the INA.

Plaintiff also complains that the Ordinance makes the federal government's immigration enforcement efforts more burdensome, such as by "forcing federal officials to track down" noncitizens "on the street," United States Br. 33-34, or by requiring federal officials "to continuously stake out Illinois jails," *id.* at 35. But it can often be said that the United States's task in enforcing a federal program would be easier if States and localities shouldered some of the burden of enforcement. The anticommandeering doctrine prevents the conscription of the States, even if that means federal law is less "efficiently administered" than it might have been if the

20

States participated. *Printz*, 521 U.S. at 931. The law at issue in *California* likewise arguably "frustrate[d] the federal government's immigration enforcement efforts," but such "frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." 921 F.3d at 890-91. In short, the federal government's desire to expend fewer resources enforcing the INA cannot justify the forced participation of City officers in immigration enforcement.

The United States invokes *Arizona* for the proposition that the Ordinance "usurp[s] the role of Congress and the Executive" to control "'the removal process'" and "determin[e] 'whether it is appropriate to allow a foreign national to continue living in the United States.'" United States Br. 35-36 (quoting *Arizona*, 567 U.S. at 409). But the Ordinance does nothing of the sort. It does not purport to affect the removal process, which remains exclusively under federal control. Nor does the Ordinance give noncitizens any additional rights to remain in the country or authorize City officials to make determinations about whether noncitizens may remain. This sets the Ordinance apart from the law at issue in *Arizona*, which allowed "state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. The Arizona law thus conflicted with INA provisions governing the detention of removable noncitizens. *Id.* at 407-08.

Plaintiff also asserts that defendants have not identified any "legitimate state interest" justifying their challenged laws. United States Br. 40. With respect

to the City, that simply ignores the Ordinance's statement of its "[p]urpose and intent," which lists several policy objectives the City hopes to achieve with the Ordinance. Municipal Code of Chicago, Ill. § 2-173-005. Chief among them is the goal of fostering cooperation between police and Chicago residents to better prevent and solve crimes, *id.*, which is paradigmatic of the police power reserved to state and local governments. *See United States v. Morrison*, 529 U.S. 598, 618 (2000). Plaintiff may disagree with how the City exercises its police power, but it cannot take away the City's ability to make these policy decisions for itself.

Next, plaintiff faults the district court for relying on the observation in *McHenry County* that the INA does not preempt defendants' laws because the statute merely allows cooperation between the States and the federal government. United States Br. 43. According to plaintiff, this "conclusion entirely begs the question." *Id.* But it is plaintiff's position that is illogical. Plaintiff claims that "states and localities have latitude in the degree to which they want to enforce their own criminal laws against aliens, and in whether they are prepared to prolong the detention of aliens who would otherwise be subject to release." *Id.* And with the Ordinance, plaintiff's argument goes, the City has exceeded its "grant of discretion" by declining to provide any assistance to the federal government. *Id.*

There are many problems with this argument. To the extent the United States means the INA is the source of this "grant of discretion," the statute does not provide support. The INA does not purport to put *any* limit on the "latitude" of States and cities to enforce their own criminal laws. Nor are there grounds to read

22

such a limitation into the INA.  "The States possess primary authority for defining and enforcing the criminal law."  *Engle v. Isaac*, 456 U.S. 107, 128 (1982).  And given the "historic police powers of the states," the court presumes that federal law does not supplant those powers.  *Patriotic Veterans*, 736 F.3d at 1046.  So there is no basis to interpret the INA as regulating defendants' "latitude" or "discretion" to engage in criminal law enforcement.

Beyond that, plaintiff wrongly assumes that the City can simply "prolong the detention of aliens who would otherwise be subject to release," United States Br. 43, without raising any constitutional problems.  For example, a prolonged detention pursuant to an immigration detainer raises Fourth Amendment concerns.  "[T]he Fourth Amendment requires a prompt probable cause determination by a neutral and detached magistrate to justify continued detention pursuant to an immigration detainer."  *Gonzalez v. United States Immigration & Customs Enforcement*, 975 F.3d 788, 798 (9th Cir. 2020).  "Detaining persons for more than 48 hours pursuant to an immigration detainer implicates *Gerstein* [*v. Pugh*, 420 U.S. 103 (1975)]," *id.* at 826, which generally requires a "judicial determinatio[n] of probable cause within 48 hours of arrest," *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  So here, prolonging a person's detention to assist with immigration enforcement, as plaintiff suggests the City may do, would expose the City to liability if the detention exceeded 48 hours.

