No. 25-2904

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff-Appellant,<br><br>      v.<br><br>STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of Illinois; CITY OF CHICAGO; BRANDON JOHNSON, in his official capacity as Mayor of Chicago; LARRY SNELLING, in his official capacity as Chicago Police Superintendent; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, in her official capacity as President of the Cook County Board of Commissioners; THOMAS J. DART, in his official capacity as Cook County Sheriff,<br><br>      Defendants-Appellees. | ) Appeal from the United States<br>) District Court for the Northern<br>) District of Illinois, Eastern<br>) Division<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 1:25-cv-1285<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) The Honorable<br>) LINDSAY C. JENKINS,<br>) Judge Presiding. |

**BRIEF OF STATE DEFENDANTS-APPELLEES**

                                            **KWAME RAOUL**
                                            Attorney General
                                            State of Illinois

                                            **JANE ELINOR NOTZ**
                                            Solicitor General

**ALEX HEMMER**
Deputy Solicitor General                            115 South LaSalle Street
115 South LaSalle Street                             Chicago, Illinois 60603
Chicago, Illinois 60603                             (312) 814-3312
(312) 814-5526
alex.hemmer@ilag.gov                             Attorneys for State Defendants

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................iii

JURISDICTIONAL STATEMENT .............................................................. 1

ISSUES PRESENTED.................................................................................. 3

STATEMENT OF THE CASE ...................................................................... 4

      A.     Federal Immigration Law ......................................................... 4

      B.     The TRUST Act....................................................................... 6

      C.     Proceedings Below................................................................... 8

SUMMARY OF ARGUMENT.................................................................... 11

ARGUMENT ............................................................................................. 14

I.      This court reviews the district court's dismissal of the complaint *de novo*....... 14

II.     The district court correctly held that the TRUST Act's information-sharing provisions are not expressly preempted by federal law. ................................... 15

      A.     There is no conflict between the TRUST Act's information-sharing provisions and section 1373(a)................................................. 16

      B.     Section 1373(a) directly regulates the States......................................... 21

III.    The district court correctly held that the TRUST Act is not conflict-preempted by federal law.......................................................................... 28

      A.     There is no conflict between the TRUST Act and the INA. ................... 28

      B.     A contrary reading of the INA would raise serious constitutional concerns. .................................................................... 34

      C.     The United States's other counterarguments lack merit....................... 40

IV.    The district court correctly held that the TRUST Act does not violate intergovernmental-immunity principles. ......................................................... 46

      A.     The Act does not discriminate against the federal government............. 47

B. A contrary rule would raise constitutional concerns. ............................ 51

CONCLUSION .................................................................................................. 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................ 4, 5, 29, 30, 32, 34

*Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ..................................................................................... 37

*Bond v. United States,*
572 U.S. 844 (2014) ..................................................................................... 40

*Carbo v. United States,*
364 U.S. 611 (1961) ..................................................................................... 45

*Chamber of Commerce of U.S. v. Whiting,*
563 U.S. 582 (2011) ................................................................................. 21, 29

*City of Chi. v. Barr,*
961 F.3d 882 (7th Cir. 2020) .......................................................................... 6

*City of Chi. v. Sessions,*
321 F. Supp. 3d 855 (N.D. Ill. 2018) .................................... 23, 26, 27, 28, 44, 45

*City of Chi. v. Sessions,*
888 F.3d 272 (7th Cir. 2018) ..................................................................... 41, 50

*City of Philadelphia v. Sessions,*
309 F. Supp. 3d 289 (E.D. Pa. 2018)....................................................... 17, 18, 23

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999)............................................................................. 23

*Cnty. of Ocean v. Grewal,*
475 F. Supp. 3d 355 (D.N.J. 2020)................................................... 17, 19, 38, 44

*City & Cnty. of San Francisco v. Sessions,*
349 F. Supp. 3d 924 (N.D. Cal. 2018) ............................................................. 26

*CoreCivic, Inc. v. Governor of New Jersey,*
145 F.4th 315 (3d Cir. 2025) ......................................................................... 53

*Crowell v. Benson,*
285 U.S. 22 (1932) ....................................................................................... 34

*Dawson v. Steager*,
  586 U.S. 171 (2019) ............................................................................... 52

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) ................................................................. 33

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) .............................................................. 26, 27, 46

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ............................................................................... 43

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ............................................................................... 29

*Kubiak v. City of Chicago*,
  810 F.3d 476 (7th Cir. 2016) ............................................................. 14

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ............................................................................... 18

*Lavallee v. Med-1 Sols., LLC*,
  932 F.3d 1049 (7th Cir. 2019) ........................................................... 29

*McHenry Cnty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022).................12, 29, 30, 32, 33, 34, 37, 39, 42, 47, 48

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ................................15, 22, 23, 24, 25, 26, 28, 36, 38, 39, 44

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
  928 F.3d 639 (7th Cir. 2019) ............................................................. 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ................................................................................... 46

*New York v. Dep't of Just.*,
  951 F.3d 84 (2d Cir. 2020).................................................................. 24

*New York v. United States*,
  505 U.S. 144 (1992) .............................................................. 21, 35, 51

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ............................................................................... 19

*Nixon v. Missouri Municipal League*,
  541 U.S. 125 (2004) ............................................................................... 37

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ........................................................................... 19

*Ocean Cnty. Bd. of Commissioners v. Att'y Gen.*,
8 F.4th 176 (3d Cir. 2021) ................................................................. 23

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) ........................................................................... 15

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019) ............................................... 23, 26

*Printz v. United States*,
521 U.S. 898 (1997) ........................................14, 21, 24, 25, 28, 30, 35, 36, 42, 46

*Santiago v. Walls*,
599 F.3d 749 (7th Cir. 2010) ............................................................ 14

*Savage v. Jones*,
225 U.S. 501 (1912) ........................................................................... 30

*Steinle v. City & Cnty. of San Francisco*,
919 F.3d 1154 (9th Cir. 2019) .......................................................... 20

*Testa v. Katt*,
330 U.S. 386 (1947) ........................................................................... 27

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ........................................................... 53

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) ................................... 24, 44, 49

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........17, 18, 19, 20, 21, 24, 29, 31, 32, 33, 37, 41, 42

*United States v. Lewis Cty.*,
175 F.3d 671 (9th Cir. 1999) ............................................................ 50

*United States v. New Jersey*,
No. 13-cv-64, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ................. 49, 52

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) .......................................... 52, 53

*United States v. New York*,
814 F. Supp. 3d 266 (N.D.N.Y. 2025) ...................................... 17, 38, 49

*United States v. Town of Thornapple.*,
143 F.4th 793 (7th Cir. 2025)..................................................................18

*United States v. Washington,*
596 U.S. 832 (2022) ........................................ 46, 47, 48, 49, 50, 52

*Va. Uranium, Inc. v. Warren,*
587 U.S. 761 (2019) ............................................................................29

*Whitman v. Am. Trucking Associations,*
531 U.S. 457 (2001) ............................................................................32

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ............................................................................34

## Constitutional Provisions, Statutes and Rules

U.S. Const. art. VI ...............................................................................53

8 U.S.C.
  § 1101 ...............................................................................................4
  § 1103 ....................................................................................4, 30, 32
  § 1181 ...............................................................................................4
  § 1182 .........................................................................................4, 19
  § 1226 .............................................................................4, 31, 33, 38
  § 1227 ...............................................................................................5
  § 1231 .......................................................4, 5, 19, 30, 31, 32, 39
  § 1357 ...............................................................................4, 5, 30, 33
  § 1360 .............................................................................................20
  § 1367 .............................................................................................20
  § 1373 .......................................................................................*passim*
  § 1644 .........................................................................................5, 15

28 U.S.C.
  § 1291 ...............................................................................................2
  § 1331 ...............................................................................................1
  § 2107 ...............................................................................................1

5 ILCS
  805/1 .......................................................................................1, 3, 6
  805/5 .........................................................................................8, 17
  805/10 ............................................................................................27
  805/15 ...................................................................7, 16, 39, 45, 49

Ill. Pub. Act No. 102-234 (2021) ...........................................................6

8 C.F.R. § 287.7 ............................................................................................ 5, 33

Federal Rule of Appellate Procedure 4 ......................................................... 1

Federal Rule of Civil Procedure 58 ............................................................... 1

Seventh Circuit Rule 28 ................................................................................. 1

**Other Authorities**

Engelbrecht, Cora, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear of Deportation*, N.Y. Times, June 3, 2018, https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html ............................................................................................... 6

Geiger, Kim, *Rauner Signs Immigration, Automatic Voter Registration Bills Into Law*, Aug. 28, 2017, Chi. Trib., https://www.chicagotribune.com/politics/ct-bruce-rauner-immigration-voting-met-0829-20170828-story.html ................... 6

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) ................................................. 21

S. Rep. No. 104-249 (1996) ......................................................................... 20

U.S. Dep't of Homeland Sec., *Form I-200: Warrant for Arrest of Alien*, https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF (last visited June 5, 2026) ................................... 34

## JURISDICTIONAL STATEMENT

Plaintiff-appellant's jurisdictional statement is not complete and correct. Defendants-appellees the State of Illinois and JB Pritzker, in his official capacity as Governor of Illinois, provide this statement under 7th Cir. R. 28(b).

Plaintiff, the United States of America, filed this action in the district court alleging that the Illinois TRUST Act, 5 ILCS 805/1 *et seq.*, violates the Supremacy Clause, in that it is preempted by federal law and violates intergovernmental-immunity principles. SA1.[1] As the district court concluded, SA15, it lacked subject-matter jurisdiction over the United States's claims against defendant Governor Pritzker (and certain municipal defendants) because it had failed to allege Article III standing as to those defendants. Otherwise, the district court had subject-matter jurisdiction over the action pursuant to 28 U.S.C. § 1331.

