No. 25-2904

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF ILLINOIS, et al.,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 25 C 1285
The Honorable Lindsay C. Jenkins, presiding

————

**BRIEF OF COUNTY DEFENDANTS-APPELLEES**

————

EILEEN O'NEILL BURKE
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6934
Jessica.Scheller@cookcountysao.org

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Deputy Chief, Civil Actions Bureau
PRATHIMA YEDDANAPUDI
JONATHON BYRER
EDWARD BRENER
JESSICA L. WASSERMAN
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS
_____

POINTS AND AUTHORITIES ...........................................................................iii

ISSUES PRESENTED ........................................................................................ 2

STATEMENT OF THE CASE............................................................................ 3

SUMMARY OF ARGUMENT ............................................................................ 6

ARGUMENT ...................................................................................................... 8

I.    Plaintiff's Preemption Arguments Fail ................................................. 8

    A.  Plaintiffs' Preemption Arguments Are Forfeited ....................... 9

    B.  The Ordinance Is Not Expressly Preempted ............................. 13

    C.  The Ordinance Is Not Conflict-Preempted. ............................... 23

II.    Plaintiff's Intergovernmental-Immunity Argument Lacks a Comparator..... 27

III.    If Sections 1373 And 1644 Preempt County Law, They Are Unconstitutional As Applied .................................................................. 30

IV.    Plaintiff Lacks Standing To Sue The County Defendants ............................. 44

CONCLUSION.................................................................................................. 51

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) ....................... 52

CERTIFICATE OF SERVICE.......................................................................... 52

# POINTS AND AUTHORITIES

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)................................................................ 36

*Alioto v. Town of Lisbon*, 651 F.3d 715 (7th Cir. 2011)................................................ 11

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) ......................................................... 20

*Ampersand, Inc. v. Finley*, 338 N.E.2d 15 (Ill. 1975) ............................................... 33

*Andrews v. Chevy Chase Bank*, 545 F.3d 570 (7th Cir. 2008)................................... 16

*Arizona v. United States*, 567 U.S. 387 (2012)..................................................... 14, 27

*Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291 (2006) ................. 38

*Armstrong v. Exceptional Child Center, Inc.,* 575 U.S. 320 (2015)............................. 1

*Atkins v. Deere & Co.*, 685 N.E.2d 342 (Ill. 1997)..................................................... 29

*Banks v. Booth*, 3 F.4th 445 (D.C. Cir. 2021) ........................................................... 22

*Barber v. Gonzales*, 347 U.S. 637 (1954)................................................................... 21

*Better Gov't Assn v. Village of Rosemont*, 82 N.E.3d 710 (Ill. App. 2017) ................. 26

*Bond v. United States*, 572 U.S. 844 (2014).............................................................. 41

*Boomer v. AT&T*, 309 F.3d 404 (7th Cir. 2002)......................................................... 13

*Bread PAC v. Federal Election Comm'n*, 455 U.S. 577 (1982).................................. 23

*Carbo v. United States,* 364 U.S. 611 (1961)........................................................ 42, 43

*Center for Biological Diversity v. United States EPA*, 937 F.3d 533

    (5th Cir. 2019)...................................................................................................... 45

*CITGO Asphalt Refining Co. v. Frescati Shipping Co.*, 589 U.S. 348 (2020)............ 16

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018)............................. 19

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ............................ 18, 19

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................. 48

*Clark v. Sweeney*, 607 U.S. 7 (2025) ....................................................................... 35

*Cleveland Hair Clinic, Inc v. Puig*, 200 F.3d 1063 (7th Cir. 2000) ........................... 35

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) .................................... 24

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) ...................................... 14

*Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016 ..................... 45

*Domka v. Portage County*, 523 F.3d 776 (7th Cir. 2008) .......................................... 41

*Engle v. Isaac*, 456 U.S. 107 (1982) ......................................................................... 39

*English v. General Elec. Co.*, 496 U.S. 72 (1990) ..................................................... 24

*Fednav Int'l Ltd. v. Continental Ins. Co.*, 624 F.3d 834 (7th Cir. 2010) .. 17, 19, 33, 35

*FERC v. Miss.*, 456 U.S. 742 (1982) ........................................................................ 38

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893) .............................................. 40

*Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019) ................... 21

*Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ................................................... 47

*Giddings v. Chandler*, 979 F.2d 1104 (5th Cir. 1992) ......................................... 28, 48

*Goldhamer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) .................................... 44, 47, 50

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ................................................................ 14

*Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012) ........................................................... 13

*Gunn v. Minton*, 568 U.S. 251 (2013) ........................................................................ 1

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ............................................... 31, 33, 34, 37

*Heyward v. Cooper*, 88 F.4th 648 (6th Cir. 2023) ......................................... 11, 12, 37

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981)................. 38

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ......................................................... 40

*Kansas v. Garcia*, 589 U.S. 191 (2020).................................................................... 21

*Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039 (7th Cir. 1999) ...................... 11

*Lac Courte Oreilles Band v. United States*, 367 F.3d 650 (7th Cir. 2004)................. 30

*Linda R. S. v. Richard D.*, 410 U.S. 614 (1973)................................................... 49, 50

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).................................................. 44

*Lukaszczyk v. Cook County*, 137 F.4th 671 (7th Cir. 2025)................................. 12, 35

*Margolin v. National Ass'n of Immigr. Judges*, 2026 U.S. LEXIS 2251

(U.S. May 26, 2026) ................................................................................................. 35

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)........................................... 40

*McHenry Cty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022)............................. 27, 28, 29, 43

*McKenzie v. United States Citizenship & Immigration Services, District Director*, 761

F.3d 1149 (10th Cir. 2014) ...................................................................................... 45

*McNeil v. Director, Patuxent Inst.*, 407 U.S. 245 (1972)........................................... 25

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................................... 14

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ............................................... 31

*Murphy v. NCAA*, 584 U.S. 453 (2018) ........................................................*passim*

*Murthy v. Missouri*, 603 U.S. 43 (2024) ................................................................... 48

*Nelson v. Great Lakes Educ. Loan Servs.*, 928 F.3d 639 (7th Cir. 2019).................. 14

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514

U.S. 645 (1995) ....................................................................................................... 20

*New York v. United States*, 505 U.S. 144 (1992) .................................................*passim*

*New York v. United States DOJ*, 964 F.3d 150 (2d Cir. 2020) .................................. 19

*Noem v. Garcia*, 145 S. Ct. 1017 (2025) ...................................................... 32

*North Dakota v. United States*, 495 U.S. 423 (1990).............................................. 27, 29

*Ocean Cnty. Bd. of Comm'rs v. Attorney General*, 8 F.4th 176 (3d Cir. 2021)..... 15, 16

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013)........................... 15

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981).............................. 38

*People v. Thomas*, 932 N.E.2d 658 (Ill. App. 2010) .................................................. 26

*Printz v. United States*, 521 U.S. 898 (1997) .......................................................*passim*

*Reno v. Condon*, 528 U.S. 141 (2000) ........................................................... 30

*Rujawitz v. Martin*, 561 F.3d 685 (7th Cir. 2009) ...................................................... 8

*Savage v. Jones*, 225 U.S. 501 (1912)................................................................. 24, 26

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) ....................................................... 45

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976).............................. 48, 49, 50

*Sprietsma v. Mercury Maine*, 537 U.S. 51 (2002) ...................................................... 14

*St. Anthony Hosp. v. Whitehorn*, 132 F.4th 962 (7th Cir. 2025) .............................. 37

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................... 50

*Time Warner Cable v. Doyle*, 66 F. 3d 867 (7th Cir. 1995)........................................ 14

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ........................... 33

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018)......................... 19

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ................................... 15, 43

*United States v. Collins*, 604 F.3d 481 (7th Cir. 2010)............................................. 19

*United States v. Female Juvenile, A.F.S.*, 377 F.3d 27 (1st Cir. 2004)................ 28, 47

*United States v. Foster*, 652 F.3d 776 (7th Cir. 2011 .......................................... 16, 28

*United States v. Kebodeaux,* 570 U.S. 387 (2013)..................................................... 41

*United States v. Mauro*, 436 U.S. 340 (1978)............................................................ 43

*United States v. Morrison*, 529 U.S. 598 (2000) ....................................................... 39

*United States v. Skoien*, 614 F. 3d 638 (7th Cir. 2010).............................................. 33

*United States v. Valdez-Hurtado,* 638 F. Supp. 3d 879 (N.D. Ill. 2022) .............. 28, 48

*United States v. Washington*, 596 U.S. 832 (2022)...................................................... 6

*United States v. White*, 879 F.2d 1509 (7th Cir. 1989).............................................. 16

*Washington v. United States*, 460 U.S. 536 (1983)..................................................... 29

*Word Seed Church v. Village of Hazel Crest*, 111 F.4th 814 (7th Cir. 2024)............. 44

*Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967)..................................... 1

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................................................ 15

*Wooden v. United States*, 595 U.S. 360 (2022)........................................................... 23

**Statutes and Ordinances**

28 U.S.C. § 1331....................................................................................................... 1

28 U.S.C. § 1345....................................................................................................... 1

28 U.S.C. § 1361 ...................................................................................................... 1

5 ILCS 805/15(h)(3)................................................................................................ 47

8 C.F.R. § 287.7.................................................................................................. 26, 47

8 U.S.C. § 1101(a)(13)(C)(1).................................................................................. 21

8 U.S.C. § 1153(b)(2)(B)(ii)(II) .............................................................................. 21

8 U.S.C. § 1231(a)(4)(A) ........................................................................ 40

8 U.S.C. § 1373..............................................................................*passim*

8 U.S.C. § 1644 .............................................................................*passim*

Circuit Rule 40(e)................................................................................ 16

Cook County Code of Ordinances § 34-81................................................ 36

Cook County Code of Ordinances § 46-37..........................................*passim*

Cook County Code of Ordinances 46-47(b) ........................................ 25, 46

