No. 25-2904

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES,
APPELLANT,

v.

STATE OF ILLINOIS, *et al.*,
APPELLEES.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

**BRIEF OF NEW JERSEY, THE DISTRICT OF COLUMBIA,
CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII,
MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA,
NEVADA, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND,
VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF
APPELLEES**

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ROMINA LILOLLARI
Assistant Attorney General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

JENNIFER DAVENPORT
Attorney General
State of New Jersey

JEREMY M. FEIGENBAUM
Solicitor General

BENJAMIN M. SHULTZ
Assistant Attorney General

25 Market Street, Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE....................................1

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT ..........................................................................................................4

I.     State And Local Governments Have Reasonably Exercised Their Police Powers To Disentangle State And Local Law Enforcement From Civil Immigration Enforcement.............................4

II.    Federal Immigration Law Does Not Preempt The Challenged Policies ........................................................................................11

    A.    The challenged policies do not stand as obstacles to the implementation of federal law ...................................13

    B.    Federal immigration law does not preempt the information-sharing restrictions of the challenged policies ........................................................................19

    C.    Interpreting the INA to preempt the challenged policies would amount to unconstitutional commandeering..................21

III.    The Challenged Policies Do Not Violate Intergovernmental Immunity Principles .......................................................................24

CONCLUSION .....................................................................................................27

i

# TABLE OF AUTHORITIES

*Cases*

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)............................................................................ 15, 16

*Bond v. United States*,
   572 U.S. 844 (2014)..............................................................................15

*C.Y. Wholesale, Inc. v. Holcomb*,
   965 F.3d 541 (7th Cir. 2020) ...............................................................14

*Chamber of Com. v. Whiting*,
   563 U.S. 582 (2011)........................................................................ 14, 20

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ........................................................... 16, 22

*City of Chicago v. Sessions*,
   888 F.3d 272 (7th Cir. 2018) ................................................................15

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ................................................................18

*Coleman v. Thompson*,
   501 U.S. 722 (1991)..............................................................................15

*County of Ocean v. Grewal*,
   475 F. Supp. 3d 355 (D.N.J. 2020)........................................................21

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993)..............................................................................20

*Engle v. Isaac*,
   456 U.S. 107 (1982)................................................................................4

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990)........................................................................... 11, 12

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992)................................................................................14

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ...................................................................17

*Kaiser v. Johnson & Johnson*,
947 F.3d 996 (7th Cir. 2020) .................................................................12

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................................................ 12, 14, 17

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ...................................... 14, 19, 21, 25, 26

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)................................................................................12

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)................................................ 3, 11, 19, 20, 22, 23

*Nelson v. Great Lakes Educ. Loan Serv., Inc.*,
928 F.3d 639 (7th Cir. 2019) .................................................................20

*New York v. United States*,
505 U.S. 144 (1992)................................................................ 15, 19, 22, 23

*North Dakota v. United States*,
495 U.S. 42 (1990)................................................................................25

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*,
8 F.4th 176 (3d Cir. 2021) .....................................................................20

*Patriotic Veterans, Inc. v. Indiana*,
736 F.3d 1041 (7th Cir. 2013) ...............................................................14

*Printz v. United States*,
521 U.S. 898 (1997)................................................................... 22, 26

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)................................................................................12

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .................................... 15, 16, 17, 18, 21

*United States v. Illinois*,
    796 F. Supp. 3d 494 (N.D. Ill. 2025)......................................................21

*United States v. Morrison*,
    529 U.S. 598 (2000)...........................................................................15

*United States v. New York*,
    814 F. Supp. 3d 266 (N.D.N.Y. 2025)......................................... 18, 21

*United States v. Washington*,
    596 U.S. 832 (2022)........................................................... 24, 25

*Va. Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019)...........................................................................14

*Washington v. United States*,
    460 U.S. 536 (1983)...........................................................................25


### Constitutional Provisions

U.S. Const. art. VI, cl. 2.....................................................................17


### Statutes and Regulations

8 U.S.C. § 1101 ......................................................................................2

8 U.S.C. § 1226................................................................... 12, 17

8 U.S.C. § 1231................................................................... 13, 17

8 U.S.C. § 1357....................................................................................18

8 U.S.C. § 1373................................................................. 13, 19, 20, 21, 22

8 U.S.C. § 1644................................................................. 13, 19, 20

Bos. Mun. Code ch. 11, § 1.9...............................................................23

Cal. Gov't Code § 7284.2 ................................................................ 4, 23

Cal. Gov't Code § 7284.6 ...............................................................................1

Conn. Gen. Stat. Ann. § 54-192h.................................................................1


*Legislative History*

Ill. Gen. Assembly., S. Sess. Transcript for May 4, 2017 (statement of Sen. Martinez)........................................................................................23


*Other Authorities*

Am. Immigr. Council, *Debunking the Myth of Immigrants and Crime* (Oct. 2024) .........................................................................................7

Meg Anderson, *Police Say ICE Tactics Are Eroding Public Trust in Local Law Enforcement*, NPR (Mar. 30, 2025).................................................. 7, 10, 11

