**No. 25-2904**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

STATE OF ILLINOIS, et al.,

*Defendants-Appellees.*

**BRIEF OF *AMICI CURIAE* ONE HUNDRED AND FOURTY-SIX
CITIES, COUNTIES, AND ELECTED OFFICIALS IN SUPPORT
OF APPELLEES**

TOBY MERRILL
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788

KARIANNE JONES
EVERGREEN LEGAL
STRATEGIES LLP
1763 Columbia Rd NW, Suite 100
Washington, D.C. 20009

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. ii

INTEREST OF AMICI ................................................................. 1

ARGUMENT ............................................................................... 2

    I.   So-Called Sanctuary Policies Promote Public Safety. ................................................................... 3

    II.  So-Called Sanctuary Policies Promote Economic Well-Being. ....................................................... 11

    III. So-Called Sanctuary Policies Promote Health and Welfare. ............................................................. 16

CONCLUSION ......................................................................... 22

ADDITIONAL COUNSEL ........................................................ 24

Appendix A – List of Amici Local Governments ...................... 31

# TABLE OF AUTHORITIES

## CASES

*Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) .................................................. 3

*Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) ................................. 21

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ............................................................ 2

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) ............................................................ 1

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................ 2

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ............................................................ 22

*Ocean v. Grewal*,
475 F. Supp. 3d 355 (D.N.J. 2020) .............................. 21, 22

*Philadelphia v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................. 18

*Philadelphia v. United States*,
916 F.3d 276 (3d Cir. 2019) .............................................. 21

*San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ............................................. 21

*San Francisco v. Garland*,
42 F.4th 1078 (9th Cir. 2022) ........................................... 21

*Steinle v. San Francisco*,
919 F.3d 1154 (9th Cir. 2019) ........................................... 21

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................. 21

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) .............................................. 21

*United States v. New Jersey,*
    No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) .... 21

*United States v. New York,*
    No. 25 Civ. 744, 2025 WL 3205011 (N.D.N.Y Nov.
    17, 2025).......................................................................... 22

**OTHER AUTHORITIES**

Allison McCord Stafford et al., *Documentation Status
    and Self-Rated Physical Health Among Latinx Young
    Adult Immigrants: The Mediating Roles of
    Immigration and Healthcare Stress*, 10 J. Racial &
    Ethnic Health Disparities 761 (2023) ............................. 17

Amanda Seitz & Jacquelyn Martin, *As Trump's Raids
    Ramp Up, a Texas Region's Residents Stay Inside -
    Even When They Need Medical Care*, AP News (July
    21, 2025)........................................................................... 18

*Balancing Community Trust and Enforcement: The
    Complex Issue of Immigration*, Police Executive
    Research Forum (Apr. 12, 2025)...................................... 11

Ben Zipperer, *Trump's Deportation Agenda Will Destroy
    Millions of Jobs*, Econ. Pol'y Inst. (July 10, 2025)........... 16

Braden Ross, *La Vergne Police Chief Urges Community
    to Use Emergency Services Despite Fears of
    Immigration Enforcement*, WSMV4 (May 22, 2025) ....... 10

Carl Davis, Marco Guzman & Emma Sifre, *Tax
    Payments by Undocumented Immigrants*, Inst. on
    Tax'n Payment & Econ. Pol'y, 3 (July 30, 2024).............. 14

Carter Evans, *Trump's Immigration Crackdown Causing Labor Shortages to California's Construction Industry, Builder Says: "They're hiding,"* CBS News (July 18, 2025) ................................. 16

Charis E. Kubrin & Bradley J. Bartos, *Sanctuary Status and Crime in California: What's the Connection?*, 3 Just. Evaluation J. 115 (2020).......................................... 5

Charles Wellford & James Cronin, *Clearing Up Homicide Clearance Rates,* 181728 Nat'l Inst. Just. J. 2 (2000) .............................................................. 14

Christian Gunadi, *On the Association between Undocumented Immigration and Crime in the United States*, 73 Oxford Econ. Papers 200 (2021) ....................... 6

Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423 (2022) ....................................................... 5

David K. Hausman, *Sanctuary Policies Reduce Deportations without Increasing Crime*, 117 PNAS 27262, 27262 (2020) ....................................................... 5

Deborah Baskin & Ira Sommers, *The Influence of Forensic Evidence on the Case Outcomes of Assault and Robbery Incidents*, 23 Crim. Just. Pol'y Rev. 186, 203 (2012) ............................................................ 6

Dkt. 76, Declaration of Support for Preliminary Injunction, *San Francisco v. Trump*, No. 25-CV-0135 (N.D. Cal. Mar. 17, 2025)............................................... 20

Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. Times (May 8, 2025) ............................................... 17

iv

Felipe M. Gonçalves, Elisa Jácome & Emily K. Weisburst, *Immigration Enforcement and Public Safety*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 32109, 2024 ..................................................... 7

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018) ..................................... 8

Helen B. Marrow, *The Power of Local Autonomy: Expanding Health Care to Unauthorized Immigrants in San Francisco*, 35 Ethnic & Racial Stud. 72 (2012) ................................................................. 19

*Here's What We Know about Foreign-Born Workers, and How They Compare to the Native-Born Population*, Peterson G. Found. (last visited Aug. 20, 2025) .............. 12

*Immigrant Entrepreneurship in the US*, Nat'l Bureau of Econ. Rsch. (Oct. 21, 2024). ............................................... 13

Jacqueline M. Torres et al., *Deportation Worry, Cardiovascular Disease Risk Factor Trajectories, and Incident Hypertension: A Community-Based Cohort Study*, 8 J. Am. Heart Ass'n 1 (2019) .............................. 17

Jan Hoffman, *Sick and Afraid, Some Immigrants Forgo Medical Care*, N.Y. Times (June 26, 2017) ...................... 19

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015) ............................................................ 8

Julia Gelatt, Jeanne Batalova & Randy Capps, *Navigating the Future of Work: The Role of Immigrant-Origin Workers in the Changing U.S. Economy*, Migration Pol'y Inst., 1 (Oct. 2020) ................. 13

Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med. 586 (2011) ................................ 17

Karla M. Sanford, *Undocumented Workers Power L.A.'s Restaurants. Will the Industry Protect Them?*, L.A. Times (June 30, 2025) ....................................................... 15

Kathleen M. Roche et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, 62 J. Adolesc. Health 525 (2018) ............................................... 10

Kristina Murphy, Lyn Hinds & Jenny Fleming, *Encouraging Public Cooperation and Support for Police*, 18 Policing & Soc'y 136 (2008) ................................ 6

