No. 25-2904

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

STATE OF ILLINOIS, et al.,
*Defendants-Appellees*

---

On Appeal from the United States District Court for the
Northern District of Illinois
Case No. 1:25-cv-01285
Honorable Lindsay C. Jenkins

---

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, MUJERES LATINAS EN ACCIÓN AND NATIONAL IMMIGRANT JUSTICE CENTER IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

Mark Fleming
Keren Zwick
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
312-660-1628
mfleming@immigrantjustice.org
kzwick@immigrantjustice.org

Rebecca K. Glenberg
*Counsel of Record*
Michelle Teresa García
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
rglenberg@aclu-il.org
mgarcia@aclu-il.org

*Attorneys for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2904

Short Caption: United States of America v. State of Illinois, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union of Illinois (ACLU-IL), The National Immigration Justice Center, The Illinois Coalition

for Immigrant and Refugee Rights and Mujeres Latinas en Accion

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roger Baldwin Foundation of ACLU, Inc. and The National Immigration Justice Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: Rebecca K. Glenberg     Date: June 16, 2026

Attorney's Printed Name:  Rebecca K. Glenberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✔]  **No** [ ]

Address:  150 N. Michigan Ave., Ste. 600, Chicago, IL 60601

Phone Number: 312-201-9740     Fax Number:  312-201-9760

E-Mail Address: rglenberg@aclu-il.org

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2904

Short Caption: United States of America v. State of Illinois, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union of Illinois (ACLU-IL), The National Immigration Justice Center, The Illinois Coalition

for Immigrant and Refugee Rights and Mujeres Latinas en Accion

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Roger Baldwin Foundation of ACLU, Inc. and The National Immigration Justice Center

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

     N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: Michelle Teresa Garcia     Date: June 16, 2026

Attorney's Printed Name: Michelle Teresa Garcia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✔]

Address: 150 N. Michigan Ave., Ste. 600, Chicago, IL 60601

Phone Number: 312-201-9740       Fax Number: 312-201-9760

E-Mail Address: mgarcia@aclu-il.org

rev. 12/19 AK

**Save As**      **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25 2904

Short Caption: United States of America v. State of Illinois

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
National Immigrant Justice Center, American Civil Liberties Union of Illinois, Illinois Coalition for Immigrant and

Refugee Rights, Mujeres Latinas en Accion

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
National Immigrant Justice Center, Rogers Baldwin Foundation of ACLU, Inc.


(3)      If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:


(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:


Attorney's Signature: /s/ Mark Fleming          Date: 06/16/2026

Attorney's Printed Name: Mark Fleming

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      **Yes** [ ]      **No** [✓]

Address: 111 W. Jackson Blvd., Ste 800

Chicago, IL 60604

Phone Number: 312-660-1628          Fax Number: 312-660-1505

E-Mail Address: mfleming@immigrantjustice.org

rev. 12/19 AK

**Save As**     **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2904

Short Caption: United States of America v. State of Illinois

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union of Illinois, Illinois Coalition for Immigrant and Refugee Rights, Mujeres Latinas en Accion, and National Immigrant Justice Center

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

National Immigrant Justice Center, Roger Baldwin Foundation of ACLU

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

          N/A

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature: s/ Keren Zwick     Date: June 16, 2026

Attorney's Printed Name: Keren Hart Zwick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐     **No** ☑

Address: National Immigrant Justice Center | 111 W. Jackson Blvd. Suite 800

Chicago, Illinois 60604

Phone Number: 312.660.1364     Fax Number: 312.660.1364

E-Mail Address: kzwick@immigrantjustice.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

INTEREST OF *AMICI* ................................................................................... 1

ARGUMENT ................................................................................................... 2

    I.      The sanctuary policies protect public safety ......................................... 4

          A.  The sanctuary policies help alleviate reluctance among community members to work with law enforcement due to fear of immigration consequences ...................................................................................... 4

          B.  The sanctuary policies preserve law enforcement resources for enforcing criminal law .......................................................................... 8

    II.     The sanctuary policies help ensure that Illinois law enforcement officers act according to the Constitution and state Law ..................... 10

    III.    Sanctuary policies preserve strong economies driven by immigrants ............................................................................................. 13

          A.  Local governments with sanctuary policies have stronger economies. .......................................................................................... 13

          B.  Illinois immigrants without documentation pay taxes that fund state and local government and public services ............................... 14

          C.  Federal immigration enforcement has already harmed Illinois' economy, if local governments are required to participate, it will get worse .................................................................................................... 16

               1.  Federal immigration enforcement has a chilling effect on the economy ........................................................................................ 16

               2.  Immigration enforcement resulted in job losses to immigrants and citizens in Illinois ................................................................ 18

CONCLUSION ............................................................................................... 20

CERTIFICATE OF COMPLIANCE ................................................................ 22

CERTIFICATE OF SERVICE ......................................................................... 23

## TABLE OF AUTHORITIES

### Cases

*Abriq v. Hall*,
295 F. Supp. 3d 874 (M.D. Tenn 2018)................................................................ 11

*C.F.C.* v. *Miami-Dade Cnty.*,
349 F. Supp. 3d 1236 (S.D. Fla. 2018)............................................................... 11

*Castañon Nava v. Dep't of Homeland Sec.*,
806 F. Supp. 3d 823 (N.D. Ill 2025)............................................................. 12, 13

*Castañon Nava v. Dep't of Homeland Sec.*,
No. 18-cv-3757 (N.D. Ill. filed May 29, 2018)..................................... 12, 18, 19