Plaintiff cites *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), for the proposition that the City exceeded its "discretion," United States Br. 43, but

23

*Crosby* bears no resemblance to this case. It involved a Massachusetts law that generally barred state agencies from "purchas[ing] goods or services from companies doing business with Burma." *Crosby*, 530 U.S. at 366. That law was preempted because it interfered with a federal law that governed sanctions and diplomacy with Burma. *Id.* at 373-74. The case did not involve any state "discretion" to engage in foreign relations. Moreover, there is no similar conflict between the Ordinance and the INA, for the reasons we have explained. *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986), on which plaintiff also relies, United States Br. 44, involved a Wisconsin law barring its agencies from doing business with repeat violators of the National Labor Relations Act. 475 U.S. at 283. The Court determined that the state law was preempted because it provided a "supplemental sanction" that conflicted with federal "comprehensive regulation of industrial relations." *Id.* at 288. The Court has since cabined *Gould* as "rest[ing] on a special preemption rule governing state laws regulating matters that the National Labor Relations Act 'protects, prohibits, or arguably protects.'" *Kansas v. Garcia*, 589 U.S. 191, 212 (2020) (quoting *Gould*, 475 U.S. at 286). This case does not implicate that "special preemption rule." Nor does the Ordinance purport to supplement any provision of federal immigration law.

Plaintiff also argues that the INA is "incoherent" under the district court's interpretation because Congress did not "inten[d] that states could force federal officers to stake out state and local jails or to chase aliens down the street and effectuate public arrests of individuals who had been in state custody a short time

24

before." United States Br. 44-45. According to plaintiff, Congress could not have imagined that States and localities would not coordinate with the federal government, or possibly Congress assumed that conflict preemption principles would block state and local laws that withheld assistance to immigration enforcement. *Id.* at 45. The Supreme Court has cautioned against such "[e]fforts to ascribe unenacted purposes and objectives to a federal statute." *Virginia Uranium*, 587 U.S. at 778. And, in any event, plaintiff's assumptions about congressional intent are not well founded. A far more likely explanation for the INA's plain language is that Congress knew it could not commandeer state and local law enforcement agencies into detaining noncitizens or transferring them to federal custody, so it did not try to write such commands into the INA.

Plaintiff's attempt to distinguish this case from *McHenry County*, United States Br. 45-47, also falls flat. Plaintiff argues that *McHenry County* is different because the INA provision at issue there "did not require the federal government to" contract with States to house immigration detainees, whereas the INA does "direc[t] federal officials to take custody of aliens at the termination of a period of state or local custody." *Id.* at 46. That misapprehends the decision. The salient feature of the housing contract provision of the INA is that it did not require the *States* to enter into such contracts. *McHenry County*, 44 F.4th at 592. Likewise, here, under the INA provisions at issue, States and local governments are not required to coordinate with federal immigration authorities for the transfer of noncitizens.

Elsewhere, plaintiff goes so far as to say this case "do[es] not involve areas

25

traditionally regulated by the states," United States Br. 56, and thus does not trigger a presumption against preemption. Plaintiff asserts that this case concerns only "the admission and exclusion of aliens," *id.*, rather than any areas of state or local control. The Ordinance, however, does not regulate the admission or exclusion of noncitizens. Instead, this case implicates the City's control over its law enforcement personnel, which is "an area of power long recognized as resting with the states." *Barr*, 961 F.3d at 892. The presumption against preemption therefore applies.