On July 25, 2025, the district court granted defendants' motions to dismiss the action, SA1, disposing of all claims against all parties. The district court stated that it would permit the United States to amend the complaint within 30 days, Doc. 85, but no amended complaint was filed, and the district court accordingly entered a separate judgment on the docket pursuant to Fed. R. Civ. P. 58 on August 26, 2025, *see* SA65. No motion to alter or amend the judgment was filed. The United States filed a notice of appeal on October 24, 2025, which was within 60 days of the Rule 58 judgment and thus timely. 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B). This

---

[1] Entries on the district court's docket are cited "Doc.," the opening brief is cited "AT Br.," and the short appendix is cited "SA."

1

court has jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C.

§ 1291.

## ISSUES PRESENTED

1.      Whether the information-sharing provisions of the Illinois TRUST Act, 5 ILCS 805/1 *et seq.*, are expressly preempted by the Immigration and Nationality Act.

2.      Whether the TRUST Act is conflict-preempted by the Immigration and Nationality Act.

3.      Whether the TRUST Act violates principles of intergovernmental immunity by "discriminating" against the federal government.

**STATEMENT OF THE CASE**

### A.    Federal Immigration Law

The Constitution gives the federal government broad authority to regulate immigration. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). Pursuant to that allocation of authority, Congress has enacted an "extensive and complex" set of statutes regulating the conditions under which noncitizens can remain in the United States and the circumstances under which those ineligible to remain are subject to removal. *Id.* at 395. The Immigration and Nationality Act ("INA") prescribes detailed criteria for admission to the United States, defines different immigration statuses, establishes when persons without legal status may or must be detained, and creates an administrative and enforcement apparatus for detaining and removing specified noncitizens from the country. *See, e.g.*, 8 U.S.C. §§ 1101, 1103, 1181, 1182, 1226, 1231. Under that scheme, the Department of Homeland Security ("DHS") is responsible for identifying, apprehending, and removing individuals who are unlawfully in the country. *Arizona*, 567 U.S. at 397.

The INA allows States to participate in federal immigration enforcement in certain circumstances. *See Arizona*, 567 U.S. at 408-10. For example, "to the extent consistent with State and local law," States and localities may enter into formal agreements with the federal government to allow law-enforcement officers to assume the responsibilities of federal immigration agents, subject to federal direction and supervision. 8 U.S.C. § 1357(g)(1), (3), (9). Such assistance can "include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access

to detainees held in state facilities." *Arizona*, 567 U.S. at 410. But the INA specifies that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9).

Similarly, the INA contemplates that federal officials may request certain forms of voluntary aid from the States. For example, immigration officers may ask state and local law enforcement officers to provide advance notice of an individual's release from state custody. *See Arizona*, 567 U.S. at 410 (citing 8 U.S.C. § 1357(d)). Such requests arise because, subject to certain exceptions, the INA requires federal immigration agents to remove noncitizens who have been convicted of state crimes only after they complete their sentences. *See* 8 U.S.C. §§ 1227(a)(2), 1231(a)(4). Federal officers generally seek such information through what DHS's regulations describe as a "detainer" request. 8 C.F.R. § 287.7(a) (authorizing agents to "request that [a state or local law enforcement] agency advise [DHS], prior to release of [an] alien, in order for [DHS] to arrange to assume custody"). Finally, by its terms, the INA requires States to allow state officers to provide one specific form of voluntary assistance. Section 1373(a) directs that "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* §§ 1373(b), 1644 (similar).

### B.     The TRUST Act

Over the last decade and spanning successive gubernatorial administrations, Illinois has taken steps to minimize the involvement of the State and its officers with federal civil immigration enforcement.  In 2017, the Illinois General Assembly enacted the TRUST Act, which expressly barred state and local officials from detaining persons based on their citizenship or immigration status, or based on federal civil immigration warrants and similar administrative requests.  *See* 5 ILCS 805/1 *et seq*.  The purpose of the Act, as then-Governor Bruce Rauner explained, was to "keep . . . communities safer" by building trust between noncitizens and law enforcement.  Kim Geiger, *Rauner Signs Immigration, Automatic Voter Registration Bills Into Law*, Chi. Trib., Aug. 28, 2017.[2]  The Act aimed to do so by reducing fears among both undocumented immigrants and their lawfully present family and friends that turning to local law enforcement officers could result in deportation.  *See City of Chi. v. Barr*, 961 F.3d 882, 886-87 (7th Cir. 2020) (many governments have "determined that . . . effective law enforcement requires the cooperation of [their] undocumented residents"); Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear of Deportation*, N.Y. Times, June 3, 2018.[3]

In 2021, the General Assembly amended the TRUST Act, including by adding most of the provisions that are the focus of this case.  Ill. Pub. Act No. 102-234

---

[2]  https://www.chicagotribune.com/politics/ct-bruce-rauner-immigration-voting-met-0829-20170828-story.html.

[3]  https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html.

(2021).  The Act now provides that, "[u]nless presented with a federal criminal warrant, or otherwise required by federal law," a law enforcement officer "may not . . . participate, support, or assist in any capacity with an immigration agent's enforcement operations."  5 ILCS 805/15(h)(1).  And it generally bars such officials (again, unless presented with a criminal warrant, and subject to certain other exceptions described below) from "transfer[ring] any person into an immigration agent's custody," "provid[ing] information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody," and "provid[ing] to any immigration agent information not otherwise available to the public relating to an individual's release or contact information."  *Id.* § 805/15(h)(3), (6)-(7).

Although the Act restricts state and local law enforcement officers' involvement in civil immigration enforcement, it preserves in multiple respects officers' ability to collaborate with the federal government in investigating and responding to crime.  For instance, it permits state and local law enforcement officers to respond to federal requests for assistance (including information) in connection with a "federal criminal warrant."  *Id.* § 805/15(h).  More broadly, the Act states that its provisions do not "preclude" state and local law enforcement officers from "investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies . . . in order to ensure public safety."  *Id.* § 805/15(i).  And the Act likewise states that its provisions "shall not be construed to prohibit or restrict any entity from sending to, or receiving from, [DHS] or other

7

federal, State, or local government entity information regarding the citizenship or immigration status of any individual" pursuant to 8 U.S.C. § 1373. *Id.* § 805/5. The Act, in other words, is designed to ensure that state and local law enforcement officers' resources are focused on investigating and responding to crime, rather than in assisting federal officials in enforcing civil immigration law.

### C.    Proceedings Below

In February 2025, the United States filed this action against Illinois, its Governor, and municipal defendants associated with the City of Chicago and Cook County, alleging that the TRUST Act and various city and county ordinances are unconstitutional. SA1. Specifically, the United States alleged that the Act and the equivalent municipal ordinances (Chicago's Welcoming City Ordinance and Cook County's Ordinance 11-O-73) were expressly and impliedly preempted by provisions of the Immigration and Nationality Act, and that all three measures contravened principles of intergovernmental immunity. Doc. 1. Defendants moved to dismiss the complaint, and the United States filed a cross-motion for summary judgment. Docs. 24, 27, 29, 31, 33, 35, 58.

The district court dismissed the complaint under Rule 12(b)(6). SA1.[4] First, the court dismissed the United States's express-preemption claim — *i.e.*, that federal law, specifically 8 U.S.C. § 1373, preempts the information-sharing provisions of the

---

[4] The district court also dismissed the United States's claims against all individual defendants — including Governor Pritzker — as well as the Cook County Board of Commissioners under Rule 12(b)(1), explaining that the United States had failed to allege an injury traceable to any of these defendants. SA13-15. The United States does not appeal that holding. AT Br. 13-14 n.5.

Act and the ordinances. The court explained that there was no conflict between section 1373 and the Act's information-sharing provisions, because the Act does not prohibit state and local law-enforcement officials from sharing information about a person's "citizenship or immigration status," as opposed to other information (such as a person's anticipated release date from state custody). SA21-30. Although the court acknowledged the United States's broader reading of section 1373, in which a State is prohibited from limiting its officials' discretion to share even information of that sort, it rejected that "capacious" interpretation as inconsistent with the "text, structure, and history of [section] 1373." SA23. The court held that, regardless, section 1373 could not preempt state laws like the Act, because the federal statute does not "regulate private actors," but instead regulates "States and their political subdivisions." SA34-36. Accordingly, the court explained, section 1373 "cannot be preemptive," SA37, regardless of its interpretive scope.

Second, the court dismissed the United States's conflict-preemption claim. SA41-57. The court reasoned that, although the United States identified several INA provisions that reflected Congress's "desire that States have the option to assist in civil immigration enforcement," those provisions did not "*compel*[] any action by a state or local official." SA48 (emphasis in original). At most, the court explained, the provisions cited by the United States reflected Congress's "hope that States [would] participate in immigration enforcement." SA53. But, the district court reasoned, because the INA "gives the States the option" to participate, "but does not require it," the Act and the municipal ordinances "do not pose an obstacle" to the federal

9

government's execution of that statute. SA54. At bottom, the court explained, even if the Act and similar measures did make it more difficult for the federal government to enforce the INA, the United States's position — that States and localities are, for practical purposes, required to assist it in enforcing the INA – would "run[] directly afoul of the Tenth Amendment and the anticommandeering rule," *id.*, and so failed for that reason, too.

Finally, the court dismissed the United States's intergovernmental-immunity claim. SA57-63. As relevant here, the district court explained that the Act does not discriminate against the federal government, because it does not treat any other "similarly situated" entity worse than the federal government. SA58-59. At bottom, the court explained, the United States's argument was that the Act is discriminatory because it singles out the enforcement of federal immigration law as an activity that Illinois state and law enforcement officers will not participate in. SA59. But "the fact that a law affects an exclusively federal domain" — that is, immigration law — "is not evidence of discrimination." *Id.* And regardless, the court reasoned, the United States's position "would allow the federal government to commandeer the States under the guise of intergovernmental immunity," which it characterized as "an end-run around the Tenth Amendment." SA63.