H.R. Rep. No. 104-725, at 383 (1996)..................................................... 23

S. Rep. No. 104-249, at 19-20 (1996)...................................................... 23

**Other Sources**

3 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES

    752 (1833) ..................................................................................... 40

Alexander Hamilton, THE FEDERALIST No. 15 (C. Rossiter ed. 1961) ....................... 30

Tim Evans and Andy Sullivan, *Federal immigration agents kill another US citizen*

    *in Minneapolis, sparking protests*, REUTERS (Jan. 25, 2026, 10:47 AM).............. 32

## JURISDICTIONAL STATEMENT

————

The jurisdictional statement of Plaintiff-Appellant United States is not complete and correct. Plaintiff filed this lawsuit against Defendants-Appellees Cook County, the Cook County Board of Commissioners, Cook County Board President Toni Preckwinkle, and Cook County Sheriff Thomas Dart (collectively, the "County"), as well as the State of Illinois, Illinois Governor Jay Robert "JB" Pritzker, the City of Chicago, Mayor Brandon Johnson, and Chicago Police Superintendent Larry Snelling, seeking injunctive and declaratory relief against the enforcement of Illinois, County, and City laws on the ground they are preempted and violate the intergovernmental immunity doctrine. The district court had statutory jurisdiction under 28 U.S.C. § 1345. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (noting "general rule that the United States may sue to protect its interests").[1] But as explained in more detail below, the district

---

[1] Although Plaintiff invokes 28 U.S.C. §§ 1331 and 1361 as statutory bases for jurisdiction, neither is applicable here. Section 1331 requires that the suit "aris[e] under" federal law, but to do so it must also implicate a federal law that "creates the cause of action," *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Plaintiff's preemption and intergovernmental immunity theories are derived from the Supremacy Clause, which "does not create a cause of action." *Armstrong v. Exceptional Child Center, Inc.,* 575 U.S. 320, 325 (2015). Section 1361 is even farther afield, as it applies only to an "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty," 28 U.S.C. § 1361, and none of the defendants here is an officer or employee of the United States or its agencies. Nor can they be treated as *de facto* employees without violating the Tenth Amendment's anti-commandeering doctrine, *see*, *infra*, Argument III.

court lacked Article III jurisdiction over most, if not all, of the Plaintiff's claims against the County. *See, infra*, Argument § IV.

On August 26, 2025, the district court dismissed the claims against all defendants, holding that the claims against the Board of Commissioners, President Preckwinkle, Sheriff Dart, and Governor Pritzker failed for lack of Article III standing, and that the claims against the remaining defendants failed on the merits. SA13, SA20. Although this dismissal was without prejudice, the district court advised that it would be converted to a dismissal with prejudice if Plaintiff failed to file an amended complaint by August 22, 2025. R. 85. Plaintiff filed no amended complaint, and the district court entered an order on August 26, 2025 modifying its dismissal to be with prejudice, R. 87, entering judgment for all defendants. SA65. Plaintiff filed its notice of appeal on October 24, 2025. GA42. That notice of appeal was timely under Fed. R. App. P. 4(a)(1)(B)(i). This court has jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether federal immigration law expressly preempts the County ordinance governing the use of County resources to provide cooperation with federal immigration officials, when Plaintiff waived any argument on that subject below by failing to respond to the County's specific arguments concerning express preemption.

2.  Whether the County ordinance conflicts with federal immigration law, when it is undisputed that federal law contemplates voluntary cooperation, and this court's precedent establishes declining to provide it is not a conflict.

3.   Whether the County's ordinance violates the intergovernmental-immunity doctrine, when it is undisputed that federal law contemplates voluntary cooperation, and this court's precedent establishes declining to provide it is not unlawful discrimination against the federal government.

4.  Whether federal immigration laws requiring County officials to involuntarily assist in federal immigration enforcement render those laws unconstitutional under the Tenth Amendment, when Plaintiff's legal theories are that Congress abrogated States' police power in immigration matters.

5.  Whether the district court had Article III standing over Plaintiff's claims against the County, where Plaintiff does not dispute the lack of standing to sue President Preckwinkle, Sheriff Dart, or the Board of Commissioners, and failed to allege how its desired relief would redress its injuries.

## STATEMENT OF THE CASE

Cook County passed an Ordinance in 2011 providing that its limited law enforcement resources may not be expended for purposes relating solely to the enforcement of federal immigration laws unless those expenditures are fully reimbursed by the federal government. Cook County Code of Ordinances ("Code") § 46-37 ("the Ordinance"). The Ordinance prohibits the use of County funds and

3

resources for the sole purpose of immigration enforcement. Code § 46-37. Specifically, the Ordinance instructs the Cook County Sheriff to decline civil detainer requests unless there is a written agreement between the federal government to reimburse the County for its costs incurred in complying with that detainer. Code § 46-37(a). The Ordinance permits federal immigration authorities' access to County facilities only if those immigration authorities have a criminal warrant, or if County officials have a "legitimate law enforcement purpose" unrelated to the enforcement of federal immigration law. Code § 46-37(b). It prohibits County personnel from communicating with federal immigration authorities regarding an individual's incarceration status or release dates while on duty, *id.*, and prohibits the expenditure of County resources or on-duty personnel hours in complying with a detainer request. Code § 46-37(b) & (c).

Plaintiff filed this lawsuit, arguing that the Ordinance violates the Supremacy Clause because (1) it is preempted by 8 U.S.C. § 1373 and 8 U.S.C. § 1644; and (2) violates the principal of intergovernmental immunity. GA17-39.

In response, the County moved to dismiss for lack of jurisdiction and failure to state a claim. The County argued that, even if the United States had standing, it had failed to state a claim. In doing so, the County first argued that §§ 1373 and 1644 do not expressly preempt the Ordinance. R. 28 at 8-12. It further maintained that, even if the United States's interpretation of those statutes were correct, they would then be unconstitutional under the Tenth Amendment's anticommandeering doctrine. *Id.* at 14-16 Finally, the County argued that the Ordinance did not violate

4

the Intergovernmental Immunity Doctrine because it neither regulates nor discriminates against the federal government. *Id*. at 16-18.

With respect to jurisdiction, the County argued that the United States had failed to allege a risk of future injury to warrant injunctive relief because its complaint referenced only past harms. R. 28 at 3-7. The individually-named County Defendants—Board President Preckwinkle and Sheriff Thomas Dart—also argued that the complaint failed to establish traceability or redressability as to their respective roles. R.32 at 2-6; R. 30. Additionally, the Cook County Board of Commissioners argued that it lacked the legal capacity to be sued. R.30 at 2-3.

The district court dismissed the individual defendants for lack of standing. It explained that the United States failed to establish traceability or redressability with respect to Cook County Board of Commissioners President Toni Preckwinkle or Cook County Sheriff Thomas Dart. SA14. It also dismissed the Cook County Board of Commissioners because it was not a suable entity. SA 10 n.5. However, the court reasoned that the United States had standing to proceed against the County because it "alleged enough plausible facts to show that there is a real and imminent threat that it will be injured through the Sanctuary Policies' continued implementation." SA10.

Regardless, the district court concluded that the United States had failed to state a claim. First, the court explained that §§ 1373(a) and 1644 were not expressly preempted by the Ordinance because those laws "only pertain[] to information regarding a person's legal classification under federal law," and the Ordinance does

5

"not restrict employees from sharing this kind of information." SA29. It further reasoned that "there is no way to read § 1373 as regulating anyone other than States and their political subdivisions," which not only "nullifies § 1373 as a preemption provision but also evokes significant anticommandeering concerns." SA36.

The court next rejected the United States's conflict preemption argument, explaining that federal immigration law "merely offers States the opportunity to assist in civil immigration enforcement." SA49. As such, the Ordinance and other challenged laws "don't make ICE's job more *difficult*; they just don't make it *easier*." SA49-50 (emphasis in original). Even assuming the Ordinance impeded federal immigration enforcement, the United States's theory of preemption would nonetheless run afoul of the anticommandeering doctrine. SA54-56. Finally, the district court rejected the United States's intergovernmental immunity argument. To be invalid under that doctrine, a state law must "either regulate the United States directly or discriminate against the Federal Government," and the challenged laws did neither. SA57-63 (emphasis removed) (quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)).

This appeal follows.

## SUMMARY OF ARGUMENT

Dismissal of Plaintiff's complaint was appropriate for numerous reasons. First, Plaintiff waived its express-preemption argument by failing to respond to the

County's statutory arguments below. The express-preemption claim is also meritless, because it cannot be reconciled with the language of the statutes Plaintiff invokes.

Second, Plaintiff's conflict-preemption theory fails because it also rests on that statutory language. And further still because such a theory cannot possibly prevail when federal law anticipates that federal requests for State cooperation may be denied. Third, Plaintiff's intergovernmental-immunity claim fails for the same reason, as the denial of voluntary cooperation cannot be discriminatory. Fourth, if federal law could somehow be understood to force the County to use local resources to assist in immigration enforcement, then that law would be unconstitutional as applied to this case, because that would constitute unlawful commandeering. Indeed, Plaintiff's arguments only confirm this fact, openly admitting that Plaintiff's understanding of the law is premised on its belief that Congress meant to displace the States' exercise of police power reserved to them under the Tenth Amendment.

Finally, Plaintiff lacks Article III standing to bring this suit against the County or any of its independently elected officials. Plaintiff does not dispute that it failed to plausibly allege standing to sue President Preckwinkle, Sheriff Dart, and the Board of Commissioners, thereby waiving any argument to the contrary. And Plaintiff's suit against the remaining County defendants fails for lack of redressability, as Plaintiff can only speculate that it will receive its desired cooperation if the Ordinance is enjoined.