Aaron Chalfin & Justin McCrary, *The Effect of Police on Crime: New Evidence from U.S. Cities, 1960-2010* (Nat'l Bureau of Econ. Rsch., Working Paper No. 18815, 2013)........................................................24

Cmty. Rel. Serv. Toolkit for Policing, *Importance of Police-Community Relationships and Resources for Further Reading* (2015)..................................4

Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, 44 Pol. Behav. 1359 (2022) ..................................................7

David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1 (2006) ................................................................8

Ryan Homer, *Immigration Enforcement and Constraints on Information Commandeering*, 174 U. Pa. L. Rev. 589 (2026) ...............................................22

Rashad James, *When Law Enforcement Meets ICE: How a Loss of Local Autonomy Puts Public Safety at Risk*, Ctr. for Policing Equity (Nov. 20, 2025).................................................................................5

Letter from Law Enforcement Immigration Task Force to U.S. Senate (Feb. 27, 2017) ................................................................................10

Sam Levin, *Police Across the US Worry Officers are Being Misidentified as ICE, Records Show*, The Guardian (Apr. 24, 2026) ...........................23

Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* (June 2006) ................................................................9

N.Y. State, *Keeping New Yorkers Safe: Governor Hochul Highlights Growing Support for Local Cops, Local Crimes Act* (Feb. 9, 2026) ...............................11

Nat'l Immigrant Just. Ctr. & Nat'l Immigr. L. Ctr., *Legislative Threats to Undermine Community Safety Policies: The Costs of Entangling Policing and Immigration Law* (Oct. 2015) .......................................................8

Off. of Cmty. Oriented Policing Serv., U.S. Dep't of Just., *Building Trust Between the Police and the Citizens They Serve* (Oct. 16, 2009).........................4

Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Final Report of the President's Task Force on 21st Century Policing* (May 2015)......................6

Shannon Schumacher et al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement*, KFF (Nov. 18, 2025) ...............................................5, 6

Alexandra Sirota & Lissette Guerrero, N.C. Just. Ctr., *Local Communities Face High Costs of Federal Immigration Enforcement* (Apr. 2019) .................24

Wesley Tharpe, Ga. Budget & Pol'y Inst., *Voluntary Immigration Enforcement a Costly Choice for Georgia Communities* (July 2018).................8

Anita Wadhwani, *In Nashville, Immigration Sweeps Deter Crime Victims From Coming Forward*, Tenn. Lookout (Oct. 8, 2025) .......................................6

Chuck Wexler, *Police Chiefs Across the Country Support Sanctuary Cities Because They Keep Crime Down*, L.A. Times (Mar. 6, 2017).........................10

Tom K. Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* (Apr. 3, 2019) .........................5

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

Amici Curiae New Jersey, the District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington (collectively, "Amici States") file this brief in support of appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2). Millions of immigrants, both documented and undocumented, call Amici States home. And immigrant communities play an important role not just in Amici States' civic and economic lives, but also in their justice systems, where immigrants' trust and cooperation are vital to ensuring public safety. In view of that reality, Amici States have adopted different approaches to their involvement in federal immigration enforcement based on state needs, public safety priorities, and available resources. Some of these approaches expressly limit how state and local law enforcement agencies use state and local resources to enforce federal civil immigration laws—including restrictions on how local law enforcement agencies respond to administrative immigration detainers and to certain types of information requests. *See, e.g.*, Cal. Gov't Code § 7284.6; Conn. Gen. Stat. Ann. § 54-192h(b).

Amici States file this brief to make two key points. First, like policies adopted in many other jurisdictions, the Illinois TRUST Act, the Cook County Ordinance, and Chicago's Welcoming City Ordinance (together, "the challenged policies")

reflect these jurisdictions' reasonable determination that disentangling local law enforcement from federal immigration enforcement best serves public safety needs—both by fostering trust and cooperation between officers and immigrant communities, and by ensuring that limited local law enforcement resources are devoted to addressing local public safety issues rather than enforcing federal immigration laws.  Second, such policies are well within the powers of state and local governments: nothing in the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., or principles of intergovernmental immunity is to the contrary, and the INA would constitute unconstitutional commandeering if it had the effect the United States claims here.

## SUMMARY OF ARGUMENT

1. State and local governments have reasonably exercised their historic police powers to disentangle local law enforcement from immigration enforcement in order to maintain trust, facilitate cooperation, and promote public safety.  These policies are reinforced by recent studies that confirm the public safety benefits of limiting local law enforcement's involvement with immigration enforcement.  And these policies enjoy considerable support from law enforcement leaders across the country, who recognize that community mistrust undermines effective policing.

2. The INA does not preempt these challenged policies.  First, these policies do not stand as obstacles to the implementation of Sections 1226 and 1231 of the

INA. Those INA provisions direct federal immigration agents to detain and remove individuals unlawfully present in the United States. But they do not require state and local governments to use their own resources to assist in immigration enforcement.