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Rsch. 102743 (2022) .................................................................. 5

Michael T. Light, Jingying He & Jason P. Robey, *Comparing Crime Rates between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 PNAS 32340 (2020) ........................ 3

Nathaniel Meyersohn & Vanessa Yurkevich, *America's Migrant Workers Are Terrified to Work But Unable to Stay Home*, CNN (June 14, 2025) .............................. 15, 16

*National Latino Family Report 2025*, AP-OD (last visited Aug. 20, 2025) ....................................................... 9

*New American Fortune 500 in 2024*, Am. Immigr. Council (Sept. 9, 2024) ..................................................... 13

Patricia A. Cavazos-Rehg et al., *Legal Status, Emotional Well-Being and Subjective Health Status of Latino Immigrants*, 99 J. Nat'l Med. Ass'n 1126 (2007) ............. 17

vi

Paul H. Robinson, Jeffrey Seaman & Muhammad Sarahne, *Standing Back and Standing Down: Citizen Non-Cooperation and Police Non-Intervention as Causes of Justice Failures and Crime*, 51 Hofstra L. Rev. 923 (2023) ................................................................. 6

*Public Health Talking Points for Immigration Justice*, Health In Partnership (last visited July 23, 2025) ......... 19

Radha Vishnuvajjala, *Insecure Communities: How an Immigration Enforcement Program Encourages Battered Women to Stay Silent*, 32 Boston College J. Law & Soc. Just. 185 (2012) ............................................. 8

Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-Born, 1870–2020,* Nat'l Bureau of Econ. Rsch., Working Paper No. 31440 (2023) ...................................... 4

Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociol. Rev. 154 (2021) .............................................. 9

Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010*, 36 Just. Q. 567 (2019) .................. 5

Robert C. Davis et al., *Working Smarter on Cold Cases: Identifying Factors Associated with Successful Cold Case Investigations*, 59 J. Forensic Sci. 375 (2014) ........... 6

Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation*, Univ. N.H. Carsey Sch. Pub. Pol'y (Aug. 29, 2024)................................................................. 12

vii

Ryan Edwards & Francesc Ortega, *The Economic Contribution of Unauthorized Workers: An Industry Analysis*, 3, Nat'l Bureau of Econ. Rsch., Working Paper No. 22834 (2016) ..................................................... 14

Steven Asch, Barbara Leake & Lillian Gelberg, *Does Fear of Immigration Authorities Deter Tuberculosis Patients From Seeking Care?*, 161 West J. Med. 373 (1994) ............................................................................ 19

*Study Finds Trump's Election Was Associated With Decrease in Well-Child Visits for Children of Immigrant Mothers*, Boston University (Sept. 8, 2023) ............................................................................. 18

Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J.L. & Econ. 937 (2014) .......................... 4

Tom K. Wong et al., *How Interior Immigration Enforcement Affects Trust in Law Enforcement*, 19 Persp. on Pol. 357 (2021) .................................................. 7

Tom K. Wong, *The Effect of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017) .............................................................................. 11

*U.S. Immigration Statistics*, Am. Immigr. Council (last visited July 22, 2025) ................................................. 13, 14

## INTEREST OF AMICI

State and local jurisdictions like *Amici* bear primary responsibility for ensuring the safety and well-being of their residents and communities. This principle is neither novel nor controversial; indeed, it lies at the core of our federalist system of government. *See, e.g., Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) (Residents' health and safety are "primarily, and historically, a matter of local concern."). In exercising that sovereign duty to promote public safety, local governments—including *Amici*, which comprise 146 cities, counties, and elected officials from across the United States—have adopted laws and policies reflecting their careful judgment of what practices best serve their communities.

In this litigation and in other litigation across the country, the federal government seeks to upset that well-established principle, attacking local policies that limit the entanglement of local law enforcement with federal immigration officers. The State of Illinois's, City of Chicago's, and Cook County's challenged policies manifest a commitment to integrating immigrants into the community and promoting public safety, public health, and a robust economy. *Amici*

1

share the goal of protecting the well-being of all residents and offer a critical perspective on how policies like those challenged in this case do just that.

## ARGUMENT

The authority of local governments to make their own policy decisions about the health and safety of their communities is a fundamental feature of our constitutional system. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)) ("[The] structure and limitations of federalism . . . allow the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"). As *Amici* well know, Appellees' decisions to adopt policies limiting entanglement with federal immigration enforcement are not only authorized as a matter of constitutional design; they are also good policy. Extensive research shows that jurisdictions adopting similar policies—in which scarce local law enforcement resources are allocated to the investigation of crimes, rather than the enforcement of federal civil immigration laws—have safer, healthier, and more economically resilient communities.

2

### I.    So-Called Sanctuary Policies[1] Promote Public Safety.

As an initial matter, the Trump Administration's repeated attempts to characterize immigrant communities as threats to public safety are simply unsupported by the evidence. In fact, immigrant communities are statistically *less likely to commit crime* than U.S.-born citizens. Specifically, U.S.-born citizens are twice as likely as undocumented immigrants to be arrested for violent crimes[2] and four

---

[1] Jurisdictions with policies like those challenged in this case adopt or are labeled with a variety of descriptors, including "sanctuary cities" and "welcoming jurisdictions." Although the Trump Administration has adopted the term "sanctuary cities" to characterize such places that enact laws to prioritize local resources for local purposes, it has not offered a specific definition of the term. Indeed, "localities which have concluded that cooperation in federal civil immigration efforts is counterproductive or simply offensive are often labeled 'sanctuary' cities or states, but that term is commonly misunderstood." *Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018). The term is a misnomer because such jurisdictions "do[] not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government." *Id.* Given the common usage of the term, however, this brief uses the phrases "so-called sanctuary jurisdictions" and "so-called sanctuary policies" to refer to those jurisdictions and policies that seek to limit the entanglement of local law enforcement with federal immigration efforts.

[2] Michael T. Light, Jingying He & Jason P. Robey, *Comparing Crime Rates between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 PNAS 32340, 32340 (2020), https://www.pnas.org/doi/full/10.1073/pnas.2014704117.

3

times as likely to be arrested for property crimes.[3] They are also significantly more likely to be incarcerated than immigrants, documented or not.[4] Is it thus unsurprising that increasing removals does not lower crime rates.[5]

In any event, and as many *Amici* have explained in litigation across the country, so-called sanctuary policies, like those challenged here, make communities safer. Any argument to the contrary is belied by extensive social science research amassed over the past several decades, which confirms that such policies either have no statistical effect on crime

---

[3] *Id.*

[4] Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-Born, 1870–2020* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31440, 2023), https://www.nber.org/papers/w31440; Christian Gunadi, *On the Association between Undocumented Immigration and Crime in the United States*, 73 Oxford Econ. Papers 200, 209 (2021), https://academic.oup.com/oep/article/73/1/200/5572162.