*Chicago v. Sessions*,
888 F.3d 272, 281 (7th Cir. 2018), reh'g en banc granted in part on other
grounds, 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), vacated, 17-
2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018)............................... 3, 4, 7, 9

*Creedle v. Miami-Dade Cnty.*,
349 F. Supp. 3d 1276 (S.D. Fla. 2018)............................................................... 11

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025) ....................................................................... 13

*Hussen v. Noem*,
822 F. Supp. 3d 944, 2026 WL 657936 (D. Minn. Mar. 9, 2026).................... 13

*M-J-M-A v. Hermosillo*,
822 F. Supp. 3d 1147, 2026 WL 562063 (D. Or. Feb. 27, 2026) ..................... 13

*Make the Road N.Y. v. Noem*,
805 F. Supp. 3d (D.D.C. 2025) ........................................................................... 13

*Morales v. Chadbourne*,
966 F. Supp. 2d 19 (D.R.I. 2014), aff'd in part, dismissed in part, 793 F.3d
(1st Cir. 2015)...................................................................................................... 11

*Orellana v. Nobles Cnty.*,
    230 F. Supp. 3d 934 (D. Minn. 2017).................................................................. 11

*Ramirez Ovando v. Noem*,
    810 F. Supp. 3d 1209 (D. Colo. 2025) ............................................................... 13

*United States v. Illinois*,
    796 F. Supp. 3d 494 (N.D. Ill 2025).................................................................... 3

*Vasquez Perdomo v. Noem*,
    790 F. Supp. 3d 850 (D. Cal. 2025), appeal dismissed sub nom. *Perdomo v.
    Noem*, 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025)........................... 13

*Villars v. Kubiatowski*,
    45 F. Supp. 3d 791 (N.D. Ill 2014)..................................................................... 11

## Statutes, Ordinances and Legislative Hearings

5 Ill. COMP STAT 805/1......................................................................................... 3

5 Ill. COMP STAT 805/10....................................................................................... 6

5 Ill. COMP STAT 805/15 (e), (h)(2), (3) ............................................................... 5

5 Ill. COMP STAT 805/15 (h) ................................................................................. 9

5 Ill. COMP STAT 805/15 (i) .................................................................................. 9

8 U.S.C. § 1357 (a)(2) ....................................................................................... 12, 13

Chicago Municipal Code Ch. 2-173 ........................................................................ 3

Chicago Municipal Code Ch. 2-173-005 ................................................................. 4

Chicago Municipal Code Ch. 2-173-010 ................................................................. 9

Cook County Municipal Code Sec. 46-37 ............................................................... 3

Cook County Municipal Code Sec. 46-37 (b)......................................................... 10

U.S. CONST. amend. X............................................................................................. 3


S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen.
Omar Aquino at 96-97).. ........................................................................................ 9

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 4, 2017, statement of Sen. John Cullerton at 118-19).................................................................................................. 4

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Daniel Biss at 91)…..................................................................................................... 5

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Don Harmon at 91)... ...................................................................................................... 10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 29, 2017, statement of Sen. Lou Lang at 38-39)........................................................................................................ 10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 29, 2017, statement of Sen. Theresa Mah at 37-38)..................................................................................................... 10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Iris Martinez at 95)....................................................................................................... 5

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Patricia Van Pelt at 130) ................................................................................................ 5

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Kwame Raoul at 94).. ..................................................................................................... 8

## Other Authorities

ACLU, *Local Jurisdictions Remain Legally Vulnerable for Honoring ICE Detainers,*(Feb. 3, 2020) (listing cases), https://assets.aclu.org/live/uploads/document/ 200626detainer_one-pager-_aclu_branded.chw_.pdf. ........................................................................................ 11

Catalina Amuedo-Dorantes and Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence?* 24 Amer. Law & Econ. Review 24, 116-170 (March 2022) https://academic.oup.com/aler/article-abstract/24/1/116/6543952 .............................. 7

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-level Investigation in the United States*, 106 Social Science Research, 102743 (August 2022)…............................................................................................... 7

Elizabeth Cox & Chloe N. East, *Labor Market Impacts of ICE activity in Trump 2.0* (Nat'l Bureau of Econ. Rsch., Working Paper No. 35129, 2026), https://www.nber.org/papers/w35129 ...................................................................... 19

Carl Davis, Marco Guzman, & Emma Sifre, *Tax Payments by Undocumented Immigrants*, Institute on Taxation and Economic Policy, 3 (July 30, 2024), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf. ...................................................................................................... 15

City of Chicago, Office of Budget and Management, FAQ, https://www.chicago.gov/city/en/depts/pbm/supp_info/faq.html (last visited Mar. 20, 2025) ...................................................................................................... 16

*Debunking the Myth of Immigrants and Crime*, Fact Sheet, American Immigration Council (Oct. 2024), https://www.americanimmigrationcouncil.org/sites/default/files/research/debunking_the_myth_of_immigrants_and_crime.pdf (citing studies) ........................................ 8

Marcela Escobari, Ian Seyal & Paul Beach, *Shock, Awe and Economic Fallout: The Employment Effects of ICE Enforcement in U.S. Cities*, Figure 2 (Chicago-Naperville-Aurora), Brookings (May, 29, 2026), https://www.brookings.edu/articles/ice-enforcement-employment-effects-us-cities/ 19

Luis Ferré-Sadurní, *New York City to Pay $92.5 Million to Improperly Detained Immigrants*, N.Y. Times, Dec.18, 2024, https://www.nytimes.com/2024/12/18/nyregion/migrants-detention-settlement-deportation.html. ...................................................................................................... 11