Plaintiff also attempts to deny that its conflict preemption argument would unlawfully commandeer defendants, by insisting that the INA "does not regulate states." United States Br. 51. This position is irreconcilable with plaintiff's argument that the INA precludes defendants from directing their employees not to assist the federal government with immigration enforcement. Nevertheless, plaintiff insists that both it and defendants are attempting to regulate "the same private actors" – specifically, noncitizens who are subject to immigration detention. *Id.* at 53. According to plaintiff, defendants "subjec[t] them to the state's criminal-justice system and then adop[t] different – and conflicting – procedures for their detention and release." *Id.* But that mischaracterizes the Ordinance. The Ordinance plainly does not regulate noncitizens; it governs only the conduct of City employees. To be sure, like any regulation of public-facing government employees, the Ordinance may have secondary effects on private individuals who interact with those employees. But plaintiff cannot use that as a basis to dictate the conduct of

26

City officials or take away the City's ability to control the actions of its employees. To hold otherwise would allow plaintiff to make an end run around the anticommandeering doctrine.

Plaintiff cites *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264 (1981), in furtherance of its argument that its position in this litigation would not commandeer defendants, United States Br. 53, but that case is readily distinguishable. *Hodel* involved a Tenth Amendment challenge to a federal law regulating "coal mine operators who are private individuals and businesses." *Hodel*, 452 U.S. at 288. The law did not commandeer the States because they were "not compelled . . . to participate in the federal regulatory program in any manner whatsoever." *Id.* If States declined to participate, "the full regulatory burden [would] be borne by the Federal Government." *Id.* Here, by contrast, plaintiff urges a construction of the INA that *would* compel the City's participation in the federal government's immigration enforcement efforts.

Plaintiff's invocation of "cooperative federalism" as a reason its suit does not pose commandeering problems, United States Br. 54-55, does not compute. Cooperative federalism allows Congress to "offer States the choice of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation." *New York v. United States*, 505 U.S. 144, 167 (1992). As plaintiff puts it, "Congress may require particular forms of state participation as a condition of the state's voluntary choice to participate in a federal program." United States Br. 54. Such an arrangement does not offend anticommandeering principles

27

because "federal law *allow*[*s*] but d[oes] not *require* the States to implement a federal program." *Murphy*, 584 U.S. at 476.  The paradigmatic example is *Hodel*, where the federal statute gave States the option to regulate coal mining consistently with the statute, but did not require any regulation by the States.  452 U.S. at 289.  This case does not remotely "fi[t] within that paradigm."  United States Br. 54.  The City is not participating in a federal program while attempting to avoid the requirements of that program.

By plaintiff's telling, the INA "present[s] states and their political subdivisions with a choice: (1) subject aliens to their criminal-justice systems in a way that does not obstruct federal immigration enforcement or (2) do not subject aliens to their criminal justice system at all."  United States Br. 55.  Defendants are allegedly "trying to have it both ways: subjecting aliens to their criminal justice systems while simultaneously obstructing federal immigration enforcement."  *Id.*; *see also id.* at 46 (asserting that defendants "participate in" the INA's regulatory scheme by enforcing their criminal laws against noncitizens).  But none of this makes sense.  Defendants do not "implement a federal program" for purposes of cooperative federalism, *Murphy*, 584 U.S. at 476, by enforcing their own criminal laws against noncitizens.  And no plausible reading of the INA supports plaintiff's view that the statute limits States and localities to these "options" when it comes to enforcing state and local criminal laws.  As we have explained, the pertinent provisions of the statute govern the conduct only of federal officials.  Beyond that, it would be absurd to interpret the INA in a way that would let the City choose

28

between enforcing criminal laws while assisting with federal immigration enforcement or "not subject[ing] aliens to th[e] criminal justice system at all." United States Br. 55. This is a false choice. The City subjects people to the criminal justice system by arresting offenders. Thus, plaintiff's "cooperative federalism" argument would mean the City's choice is either to assist with federal immigration enforcement or not to arrest people who commit crimes. It is inconceivable that the INA would encourage that result. Plaintiff's "cooperative federalism" argument is just an attempt to disguise commandeering.

The United States also wrongly insists that its position does not implicate any of the rationales for the anticommandeering doctrine. United States Br. 56-59. It asserts that its position does not disturb the "healthy balance of power between the States and the Federal Government," *Murphy*, 584 U.S. at 473 (internal quotation marks omitted), emphasizing the federal government's "authority over the admission and exclusion of aliens," United States Br. 56. That ignores that plaintiff's suit is an attempt to intervene in defendants' control over their own employees and thus intrude on state sovereignty.