The district court thus dismissed the complaint, but provided the United States with four weeks to file an amended complaint. Doc. 85. The United States did not file an amended complaint, and the district court entered final judgment. SA65.

The United States appealed.

10

## SUMMARY OF ARGUMENT

The Constitution gives the federal government the power to set the legal rules governing how noncitizens may enter and remain in the United States. In enforcing those rules, the United States may set its own priorities and direct the activities of its officers and the use of its own resources. But that authority does not give the United States any corresponding power to control state or local officials, or to dictate how Illinois uses state resources. The district court correctly held that the TRUST Act is consistent with these basic principles, and the United States fails to identify any error in its analysis.

First, the TRUST Act's information-sharing provisions are not expressly preempted by the INA. Section 1373 of the INA requires States to allow state and local officials to share "information regarding . . . citizenship or immigration status" with federal officers, and the TRUST Act expressly permits state and local officials to share exactly that information. The United States's contrary view — under which States are required to allow their officials to send release dates, address information, and more to the federal government — rests on an unduly expansive reading of the statutory text that has been rejected by every court to consider it. Information regarding citizenship or immigration status concerns a person's legal status; the phrase cannot naturally be read to encompass any fact that may assist immigration officials in determining whether an individual may be detained or removed, as the United States asserts. And even if the text could be read to bear that capacious

11

meaning, it would not matter, because section 1373 regulates the States, not private actors, and so lacks preemptive force, as courts have also repeatedly concluded.

Second, the TRUST Act is not conflict-preempted by the INA. The Act permits state and local officials to assist in criminal investigations, but not to assist in enforcing civil immigration law. That choice does not interfere with the federal government's ability to enforce the INA. The United States reads the INA to reflect a congressional assumption that States would help federal officials carry out detentions and removals as soon as state criminal jurisdiction concludes. But any decision to deprive Illinois of its power to regulate the use of its own law enforcement resources would have to be based on a clear and manifest congressional purpose, not an unstated assumption. Nothing in the INA can plausibly be read to require States to help discharge the enforcement duties that Congress assigned to federal officers. And reading the INA to contain such a requirement — or to restrict Illinois's ability to define and limit the discretion of its state and local officials to engage in immigration enforcement matters — would violate the principle that the federal government may not commandeer States or their officers to implement a federal program. The Court should read the INA to avoid any such constitutional infirmity.

Finally, the TRUST Act does not compromise the United States's immunity from discriminatory state regulation of its activities. The policy established by the Act distinguishes between the kinds of activities that state officers can permissibly undertake and does not discriminate against the federal government in doing so. This court held just that four years ago, in *McHenry County v. Raoul*, 44 F.4th 581

12

(7th Cir. 2022), which rejected a similar challenge to the Act.  And that rule must be correct:  If the United States could recast a State's decision to decline to implement a federal program as unconstitutional discrimination, there would be nothing left of the anticommandeering doctrine.

## ARGUMENT

"The Federal Government" cannot "command the State's officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Illinois, like many other States, has made the decision that it will not commit its law-enforcement resources to assisting the federal government in enforcing civil immigration law. Illinois works closely with its federal partners to apprehend and prosecute violent criminals. But it has chosen to limit its officers' involvement in the enforcement of federal civil immigration law, and it has enacted the TRUST Act to codify that commitment.

Federal courts have unanimously upheld laws analogous to the TRUST Act as consistent with the Constitution and laws of the United States, and the district court here correctly joined those courts in dismissing the complaint. No valid federal law prohibits Illinois from exercising its constitutional prerogative not to assist the federal government in its enforcement of federal immigration laws, nor does it violate intergovernmental-immunity principles for Illinois to make that decision. The Court should affirm the decision below.

## I.     This court reviews the district court's dismissal of the complaint *de novo*.

This court reviews *de novo* an order granting a motion to dismiss under Rule 12(b)(6) for failure to state a claim, *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016), applying the same legal standards that the district court would, *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010).

14

**II.    The district court correctly held that the TRUST Act's information-sharing provisions are not expressly preempted by federal law.**

The United States contends primarily that the TRUST Act is preempted by federal law.  AT Br. 29-47.  The district court correctly rejected that argument:  No valid federal law requires Illinois to assist the federal government in enforcing civil immigration law, nor would the Constitution permit any such command.

Congress may preempt a state law "through express language in a statute," or "implicitly," either "through 'field' pre-emption' or 'conflict' pre-emption."  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015); *accord Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019).  All forms of preemption "work in the same way:  Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

The United States contends first that the TRUST Act's information-sharing provisions are expressly preempted by a provision of the INA, 8 U.S.C. § 1373(a), that purports to prohibit States and localities from restricting their officials from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with DHS.  AT Br. 36-40.[5]  As the district court explained, SA20-41,

---

[5]  The United States also contends that the Act's information-sharing provisions are preempted by 8 U.S.C. § 1644, an INA provision with "nearly identical" text.  SA21.  All parties, including the United States, appear to agree that section 1644 imposes no obligations not already imposed by section 1373, *see, e.g.*, AT Br. 14 (treating the two provisions as identical), and accordingly state defendants refer only to section 1373,

that argument fails for two independent reasons:  There is no conflict between section 1373(a) and the TRUST Act's information-sharing provisions, and even if there were, section 1373(a) lacks preemptive force.  The United States's contrary arguments have been repeatedly rejected by other courts, and this court should likewise reject them.

### A.  There is no conflict between the TRUST Act's information-sharing provisions and section 1373(a).

As the district court correctly held, SA21-30, there is no conflict between the TRUST Act's information-sharing provisions and section 1373(a), because the Act expressly allows state and local law enforcement officers to share the only kind of information described by section 1373(a):  information about a person's "citizenship or immigration status," 8 U.S.C. § 1373(a), as opposed to other information about a person, like his or her anticipated date of release from custody.  *Contra* AT Br. 36-38.

To start, all parties agree that the Act does not restrict state and local officers' ability to share information with the federal government about citizenship and immigration status.  As the district court observed, SA21-22, the provisions of the Act that restrict information-sharing do not "speak to" citizenship and immigration status, instead primarily barring state and local officials from sharing information with federal officials "relating to an individual's release or contact information."  5 ILCS 805/15(h)(7); *see also id.* § 805/15(h)(6) ("information regarding any individual in the agency's custody").  Were there any doubt about the Act's sweep, it expressly

---

as did the district court.  *See* SA21 ("analyz[ing]" the two sections "as one" and citing supporting authority).

states that its operative provisions "shall not be construed to prohibit or restrict any entity from sending [DHS] . . . information regarding the citizenship or immigration status of any individual," consistent with section 1373(a).  *Id.* § 805/5.  As the district court observed, this provision ensures "compliance" with section 1373(a), SA29 n.13, at least as long as section 1373(a) is read to govern only the sharing of citizenship and immigration status information itself.  The United States, for its part, advances no contrary argument about the scope of the Act's information-sharing provisions.  *See* AT Br. 40 n.6 (acknowledging the Act's "savings clause" without contesting the State's reading of it).

Instead, the parties dispute only the scope of section 1373(a), with the United States contending that the provision reaches beyond information about "citizenship or immigration status" to encompass a broad array of other information about individuals in state custody — principally, their anticipated release dates from custody.  *Id.* at 36-38.  The district court correctly rejected that "capacious" reading of section 1373, SA23, as has every other court to consider it.  *See, e.g.*, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019), *cert. denied*, 590 U.S. 1015 (2020); *United States v. New York*, 814 F. Supp. 3d 266, 277 (N.D.N.Y. 2025), *appeal docketed*, No. 26-387 (2d Cir.); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 373 (D.N.J. 2020), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019).

In interpreting a statute, the court "begin[s] with the text," *United States v. Town of Thornapple*, 143 F.4th 793, 797 (7th Cir. 2025), and here the text of section 1373(a) is clear:  It purports to prohibit States and localities from restricting their officers from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with DHS.  8 U.S.C. § 1373(a).  As the Ninth Circuit has explained, the operative term, "citizenship or immigration status," is "naturally understood as a reference to a person's legal classification under federal law." *California*, 921 F.3d at 891.  Or, as another court has explained, the relevant term "plainly means an individual's category of presence in the United States — *e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen, etc. — and whether or not an individual is a U.S. citizen." *City of Philadelphia*, 309 F. Supp. 3d at 333.  Section 1373(a), in other words, means exactly what it says:  A State cannot prohibit its officers from sharing information with the federal government about "a person's legal classification under federal law," *California*, 921 F.3d at 891, not some other, broader set of information about the person.

The United States's contrary view largely turns on the statute's use of the word "regarding."  AT Br. 37.  In the United States's view, the phrase "information *regarding* citizenship and immigration status," 8 U.S.C. § 1373(a) (emphasis added), is best read to include any piece of information that could affect "whether and when an alien is subject to removal from the United States."  AT Br. 38; *see id.* ("[W]ords such as 'regarding' 'generally ha[ve] a broadening effect . . . .'" (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)).  That argument fails on

18

multiple levels. For one, as the district court explained, SA25-26, a person's release date is not relevant to his or her "immigration status" even on the United States's reading: Although federal law directs immigration agents not to remove a person in federal or state custody from the United States "until [he or she] is released from imprisonment," 8 U.S.C. § 1231(a)(4)(A), that does not somehow mean that such a person is "authorized to be present in the country," AT Br. 37, as the United States suggests. In other words, section 1231(a) does not affect noncitizens' "immigration status," 8 U.S.C. § 1373(a); it simply "clarifies when [federal officers'] duty to arrest is triggered." *Cf. Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (describing similar INA provision in this way). Even if section 1373(a) contemplated the transmission of all information that could be understood as "relevant to" a person's immigration status, AT Br. 37, rather than simply that status itself, a person's likely release date still would not qualify.