7

# ARGUMENT

Cook County passed an Ordinance in 2011 providing that its limited law enforcement resources may not be expended for purposes relating solely to the enforcement of federal immigration laws. Code § 46-37. Plaintiff challenged the Ordinance on the grounds that it (1) is preempted by 8 U.S.C. § 1373 and § 1644 and (2) it impermissibly discriminates against the federal government. The district court rejected those claims and dismissed the United States' complaint. This court reviews that decision de novo, *Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009), and should affirm that dismissal because Plaintiff's arguments on the merits are riven with waivers, run afoul of the language of the immigration laws, and if accepted would fundamentally revise dual federalism in a manner prohibited by the Tenth Amendment. This court should also affirm the dismissal, only modifying it to show that it was for lack of Article III jurisdiction to sue the County.

## I.     Plaintiff's Preemption Arguments Fail.

Plaintiff's arguments are not legally sound. The primary argument to which Plaintiff dedicates the bulk of its opening brief is that the Ordinance is preempted by federal law. Plaintiff asserts both express preemption and obstacle preemption. Pl. Br. 29-47, 51-53. These arguments fail for three reasons. First, Plaintiff's preemption arguments are defeated by a critical forfeiture—namely, Plaintiff's failure to respond to the County's specific arguments below that sections 1373 and 1644 are categorically inapplicable to internally facing local regulations such as the Ordinance. Second, Plaintiff's arguments that sections 1373 and 1644 expressly

8

preempt the Ordinance cannot be reconciled with the plain language of either section, particularly viewed through the lens of the presumption against preemption. Third, Plaintiff's preemption theory fails because it rests upon those same sections, and also because a preemptive conflict is impossible when a local government is exercising the discretion allowed by the same allegedly preemptive federal law.

### A.    Plaintiffs' Preemption Arguments Are Forfeited.

In its opening brief, Plaintiff advances what it characterizes as theories of express and obstacle preemption, but both theories are at their core an express-preemption theory premised on the language of sections 1373 and 1644. Regarding "express" preemption, Plaintiff says that the County Ordinance "violate[s] *express* federal law" set forth in sections 1373 and 1644 regarding provision of certain information. Pl. Br. 36-40 (emphasis added). Concerning "obstacle" preemption, Plaintiff claims that the Ordinance is an obstacle to the larger "cooperative" scheme sections 1373 and 1644 brought into being when they "expressly required" local governments to provide certain information. *Id.* at 33 (emphasis added). Indeed, the overlap is so complete that Plaintiff later seems to forget that it is supposedly offering two different theories of preemption. *Id.* at 55 ("except in the case of information sharing [sic], *see id.* §§ 1373, 1644, the preemption is implicit in the federal scheme rather than express").

This overlap is significant because Plaintiff has waived on appeal any argument that, whatever the proper scope of the information sections 1373 and

9

1644 reach, *see* Pl. Br. 38-40, those sections are properly understood to reach laws regulating purely internal government operations, such as the Ordinance. In its motion to dismiss below, the County explained that:

> sections 1373 and 1644 do not prohibit units of government from determining *for themselves* whether to use their own resources to voluntarily provide assistance or information to the federal government. Rather, they only prohibit one unit of government, or one official in that government, from prohibiting *another* unit of government or official of that other unit of government from making such a decision.

R. 28 at 9. This, the County went on to explain, was "reflected in the language of sections 1373 and 1644, the legislative history of those statutes, and this nation's long history of voluntary cooperation forming the basis of state and local participation in immigration enforcement." *Id.* It "also finds support in the canon of constitutional avoidance, because it avoids the serious constitutional questions that would arise were these sections read to eschew voluntary cooperation in favor of forced deputization of state and local officials." *Id.* The County then elaborated on these arguments at some length, noting the awkwardness of the statutory language if read to apply to a government's internally facing regulation of its own activity, the legislative history expressly disavowing any intent to "require . . . any government agency or law enforcement official to communicate with" federal immigration authorities, and this nation's tradition—dating back to the First Congress—of requesting only voluntary local cooperation with the enforcement of federal law. *Id.* at 9-12. Notably, Plaintiff disputed *none* of this in its response to the County's motion to dismiss, *see* R. 50, seeking instead to move for summary

10

judgment before discovery even began, R. 45. But that proposed motion for summary judgment offered nothing in response to the County's central argument for dismissal. R. 59 at 13 (incorporating response to motion to dismiss).

Plaintiff's deliberate omission proves fatal. It is well settled that Plaintiff's failure to respond to arguments in the district court dooms an appeal even before it is filed. "Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). "We apply that rule where a party fails to develop arguments related to a discrete issue, and we also apply that rule where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss." *Id.* Put another way, when a defendant has "given reasons for dismissing the complaint despite its formal beauties," the plaintiff "ha[s] to give reasons against. . .An unresponsive response is no response." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). That the district court dismissed this case on a ground different than the one ignored does not change things; rather, when "a plaintiff fails to respond to a motion to dismiss, the plaintiff is limited on appeal to challenging the legal grounds that the district court has given for its decision." *Heyward v. Cooper*, 88 F.4th 648, 654 (6th Cir. 2023).

The rules of forfeiture stem from core due-process principles of fair notice—even absent a response in the district court, a defendant will have fair notice "of the district court's basis for dismissing [the complaint], so the plaintiff may properly challenge the basis of the court's decision." *Id.* at 655. But if "the plaintiff wants to

11

raise arguments that go beyond the legal grounds offered by the district court, the plaintiff forfeits those claims," because the purpose of fair notice is not served when a plaintiff "brings half of his arguments to the district court and saves the other half for [this] court," which is in the business of "review[ing] the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Id.* (cleaned up).

Indeed, notice is particularly critical here because of the extraordinary prejudice the County will suffer if Plaintiff is allowed to respond to the County's argument for the first time in its reply brief or at oral argument. There is, of course, the ordinary prejudice—which itself suffices to justify a finding of waiver—that the County will suffer if "its sole opportunity to respond" to Plaintiff's argument is "at oral argument." *Lukaszczyk v. Cook County*, 137 F.4th 671, 675 (7th Cir. 2025). But that ordinary prejudice is exacerbated here, given that a coalition of several States filed an amicus brief below to argue that County employees should face federal *criminal* liability for complying with the Ordinance. R. 55 at 14-17. While those arguments are frivolous, and amici improperly attempted to use an amicus to expand the scope of this case beyond what even Plaintiff sought to achieve, it should go without saying that the prejudice caused by a lack of fair notice is at its zenith when the party deprived of that notice stands accused of criminal misconduct.

Plaintiff's forfeiture of arguments regarding the applicability of sections 1373 and 1644 to the County's internal regulations also forfeits any challenge Plaintiff might have to the dismissal of its preemption claim against the County. When two

dispositive grounds are offered for disposing of a claim, the appellant's waiver of either one of them is ground, standing alone, to affirm the judgment on appeal. *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012) (collecting authority). Here, the County offered two dispositive grounds for dismissing Plaintiff's claim: (1) that sections 1373 and 1644 do not reach the categories of information at issue here, R. 28 at 8-9; and (2) that they *also* do not apply to a government's inward-facing regulations of its own conduct, *id.* at 9-12. Plaintiff having waived any response to the latter argument, this court should affirm the dismissal of the preemption claim against the County on that ground alone and leave the former to be addressed some other day when it has been properly presented.

## B.    The Ordinance Is Not Expressly Preempted.

Even were this court to forgive Plaintiff's waiver, the result would be the same. Express preemption applies only if three requirements are met. First, the statute in question "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do" because that Clause "simply provides a rule of decision." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (cleaned up). Second, "since the Constitution confers upon Congress the power to regulate individuals, not States," the statute in question "must be best read as one that regulates private actors." *Id.* (cleaned up). Third, the statute must explicitly provide that it preempts the state law in question. *Boomer v. AT&T*, 309 F.3d 404, 417 (7th Cir. 2002).

If the statute at issue contains an express preemption clause, the focus must be on its language, *Time Warner Cable v. Doyle*, 66 F. 3d 867, 875 (7th Cir. 1995), because that language "necessarily contains the best evidence of Congress' preemptive intent," *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). When evaluating a claim of express preemption, a court must "identify the domain expressly pre-empted" by that language. *Id.*; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996); *Nelson v. Great Lakes Educ. Loan Servs.*, 928 F.3d 639, 647 (7th Cir. 2019). Potential preemption provisions, like all statutory provisions, must be read in their context and considering the overall statutory scheme. *Nelson*, 928 F.3d at 647. More importantly, when evaluating the language of federal law there is a presumption against preemption, which may be overcome only by a "clear and manifest" preemptive purpose that is determinative of both the *existence* and the *scope* of federal law's preemptive effect. *Medtronic*, 518 U.S. at 485. *Accord Arizona v. United States*, 567 U.S. 387, 452 (2012) (explaining that Congress's "decision not to adopt a regulation" alone is insufficient to demonstrate preemptive intent) (quoting *Sprietsma v. Mercury Maine*, 537 U.S. 51, 65 (2002)); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.") (cleaned up). If the law in question is amenable to multiple interpretations, then the court must adopt the narrower, non-preclusive interpretation. *See New York v. United States*, 505 U.S. 144, 170 (1992). The burden is on Plaintiff to overcome the

14

presumption, *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013), by showing a "clear and manifest purpose of Congress" to preempt, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Here, Plaintiff focuses its express preemption argument on the language of sections 1373 and 1644. Assuming for the sake of argument that those sections are within Congress' powers, Plaintiff's preemption argument fails at both the second and the third steps. First, it is clear at the very outset that sections 1373 and 1644 are not "best read" to regulate private individuals. This is facially apparent based on the plain text—section 1373 purports to say what a "State . . . or local government entity or official" is allowed to "prohibit, or in any way restrict," 8 U.S.C. § 1373, while section 1644 explicitly refers to the activity of a "State or local government entity," 8 U.S.C. § 1644. As the Third Circuit has recognized, "[t]his is a clear prohibition on *state* action; it says nothing about private actors, so it cannot be fairly read to regulate them." *Ocean Cnty. Bd. of Comm'rs v. Attorney General*, 8 F.4th 176, 181-82 (3d Cir. 2021).