Second, the information-sharing provisions of the challenged policies are not preempted by INA Sections 1373 and 1644. Those sections prohibit state and local governments from restricting sharing information about an individual's citizenship or immigration status with federal immigration agents. Because these federal statutes regulate state—not private—actors, they are not valid preemption provisions under *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). In any event, by their own terms, INA Sections 1373 and 1644 do not preempt policies that limit the sharing of information aside from an individual's citizenship or immigration status, including but not limited to information about an individual's custody status, release date, or contact information.

Finally, adopting the United States' interpretation of the INA would amount to unconstitutional commandeering and create the very harms that the anticommandeering rule aims to prevent—namely, by blurring the lines of local, state, and federal political accountability and shifting the costs of civil immigration enforcement to state and local governments.

3

3. The challenged policies do not violate intergovernmental immunity principles because they do not impermissibly discriminate against the federal government. The United States has not identified a similarly situated comparator that the State treats differently—and drawing a line between criminal enforcement and civil immigration enforcement does not demonstrate discrimination merely because the federal government performs the latter. In any event, were intergovernmental immunity principles construed to compel the States to participate in federal operations merely because they have their own criminal operations, that would again amount to impermissible commandeering.

## ARGUMENT

**I.** **State And Local Governments Have Reasonably Exercised Their Police Powers To Disentangle State And Local Law Enforcement From Civil Immigration Enforcement.**

As entities with "primary authority for defining and enforcing the criminal law," *Engle v. Isaac*, 456 U.S. 107, 128 (1982), States understand that "[a] relationship of trust" between the community and law enforcement is "central to . . . public safety," Cal. Gov't Code § 7284.2(b), (c). Community trust is essential because "[p]olice officials rely on the cooperation of community members" to report crimes and provide critical information about public-safety incidents. Cmty. Rel. Serv. Toolkit for Policing, *Importance of Police-Community Relationships and Resources for Further Reading* 1 (2015), https://bit.ly/40OdCU1; Off. of Cmty.

4

Oriented Policing Serv., U.S. Dep't of Just., *Building Trust Between the Police and the Citizens They Serve* 3 (Oct. 16, 2009), https://bit.ly/47p1cFH (community trust is the "cornerstone" of "successful policing and law enforcement").

Fears about immigration enforcement erode immigrant communities' trust in, and cooperation with, law enforcement. Anxiety about deportation is widespread among both documented and undocumented immigrants: a 2025 survey found that nearly 53% of Hispanic immigrants worry that they or a family member could be detained or deported, "up from 41% in 2023." Shannon Schumacher et al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement*, KFF (Nov. 18, 2025), https://bit.ly/4sypO7C. It is well established that when communities associate state and local law enforcement with the prospect of detention and removal, they are less likely to engage with law enforcement. *See* Rashad James, *When Law Enforcement Meets ICE: How a Loss of Local Autonomy Puts Public Safety at Risk*, Ctr. for Policing Equity (Nov. 20, 2025), https://bit.ly/4s8zBjE ("When a seemingly minor traffic violation, agreeing to a witness interview, or a call to 911" places individuals at risk of removal, "reporting drops and community harm can go unchecked."); Tom K. Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* (Apr. 3, 2019), https://tinyurl.com/3w7x33kx. This explains why the President's Task Force on 21st Century Policing recommended

5

"decoupl[ing]" civil immigration enforcement from routine local policing.  Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Final Report of the President's Task Force on 21st Century Policing* 18 (May 2015), https://bit.ly/40U7kSI.

Fresh empirical evidence, gathered amid the federal government's recently increased enforcement of civil immigration laws, bears this out.  A 2025 survey found that "[a]cross immigration statuses, larger shares of immigrants now than in 2023" reported that they "have avoided things like talking to the police, applying for a job, or traveling" due to their or a family member's immigration status. Schumacher et al., *supra.*  Another source found evidence that crime victims in Nashville were seemingly less likely to seek free victim support services from the Metro Nashville Police Department in the wake of ICE deployments.  Anita Wadhwani, *In Nashville, Immigration Sweeps Deter Crime Victims From Coming Forward*, Tenn. Lookout (Oct. 8, 2025), https://bit.ly/4dFimCP (explaining that in April 2025—just before the Tennessee Highway Patrol and ICE began conducting joint immigration sweeps—699 crime victims sought counseling, but that number had shrunk to 61 by July).  And in another jurisdiction, the local police department postponed a Hispanic community meeting "after commentators on Facebook discouraged people from attending, claiming it was an ICE roundup in disguise." Meg Anderson, *Police Say ICE Tactics Are Eroding Public Trust in Local Law Enforcement*, NPR (Mar. 30, 2025), https://bit.ly/47Sx71q.

6

Further empirical evidence confirms that disentangling local law enforcement from immigration enforcement promotes public safety. Indeed, policies limiting local law enforcement involvement in civil immigration enforcement "have been associated with lower property and violent crime rates, as well as reductions in specific crimes like domestic homicide, assault, and robbery." Am. Immigr. Council, *Debunking the Myth of Immigrants and Crime* 7 (Oct. 2024), https://bit.ly/48mVIMb. One study found that a growth in partnerships between ICE and local law enforcement in 2017 "led to a decline in reported crimes in counties with higher Hispanic populations from 2016 to 2017," which was attributable to "changes in crime reporting rather than crime commission." Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, 44 Pol. Behav. 1359, 1380-81 (2022). The study further found that the effect was "not uniform" across the country and that "counties exhibiting greater cooperation with ICE" experienced greater declines in crime reporting during that period "relative to counties limiting cooperation with ICE." *Id.* at 1380-81.