[5] Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J.L. & Econ. 937, 937 (2014), https://www.journals.uchicago.edu/doi/10.1086/680935 (finding that research on the implementation of one federal program that significantly increased the apprehension and removal of undocumented immigrants showed that increased enforcement had "no observable effect on the overall crime rate").

4

rates[6] or result in *lower* crime rates[7]—particularly for violent crimes like robbery, assault, and homicide.[8] Indeed according to one estimate, because sanctuary policies decrease violent crime, non-sanctuary jurisdictions across the country could reduce crime-related costs by \$3.28 billion per year if they adopted such policies.[9] In part, that is because one of the most important factors in a crime being "cleared," or solved, is the

---

[6] David K. Hausman, *Sanctuary Policies Reduce Deportations without Increasing Crime*, 117 PNAS 27262, 27262 (2020), https://pnas.org/doi/full/10.1073/pnas.2014673117; Charis E. Kubrin & Bradley J. Bartos, *Sanctuary Status and Crime in California: What's the Connection?*, 3 Just. Evaluation J. 115, 115 (2020), https://www.tandfonline.com/doi/full/10.1080/24751979.2020.1745662.

[7] Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Rsch. 102743, 102743 (2022), https://www.sciencedirect.com/science/article/abs/pii/S0049089X22000497.

[8] Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423, 423 (2022), https://onlinelibrary.wiley.com/doi/abs/10.1111/coep.12564; Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010*, 36 Just. Q. 567, 567 (2019), https://www.tandfonline.com/doi/abs/10.1080/07418825.2017.1400577.

[9] Manning & Burkhardt, *supra* n.8.

5

willingness of witnesses to share information with the police.[10] Local law enforcement thus relies on building trust with the communities they protect—a foundational principle of community policing that encourages cooperation with law enforcement.[11] Policies that make it more difficult for the police to maintain the trust of all community members, including immigrant populations, increase the likelihood that crimes go unreported, unsolved, or unprosecuted.

Indeed, extensive studies show that immigrants who fear removal for themselves or members of their communities are less likely to cooperate with local law enforcement. For example, a 2021 survey found that, in jurisdictions where local police coordinate with the federal

---

[10] Deborah Baskin & Ira Sommers, *The Influence of Forensic Evidence on the Case Outcomes of Assault and Robbery Incidents*, 23 Crim. Just. Pol'y Rev. 186, 203 (2012), https://journals.sagepub.com/doi/10.1177/0887403410395576; Robert C. Davis et al., *Working Smarter on Cold Cases: Identifying Factors Associated with Successful Cold Case Investigations*, 59 J. Forensic Sci. 375, 378 (2014), https://onlinelibrary.wiley.com/doi/10.1111/1556-4029.12384; Charles Wellford & James Cronin, *Clearing Up Homicide Clearance Rates,* 181728 Nat'l Inst. Just. J. 2, 4 (2000), https://nij.ojp.gov/library/publications/clearing-homicide-clearance-rates; Paul H. Robinson, Jeffrey Seaman & Muhammad Sarahne, *Standing Back and Standing Down: Citizen Non-Cooperation and Police Non-Intervention as Causes of Justice Failures and Crime*, 51 Hofstra L. Rev. 923, 926 (2023)/hlr/vol51/iss4/5/.

[11] Kristina Murphy, Lyn Hinds & Jenny Fleming, *Encouraging Public Cooperation and Support for Police*, 18 Policing & Soc'y 136, 136 (2008), http://www.tandfonline.com/doi/abs/10.1080/10439460802008660.

government to enforce federal immigration laws, undocumented immigrants are less likely to trust that law enforcement will keep them or their communities safe; less likely to believe law enforcement will protect witness confidentiality; and less likely to think law enforcement will protect the rights of all people equally, even those who are undocumented.[12]

And the problem is not just a generalized skepticism about police. Rather, that skepticism manifests itself in ways that make entire communities less safe: through decreased reporting of crime and decreased cooperation from victims and witnesses with law enforcement during their investigation and prosecution of crime. For example, one study found that increased information sharing between local police and federal immigration authorities reduced Hispanics' crime reporting rate by 30 percent and increased their crime victimization rate by 16 percent.[13] Similarly, a nationwide survey of Latinas found that,

---

[12] Tom K. Wong et al., *How Interior Immigration Enforcement Affects Trust in Law Enforcement*, 19 Persp. on Pol. 357, 357 (2021), https://www.cambridge.org/core/product/identifier/S1537592719003943/type/journal_article.

[13] Felipe M. Gonçalves, Elisa Jácome & Emily K. Weisburst, *Immigration Enforcement and Public Safety*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 32109, 2024), https://www.nber.org/papers/w32109.

regardless of immigration status, respondents who reported a greater fear of removal for themselves, a family member, or a close friend were less likely to report being a victim of a violent crime to the police.[14] Other studies show that undocumented victims of domestic violence, most of whom are women, are less likely to report abuse to authorities than documented or non-immigrant women because of fear of immigration consequences, among other reasons.[15] And beyond decreased reporting, law enforcement officers themselves have reported that fear of removal interferes with victim cooperation in prosecutions.[16]

Many *Amici* communities have adopted policies, like those challenged here, in furtherance of what the evidence overwhelmingly

---

[14] Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015), https://journals.sagepub.com/doi/10.1177/0886109915576520.

[15] Radha Vishnuvajjala, *Insecure Communities: How an Immigration Enforcement Program Encourages Battered Women to Stay Silent*, 32 Boston College J. Law & Soc. Just. 185, 186–187 (2012).