Marlen Garcia, *Immigration Crackdown Deals a Blow to Chicago's Latino Business Corridors*, Crain's Chicago Business (Sept. 4, 2025) .................................................. 16

Exequiel Hernandez, *ICE-ing the Economy: Immigrant Enforcement under Trump 2.0 and Local Economic Activity,* Univ. of Penn. – The Wharton School, 6 (May 13, 2026), https://dx.doi.org/10.2139/ssrn.6759278 ........................................... 18

Michael T. Light, et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-born US Citizens in Texas*. 117 Proc. Nat'l Acad. Sci. USA 51 (Dec. 7, 2020)................................................................ 8

Silva Mathema, *State-by-State Estimates of Family Members of Unauthorized Immigrants*, Center for American Progress (Mar. 16, 2017), https://www.americanprogress.org/article/state-state-estimates-family-members-unauthorized-immigrants/ .................................................................................. 17

Susana A. Mendoza, Illinois State Comptroller, *What Did Your Tax Dollars Pay for Fiscal Year 2023?*,https://illinoiscomptroller.gov/__media/tax%20refund%20insert%20FY%202023_web%20only.pdf................................................................................ 15

v

NBC Chicago Staff, *'Operation Midway Blitz': Homeland Security, ICE Warn of New Operation in Chicago*, NBC Chicago (Sept. 8, 2025 at 9:40 PM), https://www.nbcchicago.com/news/politics/operation-midway-blitz-homeland-security-ice-warn-of-new-operation-in-chicago/3821080/ ........................................... 18

Rebecca Davis O'Brien & Miriam *Jordan, A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times, Mar. 9, 2025, https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html ................................................................................................ 16

Akash Pillai, et al., *Potential Impacts of Mass Detention and Deportation Efforts on the Health and Well-Being of Immigrant Families*, KFF (Feb. 6, 2025), https://www.kff.org/racial-equity-and-health-policy/issue-brief/potential-impacts-of-mass-detention-and-deportation-efforts-on-the-health-and-well-being-of-immigrant-families/ .............................................................................................................. 17

Tony Preckwinkle, Pres., Cook County Bd. of Comms., *Fiscal 2025 Cook County Annual Appropriation Bill*, Executive Summary, 12, https://www.cookcountyil.gov/sites/g/files/ywwepo161/files/documents/2025-02/Volume%20I%20Adopted%202025_Web.pdf. ........................................................ 15

Michael Runner, et al., *Family Violence Prevention Fund, Intimate Partner Violence in Immigrant and Refugee Communities: Challenges*, Promising Practices and Recommendations 11, Robert Wood Johnson Foundation (Mar. 2009), https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf. ........ 7

Nell Salzman et al, *'People are scared": Fear Permeates Every Aspect of Life in Chicago, Under Threat of Mass Immigration Deportations*, Chicago Tribune, Jan. 25, 2025, https://www.chicagotribune.com/2025/01/26/trump-chicago-immigration-deportation-fear/ ....................................................................................................... 16

Shannon Schumacher, et al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement* (Nov. 18, 2025), https://www.kff.org/racial-equity-and-health-policy/kff-new-york-times-2025-survey-of-immigrants-worries-and-experiences-amit-increased-immigration-enforcement/ 17

Sixth Judicial Circuit, Circuit Administrative Order 95-7, App'x 1, (Nov. 8, 1995) (rescinded Jun. 3, 2021), https://sixthcircuitcourt.com/pdf/1995AdminOrders.pdf .... 6

Nik Theodore, *Insecure Communities Latino Perceptions of Police Involvement in Immigrant Enforcement* 5-6, University of Illinois at Chicago (May 2013), https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf. ...................... 6

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy* 5, Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ................................................................................... 6, 9, 14

David Zuchowki, *Sanctuary Policies and the Mortgage Market Behavior: Reducing Uncertainty to Promote Financial Inclusion,* J. of Econ. Behavior & Organ. 229 (2025) ......................................................................................................... 14

All parties have consented to the filing of this brief.  No party, its counsel, or any other person—other than amici, their members, or their counsel—contributed money to fund the preparation and submission of this brief.

## INTERESTS OF *AMICI*

The American Civil Liberties Union of Illinois (ACLU-IL) is a state affiliate of the American Civil Liberties Union, and a statewide, nonprofit, nonpartisan organization with more than 65,000 members across Illinois. The ACLU-IL is dedicated to protecting the principles embodied in the U.S. Constitution, Illinois Constitution, and civil rights statutes through litigation, advocacy, and public education. The ACLU-IL has long advocated for the constitutional and civil rights of immigrants through know-your-rights presentations and other public education, legislative advocacy, and litigation – both as direct counsel and amicus.

The Illinois Coalition for Immigrant and Refugee Rights (ICIRR) is the state's largest multiethnic immigrant advocacy organization. ICIRR is dedicated to promoting the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society. ICIRR has advocated on the local, state, and federal level for legislative and administrative policies that uphold the dignity of immigrants and their ability to safe, secure lives in their new home country. The policies have included promotion of U.S. citizenship, access to student assistance, driver's licenses, and health care, and protection against harmful detention and family separation, including the Chicago Welcoming

1

City Ordinance, Cook County Detainer Ordinance, Illinois TRUST Act, and Illinois Way Forward Act.

Mujeres Latinas en Acción, founded in 1973, is the nation's oldest Latina-led organization. Mujeres Latinas en Acción empowers Latinas and their families by providing various bilingual support services and leadership development programs. Each year, the organization serves nearly 2,000 community members, including immigrants, with domestic violence and sexual abuse support services and leadership programming. Mujeres believes that systems of oppression can be challenged through community engagement and collective leadership, and that the voices of those most impacted by discrimination must remain at the forefront.