Next, plaintiff argues that its position would not undermine its own "political accountability" for immigration enforcement, *Murphy*, 584 U.S. at 473, or "shif[t] the costs of regulation to the States," *Id.* at 474. United States Br. 57. But both points are wrong. When the federal government obligates state or local officials to carry out a federal program, "responsibility is blurred," *Murphy*, 584 U.S. at 474, and that would be the result under plaintiff's position. And, of course, the City

29

would need to devote resources – such as officer time and physical space at City facilities – to the federal government's enforcement efforts. That assistance would lessen the federal government's regulatory burden, while also taking away local resources that would otherwise be devoted to criminal law enforcement.

Last, plaintiff cites "historical understanding and practice," *Printz*, 521 U.S. at 905, as justification for its position, United States Br. 58-59. Plaintiff cites a 1798 law that authorized state courts to order an alien's removal and empowered federal marshals to effectuate such removals. Act of July 6, 1798, ch. 66, §§ 2-3, 1 Stat. 577-78. This just reflects that "the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions, insofar as those prescriptions related to matters appropriate for the judicial power." *Printz*, 521 U.S. at 907. This history offers no precedent for what plaintiff seeks to accomplish here: the ordering of state and local *executive* officers to carry out federal law. The anticommandeering doctrine prohibits this.

## B.     Plaintiff's express preemption claim against the City fails.

Plaintiff also cannot prevail on its express preemption claim against the City. Section 1373(a) of the INA purports to bar government entities from "prohibit[ing], or in any way restrict[ing], any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8

U.S.C. § 1373(a).[2]  This provision does not preempt the Ordinance's restrictions on sharing information with federal immigration authorities.

### 1. Section 1373 is invalid and regardless does not expressly preempt the Ordinance.

To begin, although section 1373 uses language that seeks to preempt state and local law, it is not a valid preemption provision.  To be operative, a preemption provision "must be best read as one that regulates private actors."  *Murphy*, 584 U.S. at 477.  This is consistent with how preemption works: when state law seeks to regulate private actors in a way that clashes with the way federal law regulates private actors, "federal law takes precedence and the state law is preempted."  *Id.* Section 1373 fails this requirement because the only possible reading is that it gives orders to state and local governments, not to private actors.  The statute attempts to tell States and localities what they may not do: restrict the sharing of a person's immigration or citizenship status information.  Other courts have similarly applied *Murphy* to section 1373 and determined that the statute is not a valid preemption provision for this reason.  *E.g.*, *Ocean County Board of Commissioners v. Attorney General of New Jersey*, 8 F.4th 176, 182 (3d Cir. 2021); *Colorado v. United States Department of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020).  Accordingly, the

---

[2]  Another INA provision similarly says that States and local governments may not restrict the sharing of "information regarding the immigration status" of noncitizens.  8 U.S.C. § 1644.  Plaintiff invokes both sections 1373 and 1644, *e.g.*, United States Br. 36-37, but does not argue that they have different meanings for purposes of this case.  For brevity, we refer to both provisions collectively as "section 1373."  The same arguments demonstrate why neither provision preempts the Ordinance.

31

statute cannot serve to invalidate the Ordinance's information-sharing restrictions.

Additionally, the requirement in *Murphy* that a preemptive statute regulate private conduct works in harmony with the anticommandeering rule. Just as purported preemption language is inoperative if it regulates the conduct of state or local government actors, the anticommandeering rule prohibits the federal government from "compel[ling] the States to require or prohibit" certain acts. *Murphy*, 584 U.S. at 472. Here, applying section 1373 against defendants would require them to allow their law enforcement personnel to share a person's immigration or citizenship status information. Such federal intrusion in the ability of States and local governments to control their own employees violates the anticommandeering doctrine. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 869 (N.D. Ill. 2018). The district court in the grant funding litigation issued a declaration that section 1373 was unconstitutional for that very reason. *City of Chicago v. Barr*, 405 F. Supp. 3d 748, 762 (N.D. Ill. 2019), *opinion withdrawn in part,* 513 F. Supp. 3d 828 (N.D. Ill. 2021). This court described the district court's anticommandeering analysis as "compelling" but invalidated the grant conditions on non-constitutional grounds, *Barr*, 961 F.3d at 898, and the district court subsequently withdrew the declaratory relief as unnecessary to provide complete relief to the City, *City of Chicago v. Barr*, 513 F. Supp. 3d 828, 832-33 (N.D. Ill. 2021). Nevertheless, the court's anticommandeering analysis remains persuasive. And, as the district observed, "it is impossible to ignore the state sovereignty concerns that would arise if § 1373 overtook state and local law." R. 86 at 37.