Regardless, as multiple courts have reasoned, the United States's reading of section 1373(a) fails for the separate reason that it is implausibly expansive. As these courts have explained, an "extraordinarily broad" range of information might bear on a person's immigration status, from vaccination history to wealth to membership in a political party. *See California*, 921 F.3d at 892 n.17 (citing 8 U.S.C. § 1182); *Cnty. of Ocean*, 475 F. Supp. 3d at 375. The United States identifies no reason to give the statute such a capacious reading when a more natural one is available. *Cf. N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (words like "regarding" should not be "taken to extend to the furthest reach of

19

[their] indeterminacy"). That is especially so given the many other provisions of the INA that *do* expressly contemplate transmission of a broader category of information regarding noncitizens. *See, e.g.*, 8 U.S.C. § 1367(a)(2) (forbidding federal disclosure of "any information which relates to an alien"); *id.* § 1360(b) (requiring all federal agencies to share with DHS "[a]ny information in any records . . . as to the identity and location of aliens"). Congress "certainly could have added" language of this sort to section 1373(a), "but it did not." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019). Absent such language, section 1373(a) should be read to "mean[] . . . what it says," *id.*, namely that States cannot prohibit their officers from sharing information about individuals' "citizenship or immigration status" itself.

The United States's remaining arguments are no more persuasive. It argues that section 1373(a) must sweep in information beyond immigration status because a neighboring provision, section 1373(c), uses the same statutory phrase *without* the word "regarding." AT Br. 38-39. But that is a distinction without a difference: The two provisions are simply worded differently, without any reason to believe that one has a broader scope than the other. If anything, as the Ninth Circuit reasoned, "the fact that subpart (c) only concerns itself with immigration status suggests . . . that immigration status is the extent of subpart (a)'s reach as well." *California*, 921 F.3d at 892; *accord* SA26-27 (the difference between the two subparts is "semantic" only). The United States also points to congressional reports that it says support its reading of section 1373(a), AT Br. 39-40, but one of the two reports simply restates the text of the statute, *see* S. Rep. No. 104-249, at 19-20 (1996) (section 1373(a) aims to facilitate

20

information "regarding a person's immigration status"), and the other report offers no explanation for any broader view. *Cf. Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history."). Indeed, as the Ninth Circuit (and the district court) reasoned, if anything the report undercuts the United States's position, in that it refers to the kind of information the United States seeks (that is, information about the "presence, whereabouts, or activities" of noncitizens) as *separate* from — and so not encompassed by — "information regarding [a noncitizen's] immigration status." *California*, 921 F.3d at 892 n.18 (citing H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.)); SA28. The district court correctly held that section 1373(a) covers only that latter, limited category of information, and thus does not conflict with the Act.

## B.    Section 1373(a) directly regulates the States.

The United States's express-preemption claim fails for the separate reason that section 1373(a) is not a valid preemption statute, but instead — as the district court held, SA30-41 — a direct regulation of the States.

The Constitution "confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). As a result, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.* For the same reason, the Supreme Court has explained, the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521

21

U.S. at 935. Thus, although federal law takes precedence over conflicting state law under the Supremacy Clause, that is so only if the federal law in question is "best read" to "regulate[] private actors," not States. *Murphy*, 584 U.S. at 478; *see also id.* (all preemptive statutes "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted"). By contrast, where a law does not regulate private actors, but instead simply tells States what they "may and may not do," *id.* at 474, it is "not a preemption provision," but merely a "direct command to the States," and thus invalid under the anticommandeering rule, *id.* at 480.

Section 1373(a) purports to "regulate States and local governments," not "private actors," SA41, and is invalid under the anticommandeering rule. That much is clear from its text. Section 1373(a) expressly tells States exactly what they "may not do," *Murphy*, 584 U.S. at 474: A State "*may not* prohibit, or in any way restrict," its officers' and subdivisions' ability to share certain information with DHS. 8 U.S.C. § 1373(a) (emphasis added). There is no way to read section 1373(a) as a regulation of private actors: As the district court explained, it does not "create or restrict the rights of any private actor" or "alter what private individuals can or cannot do." SA33-34. As in *Murphy* itself, in other words, "there is no way to understand" section 1373(a) "as anything other than a direct command to the States." 584 U.S. at 480. So even if there were any conflict between section 1373(a) and the TRUST Act's

information-sharing provisions, it would not matter, because section 1373(a) is invalid under the anticommandeering rule (and thus lacks preemptive force).

Courts have overwhelmingly reached the same conclusion. Most notably, in 2021 the Third Circuit rejected a preemption challenge to a New Jersey measure that prohibited certain immigration-sharing with DHS, reasoning that section 1373(a) did not "regulate[] private actors" and so could not "serve as a basis for preemption." *Ocean Cnty. Bd. of Commissioners v. Att'y Gen.*, 8 F.4th 176, 182 (3d Cir. 2021). Section 1373(a), the Third Circuit explained, operated as a "clear prohibition on *state* action; it says nothing about private actors, so it cannot fairly be said to regulate them." *Id.* Indeed, substantially every court to have addressed the issue has held that section 1373(a) is unconstitutional or lacks preemptive force. *See, e.g.*, *City of Chi. v. Sessions*, 321 F. Supp. 3d 855, 866-73 (N.D. Ill. 2018), *aff'd on other grounds*, 961 F.3d 882, 898 (7th Cir. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 971-73 (D. Or. 2019), *vacated as moot sub nom. City & County of San Francisco v. Garland*, 42 F.4th 1078, 1087-88 (9th Cir. 2022); *City of Philadelphia*, 309 F. Supp. 3d at 325-31.[6]

---

[6] The United States invokes *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), AT Br. 60, but that case turned mainly on the perceived distinction between a law that "compelled" or "conscripted" States to act (which the Second Circuit saw as barred by the anticommandeering rule) and a law that merely "prohibit[ed]" States from acting (which the court viewed as permissible). *Id.* at 35; *see also id.* (expressing concern about the consequences of a rule under which Congress "may not forbid" States from acting). But *Murphy* unanimously rejected that distinction as an "empty" one, stating that "[i]t was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition." 584 U.S. at 475. Courts have concluded that *City of New York* likely does not survive *Murphy*. *See, e.g.*, *City of Chi.*, 321 F. Supp. 3d at 873 ("*Murphy*'s

The United States advances a handful of contrary arguments, but each lacks merit.  AT Br. 59-64.  Its main argument appears to be that section 1373(a) should be understood to regulate private actors because it is a component of "a comprehensive regulatory scheme" — the INA — that *itself* regulates private actors.  *Id.* at 59-60.  But the United States cites no authority supporting its view that Congress is allowed to directly regulate a State — thus violating the anticommandeering doctrine — as long as it does so by embedding such a regulation within a broader statute that itself regulates individuals.  Indeed, even a brief glance at the Supreme Court's anticommandeering precedents refute that suggestion.  In *Printz*, for instance, the statutory provision at issue was a single subsection of a "detailed federal scheme" — the Gun Control Act of 1968 — that regulated private actors, *i.e.*, firearms dealers and owners.  *See* 521 U.S. at 902-03 (Act "prohibits firearms dealers from" taking certain actions and "forbids possession of a firearm by" certain people (citing 18 U.S.C. § 922(b), (d), (g)).  And in *Murphy*, the Supreme Court extensively discussed the relationship between the single subsection at issue and a "closely related provision" that *did* "restrict private conduct."  584 U.S. at 480; *see id.* at 480-86.  Under the United States's view, each of these statutory provisions would have been permissible because each was situated in a broader "regulatory scheme," AT Br. 59-60, that regulated private actors.  But the Supreme Court adopted no such rule,

holding deprives *City of New York* of its central support . . . ."); *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018) (similar), *aff'd*, 921 F.3d 865; *see also New York v. Dep't of Just.*, 951 F.3d 84, 113 (2d Cir. 2020) (noting tension between *Murphy* and *City of New York*).

24

instead examining the statutory subsection at issue and holding it invalid under the anticommandeering rule. *See Murphy*, 584 U.S. at 480; *Printz*, 521 U.S. at 933-35.[7]

Alternatively, United States argues that even if section 1373(a) *does* regulate States, it is still constitutionally permissible, because (in its view) all the statute does is "require 'the provision of information to the Federal Government,'" which the United States implies was deemed an acceptable intrusion on state authority in *Printz*. AT Br. 62 (quoting *Printz*, 521 U.S. at 918). But that argument, too, has been repeatedly and correctly rejected by courts. Most basically, *Printz* did not recognize an exception to the anticommandeering rule for statutes involving "the provision of information to the Federal Government." 521 U.S. at 918. Rather, the Supreme Court simply observed in *dicta* that the statute at issue — which directed state and local law enforcement officers to run background checks on handgun purchases — was distinguishable from those that "require[d] only the provision" of information. *Id.* As Justice O'Connor explained, the Court "refrain[ed] from deciding whether . . . purely ministerial reporting requirements imposed" on the States might require a different rule. *Id.* at 936 (concurring opinion). And although the United States has repeatedly asked courts to reach that unresolved question, recognize an exception to the anticommandeering rule for information-sharing statutes, and uphold section 1373(a) under that rule, courts have repeatedly rejected

---

[7] The United States also contends that it "makes no sense" to understand section 1373(a) to regulate States because, in its absence, statutes like the Act "would still be obstacle preempted, and thus invalid." AT Br. 61-62. But this argument is flawed because the Act is not obstacle-preempted. *Infra* pp. 28-46.

that request.  *See, e.g.*, *City of Chi.*, 321 F. Supp. 3d at 870-73; *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 952-53 (N.D. Cal. 2018), *aff'd in part, vacated in part*, 965 F.3d 753 (9th Cir. 2020); *Oregon*, 406 F. Supp. 3d at 973.