Plaintiff's interpretation is that both provisions apply only to information "regarding the citizenship or immigration status" of an individual, 8 U.S.C. § 1373(a), or "regarding the immigration status, lawful or unlawful, of an alien in the United States," *id.* at § 1644. As the Ninth Circuit has explained, this language is limited to information about "what one's immigration status is" and "does not include information like release dates and addresses." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019). As properly construed by *California*, any express

15

preemption argument here fails because the Ordinance says nothing about immigration status, instead covering only "incarceration status" and "release dates." Code § 46-37(b).

Plaintiffs' arguments to the contrary are unavailing. Tellingly, Plaintiff offers little response to *California* and *Ocean County*, relegating discussion of them to footnotes. Pl. Br. 41 n.7; *id.* at 60 n.10. But this court is not dismissive of the decisions of its sister circuits—"creating a circuit split generally requires quite solid justification; we do not lightly conclude that our sister circuits are wrong." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 576 (7th Cir. 2008); *see* Circuit Rule 40(e) (requiring that any panel decision that will "create a conflict between or among circuits" be circulated for *en banc* determination).

Moreover, Plaintiff's cursory treatment of an issue as significant as the creation of two separate circuit splits on two separate issues waives that argument on appeal. *E.g.*, *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) ("by failing to raise this issue other than by a passing reference in a footnote, White has waived it"). Principles of waiver apply with particular force when a litigant seeks a departure from existing law. *See United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) (rule that undeveloped arguments are waived "holds particularly true when a litigant asks us to overturn circuit precedent").[2]

---

[2] Plaintiff's criticism of *Ocean County* is also telling of the weakness of its position. Plaintiff faults the Third Circuit for relying "solely on the text of the two laws," Pl Br. 60 n.10, but that is hardly a criticism. When, as here, the statutory language is clear, the "analysis starts and ends with th[at] language," *CITGO Asphalt Refining Co. v. Frescati Shipping Co.*, 589 U.S. 348, 355 (2020).

While Plaintiff does develop an argument as to why it believes sections 1373 and 1644 "do not regulate states," Pl. Br. 59-62, that development has occurred far too late to preserve that issue for consideration. In the district court, Plaintiff presented *none* of the specific arguments set out in its brief, offering instead only a cursory *ipse dixit* that Plaintiff "seeks to regulate private individuals." R. 50 at 35. That does not remotely suffice; "a party who fails to adequately present an issue to the district court has waived the issue for purposes of appeal." *Fednav Int'l Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). That an issue "may have been before the district court in more general terms" is irrelevant; "a party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court." *Id.*

While most of Plaintiff's substantive arguments have been waived, each is also legally meritless. Plaintiff claims that sections 1373 and 1644 do not regulate states because, "considering their place in the broader statutory scheme," they are properly understood as "part of the INA's regulation of the detention and removal of aliens." Pl. Br. 59; *see id.* at 61 (claiming sections 1373 and 1644 cannot be read "as regulating states" because the remainder of the immigration laws could still conflict-preempt the Ordinance). In other words, Plaintiff believes that statutory language clearly regulating the States' actions must be understood as regulating private conduct so long as the other provisions of that statute regulate private conduct. The problem is that acceptance of this argument yields the conclusion that *Murphy* was wrongly decided. The language struck down in that case as an

17

unlawful regulation of the States was *immediately* followed by language "mak[ing] it 'unlawful' for 'a person to sponsor, operate, advertise, or promote'" gambling, 584 U.S. at 461 (quoting 28 U.S.C. § 3702(2)), a provision the Court acknowledged was a "prohibition of private conduct," *id.* at 484. If this court accepts, as Plaintiff believes, the fact that an unlawful regulation of the States is saved by the fact that it is accompanied by regulation of private individuals, then it must also conclude that *Murphy* was wrongly decided.

That problem aside, Plaintiff's argument would effectively negate the careful limits the Constitution places on Congress' authority. Congress has enumerated powers, none of which encompasses the regulation of the States. And Congress cannot simply legislate into existence additional powers to itself which the Constitution does not confer by burying an invalid provision of law over which it lacks authority within a larger statutory scheme over subject matter for which it possesses authority. Were that the case, then Congress' powers would be effectively limitless and contrary to the limited federal power the Founders sought to establish.

Trying to get around this problem, Plaintiff insists that *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), supports its claim that sections 1373 and 1644 do not regulate States. But *City of New York admitted* that those sections are regulations of the States, noting that "they prohibit state and local governmental entities or officials . . . from directly restricting the voluntary exchange of immigration information." *Id.* at 35. The Second Circuit failed to recognize the import of this fact, however, because *City of New York* predated *Murphy* by nearly

18

20 years. As a result, the courts have repeatedly recognized that *City of New York* is simply no longer good law in the wake of *Murphy*. *E.g.*, *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) ("*Murphy*'s holding deprives *City of New York* of its central support"); *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018) ("the Supreme Court's holding in *Murphy* undercuts portions of the Second Circuit's reasoning and calls its conclusion into question"); *see also New York v. United States DOJ*, 964 F.3d 150, 164 (2d Cir. 2020) (Pooler, J., dissenting from denial of rehearing) (*Murphy* "calls the viability of *City of New York* into serious question").

Plaintiff's arguments regarding the scope of sections 1373 and 1644 fare no better. According to Plaintiff, the term "regarding" in sections 1373 and 1644 must be read to encompass any information Plaintiff might deem useful to immigration enforcement, Pl. Br. 38-40, even down to minute details such as an individual's "address," *id.* at 37. But this ignores the presumption against preemption, which categorically forecloses this expansive reading.[3] As the Supreme Court has explained, "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never turn its course, for really, universally, relations stop nowhere." *New York State Conf. of Blue*

---

[3] Plaintiff did not dispute below that the presumption against preemption applies to this case, see R. 79 at 2-3 (noting this fact), thus waiving any argument on that subject on appeal, *Fednav*, 624 F.3d at 841. Plaintiff only compounds that waiver on appeal by offering only a single, cursory sentence about its application. Pl. Br. 56. Such cursory arguments are waived on appeal. *United States v. Collins*, 604 F.3d 481, 487 n.2 (7th Cir. 2010)

*Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (cleaned up).

The Court cautioned that interpreting such terms expansively would "read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." *Id*. That warning applies with full force here, where the Ordinance seeks to govern the operation of the local criminal justice system and the allocation of local law-enforcement resources—core areas of state authority. *See Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) ("When addressing questions of express or implied preemption, we begin our analysis with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). Plaintiff's boundless reading of "regarding" cannot overcome that presumption.

Even setting aside the presumption against preemption, Plaintiff's reading of sections 1373 and 1644 runs aground on the language of the statute. According to Plaintiff, those sections were meant to reach any and all "information that governs whether and when an alien is subject to removal from the United States," and thus reach even mundane information like an individual's "address" because failure to update an address can result in removal. Pl. Br. 37-38. In offering that extraordinarily broad reading of those sections, Plaintiff's interpretation focuses solely on the supposed breadth of the preposition "regarding," but has *nothing* to say about the object of that preposition: "status." "Status" being undefined in those sections, and the immigration laws more generally, it is appropriate to turn to the

20

dictionary for the commonplace definition of that term. *E.g.*, *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 434 (2019).

In the law, "status" is a term used to denote an individual's "legal condition… the sum total of a person's legal rights, duties, liabilities, and other legal relations." BLACK'S LAW DICTIONARY 1447 (8th ed. 2004). That is consistent with how the immigration laws use that term; while the immigration laws do not define "status," they use that term to denote an individual's particular legal condition and/or rights under those laws. *E.g.*, 8 U.S.C. § 1101(a)(13)(C)(1) (referring to relinquishment of "status" of being an "alien lawfully admitted for permanent residence"). Those laws also make clear that an alien can only have one status at a time under the immigration laws. *E.g.*, *id.* (referring to abandonment or relinquishment of "status" as an "alien lawfully admitted for permanent residence"); 8 U.S.C. § 1153(b)(2)(B)(ii)(II) (referring to adjustment of "status . . . from that of a nonimmigrant alien to that of a permanent resident alien"). Properly understood, then, sections 1373 and 1644 refer to the provision of information relating to an individual's *current* status under the immigration laws.

This accords with common usage as well as common sense. Statutes "should be interpreted whenever possible according to common usage," *Barber v. Gonzales*, 347 U.S. 637, 641 (1954), and federal statutes will not be given preemptive effect by reading them in a manner "flatly contrary to standard English usage," *Kansas v. Garcia*, 589 U.S. 191, 204 (2020).

21

Plaintiff's reading of sections 1373 and 1644 to reach any information that "governs" a change of immigration status is as far from standard English usage as one could get. By Plaintiff's logic, a person asked for information "regarding marital status" on the next census would understand that question to ask not only whether he is single, married, divorced, widowed, or separated, but also for details regarding his age, as well as his blood relationship and sexual activity with his spouse, since that information all "governs" his eligibility to terminate his married status via an annulment.

Or a person asked for information "regarding parental status" would think that this inquiry calls not only for information about whether he has any children, but also information concerning whether he could be accused of neglecting his children, since that information "governs" whether a court can terminate his parental rights. That is not how we communicate with one another—construing an inquiry about information "regarding" a particular fact to encompass an all-encompassing inquiry into anything that might *change* that fact. We would expect greater clarity from Congress to draft a statute if the intent is to clearly and manifestly preempt local law. *See Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("We have stated before that Congress does not hide elephants in mouseholes. In this case, we are not going to hold that Congress enumerated the mice and then unleashed an invisible elephant to trample the field.") (cleaned up).

That leads to a final, determinative point: Plaintiff has, essentially, interpreted sections 1373 and 1644 to require the County to provide information

22

relevant to an alien's removability. But had Congress intended to require State and local governments to provide such information, it could have done so by simply and unambiguously saying *exactly that*. Congress declined to do so. That is significant for purposes of statutory interpretation because the courts will not impute an intent to achieve a particular result when, as here, Congress "could easily have achieved" that result with clear language had it so intended. *Bread PAC v. Federal Election Comm'n*, 455 U.S. 577, 584 (1982).