Local involvement in civil immigration enforcement also prevents local law enforcement agencies from focusing their limited resources on local public safety issues. Indeed, carrying out the federal government's responsibility for enforcing civil immigration laws "is a huge fiscal expense" for state and local governments.

7

Nat'l Immigrant Just. Ctr. & Nat'l Immigr. L. Ctr., *Legislative Threats to Undermine Community Safety Policies: The Costs of Entangling Policing and Immigration Law* 2 (Oct. 2015), https://bit.ly/4mlh8PK.  One study found that responding to federal administrative detainers cost Georgia "an estimated $88 million over the past decade."  Wesley Tharpe, Ga. Budget & Pol'y Inst., *Voluntary Immigration Enforcement a Costly Choice for Georgia Communities* 1 (July 2018), https://bit.ly/3PUePa1.  Policies that limit local law enforcement agencies' participation in federal immigration efforts therefore help ensure that local law enforcement resources are devoted to advancing local priorities.

This all helps to explain why so many law enforcement officers have been consistent advocates for reducing the participation of States and localities in immigration enforcement.  For instance, when a campaign to involve state and local police in federal immigration enforcement emerged in the 1990s and early 2000s, "[b]y far, the most frequent and impassioned objection" to this new push "came from state and local police concerned [about] their own effectiveness."  David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1, 37 (2006).  Police officers "wanted no part of immigration enforcement because they knew that taking on this task would undermine their ability to keep the public safe."  *Id.*

8

Similarly, in 2006, a group of police chiefs and sheriffs from the 69 largest law enforcement agencies in the United States issued a statement warning that "[i]mmigration enforcement by local police would likely negatively [a]ffect and undermine the level of trust and cooperation between local police and immigrant communities." Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* 6 (June 2006), https://bit.ly/3HxyItD. The police chiefs reasoned that local entanglement with federal immigration enforcement would discourage both documented and undocumented immigrants from contacting or cooperating with the police for "fear that they themselves or undocumented family members or friends may become subject to immigration enforcement." *Id.* And, the police chiefs cautioned, "[w]ithout assurances that contact with the police would not result in purely civil immigration enforcement action, the hard won trust, communication and cooperation from the immigrant community would disappear." *Id.* Further entanglement between local officials and federal immigration enforcement would "result in increased crime against immigrants and in the broader community, create a class of silent victims[,] and eliminate the potential for assistance from immigrants in solving crimes or preventing future terroristic acts." *Id.*

Similar sentiments were expressed yet again in 2017, when more than 60 current and former local police chiefs, including those serving Alabama, Arizona,

Florida, South Carolina, and Texas, wrote to Congress expressing "concern[]" over the federal government's efforts to entangle local governments with civil immigration enforcement. Letter from Law Enforcement Immigration Task Force to U.S. Senate (Feb. 27, 2017), https://bit.ly/4rZGxQ1. They maintained that immigration enforcement was "first and foremost, a federal responsibility" and that local law enforcement could "best serve [their] communities by leaving the enforcement of immigration laws to the federal government." *Id.*

In response to more recent escalations in immigration arrests, detentions, and deportations, law enforcement leaders have reiterated these concerns. The executive director of the Police Executive Research Forum and a former leader in the Boston Police Department has explained that immigration enforcement is what is "keeping police chiefs up at night" as they "find themselves caught in the middle" between their communities and federal law enforcement. Anderson, *supra*. And "police chiefs warn that if their agencies are required to enforce federal immigration laws, it will hurt their ability to investigate and solve serious crimes in their communities." Chuck Wexler, *Police Chiefs Across the Country Support Sanctuary Cities Because They Keep Crime Down*, L.A. Times (Mar. 6, 2017), https://bit.ly/47Xa9X1. The Kingston Police Department Deputy Chief likewise has explained that local officers' participation in immigration enforcement "blurs th[eir] mission" and "undermines the trust [needed] to keep neighborhoods safe." N.Y. State, *Keeping New Yorkers*

10

*Safe: Governor Hochul Highlights Growing Support for Local Cops, Local Crimes Act* (Feb. 9, 2026), https://bit.ly/4t65lqv.  And the Minneapolis Police Chief has expressed concern over local entanglement with immigration enforcement, warning that "[i]f people are not willing to . . . cooperate as witnesses," then that creates "the potential for everyone in th[e] city to be victimized that much worse."  Anderson, *supra*.

At bottom, jurisdictions including Illinois, Chicago, and Cook County have reasonably concluded, based on studies, empirical evidence, and the experiences of state and local law enforcement leaders, that laws that disentangle state and local law enforcement from civil immigration enforcement best promote public safety.  In other words, they have concluded that expending resources on civil immigration enforcement—that could instead be spent on criminal investigations and police work in their communities—disserves their own duties.  That is their prerogative.