[16] *See* Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://www.nbcnews.com/politics/immigration/immigration-crackdown-makeswomen-afraid-testify-against-abusers-experts-warn-n908271 ("Since President Trump's inauguration, [Denver City Attorney Kristin Bronson] said, she's had to drop 30 cases of domestic violence because the victims were too afraid of deportation to cooperate and appear in court.").

shows: that decreased fear of immigration enforcement in local communities by local law enforcement increases public safety overall. Indeed, a longitudinal study examining crime reporting trends from 1980 to 2004 found that Latino victims of violent crimes were 23 percent more likely to come forward and seek police assistance after their jurisdiction adopted a so-called sanctuary policy.[17]

The federal government seeks to undermine those efforts through its immigration enforcement policies and harmful rhetoric, which directly deter immigrants from cooperating with or seeking help from local law enforcement. In fact, in a survey conducted to assess sentiment among the Latino community last year, 35 percent of Latino parent-respondents said they might avoid reporting a crime to the police.[18] That mirrors a similar survey, conducted in in 2017 (the first year of the first Trump Administration), in which almost 30 percent of participants (members of Latino immigrant communities) said they "very often" or

---

[17] Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociol. Rev. 154, 170 (2021), https://journals.sagepub.com/doi/10.1177/0003122420978406 (calculation drawn from figures in Table 4).

[18] *National Latino Family Report 2025*, AP-OD, https://nationalsurvey.ap-od.org/2025-report/ (last visited Aug. 20, 2025).

"always" avoided contact with police; 39.4 percent avoided medical care, police, and services; and 47.6 percent warned their children to stay away from authorities.[19]

State and local law enforcement agencies are also concerned. For example, in May 2025 in La Vergne, Tennessee, a six-month-old baby died after being found unresponsive where the baby's caretaker reported being afraid to call 911 due to his immigration status.[20] The police chief, addressing a community town hall, acknowledged that "there are communities in La Vergne that are losing trust in law enforcement in this country right now, and it's going to make our job very difficult."[21] These concerns were echoed in an April 2025 report detailing the experiences of five police leaders facing difficulty maintaining the trust of immigrant communities amid increased ICE activity—trust the report

---

[19] Kathleen M. Roche et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, 62 J. Adolesc. Health 525, 529 (2018), https://pubmed.ncbi.nlm.nih.gov/29503033/.

[20] Braden Ross, *La Vergne Police Chief Urges Community to Use Emergency Services Despite Fears of Immigration Enforcement*, WSMV4 (May 22, 2025), https://www.wsmv.com/2025/05/22/la-vergne-police-chief-urges-community-use-emergency-services-despite-fears-immigration-enforcement/.

[21] *Id.*

10

described as "essential to learning about crimes in their jurisdictions and to identifying and apprehending offenders."[22]

At bottom, policies like those challenged here make communities safer. They are grounded not in extremist rhetoric, but in evidence-based and rational decision-making and are eminently within the domain of the police power maintained by State and local governments, including many *Amici* communities.

## II.    So-Called Sanctuary Policies Promote Economic Well-Being.

So-called sanctuary policies are not only essential for advancing public safety—they also preserve scarce local resources and promote vibrant local economies. That is because "[w]hen local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, . . . community members stay more engaged in the local economy."[23] According to one study, cities and

---

[22] *Balancing Community Trust and Enforcement: The Complex Issue of Immigration*, Police Executive Research Forum (Apr. 12, 2025), https://www.policeforum.org/index.php?option=com_content&view=article&id=1331:trending12apr25&catid=20:site-content.

[23] Tom K. Wong, *The Effect of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

11

municipalities that adopt policies like those challenged in this case have higher median household incomes, less poverty, and less reliance on public assistance.[24] They also have higher labor force participation, higher employment-to-population ratios, and lower unemployment.[25] The study found that, on average, median household income is $4,353 higher in counties with so-called sanctuary policies than in counties without such policies.[26]

It should come as no surprise that communities with strong immigrant presence have healthy economies, given that immigrants are key contributors to the labor force across sectors. For one thing, immigrants are statistically more likely to work than native residents.[27] Indeed, one report found that between 2010 and 2018, immigrants and

---

[24] *Id.*

[25] *Id.*

[26] *Id.*; *see also* Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation*, Univ. N.H. Carsey Sch. Pub. Pol'y (Aug. 29, 2024), https://carsey.unh.edu/sites/default/files/media/2024-08/economic-impact-mass-deportation-lit-review.pdf (finding that large-scale removals lead to reduced GDP and employment, and to lower wages for citizens and authorized-immigrant workers).

[27] *Here's What We Know about Foreign-Born Workers, and How They Compare to the Native-Born Population*, Peterson G. Found., https://www.pgpf.org/article/the-foreign-born-labor-force-of-the-united-states/ (last visited Aug. 20, 2025).

their U.S.-born children represented 83 percent of workforce growth.[28] The report projected that through 2035, all new growth in the working-age population of the U.S. would come from immigrants and their children.[29] Immigrants also start businesses at far higher rates than the U.S. population overall.[30] In 2023, there were over 3.8 million immigrant entrepreneurs, generating $116.2 billion in business income and creating millions of jobs.[31] A 2024 American Immigration Council report found that a stunning 46 percent of Fortune 500 companies were founded by immigrants or the children of immigrants.[32]

Despite widespread narratives that immigrants are a burden on U.S. taxpayers, immigrants generate tax revenue, exercise immense

---

[28] Julia Gelatt, Jeanne Batalova & Randy Capps, *Navigating the Future of Work: The Role of Immigrant-Origin Workers in the Changing U.S. Economy*, Migration Pol'y Inst., 1 (Oct. 2020), https://www.migrationpolicy.org/research/future-work-immigrant-origin-workers-us-economy.

[29] *Id.*

[30] *Immigrant Entrepreneurship in the US*, Nat'l Bureau of Econ. Rsch. (Oct. 21, 2024), https://www.nber.org/be/20242/immigrant-entrepreneurship-us.

[31] *U.S. Immigration Statistics*, Am. Immigr. Council, https://map.americanimmigrationcouncil.org/

locations/national/ (last visited Aug. 20, 2025).

[32] *New American Fortune 500 in 2024*, Am. Immigr. Council (Sept. 9, 2024), https://www.americanimmigrationcouncil.org/report/new-american-fortune-500-2024/.

spending power, and help build housing wealth. In 2023, immigrant tax contributions amounted to more than $650 billion, and the collective spending power of immigrant households was $1.7 trillion.[33] Even undocumented immigrants generate tax revenue—indeed, often more than similarly situated U.S. citizens—funding programs like Social Security and Medicare that they themselves are barred from accessing.[34] An analysis by the National Bureau of Economic Research estimated that unauthorized workers contribute three percent of private sector GDP annually, which amounts to close to $5 trillion over a 10-year period.[35] Immigrants also build housing wealth, often moving into neighborhoods in decline and restoring them, thereby raising property values and making them more attractive to other U.S. residents.[36]

---

[33] *U.S. Immigration Statistics*, *supra* n.31.