The National Immigrant Justice Center (NIJC) is a national nonprofit organization with its headquarters in Chicago, Illinois. NIJC provides legal services to immigrants, refugees, and asylum seekers, reaching more than 10,000 individuals annually. NIJC draws on this experience providing consultations and direct legal representation to inform its efforts to educate the public and advocate for immigration policies that promote a fair immigration system. NIJC focuses on transparency and accountability within the immigration system and strives to ensure that immigration enforcement is carried out in accordance with the constitution and the statutory system that Congress created.

## ARGUMENT

As the District Court explained, the Constitution reserves broad "police powers" to the states that include "increasing the safety of all residents and

2

focusing officers' limited time and resources on preventing and responding to crime." *United States v. Illinois*, 796 F. Supp. 3d 494, 532 (2025). More generally, the term "police powers" refers to activities "not delegated to the United States by the Constitution, nor prohibited by it to the states" to protect the health, safety, and welfare of their residents. *See* U.S. CONST. amend. X. Illinois, Cook County, and Chicago determined that law enforcement participation in civil immigration enforcement did not serve these interests. Defendants did not make these decisions out of malice for the federal government or to thwart immigration enforcement, but for sound public policy reasons supported by evidence.

*Amici* submit this brief to describe a few reasons why jurisdictions like Defendants choose to limit their law enforcement agencies' participation in immigration enforcement. First, sanctuary policies[1] protect public safety by mitigating the fear that reporting a crime or cooperating with police will lead to someone's deportation. Such policies also ensure that the local law enforcement agencies can allocate scarce resources for their core mission of enforcing criminal law. Second, sanctuary policies prevent state and local law enforcement from violating state law or the Constitution by holding people in custody past their

---

[1] For ease of reference *Amici* use the term "sanctuary policies" for state and local policies that limit participation in civil immigration enforcement, including the laws challenged here, the Illinois TRUST Act, 5 ILCS 805/1 *et seq.*, Cook County Municipal Code Sec. 46-37, and the Chicago Welcoming City Ordinance, Chicago Municipal Code Ch. 2-173. As this Court has explained, the term is a misnomer in that "presence in . . . localities [with such policies] will not immunize anyone to the reach of the federal government." *City of Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part,* 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated in part on other grounds,* 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

release date or engaging in questionable immigration enforcement tactics. Finally, sanctuary policies protect the substantial contributions that immigrants make to the tax base and overall economic well-being.

## I. The sanctuary policies protect public safety.

### A. The sanctuary policies help alleviate reluctance among community members to work with law enforcement due to fear of immigration consequences.

Governments like Chicago, Cook County, and Illinois have reasonably determined that "their local law enforcement efforts are handcuffed by … unbounded cooperation with immigration enforcement. They have concluded that persons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home." *Chicago*, 888 F.3d at 280. Chicago's Welcoming City Ordinance observes that "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all its residents. The cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City." Chicago Code Sec. 2-173-005.

Likewise, the General Assembly originally enacted the TRUST Act in large part to advance public safety by promoting cooperation between law enforcement agencies and communities. *See* 100th General Assembly, Senate Tr., May 4, 2017, at 118-19 (Sen. J. Cullerton) ("[W]e call it the Trust Act because we want to foster trust between police and immigrant communities and refocus resources on fighting

4

priority crimes.") As one TRUST Act proponent explained, "if a person is afraid to go to the hospital because they think that they might be detained or they're afraid to let their children go to school, thinking that they will come get the children and have them go home to get their parents, or if they're afraid to speak to law enforcement, we all are in danger." *Id.* at 130 (Sen. Van Pelt). *See also* 100th General Assembly, Senate Tr., May 31, 2017, at 91 (Sen. Biss) ("Nobody should be scared to call 9-1-1 in the State of Illinois. It's not sensible. It's not fair. It's not good for public safety."); *Id.* at 95 (Sen. Martinez) ("the TRUST Act … will give a sense of the police and communities working together to make sure that they can report a domestic violence. They're not afraid to actually go ahead and have somebody arrested in their home, afraid to give up that because of their – because of their legal status.").

Targeted amendments to the TRUST Act in 2021 further supported the effort to ensure cooperation between law enforcement and immigrant communities. For example, the amendments assured members of immigrant families and communities that cooperating with local law enforcement would not subject them or their loved ones to questioning about their immigration or citizenship status, interrogation by U.S. Immigration and Customs Enforcement (ICE), or transfer to ICE custody. 5 ILCS 805/15(e), (h)(2),(3). Another public safety amendment concerned probation officers. For decades, some probation officers had routinely advised ICE of upcoming appointments with "foreign-born" probationers— sometimes pursuant to Circuit Court administrative orders. *See* Circuit

5

Administrative Order 95-7, App'x 1, Sixth Judicial Circuit, Nov. 8, 1995 (rescinded Jun. 3, 2021).[2] The natural effect of such reporting was to deter some immigrants from attending appointments, putting themselves in legal jeopardy and making it difficult for probation officers to determine whether a person was complying with conditions for release. The General Assembly addressed this issue by adding probation officers to the list of law enforcement officers governed by the TRUST Act. 5 ILCS 805/10.