32

**2.      Even if section 1373 were valid, it would not expressly preempt the Ordinance.**

Even on its own terms, section 1373 does not expressly preempt the Ordinance.  The statute purports to bar States and localities from prohibiting the sharing of "information regarding the citizenship or immigration status" of any person.  8 U.S.C. § 1373(a).  This language is "naturally understood as" referring to information conveying "a person's legal classification under federal law." *California*, 921 F.3d at 891.  Accordingly, in *California*, the court ruled that a California law that prohibited the sharing of a person's release date or home address, *id.* at 876, did not come within the scope of section 1373, *id.* at 893.  Likewise here, the Ordinance has a provision barring City personnel from communicating with federal immigration officials "regarding a person's custody status, release date, or contact information."  Municipal Code of Chicago, Ill. § 2-173-020(a)(3).  None of these categories of information constitutes "citizenship or immigration status," so that sharing prohibition is outside the scope of section 1373.

To be sure, the Ordinance also generally prohibits the sharing of "the citizenship or immigration status of any person," Municipal Code of Chicago, Ill. § 2-172-030(a)(1), while section 1373 bars such prohibitions.  Even so, there is no preemption, because – if section 1373 were valid – the Ordinance contains a savings provision that would cause the prohibition on information sharing to yield to the federal law.  The Ordinance states: "(a) Unless required to do so by statute, federal regulation, court order, or a lawfully issued judicial warrant, (1) no agent or agency shall request, maintain, or share the citizenship or immigration status of any

33

person . . . ." Municipal Code of Chicago, Ill. § 2-172-030(a)(1). A provision like this "requires compliance with federal law," and therefore the Ordinance cannot conflict with section 1373. *See City & County of San Francisco v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022) (Oregon law that similarly prohibited disclosure of information "unless disclosure is required by . . . federal law," Or. Rev. Stat. § 180.805(4)(a), did not conflict with section 1373); *see also City & County of San Francisco v. Barr*, 965 F.3d 753, 763 (9th Cir. 2020) (savings clause prohibiting use of city resources to assist in federal immigration enforcement "unless such assistance is required" by federal law, S.F., Cal., Admin. Code ch. 12H, § 12H.2, "require[d] compliance with federal law"). Here, then, if section 1373 were valid, a federal statute would require that local governments not prohibit their agents from sharing information with the federal government, so the City's prohibition on such information sharing would yield.

Before this court, plaintiff reads section 1373 not just to bar prohibitions on information sharing but to *require* information sharing. *E.g.*, United States Br. 62, 64. That reading would also activate the Ordinance's savings clause. The Ordinance's prohibition on information sharing would fall away if a statute were to require the disclosure of a person's immigration status, again leaving nothing to preempt. And while the district court ruled that the savings clause did not apply because section 1373 does not "require" the sharing of information but merely bars prohibitions on information sharing, R. 86 at 30, the savings clause operates under either interpretation, as we explain.

34

### 3. Plaintiff's arguments in defense of section 1373 as a preemption provision have no merit.

Plaintiff, for its part, asserts that section 1373 is a valid preemption provision that does not commandeer the States because it is "part of the INA's regulation of the detention and removal of *aliens,*" and therefore regulates private actors. United States Br. 59 (emphasis added). Plaintiff thus attempts to establish the validity of the preemption language in section 1373 by reference to other parts of the INA. Plaintiff even criticizes the district court for "rel[ying] solely on the text of" the provision at issue. United States Br. 60. But the validity of section 1373 depends on what that provision says, and it cannot be salvaged because it is situated in a larger statute that includes provisions regulating private individuals. Plaintiff's approach would eviscerate the anticommandeering rule by letting Congress embed orders to States and local governments in broader legislation that regulates private actors.