This court should do the same.  For one, the reasoning of the Supreme Court's anticommandeering opinions strongly suggests that a law mandating the sharing of information with the federal government would be unconstitutional.  The Court emphasized in *Printz* that *any* intentional imposition on "the functioning of the state executive," no matter how slight, operates to "compromise the structural framework of dual sovereignty," 421 U.S. at 932-33, and subsequently reiterated in *Murphy* that the anticommandeering rule applies "not only to state officers with policymaking responsibility but also to those assigned more mundane tasks," 584 U.S. at 473.  And because the States regulate virtually every aspect of day-to-day life pursuant to their police powers, an information-sharing exception to the anticommandeering rule would allow the federal government to extract vast quantities of information about every field in which the States exercise regulatory authority, ranging from medicine to elections to firearm ownership.

The United States protests that the Supreme Court recognized a limited version of this exception in *Haaland v. Brackeen*, 599 U.S. 255 (2023), AT Br. 62-63, but that seriously overreads *Brackeen*.  The Court in *Brackeen* upheld a provision of the federal Indian Child Welfare Act that "require[d] [state] courts" to maintain and provide certain records to the federal government.  599 U.S. at 287.  But it did so on the basis of the "distinctive[]" anticommandeering principles that apply "to a state

court's adjudicative responsibilities." *Id.* at 288; *see Testa v. Katt*, 330 U.S. 386, 390 (1947) (state courts must apply federal law). The unique treatment of state courts in this context, *Brackeen* explained, follows from the text of the Supremacy Clause and longstanding historical practice. 599 U.S. at 288. But the distinction the Supreme Court described in *Brackeen* is not relevant here, because the TRUST Act does not apply to state courts or court employees. *See* 5 ILCS 805/10 (the Act applies only to state agencies "charged with enforcement of State, county, or municipal laws or with managing custody of detained persons"). Presumably that is why the United States never advanced this theory (or cited *Brackeen*) below. *See* Docs. 1, 50. And to the extent the United States's argument is that section 1373(a) can constitutionally be applied to law enforcement agencies and officers that *are* covered by the Act simply because the information the United States seeks from those agencies "is, in many cases, related to court proceedings and can" *separately* "be found in court records," AT Br. 62-63, it identifies no case that has adopted such an implausibly expansive reading of *Brackeen*. At bottom, this case does not concern state courts or the information they maintain, and so *Brackeen* has no bearing.

Regardless, even if a law imposing only a "purely ministerial" information-sharing requirement could be upheld as consistent with the anticommandeering rule, section 1373(a) is not such a law. As one district judge within this circuit explained in 2018, section 1373(a) "is more than just an information-sharing provision." *City of Chi.*, 321 F. Supp. 3d at 872. Section 1373(a) does more than just pave the way for a "ministerial" data transfer; it "precludes . . . lawmakers from passing laws . . . that

27

institute locally-preferred policies" and purports to authorize state and local officers to use their paid time to pursue federal immigration enforcement, regardless of state and local policies on the subject. *Id.* at 869-70. Section 1373(a) thus exemplifies the exact concerns expressed by the Supreme Court in *Printz* and *Murphy*: It "blur[s]" the "responsibility" for federal policies by permitting state officers to participate in federal law enforcement even where the State has made a contrary choice, and in doing so it "shift[s] the costs of regulation to the States," requiring States and municipalities to fund enforcement of federal immigration law by state and local officers. *Murphy*, 584 U.S. at 473-74; *see Printz*, 521 U.S. at 929. At bottom, section 1373(a) "flouts" the principles justifying the anticommandeering rule "by barring states from adopting policies contrary to those preferred by the federal government." *City of Chi.*, 321 F. Supp. 3d at 870. Because section 1373(a) purports to regulate the States, not private actors, it cannot preempt the TRUST Act's information-sharing provisions.

## III. The district court correctly held that the TRUST Act is not conflict-preempted by federal law.

The United States also advances a broader and more nebulous preemption claim, contending that various provisions of the TRUST Act are conflict-preempted by the INA. AT Br. 30-36. The district court correctly rejected that argument, too.

### A. There is no conflict between the TRUST Act and the INA.

The United States's broader challenge to the TRUST Act rests not on any provision of the INA that expressly preempts state law, but rather on its view that the INA conflicts with, and so impliedly preempts, state laws that withhold state

resources from the project of enforcing federal civil immigration law. That argument finds no support in the INA itself, as the district court correctly held.

The United States's implied-preemption argument invokes principles of "conflict preemption (sometimes referred to as 'obstacle' preemption)." *McHenry Cnty.*, 44 F.4th at 591. The United States does not argue that there is any direct conflict between federal law and the TRUST Act, such that a party would find it impossible to comply with both regimes; rather, it contends that the Act generally "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.[8] But, as the Supreme Court has cautioned, that standard does not license a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *E.g.*, *Chamber of Commerce of U.S.*, 563 U.S. at 607. Rather, a plaintiff asserting conflict preemption "must point specifically to" the text of "a federal statute that does the displacing or conflicts with state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.); *accord Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("There is no federal preemption *in vacuo* . . . ."). And, because the TRUST Act directs the use of state law-enforcement resources — a core aspect of the State's police power, *see California*, 921 F.3d at 887 n.11 — the presumption against preemption applies,

---

[8] Amicus the Federation for American Immigration Reform ("FAIR") argues that it is impossible to comply with federal and state law because a state official who abides by the TRUST Act's restrictions will violate federal criminal statutes prohibiting the "harboring" of aliens. FAIR Br. 11-14. But the United States does not advance this extreme argument, and the court should disregard it. *See Lavallee v. Med-1 Sols., LLC*, 932 F.3d 1049, 1056 (7th Cir. 2019) (declining to "consider arguments introduced on appeal by an amicus").

meaning that the United States must establish that enforcing the Act "would do 'major damage' to clear and substantial federal interests." *McHenry Cnty.*, 44 F.4th at 591; *see Arizona*, 567 U.S. at 400 (States' police powers are not superseded "unless that was" Congress's "clear and manifest purpose"); *Savage v. Jones*, 225 U.S. 501, 533 (1912) (state law is obstacle-preempted only if "the purpose of the [federal] act cannot . . . be accomplished" if state law were enforced).

Applying these standards, the TRUST Act is not obstacle-preempted. As discussed, *supra* pp. 21-22, the Constitution protects the States' authority to decline to "administer a federal regulatory program," including the INA. *Printz*, 521 U.S. at 933. And the INA itself honors that distinction in multiple respects. Most basically, the INA envisions state officers enforcing federal immigration law directly only after the United States enters into a "formal agreement with a state or local government," *Arizona*, 567 U.S. at 408; *see* 8 U.S.C. § 1357(g), and emphasizes that the INA itself "shall [not] be construed to require any State or political subdivision to enter into" such an agreement, *id.* § 1357(g)(9). Indeed, the INA consistently — and expressly — conditions federal reliance on state resources on the States' agreement to provide those resources, thus respecting the fundamental rule that the federal government lacks authority to compel state cooperation in implementing its goals. *See, e.g., id.* § 1103(a)(10) (federal government may authorize state officials to enforce federal immigration law in emergency "with the consent" of the State), *id.* § 1103(a)(11)(A) (federal government may house immigrant detainees in state facilities "under an agreement" to do so); *id.* § 1231(i)(1) (federal government may compensate a State

for incarceration of noncitizens upon the State's "written request"). The INA, that is, "provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities." *California*, 921 F.3d at 889 (emphasis in original).

The United States's contrary view rests primarily on a set of INA provisions that govern when federal immigration agents can take custody of noncitizens who are serving terms of incarceration in state facilities. AT Br. 31-32. As the United States notes, the INA directs federal officers to take certain noncitizens into federal custody, and then to remove them from the United States, but simultaneously instructs federal officers to wait to apprehend any such individual currently in state custody until he or she is released. *See* 8 U.S.C. § 1226(c); *see also id.* § 1231(a)(1)(B)(iii), (2), (4)(A). Congress, the United States contends, thus "contemplated that once the period of state custody conclude[s], [such an] alien would be transferred to federal custody" directly, and in so doing obligated state and local governments to "coordinat[e]" with federal officials regarding the release of these individuals. AT Br. 33. Likewise, the United States implies, Congress expected that the States would ensure the "free flow of information" to DHS to facilitate that transfer, including by providing release-date information. *Id.* That argument is flawed for several reasons.

Most basically, the United States's argument overreads the INA. To be sure, the INA instructs federal officers to apprehend and detain certain noncitizens after they are released from state custody. 8 U.S.C. § 1226(c). But that is no more than a command to federal officers to refrain from taking custody of these individuals until they are released; it does not impose any obligation on state officers at all, much less

31

an obligation to "transfer" prisoners to federal custody, *contra* AT Br. 33. Indeed, the United States cites *no* provision of the INA (except section 1373(a)) that even refers to state officials, much less imposes obligations on them. Given that a direct instruction to transfer state prisoners to federal custody would strike at the heart of the States' police powers, *California*, 921 F.3d at 887 n.11, the United States must have "clear and manifest" evidence of Congress's intent to impose it, *Arizona*, 567 U.S. at 400; *see, e.g.*, *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (Congress "does not . . . hide elephants in mouseholes"). But the INA provisions the United States cites contain no indication of such a rule.

Absent textual evidence of an intent to impose obligations on the States, the United States insists that, even if the INA does not obligate States to transfer the noncitizens in question to federal custody, Congress nonetheless "contemplated" that such transfers would occur. AT Br. 33. But even if these provisions did reflect such an expectation, that would be irrelevant. Indeed, this court considered and rejected an identical argument in *McHenry County*, 44 F.4th 581, which likewise involved a preemption challenge to the TRUST Act. The plaintiffs in *McHenry County* contended that other provisions of the INA, 8 U.S.C. §§ 1103(a) and 1231(g), reflected Congress's "hope[ ] or expect[ation] that States would cooperate with any requests from the Attorney General to house [noncitizen] detainees" in state facilities, 44 F.4th at 592, such that Illinois's choice to prohibit the municipal detention of such individuals was preempted. But this court firmly rejected that argument, explaining that, even if the plaintiffs had accurately described Congress's intent, the States

32

would not be "bound by that hope or expectation." *Id.*; *accord California*, 921 F.3d at 891 (explaining that "we must distinguish between expectations and requirements" in rejecting analogous preemption claim).  So even if the cited provisions of the INA could be read to "contemplate[]" that States would transfer certain noncitizens to the federal government at the end of their sentences — contrary to the plain text of those provisions, *supra* p. 31 — it would not matter, because the States are "not bound by that . . . expectation." *McHenry Cnty.*, 44 F.4th at 492.