Plaintiff's citations of unlinked snippets of legislative history, Pl. Br. 39, while unhelpful in the quest to determine the ultimate statutory purpose, *e.g.*, *Wooden v. United States*, 595 U.S. 360, 381 (2022) (Barrett, J., concurring) ("the problems with legislative history are well rehearsed"), only serve to drive this point home. Had Congress desired States be required to turn over any information in their possession "regarding the presence, whereabouts, or activities of illegal aliens," H.R. Rep. No. 104-725, at 383 (1996), or all "immigration-related information," S. Rep. No. 104-249, at 19-20 (1996), it would have so stated. It has not.

### C.    The Ordinance Is Not Conflict-Preempted.

Plaintiff's conflict-preemption claim fares no better—stumbling immediately out of the gate as it also rests squarely on sections 1373 and 1644. Pl. Br. 32. As already explained, those sections cannot have preemptive effect here because (1)

they purport to regulate governments instead of individuals; and (2) they cannot fairly be read to apply to the information regulated by the Ordinance.[4]

Even if this fatal problem could be set aside, conflict preemption is inapplicable here. That form of preemption applies only where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). This analysis of this claim begins with a strong presumption against preemption in the areas of law traditionally delegated to the States. *See English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) ("[C]ongressional intent to supersede state law must be clear and manifest" where the area of state law to be preempted has been traditionally occupied by the States."). "[P]re-emption is ordinarily not to be implied absent an 'actual conflict.'" *Id. at* 90. Such a conflict exists only if the purposes of federal law "cannot otherwise be accomplished" absent preemption of State law. *Savage v. Jones*, 225 U.S. 501, 533 (1912).

Here, Plaintiff complains specifically that County law is preempted in two regards. First, Plaintiff's insistence that the Ordinance provides that the County "will not transfer custody to Congress [sic]." Pl. Br. 33; *accord id.* at 36 (declaring that Ordinance rejects "the validity of administrative warrants" and "reject[s] Congress's scheme for how federal officials take custody of and detain aliens"); R. 50 at 21 (complaining that County "refus[es] to turn aliens over to federal custody").

---

[4] The centrality of these sections—which undeniably attempt to regulate States—to Plaintiffs' preemption arguments thus makes it irrelevant whether, as Plaintiff claims, the immigration laws generally do not regulate the States. Pl. Br. 51.

This argument is frivolous, for the simple reason that—again—the Ordinance *says nothing about transfers from County custody*. Rather, as already noted above, the Ordinance speaks only to federal "access" to County facilities while individuals are *in* custody. Code § 46-47(b). This is wholly consistent with federal law, which Plaintiff admits specifically contemplates that the transfer to federal custody will occur only "once the period of state custody concludes." Pl. Br. 20. Obviously, a law allowing the transfer of an individual to federal immigration custody at the only time federal immigration laws allow such a transfer to occur cannot possibly be in irreconcilable conflict with those laws.[5]

That leaves Plaintiff only to complain that the Ordinance conflicts with the transfer of custody because it restricts voluntary sharing of information regarding release dates. But in making that argument, Plaintiff forgets that the County is subject to Illinois' Freedom of Information Act, which sets forth the "exclusive" means for obtaining information from Illinois local governments. 5 ILCS 140/1. And under FOIA, Plaintiff could "promptly" obtain information in County possession, "within 5 business days," 5 ILCS 140/3(d), such as the release dates contained in the

---

[5] Relatedly, Plaintiff makes the complaint that the County "will *still* release aliens" whose terms of detention have expired, Pl. Br. 33, insisting that the County "ha[s] latitude . . . to prolong the detention of aliens who would otherwise be subject to release under state law," *id.* at 43. But Plaintiff expressly disavowed seeking such extensions below. R. 59 at 3 n. 1 (Plaintiff "does not purport to force States to detain aliens on its behalf by extending the period of detention that would otherwise be warranted under state law"). Regardless, it is irrelevant what Plaintiff wants; when an individual's sentence expires, the State loses power to hold him, and further detention violates the Fourteenth Amendment. *McNeil v. Director, Patuxent Inst.*, 407 U.S. 245, 246 (1972). The "latitude" Plaintiff describes is a known human-rights abuse of Communist China. *Id.* at 254 n.3 (Douglas, J., concurring).

25

mittimus provided to the detaining authority that sets out "the specifics of the prisoner's sentence," *People v. Thomas*, 932 N.E.2d 658, 661 (Ill. App. 2010). Viewed against the backdrop of Illinois FOIA law—the disclosure requirements of which the County is powerless to override, but free to expand, *Better Gov't Assn v. Village of Rosemont*, 82 N.E.3d 710, 718 (Ill. App. 2017)—the Ordinance is properly understood as prohibiting any provision of information *outside* the proper FOIA process, and then only if the additional expense incurred in providing that response has not been compensated. But even after the County noted the ready availability of alternative means by which Plaintiff could gather information, R. 28 at 17, Plaintiff simply ignored FOIA, never "explain[ing] why it would be unable to easily obtain the information it seeks through th[is] most obvious means for obtaining information from local governments," R. 79 at 13. The undisputed ability to accomplish federal information-acquisition purposes via an ordinary FOIA request is, standing alone, fatal to any claim of conflict-preemption based on provision of information. *See Savage*, 225 U.S. at 533 (conflict preemption requires that federal purpose "cannot otherwise be accomplished").

Even were FOIA unavailable, Plaintiff's conflict preemption claim fails for the simple reason that federal immigration laws make clear that providing this information is wholly voluntary. 8 C.F.R. § 287.7; R. 1 at 7-8 ¶33. This is fatal to any conflict preemption claim regarding to the County's codified lack of interest in sharing information, since "[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation."

26

*McHenry Cty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022). Put another way, Plaintiff cannot claim that a refusal to provide information "is not the system Congress created," Pl. Br. 35 (quoting *Arizona*, 567 U.S. at 408), at the same time admitting that the system Congress created forewent the mandatory provision of information.

## II.      Plaintiff's Intergovernmental Immunity Argument Lacks A Comparator.

Next, Plaintiff argues that the Ordinance unlawfully discriminates against the federal government in violation of the intergovernmental immunity doctrine, Pl. Br. 65-66, which invalidates any state law that "discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality).[6] This argument is no better than the rest. To the extent that Plaintiff complains that the County is "refusing to transfer aliens" to federal custody, Pl. Br. 50, Plaintiff made no such allegations in its complaint, which says *nothing* about the County ever refusing the lawful transfer of an alien to federal custody. *See* R. 1 at 13-15 ¶¶53-61. The lack of any such allegation is unsurprising, given that the Ordinance imposes no restrictions on transfers of custody and applies only to attempts to access individuals before their custody concludes; the earliest point federal law allows transfers from State custody. *See, supra*, at 28.

That leaves only the Ordinance's restrictions on voluntary information sharing, but any claim that those restrictions are discriminatory is foreclosed by this court's decision in *McHenry County*. Plaintiff's complaint itself asserts that

---

[6]  Plaintiff has abandoned any argument that the Ordinance regulates the federal government, so we address that theory no further herein.

27

immigration detainer is merely a "request" for information from local law enforcement, not a requirement that such information be provided. R. 1 at 7-8 ¶33; *accord United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004) ("an INS detainer is not, standing alone, an order of custody. Rather, it serves as a request that another law enforcement agency notify the INS before releasing an alien from detention so that the INS may arrange to assume custody over the alien"); *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992) ("Filing a detainer is an informal procedure in which the INS informs prison officials that a person is subject to deportation and requests that officials give the INS" certain information); *United States v. Valdez-Hurtado,* 638 F. Supp. 3d 879, 890 (N.D. Ill. 2022) ("Numerous federal courts have agreed . . . that the language of detainer requests, and of the governing DHS regulation, shows that detainer requests are requests and not legal commands.") (collecting authority).

Federal law contemplates that immigration officials will have information provided by willing cooperators. But as *McHenry County* explained, mere "refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." 44 F.4th at 594 n.7.[7] And while Plaintiff now insists that it is not challenging a mere "refus[al] to cooperate," Pl. Br. 50, its complaint says otherwise: "Cook County [Places] Restrictions on . . . Cooperation with Federal Officials." Doc.

---

[7] Plaintiff does not develop any argument that *McHenry County* should be overruled, thus waiving any argument to that effect. *Foster*, 652 F.3d at 793.

28

1 at 13 (heading; bolding omitted). It is too late now to abandon that failed theory and adopt another.

Trying to get around these problems, Plaintiff complains that the Ordinance must be discriminatory because it "appl[ies] *only* to federal immigration enforcement agents." Pl. Br. 49; *accord id.* at 48 (complaining Ordinance "do[es] not apply to any other member of the public or law enforcement agency"). *McHenry County* rejected this precise argument, explaining that "the mere fact that [a law] touches on an exclusively federal sphere is not enough to establish discrimination." 44 F.4th at 594.[8]  Rather, "[d]ifferential treatment is critical." *Id.*; *accord Washington v. United States*, 460 U.S. 536, 544-45 (1983) (a state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them"); *North Dakota*, 495 U.S. at 438 (same). On that score, Plaintiff offers no argument that *County law* affords anyone else access that the Ordinance denies federal officials, focusing instead solely on *Illinois law*, Pl. Br. 48-49. Again, Cook County and Illinois are different legal entities; any perceived failings in Illinois law say nothing about the validity of County ordinances. Plaintiff offers no explanation why County law imposes differential treatment, waiving any such argument for purposes of this appeal.

---

8    Plaintiff also complains about supposed discrimination in the Ordinance's preamble, Pl. Br. 48, but a preamble has no substantive legal force and may "only" be used as a tool for interpreting ambiguous legislation, *Atkins v. Deere & Co.*, 685 N.E.2d 342, 346 (Ill. 1997).