## II.    Federal Immigration Law Does Not Preempt The Challenged Policies.

The Supreme Court has identified three types of preemption—"express," "conflict," and "field" preemption.  *Murphy*, 584 U.S. at 477 (citing *English v. Gen. Elec. Co.,* 496 U.S. 72, 78-79 (1990)).  Congress can preempt state law expressly by "defin[ing] explicitly the extent to which its enactments" preempt the law.  *English*, 496 U.S. at 78.  Conflict preemption, for its part, arises only where "it is impossible for a private party to comply with both state and federal requirements," *Kaiser v.*

11

*Johnson & Johnson*, 947 F.3d 996, 1008 (7th Cir. 2020) (internal quotation marks omitted), or where the state law poses an obstacle to the full effectuation of a federal statute's "text and structure," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (internal quotation marks omitted). In assessing whether a state law in fact is an obstacle to a federal statute, courts "start with the assumption that the historic police powers of the States [are] not to be superseded" by federal law "unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

In this case, the United States contends that the challenged policies run afoul of several provisions of the INA. First, the United States contends that these policies "obstruct the transfer" of noncitizens from state to federal custody and "withhold basic information necessary for [federal] agents to fulfill their duties," thereby creating an obstacle to the implementation of the INA. U.S. Br. 21, 30, 34. This conflict-preemption challenge relies on federal laws permitting immigration officers to issue administrative warrants and detainers, as well as the federal government's general authority to detain certain undocumented individuals. *See* 8 U.S.C. §§ 1226, 1231. Second, the United States argues that the information-sharing prohibitions of the challenged policies "violate express federal law," U.S. Br. 36, particularly Sections 1373(a) and 1644 of the INA, which purport to preclude States and localities from adopting policies to prohibit or restrict sharing "information

12

regarding the citizenship or immigration status" of individuals, 8 U.S.C. § 1373(a); *see id.* § 1644.

Both challenges lack merit. With respect to the first, nothing in the INA requires state and local governments to participate in immigration enforcement. On the contrary, the INA recognizes that participation is voluntary and provides a mechanism for state and local governments to voluntarily enter into cooperation agreements. Moreover, a finding of preemption would be particularly unwarranted here, given the potential infringement on States' historic police powers and the lack of a "clear and manifest" congressional intent to preempt. As for the second preemption challenge, Sections 1373 and 1644 are not valid preemption provisions because they regulate state, not private, conduct. And even if they were valid preemption provisions, they do not require state and local governments to share individuals' custody status, release date, or contact information with federal immigration agents. Finally, as a matter of constitutional law and constitutional avoidance, the INA as construed by the United States would run afoul of the anticommandeering doctrine.

## A. The challenged policies do not stand as obstacles to the implementation of federal law.

Under the doctrine of conflict preemption, federal law impliedly preempts a state law only when the state law poses an obstacle to the full effectuation of a federal statute's "text and structure." *Garcia*, 589 U.S. at 208. This is not a "freewheeling

13

judicial inquiry into whether a state statute is in tension with federal objectives," *id.* at 202 (internal quotation marks omitted), for "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111-12 (1992) (Kennedy, J., concurring in part and concurring in judgment)). Rather, courts impose a "high threshold" for obstacle preemption, *id.*, finding an obstacle to the implementation of federal law only where applying state law "would do 'major damage' to clear and substantial federal interests," *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (quoting *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013)), in the statutes themselves. Said another way, "invoking 'some brooding federal interest' is not enough to support a preemption claim." *McHenry County v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (op. of Gorsuch, J.)).

This court's preemption analysis must "begin . . . with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted), an assumption that "applies with particular force when Congress has legislated in a field traditionally occupied by the States," *id.* Because our decentralized system of federalism "secures

14

to citizens the liberties that derive from the diffusion of sovereign power," *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)), "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers," *Bond v. United States*, 572 U.S. 844, 858 (2014) (internal quotation marks omitted).  That applies here: there is "no better example of the police power, which the Founders denied to the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims," *United States v. Morrison*, 529 U.S. 598, 618 (2000), and so the State's ability to "regulate its internal law enforcement activities" is a "quintessential police power," *United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019).  The challenged policies fall appropriately within the historic police powers of Illinois, Chicago, and Cook County and thus merit this presumption.

Determining how to allocate law enforcement resources—"including whether or not to use such resources to aid in federal immigration efforts"—is a core component of state law enforcement power.  *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018).  The challenged policies reflect reasonable judgments that these jurisdictions can more effectively ensure the safety and welfare of their citizens by removing themselves from civil immigration enforcement.  And courts have repeatedly affirmed that policy judgments such as these fall within States' traditional

15

police powers. *See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 891-92 (7th Cir. 2020) (city is "exercising its police power" when "deciding that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences").