[34] Carl Davis, Marco Guzman & Emma Sifre, *Tax Payments by Undocumented Immigrants*, Inst. on Tax'n Payment & Econ. Pol'y, 3 (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/.

[35] Ryan Edwards & Francesc Ortega, *The Economic Contribution of Unauthorized Workers: An Industry Analysis*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 22834, 2016), https://www.nber.org/system/files/working_papers/w22834/w22834.pdf.

[36] *U.S. Immigration Statistics*, *supra* n.31.

But when immigrants and their families fear indiscriminate immigration enforcement, it is more difficult for them to participate fully in the economy. Recent targeting of work sites by ICE illustrates the problem, showing how heightened fear of enforcement can disrupt local economies. A CNN story in June 2025 reported on a meat production plant that was left operating at 30 percent capacity after an immigration enforcement action removed dozens of workers.[37] In Los Angeles, a spate of ICE raids has caused a slump in the restaurant industry, with fewer diners visiting restaurants and more workers calling out.[38] Leaders in

---

[37] Nathaniel Meyersohn & Vanessa Yurkevich, *America's Migrant Workers Are Terrified to Work But Unable to Stay Home*, CNN (June 14, 2025), https://www.cnn.com/2025/06/13/business/ice-workplace-raids-home-depot.

[38] Karla M. Sanford, *Undocumented Workers Power L.A.'s Restaurants. Will the Industry Protect Them?*, L.A. Times (June 30, 2025), https://www.latimes.com/food/story/2025-06-30/los-angeles-restaurant-owners-protect-immigrant-workers-ice-raids.

hospitality,[39] childcare,[40] and construction[41] sectors also project workforce shortages due to increased immigration enforcement actions.

The decision by local governments to limit entanglement with federal immigration enforcement reflects the recognition that their immigrant populations are best able to contribute to economic growth and a thriving community without the fear of indiscriminate enforcement hanging over their heads. That choice is eminently reasonable, and it is their choice to make, *see infra.*

## III. So-Called Sanctuary Policies Promote Health and Welfare.

Entanglement with federal immigration enforcement also threatens the health of communities. It contributes directly to decreased health by stoking an atmosphere of fear and chaos and increasing stress

---

[39] *See* Meyersohn & Yurkevich, *supra* n.37.

[40] *See* Ben Zipperer, *Trump's Deportation Agenda Will Destroy Millions of Jobs*, Econ. Pol'y Inst. (July 10, 2025), https://www.epi.org/publication/trumps-deportation-agenda-will-destroy-millions-of-jobs-both-immigrants-and-u-s-born-workers-would-suffer-job-losses-particularly-in-construction-and-child-care/.

[41] *See* Carter Evans, *Trump's Immigration Crackdown Causing Labor Shortages to California's Construction Industry, Builder Says: "They're hiding,"* CBS News (July 18, 2025), https://www.cbsnews.com/news/trump-immigration-crackdown-labor-shortages-california-construction-industry-builder-says/.

16

among members of immigrant communities.[42] It also discourages individuals from seeking out the medical care they or their families need—even, as one study found, for young children.[43]

In fact, as reported by the *New York Times* last year, one in five lawfully present immigrants said that they or a family member had avoided seeking medical care because of their concerns about immigration enforcement.[44] As ICE raids have ramped up across the

---

[42] Allison McCord Stafford et al., *Documentation Status and Self-Rated Physical Health Among Latinx Young Adult Immigrants: The Mediating Roles of Immigration and Healthcare Stress*, 10 J. Racial & Ethnic Health Disparities 761, 769 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC8853124/; Jacqueline M. Torres et al., *Deportation Worry, Cardiovascular Disease Risk Factor Trajectories, and Incident Hypertension: A Community-Based Cohort Study*, 8 J. Am. Heart Ass'n 1, 9 (2019), https://www.ahajournals.org/doi/10.1161/JAHA.119.013086.

[43] *See also* Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med. 586, 589 (2011), https://www.sciencedirect.com/science/article/abs/pii/S0277953611003522 (analyzing focus group discussions and finding that immigrants' removal fears led to avoidance of care); Patricia A. Cavazos-Rehg et al., *Legal Status, Emotional Well-Being and Subjective Health Status of Latino Immigrants*, 99 J. Nat'l Med. Ass'n 1126, 1130 (2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC2574408/ (surveying 143 Latino immigrants and finding 39 percent indicated they avoided social services for fear of removal).

[44] Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. Times (May 8, 2025), https://www.nytimes.com/2025/05/08/health/migrants-health-care-trump.html.

country, social workers, doctors, and medical professionals have seen upticks in patient anxiety, appointment no-shows, and reluctance from immigrants to access medical resources—including emergency care.[45] A July 2025 *Associated Press* report found that in the Rio Grande Valley, where health outcomes were already worse than the national average, increased immigration enforcement activity has caused many to skip medical appointments, fail to pick up prescriptions, and even refuse to sign their children up for health insurance.[46]

When this happens, the overall impact is not limited to immigrants; it affects entire communities. As the American Public Health Association notes, "[t]he health of the nation cannot be upheld, promoted, or protected when our immigrant and refugee communities are in fear of being

---

[45] *Id.*

[46] Amanda Seitz & Jacquelyn Martin, *As Trump's Raids Ramp Up, a Texas Region's Residents Stay Inside - Even When They Need Medical Care*, AP News (July 21, 2025), https://apnews.com/article/trump-immigration-medicaid-health-illegal-985fb65ee53095d5cedf39bdac58500f; *see also Study Finds Trump's Election Was Associated With Decrease in Well-Child Visits for Children of Immigrant Mothers*, Boston University (Sept. 8, 2023), https://medicalxpress.com/news/2023-09-trump-election-decrease-well-child-children.html (finding that anti-immigration rhetoric during the 2016 presidential election cycle, and the anti-immigration policy that followed, was associated with a decline in well-child visits for children of immigrant mothers).

18

detained and deported."[47] That is at least in part because when immigrants are reluctant to seek out healthcare for communicable diseases, it is more likely that such diseases will spread to others, including those outside of immigrant communities.[48] For example, a study found that tuberculosis outbreaks are more likely when fear of immigration enforcement deters immigrants from accessing healthcare.[49]

But policies like those challenged in this case can mitigate the negative impact that fear of immigration enforcement would otherwise have on public health.[50] As Santa Clara County Executive James R. Williams has explained, these policies "promote community members'

---

[47] *Public Health Talking Points for Immigration Justice*, Health In Partnership, https://www.apha.org/getContentAsset/8c14db2e-633d-4541-ab60-d0f9de174b08/7ca0dc9d-611d-46e2-9fd3-26a4c03ddcbb/HIP-Public-Health-Talking-Points-for-Immigration-Justice-2025.pdf?language=en (last visited Aug. 20, 2025).