Empirical evidence supports the use of sanctuary policies to drive down crime by fostering cooperation between police and immigrant communities. A 2012 survey of Latinos in Cook County (Chicago), Illinois, Harris County (Houston), Texas, Los Angeles, and Maricopa County (Phoenix), Arizona demonstrates that the fear of immigration consequences deters undocumented immigrants, and many Latinos overall, from providing information to police. For example, 45 percent of Latinos, and 67 percent of undocumented Latinos, stated that they are less likely to voluntarily offer information about crimes or to report a crime because they are afraid the police will ask them or people they know about their immigration status. Nik Theodore, *Insecure Communities Latino Perceptions of Police Involvement in Immigrant Enforcement* 5-6, University of Illinois at Chicago (May 2013).[3]

Predictably, then, overall crime rates are higher in counties where local law enforcement honor ICE detainers than in similar counties with sanctuary policies. Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center

---

[2] https://sixthcircuitcourt.com/pdf/1995AdminOrders.pdf.
[3] https://www.vawnet.org/sites/default/files/assets/files/2016-10/InsecureCommunities.pdf

for American Progress 5 (Jan. 26, 2017).[4] Significantly, "sanctuary practices are associated with a decrease in both property crime and violent crime within counties over time." Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary evidence from a county-level investigation in the United States,* 106 Social Science Research 102743 (Aug. 2022).

Sanctuary policies have a particularly strong impact on domestic and gender-based violence. Immigrant women are particularly vulnerable to such violence due to factors like language barriers, lack of familiarity with available support systems, and fear of police based on experiences in their country of origin. Michael Runner, *et al.*, Family Violence Prevention Fund, *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations*, Robert Wood Johnson Foundation 11 (Mar. 2009).[5] Moreover, some abusers threaten their victims with deportation if they disclose the abuse. *Id.*, at 12. Thus, "the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation." *Chicago*, 888 F.3d at 280. Given that reluctance, it is unsurprising that "the adoption of sanctuary policies is accompanied by a lower rate of domestic homicides involving a female *Hispanic* victim." Catalina Amuedo-Dorantes and Monica Deza,

---

[4] https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

[5] https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf.

*Can Sanctuary Policies Reduce Domestic Violence*? 24 Amer. Law & Econ. Review 24, 116-170 (March 2022) (emphasis in original).[6]

### B. The sanctuary policies preserve law enforcement resources for enforcing criminal law.

In addition to encouraging trust and cooperation between law enforcement and immigrant communities, the TRUST Act protects public safety by ensuring that state and local law enforcement agencies focus on their core mission: enforcing criminal law. The crime rate among immigrants – whether documented or not – is the same or *lower* than that of citizens. *Debunking the Myth of Immigrants and Crime*, Fact Sheet, American Immigration Council (Oct. 2024) (citing studies)[7]; Michael T. Light, et al., *Comparing Crime Rates between Undocumented Immigrants, Legal Immigrants, and Native-born U.S. Citizens in Texas*. 117 Proc. Nat'l Acad. Sci. USA 51 (Dec. 7, 2020). The City, County, and State have reasonably determined that rather than holding immigrants past their release dates, responding to queries, and arranging jail visits for ICE officers, law enforcement resources are better expended investigating crimes and apprehending suspects, regardless of their immigration or citizenship status. *See* Senate Hearing May 31 Tr. at 94 (Sen. Raoul) ("[W]e shouldn't pretend like … we have the resources to direct our local law enforcement to do anything other than focus on fighting crime. And to that extent, we shouldn't have local law enforcement focused on doing what

---

[6] https://academic.oup.com/aler/article-abstract/24/1/116/6543952.
[7] https://www.americanimmigrationcouncil.org/sites/default/files/research/debunking_the_myth_of_immigrants_and_crime.pdf

we have a federal agency charged to do."); *Id.* at 96-97 (Sen. Aquino) ([T]here's a purpose for immigration enforcement – that's on the federal level. Our … police here in our State and … in our cities and so forth should be dealing with issues that … do not deal with immigration."). In fact, "data suggest that when local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, communities are safer[,] and community members stay more engaged in the local economy." Wong, *The Effects of Sanctuary Policies*, supra, 6. And "[t]he choice as to how to devote law enforcement resources— including whether or not to use such resources to aid in federal immigration efforts—[is] traditionally … one left to state and local authorities." *Chicago*, 888 F.3d at 282.

Consistent with this emphasis on law enforcement's crime-fighting mission, the TRUST Act expressly *allows* cooperation with federal authorities on federal *criminal* enforcement. 5 ILCS 805/15(i) ("Nothing in this Section shall preclude a law enforcement official from … investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies (including criminal investigations conducted by federal Homeland Security Investigations (HSI)) in order to ensure public safety."); 5 ILCS 805/15(h) (allowing law enforcement agencies to cooperate with immigration authorities when "presented with a federal warrant."). The TRUST Act therefore keeps law enforcement resources focused where they belong, on public safety. *See also* Chicago Municipal Code Sec. 2-173-010 (exempting criminal warrants from

9

definition of "administrative warrants," on which the Chicago Police Department may not base an arrest); Cook County Municipal Code Sec. 46-37(b) (allowing certain kinds of cooperation with ICE only when "ICE agents have a criminal warrant, or Cook County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws.")

## II.   The sanctuary policies help ensure that Illinois law enforcement officers act according to the Constitution and state law.

In addition to advancing public safety, sanctuary policies help state and local law enforcement officers stay within the bounds of the Constitution and state law. Proponents of the TRUST Act understood that complying with detainers often creates Fourth Amendment liability for local law enforcement agencies. As one legislator explained, "federal courts have consistently ruled that local jails can be sued under the Fourth Amendment if they hold immigrants on detainers after those immigrants could otherwise be released if there is no probable cause to hold them." House Tr. May 29, 2017, at 38-39 (Rep. Lang). *See also id.* at 37-38 (Rep. Mah) ("I believe that the TRUST Act, as put forth by Representative Welch, is consistent with the Fourth Amendment. And the last time I checked, the application of our civil liberties was not dependent on one's immigration status or citizenship."); Senate Tr. May 31, 2017 at 91 (Rep Harmon) ("The Illinois TRUST Act sets reasonable constitutional limits on local police interaction with ICE enforcement….").