And while plaintiff cites *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), in support of its approach, *see* United States Br. 60, the rationale of that case is obsolete after *Murphy*. The Second Circuit deemed section 1373 valid because the statute does not "compe[l] states and local governments to enact or administer any federal regulatory program," or "affirmatively conscrip[t] states, localities, or their employees into the federal government's service." *Id.* at 35. The court thought it was permissible for the statute to instead "prohibit" States and local governments from restricting the sharing of immigration information. *Id. Murphy* subsequently made clear, however, that it makes no difference if a statute

35

requires the States to act, or prohibits state action – both unlawfully commandeer the States. 584 U.S. at 474-75. Accordingly, *City of New York* does not help plaintiff.

Plaintiff further argues that even in the absence of section 1373, States and local governments would still be impliedly required to share immigration information with the federal government because without that information, federal enforcement will be less effective. United States Br. 61-62. Thus, according to plaintiff, the federal government's regulation of individual noncitizens includes the power to require information sharing by States and localities. But as we have explained, plaintiff cannot use other parts of the INA that regulate private individuals to impose obligations on the States. Section 1373 purports to do what the rest of the INA does not: issue a direct command to States and local governments. That is not a valid preemption provision.

Plaintiff is also wrong to say that section 1373's terms extend to information about a person's release date or contact information. United States Br. 36-40. Plaintiff argues that a person's release date relates to his immigration status because section 1231 of the INA allows a noncitizen's removal only after he "'is released from imprisonment.'" United States Br. 37 (quoting 8 U.S.C. § 1231(a)(4)(A)). But as the district court explained, R. 86 at 25-26, this INA provision speaks only to the timing of a noncitizen's removal, not his "immigration status." Indeed, section 1231 applies only to noncitizens with the immigration status of having been "ordered removed." 8 U.S.C. § 1231. The day a person is

released from state or local custody does not change that status. Accordingly, a person's release date is not information regarding his immigration status.

With respect to contact information, the United States relies on INA provisions requiring noncitizens to notify the federal government of a change of address and providing for a noncitizen's removal for failing to give such notice. United States Br. 37 (citing 8 U.S.C. §§ 1305 and 1306(b)). But it does not follow that an address relates to one's immigration status. An address, by itself, does not say anything about a person's immigration status. And even a person's failure to update his address does not necessarily result in his removal, as the district court explained. R. 86 at 25. If the person can show "that such failure was reasonably excusable or was not willful," he is not subject to removal. 8 U.S.C. § 1306(b). And plaintiff makes no argument that contact information other than an address relates to a person's immigration status. Section 1373 does not reach contact information.

Plaintiff attempts to support its expansive reading of section 1373 by relying on *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018). United States Br. 38. In that case, the Court observed that "the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin*, 584 U.S. at 717. Plaintiff argues that the word "regarding" in section 1373 (information "*regarding* the citizenship or immigration status, lawful or unlawful, of any individual"), has a similar broadening effect. United States Br. 38. But *Lamar* was a bankruptcy case, 584 U.S. at 712, and thus did not implicate a

presumption against preemption. That presumption belies a reading that would make section 1373 preempt an unduly broad range of state and local laws.

Plaintiff also seeks to bolster its interpretation of section 1373(a) by reference to section 1373(c), United States Br. 38-39, noting that while paragraph (a) covers "information regarding" a person's "citizenship or immigration status," 8 U.S.C. § 1373(a), paragraph (c) mentions only a person's immigration "citizenship or status information," 8 U.S.C. § 1373(c), so section 1373(a) "covers more information," United States Br. 39. The omission of "regarding" in paragraph (c) cannot support the weight that plaintiff ascribes to it. As the district court explained, R. 86 at 27, paragraph (c) obligates the federal government to respond to inquiries "to verify or ascertain the citizenship or immigration status of any individual . . . by providing the requested verification or status information," 8 U.S.C. § 1373(c). Non-federal units of government might not possess an "official record" of a person's immigration status. R. 86 at 27 (internal quotation marks omitted). That would explain why section 1373(a) "may have been drafted to sweep in more sources of information needed to verify a person's status." *Id.*