The United States alternatively appears to suggest that, even if the INA does not obligate States to automatically transfer certain noncitizens to federal custody at the conclusion of their sentences, it nonetheless obligates States to detain or transfer those individuals if presented with a detainer or administrative warrant.  AT Br. 33, 35.  But the INA cannot plausibly be read to require that result, either.  The INA authorizes federal immigration agents to issue "detainers" to state and local officials that ask those officials to (a) inform DHS of individuals' pending release dates and (b) temporarily detain those individuals to permit DHS to assume custody.  8 U.S.C. § 1357(d)(3); 8 C.F.R. § 287.7(a), (d).  But even DHS's regulations acknowledge that a detainer is a "request," not an obligation.  8 C.F.R. § 287.7(a); *see Galarza v. Szalczyk*, 745 F.3d 634, 640-41 (3d Cir. 2014) (collecting cases to the same effect).  And although the INA authorizes federal immigration officers to conduct arrests of noncitizens using administrative warrants, 8 U.S.C. § 1226(a); *see* U.S. Dep't of

Homeland Sec., *Form I-200: Warrant for Arrest of Alien*,[9] it imposes no obligation on state or local officers to assist with or facilitate those arrests. So the INA cannot be read to require States to detain or transfer individuals when presented with these documents, either.

At bottom, the INA creates mechanisms that States and localities can use to assist the federal government in enforcing federal civil immigration law, but is clear that the decision whether to provide such assistance is just that — a decision for States to make. *See McHenry Cnty.*, 44 F.4th at 591-92. Because the TRUST Act simply embodies Illinois's decision not to provide this assistance, the district court correctly held that there is no conflict between the INA and the Act.

## B.    A contrary reading of the INA would raise serious constitutional concerns.

As the preceding discussion shows, the INA does not reflect a "clear and manifest purpose" to displace States' authority to use their own law-enforcement resources as they see fit. *Arizona*, 567 U.S. at 400. But were there any question, the canon of constitutional avoidance would require the same result. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (when an interpretation of a statute would "raise[] 'a serious doubt' as to its constitutionality," courts must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The United States's reading of the INA would compel state and local officials to assist with federal immigration

---

[9] https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF (last visited June 5, 2026).

enforcement activities and prohibit States from constraining their officers' discretion to provide such assistance, all in violation of the anticommandeering rule.  The Court should not read the statute to contain such unconstitutional commands.

As discussed, *supra* pp. 21-22, because the Constitution "confers upon Congress the power to regulate individuals, not States," *New York*, 505 U.S. at 166, the federal government "may not compel the States to implement, by legislation or executive action, federal regulatory programs," *Printz*, 521 U.S. at 925.  Here, any obligation that state and local officials facilitate transfers of individuals to federal custody or supply information to the federal government in support of those transfers would be inconsistent with this basic rule.  Imposing such requirements would conscript state officials into executing a federal program to detain and remove individuals based on federally determined enforcement priorities.  It would stop States from "declin[ing] to administer [a] federal program." *New York*, 505 U.S. at 177.  And it would compel States and localities to divert their attention from issues of greater local concern, *see id.* at 174, and "absorb . . . financial burden[s]" of federal immigration enforcement, *Printz*, 521 U.S. at 930.  Indeed, the United States's primary concern with the Act appears to be that, without the ability to obtain Illinois's aid on demand, the federal government will have to commit more of its own resources to accomplish its goals.  *See* AT Br. 35 (explaining that it is "expensive" for immigration agents to apprehend noncitizens after their release from state custody); *see also* Doc. 50 at 21 (similar).  But the Constitution does not permit the national

government "to impress into its service — and at no cost to itself — the police officers of the 50 States." *Printz*, 521 U.S. at 922.

The Constitution likewise does not permit Congress to deprive state legislatures of their authority to set the terms on which state and local authorities may participate in civil immigration enforcement. Under the anticommandeering rule, Congress may neither compel state legislatures to affirmatively adopt federally preferred policies, *New York*, 521 U.S. at 161-62, nor preclude them from enacting legislation of their own choosing, *Murphy*, 584 U.S. at 474-75. The United States's reading of the INA here would purport to order the Illinois legislature to refrain from adopting laws that limit state and local discretion to assist the federal government. That would amount to a federal "dictate[] [of] what a state legislature may and may not do." *Id.* at 474. The United States disclaims the intention of requiring States "to regulate in a particular area by enacting or repealing a particular law," but it asserts that, under its interpretation of the INA, federal law would "prevent[] states . . . from implementing" policies with which the United States disagrees. AT Br. 51-52. That is the definition of legislative commandeering. *Murphy*, 584 U.S. at 475 (Congress may not order state legislatures to "refrain from enacting state law" governing the State's own activities).

Indeed, the federalism concerns with the United States's interpretation of the INA are acute, because it would vest the federal government with authority to dictate how decisionmaking power is distributed within the State and to control how the State prioritizes the use of its own law enforcement resources. In the United States's

36

view, the authority to determine whether and how state and local officials cooperate with immigration officers resides not with state policymakers, but (apparently) with individual state and local employees, even as they carry out their official duties using public resources. But the federal government does not have the power to prescribe how a State allocates its internal decisionmaking power or fixes its enforcement priorities in this way. *See, e.g.*, *Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015) ("States retain autonomy to establish their own governmental processes"); *McHenry Cnty.*, 44 F.4th at 590 ("[W]e operate under a 'working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism . . . .'" (quoting *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004)). If anything, the United States's interpretation of the INA is more offensive to the anticommandeering rule even than the laws at issue in *Murphy, New York*, and *Printz*, which did not purport to override a State's determination about how to structure internal state decisionmaking authority.

Consistent with these principles, courts have consistently rejected the United States's interpretation of the INA on constitutional grounds. Most relevant here, the Ninth Circuit rejected in 2019 a preemption challenge to California's analogous law, which (like the Act) limits the circumstances under which state and local officers can provide information to the federal government about detainees or facilitate transfers of those detainees to immigration custody. *See California*, 921 F.3d at 876. There, too, the United States argued that California's law was impliedly preempted by the

37

INA, in that it conflicted with Congress's "contemplat[ion]" that state and local law enforcement would assist DHS in apprehending noncitizens for removal. *Id.* at 888. But the Ninth Circuit rejected that argument, explaining that the United States's position "r[an] directly afoul of the Tenth Amendment and the anticommandeering rule." *Id.* "Extending conflict or obstacle preemption to [the state law] would," the court explained, "in effect, 'dictate what a state legislature may and may not do,' because it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law." *Id.* at 890 (quoting *Murphy*, 584 U.S. at 475). At bottom, the court reasoned, "the choice of a state to refrain from participation" in a federal regulatory program "cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *Id.* To our knowledge, every other court to have considered a similar challenge to a state law of this sort has agreed. *See, e.g.*, *New York*, 814 F. Supp. 3d at 278-79; *Cnty. of Ocean*, 475 F. Supp. 3d at 379-83. This court should not be the first to break from this consensus.

The United States's counterarguments are badly flawed. The United States contends primarily that the INA (as it interprets it) does not commandeer the States because it is a regulation of private individuals — *i.e.*, noncitizens — that conflicts with Illinois's own regulation of the same individuals. AT Br. 52-54. That is wrong on multiple levels. For one, the INA provisions cited by the United States are not best understood themselves to regulate private actors; instead, they direct the actions of federal officers, instructing them whom to "take into custody," 8 U.S.C. § 1226(c),

38

to "detain," *id.* § 1231(a)(2), and to "remove," *id.* § 1231(a)(1)(A), (4)(A), and when to do so. These provisions simply provide federal officers with marching orders; they do not "confer any federal rights" on private actors or "impose any federal restrictions" on them. *Murphy*, 584 U.S. at 480. And even if the federal provisions could be read to regulate private actors, the challenged provisions of Illinois's state law certainly cannot: They neither require nor entitle private actors to do anything that federal law prohibits, but instead constrain *state officials'* discretion to provide certain forms of assistance to federal immigration enforcement efforts. *See, e.g.*, 5 ILCS 805/15(h) (instructing state "law enforcement agenc[ies] [and] official[s]" not to take certain actions); *see also McHenry Cnty.*, 44 F.4th at 593 (Act "regulates only State and local entities and law enforcement"). The challenged provisions of the Act thus neither "confer[] rights" nor "impose[] restrictions" on private actors that are "inconsistent — *i.e.*, in conflict — with" those imposed by "federal law." *Murphy*, 584 U.S. at 477-78.

The United States attempts to shoehorn the challenged provisions of the Act into this framework by casting them as regulations of individuals "subject[ed] . . . to the state's criminal-justice system," AT Br. 53, but that paints with far too broad a brush. A provision directing a state official not to provide certain information to the federal government does not regulate the individuals about whom the information pertains, as discussed. That is so even if such a provision could be characterized broadly as part of a State's regulation of its "criminal-justice system," AT Br. 53 — that is, as part of a broader statutory scheme that *itself* regulates private actors.

Again, *supra* p. 24, in its commandeering cases the Supreme Court has analyzed the constitutionality of individual statutory provisions, not of statutory schemes as a whole.  Just as Congress could not shield an unconstitutional directive to the States by cloaking it in a broader statute that regulates private individuals, the United States cannot characterize provisions of state law that direct the use of state law-enforcement resources as regulations of private actors by simply asserting that such provisions "regulate aliens' interaction with the state criminal-justice system."  AT Br. 53.