## III. If Sections 1373 And 1644 Preempt County Law, They Are Unconstitutional As Applied.

Acceptance of Plaintiff's expansive interpretation of Sections 1373 and 1644 would be a hollow victory, because any ruling that the County may not "ignore" both sections puts the anti-commandeering doctrine into play. *Lac Courte Oreilles Band v. United States*, 367 F.3d 650, 662 (7th Cir. 2004) (when States may simply "ignore" a request from the federal government, anti-commandeering is not implicated). As the Supreme Court has made clear, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. This reflects that the Constitution was designed to undo the "'great and radical vice'" of the dysfunctional Articles of Confederation it replaced, by substituting federal regulation of the States with federal regulation of individuals. *Id.* at 163 (*quoting* Alexander Hamilton, THE FEDERALIST No. 15 at 108 (C. Rossiter ed. 1961)).

It further reflects that the federal government may not "take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes," nor may it shift to the States "the blame for [a federal initiative's] burdensomeness and for its defects." *Printz v. United States*, 521 U.S. 898, 930 (1997). Under this principle, the federal government may not "direct state law enforcement officers to participate," even "temporarily, in the administration of a federally enacted regulatory scheme." *Id.* at 904. Nor may it "require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*

30

*v. Condon*, 528 U.S. 141, 151 (2000); *accord Haaland v. Brackeen*, 599 U.S. 255, 283 (2023).

Contrarily, Plaintiff's case against Cook County is that the County must assist in the enforcement of the federal immigration laws despite Plaintiff's *admitted* refusal to compensate the County for the resources expended in doing so. *See* R. 1 at 14 ¶56 (admitting Plaintiff would reimburse only "certain costs" incurred by County).[9] In short, Plaintiff believes that section 1373 and 1644 strip from the County its fundamental home rule authority under the Illinois Constitution, Article VII, Section 6, to allocate limited local funds solely to local affairs.

This broad interpretation of sections 1373 and 1644 strikes at the very core of the anti-commandeering doctrine by requiring state and local governments to use local resources to assist in the enforcement of federal law, while the federal government takes the credit for "solving" the problem of illegal immigration. *Printz*, 521 U.S. at 930. In fact, *Printz* noted that both immigration and detention of individuals who violate federal law have traditionally been considered matters on which the federal government asked only for voluntary cooperation, indicating that

---

[9] This allegation is a judicial admission, *Moran v. Calumet City*, 54 F.4th 483, 494 (7th Cir. 2022), that disposes of Plaintiff's argument that it is not "shift[ing] the costs of removing criminal aliens to the states," Pl. Br. 57. It also disposes of its claim that the federal government will still take the political blame for its program, *id.*; *Printz* rejected that very argument, precisely because of the "financial burden" that program sought to force on the States. 521 U.S. at 930. That Plaintiff was willing to reimburse part of the County's costs is irrelevant, because even a "minimal and only temporary" imposition on local sovereignty violates the very structure of the Constitution. *Id.* at 931-32.

such matters are at the very heart of the anti-commandeering doctrine. *Id.* at 909-910, 916.

The anticommandeering concerns here are particularly acute because Plaintiff seeks to compel the County to use its resources and personnel in support of a federal program that has been implemented in a manner that has resulted in not only violations of the law—for example, the improper removal of at least one individual to a "Center for Terrorism Confinement" in El Salvador resulting from "administrative error," *Noem v. Garcia*, 145 S. Ct. 1017, 1018 (2025)—but also egregious acts of violence, including the shooting deaths of at least two American citizens.[10] This is significant because the anticommandeering doctrine "promotes political accountability," *Murphy,* 584 U.S. at 473, by preventing the federal government from putting States "in the position of taking the blame for [a federal program's] burdensomeness and for its defects," *Printz*, 521 U.S. at 930. Commandeering obscures political accountability by forcing States to carry out political directives they do not control. *See Murphy*, 584 U.S. at 473–74 ("[I]f a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred.").

That the commandeering is supposedly done, as Plaintiff claims here, in advancement of a critical federal goal is irrelevant; commandeering is a violation of

---

[10] Tim Evans and Andy Sullivan, *Federal immigration agents kill another US citizen in Minneapolis, sparking protests*, REUTERS (Jan. 25, 2026, 10:47 AM), https://www.reuters.com/world/us/minnesota-governor-says-federal-agents-involved-shooting-minneapolis-2026-01-24/.

the Constitution and may not be justified by any amount of balancing costs against benefits, *Printz*, 521 U.S. at 932, the activity is not permissible because it presents "an expedient solution to the crisis of the day." *New York*, 505 U.S. at 187. For all these reasons, in the manner Plaintiff seeks to interpret and apply them against the County here, sections 1373 and 1644 are unconstitutional.

Plaintiff's arguments to the contrary contain the misplaced insistence that the Ordinance prohibits "transfer to federal officials absent a judicial warrant," Pl. Br. 53; *see id.* at 58-59 (discussing historical practices relating to transfers), when the Ordinance plainly says nothing of the sort. That leaves only the portion of the Ordinance regarding information sharing without compensation. On that subject, Plaintiff's primary argument is that the anti-commandeering doctrine is inapplicable to "court records." *Id.* at 25 (citing *Haaland*, 599 U.S. 255; *accord id.* at 62-65 (discussing *Haaland* at length). But once again, Plaintiff made no such argument below, nor did it allege that the information it sought is "court records"— indeed, it did not even cite *Haaland*, the centerpiece of its current argument on appeal. Such arguments, absent below but offered as saving grace on appeal, are waived. *Fednav*, 624 F.3d at 841.

In addition to being waived, the argument is also meritless. Supreme Court decisions must be read to address the circumstances at hand, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (cleaned up); *accord United States v. Skoien*, 614 F. 3d 638, 640 (7th Cir. 2010) (*en banc*), and *Haaland* addressed only a federal statute requiring "courts to provide" certain information,

33

599 U.S. at 287. Accordingly, *Haaland* did not purport to exempt from the anti-commandeering doctrine the provision, from any source, of information "related to state-court proceedings," but focused specifically on the fact that "anticommandeering doctrine applies 'distinctively' to a state court's adjudicative responsibilities," as demonstrated by Constitutional text and history. *Id.* at 288-90 (quoting *Printz*, 521 U.S. at 907).

As a result, the Court held, that doctrine "does not prohibit the Federal Government from imposing adjudicative tasks on state courts," nor from "rely[ing] on state courts to perform adjudication-adjacent tasks" such as "recordkeeping." *Haaland,* at 290-291. Crucially for present purposes, the Court distinguished such federal regulation of State judiciaries from regulations of "state legislatures and executives," because regulations of the former "are a logical consequence of our system of 'dual sovereignty' in which state courts are required to apply federal law." *Id.*; *accord Printz*, 521 U.S. at 907 (noting "assumption" that "the Constitution was originally understood to permit imposition of an obligation on *judges* to enforce federal prescriptions") (emphasis in original). That distinction is fatal to Plaintiff's invocation of *Haaland*—any regulations of Cook County and its officials literally *cannot* regulate the courts, because Cook County *has no courts. Ampersand, Inc. v. Finley*, 338 N.E.2d 15, 18 (Ill. 1975) ("Only one unified court system operating statewide is contemplated.").

Plaintiff's attempt to reinforce its interpretation of *Haaland* with selective quotations from *Printz*, purporting to exempt information-sharing from anti-

34

commandeering principles, Pl. Br. 62, is also readily disposed of. In language

Plaintiff conspicuously omits from the exact passage it purports to quote, *Printz*

specifically said that, because federal statutes "which require only the provision of

information to the Federal Government, do not involve the precise issue before us

here," the Court would "*not* address these or other currently operative enactments

that are not before us; it will be time enough to do so if and when their validity is

challenged in a proper case." 521 U.S. at 918 (emphasis added). Such selective

omissions are strongly disfavored. *Cleveland Hair Clinic, Inc v. Puig*, 200 F.3d 1063,

1069 (7th Cir. 2000).

Plaintiffs' remaining arguments against application of the anti-

commandeering doctrine here are as disconcerting as they are meritless. Plaintiff

begins by claiming that commandeering does not apply because the Ordinance

"seek[s] to regulate" aliens already regulated by federal law, Pl. Br. 51, by

supposedly conferring certain "rights" on aliens, thus making those laws proper

targets for "permissible preemption," *id.* at 52-53. This is yet another argument

offered for the first time on appeal, so it is waived. *Fednav*, 624 F.3d at 841.

Rejecting that argument on the grounds of waiver alone is particularly appropriate

considering the Supreme Court's recent, repeated emphasis on the primacy of the

principle of party presentation in federal litigation, *Margolin v. National Ass'n of

Immigr. Judges*, No. 25-767, 2026 U.S. LEXIS 2251 at *1 (U.S. May 26, 2026) (per

curiam); *Clark v. Sweeney*, 607 U.S. 7, 8 (2025) (per curiam), a principle at the very

heart of the waiver doctrine, *see, e.g.*, *Lukaszczyk*, 137 F.4th at 674.

35

Plaintiff's theory is also boundless—by Plaintiff's understanding, literally *every* local law governing local officials' conduct would constitute a regulation of aliens subject to preemption, because they would provide rights-creating "procedures," Pl. Br. 52, governing those officials' interactions with aliens. For example, County ordinances setting out procedures for administrative hearing officers to evaluate challenges to local taxes, Code § 34-81, could apparently be preempted on the ground that they somehow create "rights" in refund-seeking aliens beyond those granted by immigration laws. Unsurprisingly, the law is clear that such regulation of internal operations is not how individual rights are created. *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

Plaintiff next offers a theory even more grand in scope and application, claiming that commandeering is inapplicable because it is merely hoping to enforce a form of "cooperative federalism," under which "Congress may require particular forms of state participation as a condition of the state's voluntary choice to participate in a federal program." Pl. Br. 54. According to Plaintiff, the States may incarcerate aliens arrested and convicted of murder, sexual assault, or any other number of acts violative of State criminal law, not because the Tenth Amendment guarantees them the police power to do so, but only because *Congress* has "*allow[ed]* states to subject aliens to their criminal-justice systems." *Id.* (emphasis added).