The United States has not met the high threshold of demonstrating that Congress' "clear and manifest purpose" was to override the historic rights of States to determine how to allocate law enforcement resources and to limit their assistance with federal immigration enforcement. *Altria*, 555 U.S. at 77 (internal quotation marks omitted). Rather, the United States merely contends that by passing the INA's detention and administrative warrant provisions (in particular, Sections 1226 and 1231), "Congress contemplated" that noncitizens "would be transferred to federal custody . . . upon the completion of a period of state or local custody." U.S. Br. 33.

The INA provisions at issue in this case, however, "direct *federal* activities, not those of state or local governments." *California*, 921 F.3d at 887. In *California*, the Ninth Circuit concluded that the INA provisions that allow the federal government to issue detainers or direct it to remove certain undocumented immigrants "cannot [be] assume[d]" to "impliedly mandate[] that state and local governments . . . act in accordance" with these laws. 921 F.3d at 887. Rather, the INA allows the federal government to make requests of jurisdictions and otherwise directs how *federal* resources should be used. *See, e.g.*, *Galarza v. Szalczyk*, 745

16

F.3d 634, 640-41 (3d Cir. 2014) (observing that every court of appeals to have "commented on the character of ICE detainers" refers to them as "requests"). The INA provisions that the United States relies on to argue obstacle preemption are the same as the ones considered in *California* and they "do[] not actually mandate any state action" at all. 921 F.3d at 887 (reviewing 8 U.S.C. §§ 1226, 1231). Section 1226 specifies what the Attorney General and the Secretary of Homeland Security "may" and "shall" do with respect to the apprehension and detention of noncitizens, 8 U.S.C. § 1226, and Section 1231 outlines the Attorney General's removal authority, *id.* § 1231. But these provisions do not impose any requirements on state or local governments.

Nor do the challenged policies obstruct the federal government's statutory regime allowing officers to detain and remove individuals for civil immigration violations. The mere "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption" because the Supremacy Clause "gives priority to 'the Laws of the United States,' not the . . . law enforcement priorities or preferences of federal officers." *Garcia*, 589 U.S. at 212 (quoting U.S. Const. art. VI, cl. 2). The fact that these policies may "make enforcement more burdensome than it would be if state and local law enforcement provided immigration officers with their assistance[,]" *California*, 921 F.3d at 888 (internal quotation marks omitted), does not mean that they are actively obstructing federal

17

immigration efforts. Simply put, "refusing to help is not the same thing as impeding." *Id.*; *see also United States v. New York*, 814 F. Supp. 3d 266, 278-79 (N.D.N.Y. 2025) (collecting cases rejecting similar conflict preemption challenges premised on the argument that "it could be easier to enforce federal immigration priorities" if States assisted the federal government).

These points are further buttressed by another INA provision, 8 U.S.C. § 1357(g), which explicitly leaves to States the discretion to decide whether to assist immigration enforcement efforts. *See id.* § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement."); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). Moreover, the INA states that agreements under Section 1357(g) can be carried out only "to the extent consistent with State and local law," 8 U.S.C. § 1357(g)(1), which means "some state and local regulation of cooperation is permissible." *El Cenizo*, 890 F.3d at 178; *see also id.* (federal law "does not suggest the intent—let alone a 'clear and manifest' one—to prevent [S]tates from regulating" the decision to enter such agreements). Thus, the INA contemplates that States and localities will have wide leeway in deciding the extent to which they will dedicate their own resources to federal immigration enforcement efforts.

18

**B.    Federal immigration law does not preempt the information-sharing restrictions of the challenged policies.**

The United States next contends that provisions of the INA, 8 U.S.C. §§ 1373, 1644, expressly preempt the information-sharing restrictions of the challenged policies.  But those laws are not valid preemption provisions, and even if they were, they would not preempt the challenged state and local laws.

To begin, 8 U.S.C. §§ 1373, 1644 are not valid preemption provisions because they regulate state, not private, actors.  Because the Constitution "confers upon Congress the power to regulate individuals, not States," *New York*, 505 U.S. at 166, a preemptive federal law "must be best read as one that regulates private actors," *Murphy*, 584 U.S. at 477.  Indeed, "every form of preemption is based on a federal law that regulates the conduct of private actors" because a federal law that directly regulates States would raise Tenth Amendment concerns and hence be void. *Murphy*, 584 U.S. at 479; *McHenry County*, 44 F.4th at 592 (same).  But "there is no way" in which these INA provisions "can be understood as a regulation of private actors."  *Murphy*, 584 U.S. at 479-80.  For example, Section 1373 expressly orders "Federal, State, or local government entit[ies] or official[s]" not to restrict certain forms of information sharing with the Immigration Naturalization Service.  8 U.S.C. § 1373(a); *see id.* § 1644 (directing "State or local government entit[ies]").  This provision "is a clear prohibition on *state* action," *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021), and does not "impose any federal

19

restrictions on private actors," *Murphy*, 584 U.S. at 480.  Nor do these provisions "confer any federal rights" on private persons, *Murphy*, 584 U.S. at 480, as the United States contends, U.S. Br. 59-60.  Whether state and local governments share certain information with federal immigration agents has no bearing on an individual's citizenship or immigration status, nor does it provide the individual with any new rights or disabilities.  That is fatal.  *Ocean County*, 8 F.4th at 182 (finding the fact that 8 U.S.C. §§ 1373, 1644 regulate exclusively state and local governments rather than private parties disposes of preemption).