[48] Jan Hoffman, *Sick and Afraid, Some Immigrants Forgo Medical Care*, N.Y. Times (June 26, 2017), https://www.nytimes.com/2017/06/26/health/undocumented-immigrants-health-care.html.

[49] Steven Asch, Barbara Leake & Lillian Gelberg, *Does Fear of Immigration Authorities Deter Tuberculosis Patients From Seeking Care?*, 161 West J. Med. 373, 373 (1994), https://pmc.ncbi.nlm.nih.gov/articles/PMC1022616/.

[50] Helen B. Marrow, *The Power of Local Autonomy: Expanding Health Care to Unauthorized Immigrants in San Francisco*, 35 Ethnic & Racial Stud. 72, 84 (2012), https://www.taylorfrancis.com/chapters/edit/10.4324/9781315868622-6/power-local-autonomy-helen-marrow.

trust in government services. With that trust comes increased engagement with County systems across the board, from maternal and pediatric healthcare to services for vulnerable seniors, increasing the well-being of the entire community."[51] The federal government's efforts to undermine those sound policies should be rebuffed.

* * * * * * * *

What is happening here is a full-scale repeat of precisely the same arguments that the Trump Administration pressed and lost in its first go-around. They offer nothing new, nothing novel, nothing to distinguish

---

[51] *See* Dkt. 76, Declaration of Support for Preliminary Injunction, *San Francisco v. Trump*, No. 25-CV-0135 (N.D. Cal. Mar. 17, 2025).

this case from the many they have lost before.[52] To put it plainly, no federal law prohibits or displaces the kind of local decisions challenged here. Indeed, any contrary conclusion would run afoul of the U.S.

---

[52] *See City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 868–69, 872 (N.D. Ill. 2018) (holding that § 1373 offends the anticommandeering doctrine because it "does not evenhandedly regulate activities in which both private and government actors engage") *aff'd sub nom City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020); *Ocean v. Grewal*, 475 F. Supp. 3d 355, 372, 376 (D.N.J. 2020) (holding that 8 U.S.C. § 1373 applies "only to information specifically regarding an individual's immigration or citizenship status" and that "sections 1373(a) and 1644 do not constitute preemption provisions"), *aff'd*, *Ocean Cnty. Board of Comm'rs v. New Jersey*, 8 F.4th 176 (3d Cir. 2021); *United States v. New Jersey*, No. 20-1364, 2021 WL 252270, at *13 (D.N.J. Jan. 26, 2021) (reaffirming conclusion in *Ocean*); *San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022) (noting that the Ninth Circuit has "rejected DOJ's interpretation of Section 1373 repeatedly"); *San Francisco v. Barr*, 965 F.3d 753, 764 (9th Cir. 2020) (holding that "the only information to which § 1373 extends" is "information regarding a person's citizenship or immigration status"); *Steinle v. San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (holding that "no plausible reading of 'information regarding' 'immigration status' encompasses the state or local release date of an inmate who is an alien"); *United States v. California*, 314 F. Supp. 3d 1077, 1102 (E.D. Cal. 2018) ("[T]he plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses."), *rev'd in part on other grounds*, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("[T]he United States argues that § 1373 actually applies to more information than just immigration status .... We disagree."); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329–33 (E.D. Pa. 2018) (holding that § 1373(a) refers to "an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country," and that § 1373(a) and § 1373(b) "[o]n their face . . . regulate state and local governmental entities and officials, which is fatal to their constitutionality under the Tenth Amendment"), *vacated in part on other grounds*, *Philadelphia v. United States*, 916 F.3d 276 (3d Cir. 2019).

Constitution, which prevents Congress from "strong arm[ing]" local governments "into doing its bidding." *Ocean*, 475 F. Supp. 3d at 381 (rejecting the same arguments raised in this case); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018) ("A more direct affront to state sovereignty is not easy to imagine" than in a federal law that "dictates what a state legislature may and may not do."). The Trump Administration thus lacks any legal basis for the claims it presses in this case, or indeed to support its more general endeavor to usurp state and local governments to carry out offensive and dangerous immigration policy, *see United States v. New York*, No. 25 Civ. 744, 2025 WL 3205011, at \*13, \*16–20 (N.D.N.Y. Nov. 17, 2025) (dismissing similar claims).

State and local governments like *Amici* are duty-bound to promote the safety and welfare of all residents in their communities, regardless of immigration status. In enacting the challenged policies, the State of Illinois, City of Chicago, and Cook County lawfully exercised their sovereign duty to do just that.

## CONCLUSION

*Amici* support Appellees and respectfully submit that the district court's decision should be affirmed.

22

Dated:  June 16, 2026                Respectfully submitted,

*/s/ Toby Merrill*

TOBY MERRILL
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788

KARIANNE JONES
EVERGREEN LEGAL
STRATEGIES LLP
1763 Columbia Rd NW, Suite 100
Washington, D.C. 20009

*Attorneys for Amici Curiae*

23

**ADDITIONAL COUNSEL**

ANDREA WEDDLE
Interim County Counsel
112 Oak St.
Oakland, CA 94612
*Counsel for the County of Alameda, California*

YIBIN SHEN
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501
*Attorney for the City of Alameda, California*

ROBERT MAGEE
Corporation Counsel
24 Eagle Street, Room 106
Albany, NY 12207
*Attorney for the City of Albany, New York*

LAUREN KEEFE
City Attorney of Albuquerque
One Civic Plaza, 4th Floor
Albuquerque, NM 87102
*Attorney for the City of Albuquerque, New Mexico*

ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for Allegheny County, Pennsylvania*

SCOTT KAPLAN
City Attorney
The Beaverton Building
12725 SW Millikan Way
Beaverton, OR 97005-1678
*Attorney for the City of Beaverton, Oregon*

IAN LEITHEISER
City Attorney
710 NW Wall Street
Bend, OR 97709
*Attorney for the City of Bend, Oregon*

SARAH W. CHAPLIN
AMY B. KRAHAM
Senior Assistant City Attorneys
210 Lottie Street
Bellingham, WA 98225
*Attorneys for the City of Bellingham, Washington*

FARIMAH FAIZ BROWN
City Attorney
2180 Milvia Street, 4th Floor
Berkeley, CA 94704
*Attorney for the City of Berkeley, California*