Indeed, many federal courts have found that local governments have violated the Fourth Amendment when they detained someone based solely on an ICE

10

detainer request. *See Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018) (plaintiff plausibly alleged that County violated the Fourth Amendment by holding him based solely on an ICE detainer); *C.F.C. v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1236 (S.D. Fla. 2018) (same); *Abriq v. Hall*, 295 F. Supp. 3d 874 (M.D. Tenn. 2018) (same); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934 (D. Minn. 2017) (detention based solely on immigration detainer violated Fourth Amendment absent probable cause to believe that plaintiff was likely to escape); *Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D.R.I. 2014), *aff'd in part, dismissed in part,* 793 F.3d 208 (1st Cir. 2015) (plaintiff stated a Fourth Amendment claim against state for detaining him without probable cause based on a detainer request); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791 (N.D. Ill. 2014) (plaintiff stated a Fourth Amendment claim against Village for continuing to hold him based on ICE detainer after he posted bond for traffic violation). Many local jurisdictions have paid large settlements to plaintiffs who were held pursuant to a detainer. *See Local jurisdictions remain legally vulnerable for honoring ICE detainers*, ACLU (Feb. 3, 2020) (listing cases)[8]; Luis Ferré-Sadurní, *New York City to Pay $92.5 Million to Improperly Detained Immigrants*, N.Y. Times, Dec.18, 2024.[9]  Sanctuary policies eliminate this potential liability.

Assisting in ICE operations also increases state and local law enforcement's risk of liability for participating in ICE's own civil rights violations. Over the past

---

[8] https://www.aclu.org/sites/default/files/field_document/ice_detainer_damages_cases_0.pdf.
[9] https://www.nytimes.com/2024/12/18/nyregion/migrants-detention-settlement-deportation.html.

eighteen months, in Illinois and across the country, courts have repeatedly found ICE and the Department of Homeland Security (DHS) in violation of federal statutes and the Constitution.  For example, in Illinois, a district court held that DHS repeatedly and materially violated a consent decree and 8 U.S.C. § 1357(a)(2) by conducting warrantless arrests without probable cause to believe that the arrestee was both unlawfully present and likely to flee before a warrant could be obtained.  *Castañon Nava v. Dep't of Homeland Sec.,* 806 F. Supp. 3d 823 (N.D. Ill. 2025)*, aff'd relevant part,* 175 F.4th 828 (7th Cir. 2026).  The court found 22 individual violations and further found that DHS's misbehavior warranted an extension of the consent decree. *Id.* at 1-2. Since then, the district court has ordered release or other relief for 99 additional individuals whose arrests violated the statute. *See Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757 (N.D. Ill.), Dkts. 301, 309, 314, 359, 379, 405, 423, 448. And the court continues to consider additional motions to enforce concerning DHS's alleged illegal warrantless arrests to this day. *See id.,* Dkts. 445, 447.  The court has noted the impact DHS's tactics have had within communities:

> Citizens, non-citizens with legal status, and foreign nationals are interwoven throughout ICE's Chicago Area of Responsibility and American society in general. Citizens and non-citizens with legal status who share commonalities (such as race/ethnicity, a preference for speaking Spanish, or employment in certain occupations or locations) with—or mere physical proximity to—Latino foreign nationals may now find themselves more likely to be subjected to ICE questioning for sometimes lengthy periods of detention, and, potentially, warrantless arrests during immigration enforcement operations.

*Castañon Nava*, 806 F. Supp. 3d at 852. Without sanctuary policies, state or local law enforcement could have been implicated in ICE's legal violations and targeting of Latino residents.

Outside of Illinois, courts have found countless likely constitutional and statutory violations by ICE and CBP, such as expanding the scope of expedited removal in violation of the Due Process Clause, *Make the Rd. New York v. Noem*, 805 F. Supp. 3d 139 (D.D.C. 2025) and conducting stops or arrests that violate the Fourth or Fifth Amendment or 8 U.S.C. § 1357(a)(2), *Hussen v. Noem*, 822 F.Supp.3d 944. 2026 WL 657936 (D. Minn. Mar. 9, 2026); *M-J-M-A- v. Hermosillo*, 822 F.Supp.3d 1147, 2026 WL 562063 (D. Or. Feb. 27, 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1 (D.D.C. 2025); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209 (D. Colo. 2025); *Vasquez Perdomo v. Noem,* 790 F.Supp.3d 850 (D. Cal. 2025), *appeal dismissed sub nom. Perdomo v. Noem*, 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025).

Illinois, Cook County, and Chicago have good reason to eliminate the risk of state and local involvement in these allegedly unlawful activities – along with the litigation and liability risks that come with them.

## III. Sanctuary policies preserve strong economies driven by immigrants.

### A. Local governments with sanctuary policies have stronger economies.

Before the second Trump administration, one nationwide study, comparing counties that assisted federal immigration enforcement with those that did not, concluded that "[e]conomies are stronger in sanctuary counties – from higher

median household incomes, less poverty, and less reliance on public assistance to higher labor force participation, higher employment-to-population ratios, and lower unemployment." Wong, *supra,* at 2. On average, for counties with sanctuary policies, the median household income was $4,353 higher, the poverty rate was 2.3% lower, and the unemployment rate was 1.1% lower. *Id.* at 1.