Contrary to plaintiff's contention, United States Br. 39, the district court's acknowledgement that section 1373(a) may be broader than section 1373(c) is fully consistent with its separate conclusion that section 1373(a) does not reach a person's release date or contact information. The court simply acknowledged that the federal government is likely to have "*sources* of information" regarding a person's immigration status that differ from those sources in the possession of state

and local governments. R. 86 at 27 (emphasis added). It does not follow that the *information* to which section 1373(a) alludes is so broad that it encompasses things – such as release dates and contact information – that do not indicate a person's immigration status. By contrast, where Congress does "inten[d] to reach broader swaths of information," it uses language to that effect, such as by "mandating the inclusion of 'such other relevant information as the Attorney General shall require.'" *California*, 921 F.3d at 892 (quoting 8 U.S.C. § 1360(a)).

Finally, the United States's reliance on legislative history, United States Br. 39-40, is misplaced. This court considers legislative history only if statutory text is ambiguous. *Petr Trustee for BWGS, LLC v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1098 (7th Cir. 2024). Plaintiff has not identified any ambiguity in section 1373(a), and none exists. In any event, other legislative history cuts against plaintiff's interpretation. *See California*, 921 F.3d at 892 n.18 (highlighting a congressional report supporting a narrow reading of section 1373(a)).

In the alternative, plaintiff argues that even if section 1373 *did* regulate States and localities, it would not violate the Tenth Amendment's prohibition on commandeering. United States Br. 62-65. Citing *Printz*, plaintiff argues as if the Supreme Court established a general information-sharing exception to the anticommandeering doctrine. United States Br. 62. That is incorrect. The Court left open the question whether statutes that "require only the provision of information to the Federal Government" give rise to anticommandeering problems. *Printz*, 521 U.S. at 918; *see also id.* at 936 (O'Connor, J., concurring). But even if

39

plaintiff were right that there is an information-sharing exception to the prohibition on commandeering, that would not matter here.  That is because section 1373(a), by barring state and local governments from prohibiting information sharing, "prohibits certain rule making by state policymakers."  *Sessions*, 321 F. Supp. 3d at 872.  Thus, it is similar to a statute that issues orders to state legislatures – something the Tenth Amendment indisputably does not allow.

Plaintiff also invokes *Haaland v. Brackeen*, 599 U.S. 255 (2023), United States Br. 63-65, but that case does not support its position.  In *Haaland*, the Supreme Court observed that "[t]he anticommandeering doctrine applies distinctively to a state court's adjudicative responsibilities."  599 U.S. at 288 (internal quotation marks omitted).  In that context, the Court explained, Congress could impose "ancillary recordkeeping requirements related to" a state court's obligation to conduct child custody proceedings in compliance with the Indian Child Welfare Act proceedings "without violating the Tenth Amendment."  *Id.* at 291.  Such recordkeeping requirements "are a logical consequence of our system of 'dual sovereignty' in which state courts are required to apply federal law."  *Id.*  Importantly, the court noted that such requirements do not "put state legislatures and executives under the direct control of Congress."  *Id.* (internal quotation marks omitted).  *Haaland* has nothing to do with this case.  The issue here is not one of state courts enforcing provisions of a federal law and being required to keep certain records associated with those proceedings.  The INA does not engage the City in federal immigration enforcement and simply ask the City to keep track of what it is

40

doing. Nor, in any event, does plaintiff limit its demands to state-court adjudicative recordkeeping. Instead, plaintiff would require the City to hand over immigration-related information regardless of whether a noncitizen ever faced charges, let alone a full adjudication. *Haaland* does not support plaintiff's express preemption claim against the City under section 1373.

## II. The District Court Correctly Dismissed Plaintiff's Claim That the Ordinance Discriminates Against the Federal Government.