At bottom, the United States's view appears to be that, even if the federal government cannot formally "require jurisdictions to enforce a federal regulatory scheme*,*" *id*. at 52, it can functionally achieve the same result by characterizing state laws declining such participation as "imped[iments]" to the federal scheme, *id*. at 51. But such an outcome, just like the formal commandeering the United States disclaims, would "override[] the usual balance of federal and state powers," *Bond v. United States*, 572 U.S. 844, 858 (2014), providing the federal government with an effective veto over state laws and policies to which it objects.  Bedrock principles of federalism prohibit that conclusion.

### C.     The United States's other counterarguments lack merit.

The United States's remaining objections to these arguments, and to the district court's holdings, are meritless.

The United States's overarching argument is that the anticommandeering principle allows States to decline to administer federal programs, but not to actively

40

"thwart" or "interfere with" the federal government's own administration of those programs. AT Br. 43, 45-46, 51-52, 56-57. But that mischaracterizes the Act. The Act regulates the use of the State's own law-enforcement resources, establishing the conditions under which state and local law enforcement agencies can deploy public funds and personnel to assist in civil immigration enforcement. It allows those agencies to communicate individuals' release dates and to transfer them to federal custody in a range of circumstances, including in connection with a federal criminal warrant or where required by federal law. *Supra* p. 7. And where the Act restricts cooperation, it simply directs state and local officials to do nothing — allowing the federal government to enforce the INA using the federal resources that Congress provided for that purpose. Indeed, as this court concluded in 2018 about Chicago's analogous ordinance, Illinois's decision not to participate in immigration enforcement efforts does not "involve[] any affirmative *interference* with federal law enforcement at all." *City of Chi. v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (emphasis in original).[10] In the Ninth Circuit's words, "refusing to help is not the same as impeding." *California*, 921 F.3d at 888.

The United States criticizes *McHenry County* and *California*, arguing that *California*, in particular, is "flawed" and that the court should "decline to follow it."

---

[10] *Vacated in part on other grounds and reh'g en banc granted in part*, 2018 WL 4268817 (7th Cir. June 4, 2018) (concerning scope of preliminary injunction), *reh'g en banc vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). To be sure, as the United States contends, *Sessions* ultimately resolved a distinct legal claim, and so "does not control" the separate question whether the Act is preempted. AT Br. 42 n.8. But the court nonetheless correctly characterized the nature and effect of measures like the Act on the federal government's ability to enforce the INA.

AT Br. 41 n.4; *see also id.* at 42-43, 45-47.  But *McHenry County* is the law of this circuit, and it expressly embraces *California*'s reasoning, *see* 44 F.4th at 591-92 (describing *California* as presenting issues that were "exactly the same").  So the United States cannot simply wave *California* away.  Perhaps recognizing as much, the United States contends that *McHenry County* applies (and *California* should at most apply) only where federal law expressly provides that "states and the federal government may enter into cooperative arrangements, but a state law bars such cooperation."  AT Br. 41 n.7; *see also id.* at 45-47.  But the INA provisions that make state assistance contingent on state consent, *supra* p. 30, were drafted in the shadow of the anticommandeering rule, cognizant of the States' constitutional prerogative to decide whether or not to participate in federal projects.  *Cf. Printz*, 521 U.S. at 918 (describing "almost two centuries" of congressional practice).  And *McHenry County* expressly grounds its holding in that reasoning, explaining that "the specter of the anticommandeering rule" would require the rejection of the plaintiffs' preemption argument independently of the statutory text.  44 F.4th at 592; *see also id.* ("[T]he United States 'could not *require* [state] cooperation without running afoul of the Tenth Amendment.'" (quoting *California*, 921 F.3d at 891)).[11]

---

[11]  For that reason, the United States is wrong to suggest that *McHenry County* would have come out differently had the INA provision at issue in that case "require[d]" the Executive to "enter[] into cooperative agreements" with States, rather than simply tasking it with "explor[ing] the possibility" of such agreements.  AT Br. 46.  Congress cannot command the States to enter into "cooperative agreements," *id.*, so the result would have been the same even had Congress imposed a more direct obligation on the Executive Branch.

The United States's analogies to other cooperative agreements between the federal government and the States, AT Br. 45, 54-55, undercut rather than support its arguments. Illinois and other States have agreed via the Interstate Agreement on Detainers to transfer state prisoners to one another (and to the federal government) for trial under certain circumstances, *id*. at 45, but there is no argument that the States were *required* to enter that agreement, as the United States now contends the INA commands. The fact that States may choose to transfer prisoners in one context has no bearing on whether they are obligated to transfer prisoners in another. Nor does the United States's invocation of "'cooperative federalism' programs*,*" *id*. at 54, help its argument. *Murphy* used that term to describe the statutory scheme held constitutional in *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), which required the federal government to comprehensively regulate the operations of certain coal mining companies but permitted the States to propose and enforce their own regulatory regimes if they chose to do so, *id.* at 270-71. But the INA is in no way "akin to," AT Br. 54, the scheme upheld in *Hodel*. Under *Hodel*, Congress can offer States a choice between regulating private parties in a certain manner or allowing the federal government to do so in their jurisdictions. *See* 452 U.S. at 288 (explaining that, if States opt not to enact regulations, they need not "enforce the steep-slope standards, . . . expend any state funds, or . . . participate in the federal regulatory program in any manner whatsoever"). But the INA does not present the States with a choice of that sort. The United States's analogy rests on the premise that Congress "could have" enacted a different regulatory program

43

altogether, and chose not to, thus implicitly "impos[ing] certain conditions" on the States. AT Br. 54-55. That is not *Hodel*'s reasoning, and such logic would enable the federal government to justify any command to the States simply by pointing to some more sweeping regulation that Congress "could have" imposed, *id.*, but chose not to. That is not cooperative federalism; it is commandeering.

The United States's invocation of the purposes of the anticommandeering rule, *id.* at 56-58, likewise undermines its arguments. Courts have repeatedly explained why the obligations the United States reads the INA to impose on the States would contravene anticommandeering principles. The United States's interpretation of the INA would "make[ ] it difficult for citizens to distinguish between state and federal policy in the immigration context" and "force[ ] [S]tates to allow their employees to participate in the federal scheme, shifting employee time — and thus corresponding costs — to federal initiatives and away from state priorities." *City of Chi.*, 321 F. Supp. 3d at 870; *accord, e.g., Cnty. of Ocean*, 475 F. Supp. 3d at 378-79; *California*, 314 F. Supp. 3d at 1107-09. Those are *exactly* the reasons that the Supreme Court explained in *Murphy* made "adherence to the anticommandeering principle . . . important." 584 U.S. at 473. The United States's contrary protestations are not responsive. The fact that the Constitution gives authority over "the admission and exclusion of aliens" to the federal government, AT Br. 56, is irrelevant: The TRUST Act does not purport to regulate on that subject, and in any event that Congress has authority to regulate in some area does not mean that it has "the power to issue direct orders to the government of the States" in that area. *Murphy*, 584 U.S. at 471.

44

The United States's contention that requiring States to share information about —

and facilitate the transfer of — state inmates would not "undermine political

accountability or shift . . . costs" to the States, AT Br. 57, is wrong.  The United

States's reading of the INA would require the States to "stand aside" while the

federal government "conscript[s] the time and cooperation" of their employees in

responding to federal inquiries and enabling federal transfers, *City of Chi.*, 321 F.

Supp. 3d at 873; that the United States would bear *other* costs (specifically, the "costs

of the subsequent detention and removal," AT Br. 57) is irrelevant.  And the United

States's insistence that the States will not "be blamed" for their enforcement of

federal immigration law*, id*. at 57-58, cannot be squared with Illinois's stated goals in

passing the Act, namely to build "trust" between state and local law enforcement and

immigrant communities.  *Supra* p. 6.

Finally, "historical practice" cannot justify the United States's expansive

reading of the INA.  AT Br. 58-59.  The United States observes that States have for

two centuries transferred prisoners to one another (and to the federal government)

pursuant to court order.  *Id*. at 58; *see Carbo v. United States*, 364 U.S. 611, 620

(1961).  But the Act is completely consistent with that historical tradition, in that it

permits state and local law enforcement officers to provide information and transfer

inmates when "presented with a federal criminal warrant" or other court order.  *See*

5 ILCS 805/15(h).  The United States also points to a 1798 statute authorizing state

courts to issue removal orders, which were then executed by federal officers.  AT Br.

58-59.  Even assuming a single statute could demonstrate a "historical practice," *see*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 46 (2022) ("doubt[ing]

that *three* . . . regulations could suffice to show a [historical] tradition" (emphasis in

original)), it is well settled that Congress can issue commands to state courts that it

could not issue to state executive officials. *See Brackeen*, 599 U.S. at 288; *Printz*, 521

U.S. at 908. The statute the United States identifies falls comfortably within *that*

historical tradition — *i.e.*, the tradition of "requir[ing] 'state judges to enforce federal

prescriptions,'" *Brackeen*, 599 U.S. at 288 (quoting *Printz*, 521 U.S. at 908). Nothing

about this statute illustrates a broader tradition of permitting federal officials to

require state officials to transfer inmates on demand. *Cf. Printz*, 521 U.S. at 918

(describing "almost two centuries of apparent congressional avoidance of the

practice").

## IV.    The district court correctly held that the TRUST Act does not violate intergovernmental-immunity principles.

The United States finally contends that the TRUST Act violates principles of

intergovernmental immunity, under which the States cannot "regulate the United

States directly or discriminate against the Federal Government or those with whom

it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (brackets omitted).