Thus, Plaintiff says, Congress' plenary authority over immigration allows it to outright negate the States' police power to punish violations of their criminal law, by "direct[ing] that all criminal aliens be removed—regardless of whether they have

36

served their state criminal sentence [sic]." *Id.* at 24-25. Given that broad absolute authority, Plaintiff goes on, Congress necessarily also has the lesser authority to "expressly" prohibit the States from incarcerating aliens who violate State criminal laws unless those States first "agre[e] to certain requirements." *Id.* at 55. By Plaintiff's reckoning, that is all Congress has done here: force the States to either agree to conditions on their power to enforce their criminal laws, or be unable to "subject aliens to their criminal-justice system *at all*." *Id.* (emphasis added).

This extraordinary theory need not be considered, for the simple reason that—just like Plaintiffs' theory under *Haaland* and its federal rights-creation argument—it is waived. Plaintiff never even *hinted* at, let alone developed, this theory during the litigation in the district court; indeed, the words "cooperative federalism" are nowhere to be found in its filings below. That theory is thus waived for purposes of this appeal, *Heyward*, 88 F.4th at 654, and this court can and should reject it on that ground alone.

Waiver aside, Plaintiff identifies nothing remotely recognizable as cooperative federalism. There are, obviously, established ways in which Congress may encourage voluntary State participation in federal programs. For example, when exercising its spending power, Congress may condition the receipt of federal funds on State agreement to comply with specific federal requirements relating to the use of those funds. *See, e.g, St. Anthony Hosp. v. Whitehorn*, 132 F.4th 962, 978 (7th Cir. 2025) (explaining that "Medicaid is a form of cooperative federalism" because it "conditions federal funds on a state agreeing to comply with various

37

conditions"). And when exercising its enumerated regulatory powers, Congress may encourage the States through conditional preemption. *FERC v. Miss.*, 456 U.S. 742, 765 (1982). Rather than displacing state law outright, Congress may offer states the choice to regulate pursuant to federal standards or yield to federal regulation. *New York*, 505 U.S. at 167. That choice carries consequences: if a state elects to participate, it typically retains discretion in implementing the federal program; if it declines, federal law preempts the field. *See, e.g, Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981) (describing Surface Mining Act as cooperative-federalism program that "prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered regulatory program"). But the existence of a *real choice* is crucial. Cooperative federalism requires clear notice so that States may "exercise their choice knowingly, cognizant of the consequences." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The federal government cannot conjure an "agreement" into existence where the States were never informed of its terms—let alone given any opportunity to accept or reject them. *See Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain.").

Nevertheless, Plaintiff identifies nothing indicating that Congress presented any such "choice" to the States. Under Plaintiff's logic, States are simply deemed to have agreed to participate in a federal program simply by enforcing their own laws

tangentially related to federal goals. The consequences of that logic are expansive: policing gun violence is an agreement with federal firearms regulation, enforcing littering laws is an agreement with federal climate policy, and enforcing public health violations is an agreement with federal healthcare policy. These applications transform cooperative federalism into compulsive federalism—which is precisely forbidden by the anti-commandeering doctrine. *See Murphy*, 584 U.S. at 455 ("Congress may not simply 'commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program.'") (quoting *New York*, 505 U.S. at 161); *cf. Saint Anthony Hosp.,* 132 F.4th at 978 (rejecting understanding of federal law that "would risk transforming an exercise of cooperative federalism into one of compulsive federalism").

Despite insisting that its theory "maintains the balance of power between the States and the Federal Government" because this case does not "involve areas traditionally regulated by the states," Pl. Br. 56 (cleaned up), Plaintiff conspicuously overlooks that aliens are in custody only if they have been accused or convicted of a crime. This is significant because it is settled law that the suppression of crime "has always been the prime object of the States' police power," reserved against federal transgression by the Tenth Amendment itself. *United States v. Morrison*, 529 U.S. 598, 615 (2000)*; accord Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law."). And while the federal government has the enumerated authority to remove individuals unlawfully in this country, that power is coterminous with the police power reserved to the

States, *see* 3 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 752 (1833) (explaining that "what is not conferred, is withheld, and belongs to the state authorities"). This is why federal law specifically prohibits the removal of any "alien who is sentenced to imprisonment until the alien is released from imprisonment," 8 U.S.C. § 1231(a)(4)(A); to say otherwise would be to transgress the fine line between the enumerated federal authority to remove aliens, and state authority to punish violations of its laws as it deems fit.

Plaintiff's theory rests on its belief that the federal government may simply obliterate the States' police power to punish violations of their criminal law, as a necessary implication of its "plenary authority over the presence of aliens in the country." Pl. Br. 24-25. But the federal government may use only "proper means" to carry out this authority, *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893), and Plaintiff's expansive view of propriety was laid to rest by no less than Chief Justice Marshall, who made clear long ago that "a great substantive and independent power . . . cannot be implied as incidental to other powers." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 411 (1819).

The Supreme Court has long recognized that "[t]he safety and the health of the people" is entrusted to the States "to guard and protect," and the national government "should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Thus, "[i]t is difficult to imagine a clearer example of such a 'great substantive and independent power' than the power to help protect the public

40

and alleviate public safety concerns." *United States v. Kebodeaux*, 570 U.S. 387, 402 (2013) (Roberts, C.J., concurring) (cleaned up); *accord Bond v. United States*, 572 U.S. 844, 879 (2014) (Thomas, J., concurring) (federal law that "regulates local criminal conduct that is subject to the powers reserved to the States" is an "aggrandizement of federal power [that] cannot be justified as a 'necessary and proper' means" of implementing enumerated powers).

Plaintiff's broad view of Congress' regulatory powers begs the question of what would be left of State sovereignty if Congress could leverage its immigration authority to simply obliterate State criminal law. If Plaintiff's theory of federal immigration authority were correct, it is not clear why that authority could not also be used to obliterate the States' authority to create local units of government absent the States' agreement that it will compel those local units of government to fully cooperate with federal immigration authorities. But the organization of State government is central to its sovereignty. What Plaintiff proposes is not cooperative federalism, but rather a proposal for dual federalism's demise. Any federal immigration laws premised on such a theory would be unconstitutional. *See Bond*, 572 U.S. at 879 (Scalia, J., concurring) ("No law that flattens the principle of state sovereignty, whether or not 'necessary,' can be said to be 'proper.'").

Plaintiff next tries to claim that "historical practice" eliminates any commandeering concerns here. Pl. Br. 58-59. Plaintiff makes this argument for the first time on appeal, so it, too, is waived. *Domka v. Portage County*, 523 F.3d 776, 783 n. 11 (7th Cir. 2008). Waiver aside, Plaintiff's attempt to leverage history in its

41

favor runs afoul of *Printz,* which noted that early constitutional ratification debates rested on the significant "assumption that the States would consent to allowing their officials to assist the Federal Government," not that the federal government could force such assistance on the States. 521 U.S. at 910-11. Reflecting as much, the First Congress specifically declined to require States to provide even "assistance of the most rudimentary and necessary sort for the enforcement of the new Government's laws." *Id.* at 909. When Georgia declined to provide that assistance voluntarily, as was its right, the federal government responded not by trying to force its hand, as Plaintiff tries to do here, but by providing for federal marshals to rent temporary jail facilities. *Id.* And in the immigration context, the federal government has traditionally declined to force the States to participate in the enforcement of federal immigration law, as Plaintiff now demands, but rather only authorized the entry of voluntary contracts with the States to allow such participation. *Id.* at 916. In short, history reflects what the commandeering doctrine requires—a system in which the States may always be asked to cooperate in the enforcement of supreme federal law but may never be compelled to do so.

Plaintiff's sparse historical examples, Pl. Br. 58-59, do not undermine this history of purely voluntary cooperation. That is most obvious with *Carbo v. United States,* which went only to the narrow question whether issuance of a writ ordering the Carbo's production from state custody for federal criminal proceedings in California "was within the jurisdiction of the [federal district] court." 364 U.S. 611, 613 (1961). Notably, the state authorities there voluntarily honored the federal writ,

making it unnecessary to "decide what would be the effect of a similar writ absent such cooperation." *Id.* at 621 n. 20; *see also United States v. Mauro*, 436 U.S. 340, 363 (1978) (noting the Court was "unimpressed" with the government's argument that "it would be contrary to the Supremacy Clause . . .to permit a State to refuse to obey" a federal writ of habeas corpus *ad prosequendum*"). So, too, with the Alien Enemies Act, which Plaintiff admits merely "authoriz[ed] state courts" take certain actions, Pl. Br. 58, but did not require them to do so. It should go without saying that historical examples of voluntary cooperation are a slender reed from which to hang Plaintiff's current demand that County officials be *forced* to cooperate with federal law enforcement efforts.

That brings us to Plaintiff's final complaint regarding commandeering, that the County has not provided the "baseline cooperation between sovereigns" that Plaintiff once enjoyed. Pl. Br. 59. But past cooperation only shows that past political and practical circumstances made such cooperation possible and mutually desirable; it did not create a federal easement across state sovereignty compelling such cooperation for all time. *See McHenry County*, 44 F.4th at 592 (although federal government "may have hoped or expected that States would cooperate," the "States are not bound by that hope or expectation"); *United States v. California*, 921 F.3d 865 at 891 ("[T]he federal government was free to expect as much as it wanted, but it could not require [the state's] cooperation without running afoul of the Tenth Amendment.").

That Plaintiff goes so far as to invoke the County's identity as a "sovereign," in support of its demand for judicially compelled "cooperation" only illustrates the paradox underlying this entire suit. For all Plaintiff's avowals of "cooperative federalism," the fact remains that Plaintiff is not seeking a declaration that some ambiguous provision of federal law or State law has been misunderstood to impose some artificial obstacle to cooperation desired by both sides of this case. Plaintiff demands compulsory obedience: an injunction compelling the County to expend local funds advancing federal immigration goals. Such a demand is anathema to the very notion of cooperation, as well as to "the very *principle* of separate state sovereignty," *Printz*, 521 U.S. at 932, that the Tenth Amendment protects.

## IV.    Plaintiff Lacks Standing To Sue The County Defendants.

While this court should affirm based on Plaintiff's obviously faulty merits arguments, this court must also determine that its jurisdiction is secure, by addressing Plaintiff's standing to sue the County. *Word Seed Church v. Village of Hazel Crest*, 111 F.4th 814, 819 (7th Cir. 2024). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), and "[u]nless a case or controversy is presented, no federal court has the jurisdiction to decide whether a federal, state, or local law is constitutional." *Goldhamer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010). To establish standing to seek injunctive relief, the government must show (1) a threat of an actual and imminent injury in fact; (2) a causal relation between that injury and the conduct to be enjoined; and (3) that it is likely,

44

rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury. *Id.* at 585. And because this case reached only the pleadings stage, standing must be shown in the same way as the existence of a claim on the merits: by well-pleaded facts satisfying the plausibility standard set forth in *Twombly* and *Iqbal. Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (collecting authority). Under that standard, a plaintiff must allege well-pleaded facts showing that it is plausible, not merely possible, that he has standing to bring his suit. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588-89 (7th Cir. 2016).

Here, there is no dispute that Plaintiff failed to satisfy these requirements as to President Preckwinkle or Sheriff Dart. As to President Preckwinkle, the court noted that "the complaint makes no allegations demonstrating traceability or redressability related to her role." SA14. And as to Sheriff Dart, the court noted that Plaintiff had failed to explain what action it wanted him to take or eschew, thus preventing a finding of redressability. *Id.* Despite opposing dismissal below, Plaintiff now expressly waives any challenge to either of these conclusions. Pl. Br. 13 n. 5. And while the court further found no standing to sue the Board of Commissioners, SA15, Plaintiff simply ignores that ruling altogether. This is determinative of standing as to these defendants because "[a]rguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." *Center for Biological Diversity v. United States EPA*, 937 F.3d 533, 542 (5th Cir. 2019) (collecting authority); *accord, e.g., McKenzie v. United States Citizenship &*

45

*Immigration Services, District Director*, 761 F.3d 1149, 1155 (10th Cir. 2014). This court thus must affirm the dismissal of the claims against President Preckwinkle, the Board, and Sheriff Dart for lack of Article III standing.

That leaves the claims against Cook County itself, but those fare no better. On appeal, Plaintiff claims two specific injuries to its interests: (1) supposed obstruction of "the transfer of criminal aliens"; and (2) the purported withholding of information. Pl. Br. 21. But Plaintiff's desired relief would redress none of these injuries.

Starting with the former, Plaintiff insists that the Ordinance "bar[s] the transfer" of individuals to federal custody. Pl. Br. 11; *accord*, *e.g.*, *id.* at 21 (Ordinance "obstruct[s] the transfer of criminal aliens"); *id.* at 50 (County is "refusing to transfer aliens"). But the Ordinance does nothing of the sort. As Plaintiff admits, federal law does not allow federal agents to seize individuals from ongoing State custody, but instead specifically contemplates that transfer to federal custody will occur only "once the period of state custody concludes." *Id.* at 20; *accord id.* at 44 ("Congress authorized states and localities to detain aliens, to the exclusion of federal officials, under their criminal laws."); R. 59 at 4 ("release from state custody is a pre-condition to the initiation of federal custody"). The Ordinance governs only "access" to an individual *during* County custody, Code § 46-47(b), and says nothing about the conduct of transfers *after* custody concludes.

As the County explained below, the Ordinance "governs only the use of County resources and facilities—resources and facilities no longer at issue after an

46

individual's release from custody." R. 79 at 6. Indeed, Plaintiff effectively admits as much in its opening brief, which offers only the language of *Illinois* law in support of its arguments against the County regarding obstruction of transfers to federal custody, while burying the Ordinance behind "*see*" citations. Pl. Br. 11 (quoting 5 ILCS 805/15(h)(3); *see*-citing Code § 46-37(b)).

Plaintiff's claimed informational injury is not redressable either. Article III standing must be assessed in light of the specific relief requested. *Goldhamer*, 621 F.3d at 585. Here, Plaintiff's complaint does not demand that the County be compelled to provide any information to the Plaintiff—it does not, for example, ask that the County be compelled to respond whenever a detainer request is submitted—it instead demands only that the Ordinance be declared invalid and that the County be enjoined from its enforcement. R. 1 at 21. Plaintiff could only speculate that, absent the Ordinance, County employees would voluntarily provide it the desired information, as federal law gives individuals broad, unfettered discretion to determine for themselves whether to cooperate and provide information at federal authorities' "request." *See* 8 C.F.R. § 287.7; R. 1 at 7-8 ¶33 (admitting that an immigration detainer is merely a "request" that local law enforcement advise ICE before releasing an individual); *accord Galarza v. Szalczyk*, 745 F.3d 634, 640-41 (3d Cir. 2014) (collecting cases) ("All Courts of Appeals to have commented on the character of ICE detainers refer to them as 'requests' or as parts of an 'informal procedure.'"); *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27 at 35 ("an INS detainer is not, standing alone, an order of custody. Rather, it serves

47

as a request that another law enforcement agency notify the INS before releasing an alien from detention so that the INS may arrange to assume custody over the alien"); *Giddings*, 979 F.2d 1104 at 1105 n.3 ("Filing a detainer is an informal procedure in which the INS informs prison officials that a person is subject to deportation and requests that officials give the INS notice of the person's death, impending release, or transfer to another institution."); *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879 at 890 ("Numerous federal courts have agreed . . . that the language of detainer requests, and of the governing DHS regulation, shows that detainer requests are requests and not legal commands.") (collecting authority). The most that invalidating the Ordinance would do, then, is restore the independent discretion of on duty Cook County personnel (and therefore the remote possibility of voluntary cooperation) that existed in its absence.

That fact defeats Plaintiffs' standing. When it is "just as plausible" as not that a favorable judgment will redress the plaintiff's injury, Article III's redressability requirement is not met. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43-46 (1976). In other words, "guesswork as to how independent decisionmakers will exercise their judgment" does not suffice to show Article III standing, which requires that an individual "will likely react in predictable ways" to the relief requested. *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) (noting that Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").

48

The Supreme Court has repeatedly found standing lacking when the plaintiff's desired relief would do nothing but restore individuals' unfettered decision-making discretion. In *Simon*, for example, the plaintiffs challenged a federal law rescinding the requirement that hospitals offer free healthcare to low-income populations to receive favorable tax treatment. 426 U.S. at 28-32. As plaintiffs saw things, restoring that requirement "would 'discourage' hospitals from denying their services to" the indigent plaintiffs. *Id.* at 42. But as the Court explained, it was wholly "speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services," because the allegations in the complaint left it "just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* at 43. Noting that "unadorned speculation will not suffice to invoke the federal judicial power," *id.* at 44, the Court vacated the judgment of the lower court and remanded with instructions to dismiss for lack of jurisdiction. *Id.* at 46. Similarly, in *Linda R. S. v. Richard D.*, 410 U.S. 614 (1973), the plaintiff sought an injunction against enforcement of a state law requiring child maintenance payments only to so-called "legitimate children," but not to "illegitimate children," *id.* at 615. But as the Supreme Court observed, all that one could say with any certainty was that granting that relief would cause "the jailing of the child's father," while "the prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative." *Id.* at 618. As

49

a result, the Court concluded, standing was lacking, and the district court was correct to dismiss the plaintiff's claim for lack of Article III jurisdiction. *Id.* at 619.[11]

Here, all Plaintiff can offer is speculation that invalidation and injunction of the Ordinance will result in the provision of the information it desires. Indeed, it admitted below that it "does *not* contend that enjoining the County Ordinance would necessarily require . . . a particular action." R. 50 at 16 (emphasis added). Nor could it so contend, since it is just as likely that local officials will instead choose to leave it to federal law enforcement officials to enforce the immigration laws, and allocate limited local resources to matters of purely local concern. It is just as likely as not that all Plaintiff will actually get from this suit is the satisfaction that a disfavored law is no longer being enforced, but such empty "psychic satisfaction" has never sufficed to confer Article III standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). It certainly doesn't suffice here.

Because Plaintiff lacks Article III standing to sue the County, this suit should have been dismissed in its entirety for lack of jurisdiction.

---

[11] To the extent the district court believed that merely providing an "option" to take action constitutes "partial" redress, SA13 n.8, that theory of redress cannot be reconciled with *Simon, Linda R.S.*, and *Goldhamer*, since the relief requested in those cases would also have made available options otherwise foreclosed by the law being challenged.

## CONCLUSION

———————

This court should affirm the judgment of the district court.

     Respectfully submitted,

     EILEEN O'NEILL BURKE
     State's Attorney of Cook County

  BY: s/Jessica M. Scheller
     Jessica M. Scheller
     Assistant State's Attorney
     Chief; Advice, Business & Complex
     Litigation Division
     500 Richard J. Daley Center
     Chicago, IL 60602
     (312)603-6934
     Jessica.Scheller@cookcountysao.org

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

_____

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,413 words, beginning with the words "Jurisdictional Statement" on page 1 and ending with the words "Respectfully submitted" on page 50. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

_s/Jessica M. Scheller_
Jessica M. Scheller, Attorney

**CERTIFICATE OF SERVICE**

_____

I certify that on June 9, 2026, I electronically filed the attached Brief of Defendant-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_s/Jessica M. Scheller_
Jessica M. Scheller, Attorney