Even if Sections 1373 and 1644 were valid preemption provisions, they do not preempt policies that limit information sharing with respect to information other than an individual's citizenship or immigration status.  Express preemption applies "when Congress clearly declares its intention to preempt state law." *Nelson v. Great Lakes Educ. Loan Serv., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019).  The court's inquiry "focus[es] on the plain wording" of the preemption clause, "which necessarily contains the best evidence of Congress' preemptive intent."  *Whiting*, 563 U.S. at 594 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).  The INA provisions concern restrictions on sharing information "regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373, which "is naturally understood as a reference to a person's legal classification under federal law," *California*, 921 F.3d at 891, rather than all personal information about an

20

individual.  With one exception,[1] the challenged policies limit information sharing with respect to individuals' custody status, release date, or contact information—information that "does not directly relate to, or regard, an individual's immigration status."  *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020).  Congress has not expressed an intent to preempt provisions restricting sharing such information, and courts have repeatedly rejected the United States' overly broad reading of Sections 1373 and 1644 of the INA.  *See, e.g.*, *California*, 921 F.3d at 891; *New York*, 814 F. Supp. 3d at 278 (collecting cases).

**C.    Interpreting the INA to preempt the challenged policies would amount to unconstitutional commandeering.**

Even if the INA could be read to preempt the challenged policies, such an interpretation would "run[] afoul of the Tenth Amendment" and the anticommandeering rule.  *McHenry County*, 44 F.4th at 592 (quoting *California*, 921 F.3d at 891).  The anticommandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy*, 584 U.S. at 470.  Because States have every right in our federalist system to pursue their own

---

[1]    Welcoming City Ordinance § 2-173-030(a)(1) limits local officials from sharing "the citizenship or immigration status" of any individual.  Accordingly, the district court concluded that it would be expressly preempted by federal law if the relevant federal laws were valid preemption provisions.  *United States v. Illinois*, 796 F. Supp. 3d 494, 519 (N.D. Ill. 2025).

policies, direct federal "commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997).  Indeed, the anticommandeering rule protects "the exact types of decisions that [these] jurisdictions have made: the right *not* to participate in federal regulatory schemes."  Ryan Homer, *Immigration Enforcement and Constraints on Information Commandeering*, 174 U. Pa. L. Rev. 589, 592 (2026); *see also New York*, 505 U.S. at 176-77 (holding that the take title provision violated the anticommandeering doctrine because it took away the State's right to "decline to administer [a] federal program").  In application of these principles, courts have repeatedly construed federal law in similar contexts to avoid commandeering concerns.  *See, e.g.*, *City of Chicago*, 961 F.3d at 898-909 (interpreting a federal grant program not to require compliance with 8 U.S.C. § 1373, "avoid[ing] potential constitutional questions" under the Tenth Amendment).

Adopting the United States' interpretation of the INA would create the very harms that the anticommandeering rule aims to prevent.  To start, the anticommandeering rule "promotes political accountability" by making it clear to voters "who to credit or blame" for governmental action.  *Murphy*, 584 U.S. at 473; *see New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials . . . remain insulated.").  If a state or local government

22

participates in federal immigration enforcement "only because it has been commanded to do so by Congress," then responsibility for immigration enforcement "is blurred." *Murphy*, 584 U.S. at 473-74. This blurring of roles and responsibilities is not hypothetical. *See, e.g.*, Sam Levin, *Police Across the US Worry Officers are Being Misidentified as ICE, Records Show*, The Guardian (Apr. 24, 2026), https://bit.ly/4o0tFJa. Many States and localities have passed laws like the policies at issue here to expressly create separation between their law-enforcement priorities and the distinct policies of the federal government. *See, e.g.*, Ill. Gen. Assembly., S. Sess. Tr. for May 4, 2017, at 127, https://bit.ly/34ND9TF (statement of Sen. Martinez) (noting that immigration enforcement "is a federal issue" that "should not be . . . mixed in with . . . regular law enforcement," and that the state law sought to appropriately separate the two); Cal. Gov't Code § 7284.2(d) ("Entangling state and local agencies with federal immigration enforcement programs . . . blurs the line of accountability between local, state, and federal governments."); Boston Trust Act, Bos. Mun. Code ch. 11, § 1.9. Those choices should not be undermined.

The anticommandeering rule also "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 474. Participating in federal immigration enforcement imposes significant costs on state and local governments, and these costs can be both immediate and direct. For example, one study found that North Carolina's involvement in civil immigration enforcement cost taxpayers "at

least $81.7 million" over a decade. Alexandra Sirota & Lissette Guerrero, N.C. Just. Ctr., *Local Communities Face High Costs of Federal Immigration Enforcement* 4 (Apr. 2019), https://bit.ly/4vvrkbq. Furthermore, state and local governments also suffer the costs of less effective law enforcement by participating in federal immigration efforts. When immigrants are less willing to share information, jurisdictions must employ more agents to investigate crimes, which compels them to further take on the financial costs of purely federal actions. States that do not, or cannot, expend those additional resources must bear the costs associated with a rise in crime. *See* Aaron Chalfin & Justin McCrary, *The Effect of Police on Crime: New Evidence from U.S. Cities, 1960-2010*, at 42 (Nat'l Bureau of Econ. Rsch., Working Paper No. 18815, 2013), https://bit.ly/33rVq8D (estimating that crime costs residents of high-crime cities anywhere from 5% to 34% of their annual income). The INA must not be construed broadly, whether through conflict or express preemption, to produce a series of unconstitutional commands.

## III. The Challenged Policies Do Not Violate Intergovernmental Immunity Principles.

The intergovernmental immunity doctrine prohibits "state laws that *either* 'regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals.'" *United States v. Washington*, 596 U.S. 832, 838 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). A state law discriminates against the federal government if it "singles [it]

24

out for less favorable treatment." *Id.* at 839 (citation modified). But a law is not unconstitutional merely because it "indirectly increases costs for the Federal Government," so long as it does so "in a neutral, nondiscriminatory way." *Id.*

The challenged policies do not impermissibly discriminate against the federal government. Although the policies limit state and local government involvement with immigration enforcement, they do not treat the federal government unfavorably compared to non-federal actors. Nor do the policies "impose[] upon the Federal Government costs that state or private entities do not bear." *Id.* The United States asserts that the challenged policies "explicitly treat federal immigration agents differently from other law enforcement personnel," U.S. Br. 47 (citation modified), but it does not identify a specific "similarly situated" state or local law enforcement agency that raises the same concerns for the State or locality and that their policies treat more favorably than the federal government, *Washington*, 596 U.S. at 839. To the extent the United States argues that the challenged policies discriminate against the federal government merely because they "affect[] an exclusively federal domain, that argument [also] fails." *McHenry County*, 44 F.4th at 594; *see Washington v. United States*, 460 U.S. 536, 544-45 (1983) (a State does not discriminate against the federal government "unless it treats someone else better than it treats them").

Furthermore, it would be particularly odd to say that the policies violate the intergovernmental immunity doctrine when federal law *itself* authorizes States and

25

local governments to decline to enter into cooperative agreements to enforce federal immigration law, and federal law itself makes other forms of cooperation (such as honoring detainer requests) entirely voluntary. *See supra* pp. 18-19; *McHenry County*, 44 F.4th at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."). And the United States' approach to intergovernmental immunity in any event cannot withstand the Tenth Amendment, which ensures that the "Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. If a State must assist in the enforcement of federal immigration policy because anything else is somehow deemed discriminatory, then States would be subject to the very command that the Constitution's anticommandeering principle abhors.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

| | |
|---|---|
| BRIAN L. SCHWALB<br>Attorney General<br>District of Columbia | JENNIFER DAVENPORT<br>Attorney General<br>State of New Jersey |
| CAROLINE S. VAN ZILE<br>Solicitor General | /s/ Jeremy M. Feigenbaum<br>JEREMY M. FEIGENBAUM<br>Solicitor General |
| ASHWIN P. PHATAK<br>Principal Deputy Solicitor General | |
| ROMINA LILOLLARI<br>Assistant Attorney General | BENJAMIN M. SHULTZ<br>Assistant Attorney General |
| 400 6th Street, NW, Suite 8100<br>Washington, D.C. 20001<br>(202) 724-6609<br>caroline.vanzile@dc.gov | 25 Market Street, Box 080<br>Trenton, NJ 08625<br>(862) 350-5800<br>jeremy.feigenbaum@njoag.gov |

June 2026

On behalf of:

ROB BONTA
Attorney General
State of California

PHILIP J. WEISER
Attorney General
State of Colorado

WILLIAM TONG
Attorney General
State of Connecticut

KATHLEEN JENNINGS
Attorney General
State of Delaware

ANNE E. LOPEZ
Attorney General
State of Hawaii

AARON M. FREY
Attorney General
State of Maine

ANTHONY G. BROWN
Attorney General
State of Maryland

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

DANA NESSEL
Attorney General
State of Michigan

KEITH ELLISON
Attorney General
State of Minnesota

AARON D. FORD
Attorney General
State of Nevada

RAÚL TORREZ
Attorney General
State of New Mexico

LETITIA JAMES
Attorney General
State of New York

DAN RAYFIELD
Attorney General
State of Oregon

PETER F. NERONHA
Attorney General
State of Rhode Island

CHARITY R. CLARK
Attorney General
State of Vermont

JAY JONES
Attorney General
Commonwealth of Virginia

NICHOLAS W. BROWN
Attorney General
State of Washington

28

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29.  The brief contains 6,006 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Federal Rule of Appellate Procedure 32(f).  I certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Jeremy M. Feigenbaum
JEREMY M. FEIGENBAUM

**CERTIFICATE OF SERVICE**

I certify that on June 15, 2026, I electronically filed this brief with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Jeremy M. Feigenbaum
JEREMY M. FEIGENBAUM