MICHAEL FIRESTONE
Corporation Counsel
One City Hall Square
Room 615
Boston, MA 02201
*Attorney for the City of Boston, Massachusetts*

JESSICA C. BROWN
City Attorney
Office of City Attorney & Corporation Counsel
149 Church Street
Burlington, VT 05401
*Counsel for the City of Burlington, Vermont*

MEGAN B. BAYER
City Solicitor
795 Massachusetts Avenue
Cambridge, MA 02139
*Attorney for the City of Cambridge, Massachusetts*

EMILY SMART WOERNER
City Solicitor
801 Plum Street, Room 214
Cincinnati, OH 45202
*Attorney for the City of Cincinnati, Ohio*

25

HEATHER BAKER
City Attorney
City Hall
9770 Culver Boulevard, Third Floor
Culver City, CA 90232
*Attorney for the City of Culver City, California*

MIKO BROWN
City Attorney
1437 Bannock Street, Room 353
Denver, CO 80202
*Attorney for the City and County of Denver, Colorado*

LEESA MANION
Prosecuting Attorney
King County Courthouse
516 Third Avenue, W400
Seattle, WA 98104
*Prosecuting Attorney for Martin Luther King, Jr. County, Washington*

NATASHA IRVING
District Attorney
Lincoln County Courthouse
P.O. Box 249
Wiscasset, ME 04578
*District Attorney, Lincoln County, Maine*

HYDEE FIELDSTEIN SOTO
City Attorney
200 N. Main Street, 8th Floor
Los Angeles, CA 90012
*Attorney for the City of Los Angeles, California*

DAWYN HARRISON
County Counsel
500 W. Temple Street
Los Angeles, CA 90012
*Attorney for the County of Los Angeles, California*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd, Room 401
Madison, WI 53703
*Attorney for the City of Madison, Wisconsin*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
*Counsel for the County of Marin, California*

KRISTYN ANDERSON
City Attorney
350 S. Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis, Minnesota*

JOHN P. MARKOVS
County Attorney
101 Monroe Street, Third Floor
Rockville, MD 20850
*Attorney for Montgomery County, Maryland*

RAMIN FATEHI
Commonwealth's Attorney
800 E. City Hall Avenue, Suite 600
Norfolk, VA 23510
*Attorney for the City of Norfolk, Virginia*

ALAN SEEWALD
City Solicitor
One Roundhouse Plaza, Suite 304
Northampton, MA 01060
*Attorney for the City of Northampton, Massachusetts*

STEPHEN FISCHER
City Attorney
305 West Third Street
Oxnard, CA 93030
*City of Oxnard, California*

LISA MARCUS
City Solicitor
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh, Pennsylvania*

27

ROBERT TAYLOR
City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
*Attorney for the City of Portland, Oregon*

PATRICK BEATH
Corporation Counsel
30 Church Street, Room 400A
Rochester, NY 14614
*Attorney for the City of Rochester, New York*

GUSTAVO L. MARTINEZ
Interim City Attorney
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for the City of Sacramento, California*

HEATHER FERBERT
City Attorney
1200 Third Ave., Suite 1100
San Diego, CA 92101
*Counsel for the City of San Diego, California*

DAMON BROWN
County Counsel
1600 Pacific Highway, Room 355
San Diego, CA 92101
*Attorney for the County of San Diego, California*

DAVID CHIU
City Attorney
City Hall, Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
*Attorney for the City and County of San Francisco, California*

SUSAN ACALA WOOD
City Attorney
200 East Santa Clara Street, 16th Floor
San José, CA 95113
*Attorney for the City of San José, California*

28

JOHN D. NIBBELIN
County Counsel
400 County Center, 6th Floor
Redwood City, CA 94063
*Attorney for San Mateo County, California*

TONY LOPRESTI
County Counsel
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
*Counsel for the County of Santa Clara, California*

HEIDI VON TONGELN
Interim City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica, California*

ERIKA EVANS
City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
*Attorney for the City of Seattle, Washington*

CINDY AMARA
City Solicitor
93 Highland Avenue
Somerville, MA 02143
*Attorney for the City of Somerville, Massachusetts*

IRENE KAO
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
St. Paul, MN 55102
*Attorney for the City of St. Paul, Minnesota*

CHRIS BACHA
City Attorney
747 Market Street
Tacoma, WA 98402
*Attorney for the City of Tacoma, Washington*

29

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 S. Grand Avenue, 25th Floor
Los Angeles, CA 90071
*Attorney for the City of West Hollywood, California*

## Appendix A – List of Amici Local Governments

County of Alameda, California

City of Alameda, California

City of Albany, New York

City of Albuquerque, New Mexico

Allegheny County, Pennsylvania

City of Allentown, Pennsylvania

City of Beaverton, Oregon

City of Bellingham, Washington

City of Bend, Oregon

City of Berkeley, California

City of Boston, Massachusetts

City of Burlington, Vermont

City of Cambridge, Massachusetts,

City of Cincinnati, Ohio

City of Culver City, California

City of Denver, Colorado

City of Evanston, Illinois

31

City of Frederick, Maryland

City of Glendale, Wisconsin

City of Jersey City, New Jersey

City of Kenmore, Washington

Martin Luther King, Jr. County, Washington

Lincoln County, Maine

City of Los Angeles, California

County of Los Angeles, California

City of Madison, Wisconsin

County of Marin, California

City of Minneapolis, Minnesota

Montgomery County, Maryland

City of New Haven, Connecticut

City of Norfolk, Virginia

City of Northampton, Massachusetts

City of Olympia, Washington

City of Oxnard, California

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Providence, Rhode Island

City of Rochester, New York

City of Sacramento, California

City of San Diego, California

County of San Diego, California

City and County of San Francisco, California

City of San José, California

County of San Mateo, California

County of Santa Clara, California

City of Santa Monica, California

City of Seattle, Washington

City of Somerville, Massachusetts

City of St. Paul, Minnesota

City of Tacoma, Washington

City of West Hollywood, California

**Local Government Leaders**

Brenda Adams
*Supervisor, Town of Canaan, New York*

Victor Aguilar, Jr.
*Councilmember, San Leandro, California*

Larry Agran
*Mayor, City of Irvine, California*

Paul Akinjo
*Mayor, City of Lathrop, California*

Elizabeth Alcantar Loza
*Councilmember, City of Cudahy, California*

Luis Alejo
*Supervisor, Monterey County, California*

Soli Alpert
*Rent Stabilization Board Chair, City of Berkeley, California*

Chad Jason Ashmore
*Mayor, City of Sesser, Illinois*

Rachel Barnhart
*Legislator, Monroe County, New York*

Adam Bazaldua
*Councilmember and Deputy Mayor Pro Tem, City of Dallas, Texas*

Zac Bears
*City Council President, City of Medford, Massachusetts*

Celina Benitez
*Mayor, City of Mount Rainier, Maryland*

Jack Bradley
*Mayor, City of Lorain, Ohio*

Lisa Brown
*Mayor, City of Spokane, Texas*

34

Sara Brown
*City Councilor At-Large, City of Greenfield, Massachusetts*

Chelsea Byers
*Councilmember & Mayor, City of West Hollywood, California*

Shannon Cameron
*Chief of Staff, City of Aurora, Illinois*

Chris Canales
*Councilmember, City of El Paso, Texas*

Ronald Case
*Mayor, City of Eden Prairie, Minnesota*

Guyleen Castriotta
*Mayor, City and County of Broomfield, Colorado*

Markus Ceniceros
*Governing Board Vice President, Littleton Elementary School District, Arizona*

David Chiu
*City Attorney, City and County of San Francisco, California*

John Clark
*Mayor, Town of Ridgway, Colorado*

Katharine Clark
*County Clerk, County of Santa Fe, New Mexico*

Mark Conway
*Councilmember, City of Baltimore, Maryland*

Alison Coombs
*Mayor Pro Tem & City Councilmember At-Large, City of Aurora, Colorado*

Christine Corrado
*Councilmember, Town of Brighton, New York*

Jon Culver
*Councilmember, City of Kenmore, Washington*

Kyle Davis
*Councilor At-Large, City of Salem, Massachusetts*

35

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*Councilmember, City of Sacramento, California*

Michael Dougherty
*District Attorney, County of Boulder, Colorado*

Katrina Doughty
*School Board Director, Multnomah Education Service District of Multnomah
County, Oregon*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Erin Evans
*Trustee of the County Board of Education, City of San Diego, California*

Marilyn Ezzy Ashcraft
*Mayor, City of Alameda, California*

Bryan "Bubba" Fish
*Councilmember, City of Culver City, California*

Nikki Fortunato Bas
*Supervisor, County of Alameda, California*

Vanessa Fuentes
*Councilwoman, City of Austin, Texas*

Brenda Gadd
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Kelly Girtz
*Mayor, Unified Government of Athens-Clarke County, Georgia*

Martha Guerrero
*Mayor, City of West Sacramento, California*

36

Jonathan Guzmán
*School Committee Member-At-Large, City of Lawrence, Massachusetts*

Beau Harbin
*County Legislator and Democratic Minority Leader, County of Courtland, New York*

Kim Harless
*Councilmember, City of Vancouver, Washington*

Bear Heiser
*Mayor Pro Tem, City of Kyle, Texas*

Kenny Herzog
*Trustee, Village of Tarrytown, New York*

Iliana Holguin
*Commissioner, El Paso County, Texas*

Stephanie Howse-Jones
*Councilmember, City of Cleveland, Ohio*

Susan Hughes-Smith
*County Legislator, County of Monroe, New York*

Christian Isaac
*Civil Service Board Member, City of Tacoma, Washington*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

Jerald Lentini
*Director, Town of Manchester, Connecticut*

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Quinton Lucas
*Mayor, City of Kansas City, Missouri*

Mary Lupien
*Councilmember, City of Rochester, New York*

Alexander Marion
*City Auditor, City of Syracuse, New York*

37

Kevin McDonnell
*Mayor, City of Petaluma, California*

Denyse C. McGriff
*Mayor, City of Oregon City, Oregon*

Michael McGuinness
*Mayor, City of Pontiac, Michigan*

Yasmine-Imani McMorrin
*Councilmember, City of Culver City, California*

Carolina Mejia
*Commissioner, Thurston County, Washington*

Nancy Metayer Bowen
*Vice Mayor, City of Coral Springs, Florida*

Kathy Mulkerin
*School Board Director, Walla Walla Public Schools, Washington*

Mark Mullett
*Mayor, City of Issaquah, Washington*

Steve Mulroy
*District Attorney, County of Shelby, Tennessee*

Arnetta Murray
*Councilmember, City of Iowa Colony, Texas*

Donna Neville
*Mayor, City of Davis, California*

Patricia Nolan
*Councilmember, City of Cambridge, Massachusetts*

Kim Norton
*Mayor, City of Rochester, Minnesota*

Sonja Okun
*Supervisor, County of Columbia, New York*

Diana Perez
*Councilmember, City of Vancouver, Washington*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, County of Tompkins, New York*

Jacqueline Porter
*Commissioner, City of Tallahassee, Florida*

Aftab Pureval
*Mayor, City of Cincinnati, Ohio*

Jaime Resendez
*Councilmember, City of Dallas, Texas*

Ryan Richardson
*City Attorney, City of Oakland, California*

Christina Sanchez
*County Attorney, El Paso County, Texas*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Dawn Marie Sass
*Clerk/Deputy Treasurer, Town of Exeter, Wisconsin*

Michael Siegrist
*Clerk, Canton Township, Michigan*

Seema Singh
*Councilmember, City of Knoxville, Tennessee*

David Stout
*Commissioner, El Paso County, Texas*

Lena Tam
*Supervisor, County of Alameda, California*

Keith Tate
*School Board Member and Clerk, Osseo Area School Board, Maple Grove, Minnesota*

39

Caroline Torosis
*Mayor Pro Tempore, City of Santa Monica, California*

Briana Urbina
*Councilmember, City of New Carrollton, Maryland*

Nicole Warren
*General Counsel/Assistant City Attorney, City of Austin, Texas*

Ginny Welsch
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Braxton White
*Commissioner, County of Clarion, Pennsylvania*

Kevin Wilk
*Mayor, Walnut Creek, California*

Katie Wilson
*Mayor, City of Seattle, Washington*

Robin Wilt
*Councilmember, Township of Brighton, New York*

Robin Wonsley
*Councilmember, City of Minneapolis, Minnesota*

Steven Woodside
*Mayor, City of Sausalito, California*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the typeface and type style requirements of Federal Circuit Rule 32(b) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point or greater Century Schoolbook font, and complies with Circuit Rule 29 in that the brief contains 4,402 words.

By: */s/ Toby Merrill*
Toby Merrill

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 16, 2026, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that the other participants in this appeal are CM/ECF users, and thus will be served via the CM/ECF system.

By: */s/ Toby Merrill*
Toby Merrill