Poverty was lower for counties with sanctuary policies, which reflected statistically significant results. *Id.* at 7. In counties with sanctuary policies, the percentage of people living at or below the federal poverty line was on average 1.4% lower for whites and 2.9% lower for Latinos. *Id.* at 8. These counties also had fewer households relying on public assistance (4.9 percent lower). *Id.*

Even homeownership, one of the main ways low-income families generate wealth, was stronger in sanctuary counties. From 2010 to 2021, there were higher rates of Latino borrowers seeking (10.6%) and receiving (9.2%) home mortgages in counties with sanctuary policies. David Zuchowki, *Sanctuary Policies and the Mortgage Market Behavior: Reducing Uncertainty to Promote Financial Inclusion,* J. of Econ. Behavior & Organ. 229 (2025).

### B. Illinois immigrants without documentation pay taxes that fund state and local government and public services.

Illinois immigrants without documentation are notable members of the economy. Immigrants without documentation pay sales and excise taxes on their purchases, property taxes on their homes and as renters, and personal and business income taxes. These taxes fund public services provided by states and local governments. In 2022, nationwide, immigrants without documentation contributed

14

an estimated $37.3 billion in state and local taxes. Carl Davis, Marco Guzman, & Emma Sifre, *Tax Payments by Undocumented Immigrants,* Institute on Taxation & Econ. Policy 3 (July 30, 2024).[10]

In Illinois, immigrants without documentation provided an estimated $1.5 *billion* in state and local tax revenue, which includes $585.6 million in sales and excise taxes, $529.6 million in property taxes, and $418.3 million in personal and business income taxes. *Id.* at 14 (Appendix A: State-Level Disaggregation of the State and Local Tax Contributions of Undocumented Immigrants). This revenue funds government operations and public services. For example, Illinois uses its tax revenue to pay for public services, including education (elementary through higher education), public pensions, health (including Medicaid), social services, public protection and justice, and employment and economic development. *See e.g.,* Susana A. Mendoza, Illinois State Comptroller, *What Did Your Tax Dollars Pay for Fiscal Year 2025?*[11] Cook County uses its tax revenue to fund public health (including Cook County Health & Hospital System which provide free care to more than 200,000 patients a year), Circuit Courts, Public Defenders, State's Attorneys, and the Sheriff. *See* Tony Preckwinkle, Pres., Cook County Bd. of Comms., *Fiscal 2025 Cook County Annual Appropriation Bill*, vol. 1, Executive Summary, xiv-xv.[12] Similarly, Chicago uses its tax revenue to pay for city leadership, operations, public

---

[10] https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf.

[11] https://illinoiscomptroller.gov/__media/tax-refund-insert-2025.pdf

[12] https://www.cookcountyil.gov/ sites/g/files/ywwepo161/files/documents/2025-02/Volume%20I%20Adopted%202025_Web.pdf

safety (police and fire departments), and business and consumer services. *See* City of Chicago, Office of Budget and Management, FAQ.[13]

> ### C. Federal immigration enforcement has already harmed Illinois' economy, if local governments are required to participate, it will get worse.

> #### 1. Federal immigration enforcement has a chilling effect on the economy.

Within days of President Trump's Executive Orders and threats to deport all immigrants regardless of criminal background, immigrants in Chicago stopped going to work, taking children to school, going to medical appointments, and frequenting businesses in neighborhoods. *See* Nell Salzman et al, '*People are Scared': Fear Permeates Every Aspect of Life in Chicago, under Threat of Mass Immigration Deportations,* Chicago Tribune, Jan. 25, 2025.[14] Months later, immigrants continued to stay home. *See* Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times, Mar. 9, 2025.[15] By September 2025, in Chicago, even Latino legal permanent residents and U.S. citizens were staying home and not frequenting local businesses because of fear of being wrongfully detained by ICE. *See* Marlen García, *Immigration Crackdown Deals a Blow to Chicago's Latino Business Corridors,* Crain's Chicago Business (Sept. 4, 2025).

A November 2025 survey found that fear of potential detention increased among likely undocumented immigrant workers (75%), lawfully present immigrants

---

[13] https://www.chicago.gov/city/en/depts/obm/supp_info/faq.html (last visited June 15, 2025).
[14] https://www.chicagotribune.com/2025/01/26/trump-chicago-immigration-deportation-fear/.
[15] https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html.

(from 33% to 50%) and naturalized citizens (from 12% to 31%). Shannon Schumacher, et. al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement* (Nov. 18, 2025).[16] More than half of immigrants (53%) including lawfully present immigrants and naturalized citizens, were "not confident they or family member would receive fair treatment by the U.S. legal system if detained on immigrant related charges. Living with these fears, three in ten immigrants, including three in four likely undocumented immigrants and about one third of lawfully present immigrants, reporte[d] avoiding traveling, seeking medical care, or going to work or other public spaces." *Id.*

The fear of immigration enforcement is warranted because detention and deportation affect more than individual immigrants. In Illinois, an estimated 817,066 people lived with at least one family member without documentation and 342,809 children lived with at least one family member without documentation. *See* Silva Mathema, *State-by-State Estimates of Family Members of Unauthorized Immigrants,* Center for American Progress (Mar. 16, 2017).[17] When breadwinners are detained or deported, the loss of income can make families struggle to pay rent or mortgages, utilities, and pay for food and medicine. *See* Akash Pillai, et al., *Potential Impacts of Mass Detention and Deportation Efforts on the Health and Well-Being of Immigrant Families,* KFF (Feb. 6, 2025).[18] With the separation of

---

[16] https://www.kff.org/racial-equity-and-health-policy/kff-new-york-times-2025-survey-of-immigrants-worries-and-experiences-amid-increased-immigration-enforcement/
[17] https://www.americanprogress.org/article/state-state-estimates-family-members-unauthorized-immigrants/.
[18] https://www.kff.org/racial-equity-and-health-policy/issue-brief/potential-impacts-of-mass-detention-and-deportation-efforts-on-the-health-and-well-being-of-immigrant-families/.

families, there are direct health impacts, including depression and worsening chronic conditions, and the inability to pay for health care. *Id.*

The economic impact of immigration enforcement also includes state and local governments whose tax bases depend on local spending. Exequiel Hernandez, *ICE-ing the Economy: Immigrant Enforcement under Trump 2.0 and Local Economic Activity,* Univ. of Penn. – The Wharton School, 6 (May 13, 2026).[19] A nationwide analysis of immigration enforcement's chill on spending using cellphone and debit and credit card data, reflected that in metropolitan areas targeted by ICE, including Chicago, a 2.73% decline in foot traffic and a 6.18% decline in spending per week. *Id.* at 2. This represents loss of $3-15 billion in 2025, compared to 2024. *Id.*

### 2. Immigration enforcement resulted in job losses to immigrants and citizens in Illinois.

On September 8, DHS began Operation Midway Blitz in Chicagoland and Illinois, purportedly to deport undocumented immigrants who were dangerous criminals.[20] *See* NBC Chicago Staff, *'Operation Midway Blitz': Homeland Security, ICE Warn of New Operation in Chicago,* NBC Chicago (Sept. 8, 2025 at 9:40 PM). According to DHS, from June 11 to October 7, 2025, ICE arrested 1,852 people and this number grew to about 3,000 people including arrests by U.S. Customs & Border Protection (CBP). *Castañon Nava,* Dkts. 217, 217-1 ¶7; 232 at 2. Most people detained posed no public safety risk. *See id.,* Dkts. 255, 255-1. While many of these

---

[19] http://dx.doi.org/10.2139/ssrn.6759278
[20] https://www.nbcchicago.com/news/politics/operation-midway-blitz-homeland-security-ice-warn-of-new-operation-in-chicago/3821080/

arrests were and continue to be challenged as unlawful (*see Castañon Nava,* Dkts. 301, 309, 314, 359, 379, 405, 423, 445, 447-448 ), most of the detained people were removed or voluntarily departed the country. *See e.g, id.,* Dkt. 232 at 3 (By October 22, 2025, of 1,852 people arrested by ICE, only 750 were still detained).

Several national studies show that federal immigration enforcement seriously harmed the economy in Illinois, resulting in job losses greater than the number of people arrested. Looking at the impact of ICE's enforcement (and not CBP arrests), in Chicago and surrounding suburbs, from January 2025 to September 2025, one study calculated that ICE increased its enforcement by 326% resulting in an employment loss of 32,678 jobs. Marcela Escobari, Ian Seyal & Paul Beach, *Shock, Awe and Economic Fallout: The Employment Effects of ICE Enforcement in U.S. Cities,* Figure 2 (Chicago-Naperville-Aurora), Brookings (May, 29, 2026).[21] This was third highest loss of jobs attributed to immigration enforcement after the New York and Los Angeles areas. *See id.* Appendix C.

While some of the job losses can be attributed to the people removed, immigration enforcement also harmed immigrants who remained and U.S citizens. Elizabeth Cox & Chloe N. East, *Labor Market Impacts of ICE Activity in Trump 2.0* (Nat'l Bureau of Econ. Rsch., Working Paper No. 35129, 2026)[22]. In a nationwide analysis which included Illinois, for immigrant workers, there was a "significant 4% reduction in employment." *Id.* at 2. Immigration enforcement did not result in employers increasing wages to attract U.S. born workers or even creating more jobs

---

[21] https://www.brookings.edu/articles/ice-enforcement-employment-effects-us-cities/
[22] https://www.nber.org/papers/w35129

for U.S. born workers. *Id.* The study estimated that with the increased enforcement, for every six workers without documentation who lost their jobs, one U.S. born worker lost their job. *Id.* at 12.

Federal immigration enforcement in the last year has already harmed Illinois' economy with the loss of income to local businesses and tax revenue, and job losses to both immigrants and U.S. citizens. If Illinois, Cook County and Chicago were forced to participate in future immigration enforcement, the economy would only worsen, harming the overall welfare that these governments seek to protect.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge the Court to affirm the dismissal of Plaintiff's case.

Dated: June 16, 2026        Respectfully submitted,

/s/ Rebecca K. Glenberg

Rebecca K. Glenberg
Michelle Teresa García
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave, Suite 600
Chicago, IL 60601
Tel.: 312-201-9740
Fax: 312-201-9760
rglenberg@aclu-il.org
mgarcia@aclu-il.org

Mark Fleming
Keren Zwick
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Tel.: 312-660-1628
Fax: 312-660-1505
mfleming@immigrantjustice.org
kzwick@immigrantjustice.org

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Amici curiae, furnishes the following in compliance with Fed. Rs. App. P. 32(a) and 29. I hereby certify that this brief conforms to Cir. R. 29 for a brief because the length of this brief is 6387 words.

/s/ Rebecca Glenberg

*Attorney for Amici Curiae*

Dated: June 16, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2026, I filed the foregoing on counsel for all parties by means of the Court's ECF system.

/s/ Rebecca K. Glenberg

Rebecca K. Glenberg