Plaintiff also cannot prevail on its claim that the Ordinance unlawfully discriminates against the federal government. States may not "discriminat[e] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (internal quotation marks omitted). Anti-federal discrimination exists where state law singles out the federal government "for less favorable treatment." *Id.* at 839 (internal quotation marks omitted). And as this court has emphasized, a claim of discrimination against the federal government requires a showing of "[d]ifferential treatment." *McHenry County*, 44 F.4th at 594. Thus, a challenger must identify "actors [who are] 'similarly situated' to the federal government that receive more favorable treatment." *Id.*

Here, plaintiff cannot identify a similarly situated entity that receives more favorable treatment. *McHenry County* is instructive. There, the law barring the State of Illinois and local governments from contracting to house immigration detainees did not discriminate against the federal government because no comparable actors received better treatment under the Illinois law. *McHenry County*, 44 F.4th at 594. The court rejected an argument that the law was

41

discriminatory "because it affects an exclusively federal domain." *Id.* "The mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination." *Id.* The same is true here. The Ordinance does not treat any similarly situated entity better than the federal government.

*McHenry County* also rejected the anti-federal discrimination claim because Illinois and local governments in the State were free to "continue to provide detention services to the federal government for other detainees." 44 F.4th at 594. In other words, the Illinois law did not discriminate against the federal government *as such*, but barred only a specific kind of cooperation with the United States. The Ordinance is similar. Rather than bar all coordination with federal law enforcement, it prohibits only the assistance by City officials in enforcing civil federal immigration law. The Ordinance does not discriminate against the federal government.

Beyond that, plaintiff cannot rely on anti-discrimination principles to commandeer the assistance of state and local officials. The Tenth Amendment lets States and local governments choose whether to assist in the execution of federal law. The United States cannot take away that choice on the theory that withholding support amounts to anti-federal discrimination. Here, too, plaintiff asserts a claim that would eviscerate anticommandeering principles in the Tenth Amendment.

None of the cases on which plaintiff relies to support its discrimination claims, United States Br. 47-50, involved a law preventing state or local officials

from assisting with immigration enforcement. *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), involved a law barring private contractors at a county airport from providing services for deportation flights. *Id.* at 748. In concluding that the law discriminated against the federal government, the court noted that "[t]his is not a situation in which King County officials are being conscripted into carrying out federal immigration laws on the federal government's behalf." *Id.* at 758. Plaintiff's suit did not pose a commandeering problem because it sought only to "to lift a discriminatory prohibition on private parties' ability to engage in business with the federal government." *Id.* Here, however, plaintiff would conscript City officials in the enforcement of federal immigration law.

In *Washington*, United States Br. 47, there was no question that the state law at issue was discriminatory because it "explicitly treat[ed] federal workers differently than state or private workers," 596 U.S. at 839. The issue before the Court was whether Congress authorized the discriminatory law. *Id.* Here, by contrast, plaintiff has no similarly situated comparators, as we have explained. And *North Dakota v. United States*, 495 U.S. 423 (1990), which plaintiff cites for the proposition that the court need not "look for comparators," United States Br. 49, actually explained that a State does not discriminate against the federal government "unless it treats someone else better than it treats them," *North Dakota*, 495 U.S. at 438 (internal quotation marks omitted). Plaintiff also cites *McHenry County*, United States Br. 50, where this court determined that Illinois's decision not to contract with the federal government was not discriminatory, 44

43

F.4th at 593. Plaintiff nevertheless claims that *McHenry County* supports its position because the City "refus[es] to transfer aliens or information to *federal agents*." United States Br. 50. But that misstates what the Ordinance does. It bars cooperation with federal immigration officials, Municipal Code of Chicago, Ill. § 2-173-020(a), not all federal agents. The Ordinance also bars the sharing of a person's immigration status with anyone, regardless of whether that person works for the federal government. *Id.* § 2-173-020(a)(1). The Ordinance does not discriminate against the federal government.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

MARY B. RICHARDSON-LOWRY
Corporation Counsel
  of the City of Chicago

s/ Stephen G. Collins
BY:   STEPHEN G. COLLINS
Assistant Corporation Counsel Supervisor
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 742-0115
stephen.collins@cityofchicago.org

44

## CERTIFICATE OF COMPLIANCE

_____

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32(c). This brief contains 11,364 words, beginning with the words "Jurisdictional Statement" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word word processing system used to prepare the brief.

s/ Stephen G. Collins
STEPHEN G. COLLINS, Attorney

## CERTIFICATE OF SERVICE

_____

I certify that on June 9, 2026, I electronically filed the attached Brief of Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/ Stephen G. Collins
STEPHEN G. COLLINS, Attorney