Specifically, it argues that the Act discriminates against the federal government by

"treat[ing] . . . federal immigration agents less favorably than the general public and

other law enforcement agencies." AT Br. 48.[12] But *McHenry County* rejected this

---

[12] In the district court, the United States separately alleged that the Act violated
intergovernmental-immunity principles by "effect[ing] direct regulation of the
Federal Government." Doc. 1 at 20 (count three). The district court dismissed that

argument, *see* 44 F.4th at 594, and for good reason:  Any other result would read the intergovernmental-immunity doctrine to override the anticommandeering rule.  The district court correctly dismissed the United States's intergovernmental-immunity claim.

### A.     The Act does not discriminate against the federal government.

The district court correctly held that the Act does not contravene principles of intergovernmental immunity by discriminating against the federal government.  The intergovernmental-immunity doctrine prohibits States from "discriminat[ing] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (cleaned up).  States may not "single those parties out 'for less favorable treatment'" than some "similarly situated" group, or "regulate them 'unfavorably on some basis related to their governmental status.'" *McHenry Cnty.*, 44 F.4th at 593-94 (quoting *Washington*, 596 U.S. at 839).  As the district court explained, SA58-60, the Act does not transgress this rule.

Most basically, the Act does not "single out" the federal government for "less favorable treatment" than a "similarly situated" entity. *McHenry Cnty.*, 44 F.4th at 593-94.  It establishes a categorical policy of declining to provide state resources to a specific activity:  the enforcement of civil immigration law.  The fact that (as the district court observed) "only the federal government enforces civil immigration law," SA59, does not mean that Illinois is "discriminating against the Federal

claim, SA60-63, and the United States does not challenge that decision on appeal, AT Br. 13-14 n.5.

Government" in declining to assist in enforcing that law, *Washington*, 596 U.S. at 838 (cleaned up); it simply means that Illinois has reasonably distinguished between activities to which it will lend law-enforcement resources and activities to which it will not. The district court accordingly correctly dismissed the United States's intergovernmental-immunity claim: Because there is no entity "similarly situated" to the federal government with respect to the enforcement of civil immigration law, *Washington*, 596 U.S. at 839, the Act does not "single out" the United States in a manner cognizable under that doctrine, *McHenry Cnty.*, 44 F.4th at 593.

Indeed, *McHenry County* rests on exactly this reasoning. There, too, the plaintiffs argued that a provision of the Act — section 15(g) — discriminated against the federal government, in that it prohibited state and local entities from entering into contracts with the federal government to house immigrant detainees. 44 F.4th at 592. This court rejected that argument, explaining that section 15(g) did not discriminate against the federal government on its face, in that it left the plaintiff municipalities free to "provide detention services to the federal government for other detainees." *Id.* at 594. And to the extent the plaintiffs argued that section 15(g) was discriminatory because it "affect[ed] an exclusively federal domain," *i.e.*, federal immigration law, the court explained, that argument also failed, because section 15(g) did not provide "more favorable treatment" to "any actors 'similarly situated' to the federal government" with respect to federal immigration law. *Id.* at 594. "The mere fact that the Act touches on an exclusively federal sphere," it held, "is not enough to establish discrimination." *Id.* Other courts have repeatedly and

48

overwhelmingly reached the same conclusion in rejecting similar challenges. *See, e.g.*, *United States v. New Jersey*, No. 13-cv-64, 2021 WL 252270, at \*14 (D.N.J. Jan. 26, 2021) (dismissing intergovernmental-immunity challenge to similar New Jersey measure because it did not "treat[] any similarly situated parties better than the federal government"); *New York*, 814 F. Supp. 3d at 282-83 (same); *California*, 314 F. Supp. 3d at 1111 (same).

The United States has no meaningful response. It insists that the Act treats federal officials differently from "other law enforcement agencies" by prohibiting state and local officials from sharing information and providing access to detainees as to only "'immigration agents.'" AT Br. 48 (quoting 5 ILCS 805/15(h)). But that argument is not responsive to *McHenry County* or to the district court's reasoning: Immigration agents are not "similarly situated," *Washington*, 596 U.S. at 839, to state and local law enforcement officers with respect to the enforcement of civil immigration law. Section 15(i) of the Act, which the United States asserts supports its claim, AT Br. 48-49, only illustrates that the Act distinguishes on the basis of *activity*, not on the basis of federal status: It clarifies that the Act does not prevent state and local officers from cooperating with "federal . . . law enforcement agencies" in "investigating violations of criminal law," 5 ILCS 805/15(i) — thus *permitting* state officers to provide assistance to federal officers (including, for that matter, federal immigration agents), as long as doing so means helping enforce criminal law, not civil immigration law. That is not "discrimination against the Federal

49

Government," *Washington*, 596 U.S. at 838 (cleaned up); it is simply a decision about which activities Illinois law enforcement officers can permissibly undertake.

Finally, the Act does not impermissibly discriminate against the federal government for the independent reason that Congress has authorized the States to decline to enforce federal civil immigration law. Congressional action may "sufficiently qualif[y] the intergovernmental immunity of the United States to permit the state to make the distinction it has." *United States v. Lewis Cty.*, 175 F.3d 671, 676 (9th Cir. 1999); *see Washington*, 596 U.S. at 839-40. In enacting the INA, Congress contemplated that States would make their own voluntary choices about whether to participate in immigration enforcement. *Supra* pp. 30-31. If a State exercising that choice declines to provide certain forms of assistance to immigration authorities, that does not impermissibly discriminate against the United States. The United States contests this point, but its objection rests exclusively on its view that Illinois is "not merely refusing to cooperate," but instead "undermining," the federal scheme. AT Br. 50. But that premise is mistaken, as discussed, *supra* pp. 40-41: Illinois's choice about how to deploy its own law-enforcement resources leaves the United States free to enforce the INA using its own resources, and does not "involve[] any affirmative *interference* with" that mission "at all." *City of Chi.*, 888 F.3d at 282 (emphasis in original). Illinois does not discriminate against the federal government in doing so.

50

## B.     A contrary rule would raise constitutional concerns.

The United States's intergovernmental-immunity claim separately fails for a second reason, which is that its reading of the intergovernmental-immunity doctrine would effectively override a State's constitutional entitlement to "decline to administer [a] federal program." *New York*, 505 U.S. at 176-77.  Under the United States's view, a State cannot enact a law declining to assist the federal government (and only the federal government) in administering a federal program, because doing so would "single out" the federal government "for less favorable treatment."  AT Br. 47.  But, as the district court explained, that cannot be correct:  "It would allow the federal government to commandeer States under the guise of intergovernmental immunity — the exact type of direct regulation of states barred by the Tenth Amendment."  SA63.

The Ninth Circuit's opinion in *California* rests on this reasoning.  There, the federal government argued that California's analogue to the TRUST Act violated the doctrine of intergovernmental immunity (in addition to being preempted).  291 F.3d at 891.  But the Ninth Circuit summarily rejected that argument, explaining that "[a] finding that [the statute] violates the doctrine of intergovernmental immunity would imply that California *cannot* choose to . . . refus[e] to assist [federal] enforcement efforts — a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule."  *Id.*  Again, other courts have resoundingly rejected this understanding of the intergovernmental-immunity doctrine, including in cases that challenge state laws effectuating a choice not to assist in federal immigration

51

enforcement efforts. *See, e.g.*, *United States v. New York*, 810 F. Supp. 3d 329, 355 (N.D.N.Y. 2025) ("Finding that these same provisions constitute discrimination . . . would provide an end-run around the Tenth Amendment."), *appeal docketed*, No. 26-104 (2d Cir.); *New Jersey*, 2021 WL 252270, at *13 ("[I]f the Court were to accept the United States' position[,] . . . state participation in such efforts would no longer be voluntary.")).

Indeed, the United States cites no case that has ever found a state law effectuating a State's decision not to participate in a federal program invalid on immunity grounds, and the Supreme Court's own recent immunity cases look nothing like this one. In *Washington*, for instance, the Supreme Court held invalid on discrimination grounds a state law that provided federal employees with greater workers' compensation benefits than were accorded other workers within the State. 596 U.S. at 836-37, 839. Likewise, in *Dawson v. Steager*, 586 U.S. 171 (2019), the Court held invalid a state law that afforded a tax benefit to retired state employees, but not to similarly situated federal retirees, *id.* at 174-75. The TRUST Act looks nothing like these statutes. It does not regulate federal employees or property in a manner inconsistent with the State's regulation of other similarly situated parties; rather, it reflects only the State's decision not to invest its own limited resources to administer a federal program. If the federal government could recast such a decision as unconstitutional discrimination against the United States, there would be nothing left of the anticommandeering rule.

52

The United States acknowledges these arguments, AT Br. 65-66, but does not genuinely engage with them. It suggests that the courts that have rejected immunity claims on this basis are wrong because the INA "regulates private individuals," and thus is "supreme" over state laws. AT Br. 65 (citing U.S. Const. art. VI, cl. 2)). That is wholly nonresponsive. An intergovernmental-immunity claim does not depend on what a federal statute says; rather, it rests directly on the Supremacy Clause itself. *See, e.g.*, *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) (distinguishing between immunity and preemption theories); *Texas v. DHS*, 123 F.4th 186, 209 (5th Cir. 2024) (same); *New York*, 810 F. Supp. 3d at 351 n.12 ("[I]n a world without federal legislation, intergovernmental immunity would still invalidate offending state regulations"). It does not matter, in other words, for purposes of the United States's intergovernmental-immunity claim what "the INA does," AT Br. 65, and the United States advances no other argument about why its expansive reading of that doctrine would not swallow the anticommandeering rule. The district court thus correctly reasoned that this claim fails on this basis, too.

53

## CONCLUSION

For these reasons, the court should affirm the decision below.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General       115 South LaSalle Street
115 South LaSalle Street       Chicago, Illinois 60603
Chicago, Illinois 60603        (312) 814-3312
(312) 814-5526
alex.hemmer@ilag.gov           Attorneys for State Defendants

June 9, 2026

54

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32(c) because it contains 13,777 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(f)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook BT) using Microsoft Word.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER

June 9, 2026

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 9, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER