**No. 25-2904**

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

STATE OF ILLINOIS, et al.,
            *Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:25-cv-01285
(Judge Lindsay C. Jenkins)

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

---

BRETT A. SHUMATE
    *Assistant Attorney General*

ERIC D. MCARTHUR
    *Deputy Assistant Attorney
    General*

MARK R. FREEMAN
DANIEL TENNY
MICHAEL E. TALENT
J. KAIN DAY
    *Attorneys*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-8976*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 3

I.    The Sanctuary Policies Are Preempted ............................................ 3

II.    There Are No Anti-Commandeering Problems ............................. 18

III.   The Sanctuary Policies Discriminate Against The United States ................................................................................ 30

IV.   The United States Has Standing To Seek Relief Against Cook County ........................................................................... 32

CONCLUSION .................................................................................. 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                       **Page(s)**

*Alioto v. Town of Lisbon,*
651 F.3d 715 (7th Cir. 2011) ...................................................... 17

*Amcast Indus. Corp. v. Detrex Corp.,*
2 F.3d 746 (7th Cir. 1993) ........................................................ 15

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................... 3, 7

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................. 34

*Bew v. City of Chicago,*
252 F.3d 891 (7th Cir. 2001) ............................................... 15, 16

*Boeing Co. v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014) ..................................................... 31

*City of Chicago v. Sessions,*
888 F.3d 272 (7th Cir. 2018) ...................................................... 8

*City of New York v. United States,*
179 F.3d 29 (1999) ................................................................... 25

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................. 5, 22

*Demore v. Kim,*
538 U.S. 510 (2003) ................................................................... 4

*FEC v. Akins,*
524 U.S. 11 (1998) ................................................................... 33

*FERC v. Mississippi,*
456 U.S. 742 (1982) ............................................................. 19, 20

*Gutierrez v. Saenz,*
606 U.S. 305 (2025) ................................................................. 33

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ............................................................ 25, 26

*Heyward v. Cooper,*
  88 F.4th 648 (6th Cir. 2023) ............................................... 17

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ............................................................... 22

*Hively v. Ivy Tech. Cmty. Coll.,*
  853 F.3d 339 (7th Cir. 2017) (en banc) ............................. 15

*Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,*
  452 U.S. 264 (1981) ............................................................. 19

*International Paper Co. v. Ouellette,*
  479 U.S. 481 (1987) .............................................................. 7

*Kirksey v. R.J. Reynolds Tobacco Co.,*
  168 F.3d 1039 (7th Cir. 1999) ............................................ 17

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018) ............................................................. 13

*Larson v. Valente,*
  456 U.S. 228 (1982) ............................................................. 33

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973) ............................................................. 33

*McHenry County v. Raoul,*
  44 F.4th 581 (7th Cir. 2022) ........................................... 7, 31

*Mullin v. Doe,*
  2026 WL 1825840 (U.S. June 25, 2026) ............................ 13

*Murphy v. NCAA,*
  584 U.S. 453 (2018) ................................................. 22, 23, 26

*New York v. Department of Justice,*
  951 F.3d 84 (2d Cir. 2020) ................................................. 23

*Nielsen v. Preap,*
  586 U.S. 392 (2019) .......................................................... 4 , 22

iii

*Ocean County Board of Commissioners v. Attorney General,*
  8 F.4th 176 (2021) .......................................................... 23

*Oregon Prescription Drug Monitoring Program v. U.S. DEA,*
  860 F.3d 1228 (9th Cir. 2017) ........................................... 7

*Pilot Life Ins. Co. v. Dedeaux,*
  481 U.S. 41 (1987) ....................................................... 13

*Printz v. United States,*
  521 U.S. 898 (1997) ........................................... 20, 24, 25

*Reno v. Condon,*
  528 U.S. 141, (2000) ..................................................... 27

*Shirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010) ........................................... 34

*Simon v. Eastern Kentucky Welfare Rights Organization,*
  426 U.S. 26 (1976) ....................................................... 34

*United States v. Brown,*
  348 F.3d 1200 (10th Cir. 2003) ........................................ 16

*United States v. California,*
  921 F.3d 862 (9th Cir. 2019) ....................................... 14, 18

*United States v. Cohen,*
  159 F.4th 1121 (7th Cir. 2025) ........................................ 14

*United States v. Mauro,*
  436 U.S. 340 (1978) ...................................................... 29

*United States v. Missouri,*
  114 F.4th 980 (8th Cir. 2024) ....................................... 8,  32

*United States v. Texas,*
  599 U.S. 670 (2023) ...................................................... 34

## Federal Statutes:

Act of July 6, 1798, ch. 66, §§ 2-3, 1 Stat. 577 ...................... 29

8 U.S.C. § 1182(d)(5)(A) ............................................... 12

8 U.S.C. § 1226(a) ............................................................... 4

8 U.S.C. § 1226(c) ............................................................... 4

8 U.S.C. § 1226(c)(1) ........................................................ 12

8 U.S.C. § 1231(a)(1)(B)(iii) ............................................... 4

8 U.S.C. § 1231(a)(2)..................................................... 4, 12

8 U.S.C. § 1231(a)(4)(A) ............................................ 4, 12, 22

8 U.S.C. § 1357(d) .............................................................. 4

8 U.S.C. § 1357(g)(1) .......................................................... 8

8 U.S.C. § 1357(g)(9) .......................................................... 8

8 U.S.C. § 1373(a) ......................... 3, 6, 12, 14, 15, 16, 17, 21, 23, 24, 25

8 U.S.C. § 1373(c) ......................................................... 6, 14

8 U.S.C. § 1644 ............................. 3, 6, 12, 14, 21, 23, 24, 25

**U.S. Constitution:**

Art. VI, cl. 2 ..................................................................... 3

**Local Ordinances:**

Cook County, Ill., Code of Ordinances § 46-37

   pmbl............................................................................ 11

   § 46-37(a)............................................................... 9, 17

   § 46-37(b)............................................................... 9, 17

   § 46-37(c) ............................................................... 9, 17

**Regulations:**

8 C.F.R. § 245.1(d)(1)(v) ................................................. 12

8 C.F.R. § 287.7(a) ......................................................... 6, 8

## INTRODUCTION

At bottom, this case is about Congress's comprehensive scheme for handling criminal aliens—a scheme in which Illinois, Chicago, and Cook County (collectively, defendants) have affirmatively benefited (by being able to incarcerate those aliens) while intentionally rejecting concomitant obligations to cooperate with federal officials to transfer those aliens to federal custody. There is no dispute that Congress intended to allow states and localities to incarcerate persons subject to removal before the federal government removed them, that Congress directed federal officials to take custody of criminal aliens after their release from state or local custody, and that Congress authorized the use of administrative warrants and detainers to do so. At issue here is defendants' wish to decline the bitter and only partake in the sweet; they desire to incarcerate criminal aliens who are subject to removal but also to disregard Congress's requirement of cooperation to ensure the orderly detention and removal of aliens after their period of incarceration.

At times, defendants appear to suggest that Congress's express provisions directing that criminal aliens complete a period of state or local incarceration and then immediately be detained and removed by the

federal government are inadequate to make clear Congress's intent that both state and federal officials cooperate to bring about that sequence of events. At other times, they appear to suggest that Congress lacks authority to set a basic level of cooperation before states and localities can execute their criminal laws first. Neither contention is plausible.

The fundamental error in defendants' argument arises from their steadfast view that the Sanctuary Policies at issue in this litigation are merely directives "to do nothing." *E.g.*, Ill. Br. 41. States and localities are not doing "nothing." They are exercising their criminal regulatory authority by incarcerating criminal aliens in which the federal government also has an interest—namely, an interest in removing them from the country. None of the issues in this litigation would arise if defendants were not electing to incarcerate these individuals. The only question is whether defendants must do so in a manner consistent with the federal scheme, or whether they can deliberately obstruct that scheme.

State and local laws that effectively nullify federal law governing criminal aliens and that obstruct federal officials engaged in federal functions are preempted—especially as to policies barring the sharing of

2

information, which are expressly preempted by 8 U.S.C. §§ 1373(a) and 1644. And by imposing unique burdens on federal immigration officials that no other official, including state and local officials, face, the Sanctuary Policies impermissibly discriminate against the federal government.

Holding the Sanctuary Policies invalid therefore vindicates the constitutional structure, which holds that federal law is "supreme." U.S. Const. art. VI, cl. 2. At the same time, granting the United States' request for relief will not convert state and local law enforcement into arms of the Department of Homeland Security. States and localities are not compelled to arrest or detain criminal aliens. Rather, when they do, they must cooperate with federal officials who have an interest in those same individuals.

## ARGUMENT

### I. The Sanctuary Policies Are Preempted

1. Congress has established an "extensive and complex" scheme governing the detention and removal of unlawfully present aliens, *Arizona v. United States*, 567 U.S. 387, 395 (2012), including aliens who have committed state crimes and are subsequently imprisoned. The

3

federal government is expressly prohibited from removing such aliens from the United States "until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A).  But the federal government must detain certain of those aliens after their release from state or local custody, *see, e.g.*, *id.* §§ 1226(c), 1231(a)(2); *see also id.* § 1231(a)(1)(B)(iii) (requiring removal within a specified period after the alien has been released from "detention or confinement"); *Nielsen v. Preap*, 586 U.S. 392, 414 (2019), and it has discretion to detain them in other cases, *see* 8 U.S.C. § 1226(a).

The mandatory detention requirements in the Immigration and Nationality Act (INA) address past issues with removing "deportable criminal aliens" due to a "failure to detain" them.  *Demore v. Kim*, 538 U.S. 510, 519 (2003).  To ensure those aliens would not "engage in crime and fail to appear for their removal hearings," Congress "require[d] that [they] be detained [during] their removal proceedings."  *Id.* at 513.  To take custody of detainable aliens, Congress authorized the use of administrative warrants, 8 U.S.C. § 1226(a), and detainers, *id.* § 1357(d).

The federal scheme thus creates an explicit arrangement under which states and localities can enforce their criminal laws without

4

federal interference, but the federal government can thereafter assume custody of aliens.

Illinois points out (Ill. Br. 32) that Congress did not expressly state that states and localities which incarcerate criminal aliens are required to provide the basic cooperation necessary for federal officials to execute their part of the scheme and take those aliens into custody upon their release.  It is hard to fathom that Congress believed it had to state expressly that states and localities could not disrupt the federal scheme by refusing to cooperate with federal officials seeking to take criminal aliens into custody.  Rather, it likely did not occur to Congress that states and localities would deliberately thwart federal law enforcement—and even if Congress entertained that thought, there is still no reason to believe it would have done things differently.  The "failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 387–88 (2000).  After all, the entire premise of obstacle preemption is that when a state enactment interferes with the self-evident will of Congress, it cannot stand.  *See id.* at 373 (State laws that "stand[] as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress" are preempted.) (quotations omitted).

In addition, Congress made the requirement of cooperation express in significant ways. The INA prohibits restrictions that would prevent state and local officials from sharing information regarding immigration status with federal immigration officials. 8 U.S.C. § 1373(a); *accord id.* § 1644. It also requires federal officials to respond to inquiries from State or local agencies "seeking to verify or ascertain the . . . immigration status" of a person. *Id.* § 1373(c). As the United States has explained, *see, e.g.*, U.S. Br. 37, certain information, such as a criminal alien's release date, is crucial to determine whether an alien is removable or subject to continued lawful presence in the country while incarcerated. Indeed, a detainer includes a request for such information "in order for the Department to arrange to assume custody." 8 C.F.R. § 287.7(a). A policy prohibiting such vital information from being shared is expressly preempted.

2.     Defendants' responses largely miss the point. Defendants argue that the Policies simply "withhold state [and local] resources," Ill. Br. 28-29; *see, e.g.*, Ill. Br. 30-34; Chi. Br. 13-17, 19-21; Cty. Br. 20, and

6

are exercises of law enforcement "'latitude' or 'discretion,'" Chi. Br. 23; *see* Ill. Br. 34-37, that are unaffected by the INA, which imposes duties on federal officers but not state or local officials, *see*, *e.g.*, Ill. Br. 31-34; Chi. Br. 13-14.  Defendants invoke this line of argument both to insist upon a presumption against preemption and to urge that there is no conflict with federal law.

The conflict here, however, arises not from defendants' inaction, but from their refusal to ensure that the exercise of their own regulatory authority with regard to criminal aliens is consistent with the federal scheme.  In particular, defendants treat criminal aliens in a manner that interferes with an "ultimate goal" of the INA—federal custody of criminal aliens—and, because the Policies require federal officials to use judicial warrants rather than administrative warrants or detainers, with "the methods by which the federal statute was designed to reach this goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *see Arizona*, 567 U.S. at 406; *Oregon Prescription Drug Monitoring Program v. U.S. DEA*, 860 F.3d 1228, 1236 (9th Cir. 2017).

This case thus bears no resemblance to *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), where this Court held that states and

7

localities need not enter into agreements to house federal detainees at state facilities. Defendants' conduct in this case is not analogous to a decision to refrain entirely from interacting with detainees, as in *McHenry County*, but rather would be analogous to an effort to agree to house federal detainees but to refuse to do so on the terms that Congress contemplated.

It is equally irrelevant that in other immigration contexts states can choose whether "to enter into an agreement with the" federal government, 8 U.S.C. § 1357(g)(1), (9), or that a "detainer is a request," 8 C.F.R. § 287.7(a). The federal government is not insisting that any state or locality enter into an agreement to affirmatively assist with federal law enforcement, or to prolong the detention of any individual. The only point here is that when defendants do regulate the same aliens that the federal government seeks to regulate, they do so on terms compatible with the federal scheme.[1] *See United States v. Missouri*, 114

---

[1]     Chicago incorrectly states that this Court's decision in *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *reh'g en banc granted in part, vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018), *grant of reh'g vacated per curiam*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018), held that the city's Sanctuary Policy "cannot be construed as impeding federal enforcement efforts." Chi. Br. 15. That statement is
*Continued on next page.*

8

F.4th 980, 986 (8th Cir. 2024) ("That Missouri may lawfully withhold its assistance from federal law enforcement . . . does not mean that the State may do so by purporting to invalidate federal law.").

Cook County takes a different tack and appears to contend that it is not actually impeding federal law enforcement because it ostensibly permits transfers of criminal aliens to federal custody. See Cty. Br. 25. But Cook County prevents federal officials from accessing aliens even "to effect their safe transfer to federal immigration custody when presented with a federal administrative warrant." GA21. For example, ICE access to a building entrance to receive a criminal alien being released from local custody would require "use [of] County facilities," and so is barred by the ordinance. Cook County, Ill., Code of Ordinances § 46-37(b). Furthermore, County personnel cannot "expend their time responding to ICE inquiries or communicating with ICE," *id.* § 46-37(a)-(b); *see id.* § 46-37(c), which effectively precludes the orderly transfers that Congress contemplated. Even the district court accepted that Cook County's Ordinance has the purpose and effect of impeding the federal

---

*dictum* and not binding, *see* U.S. Br. 42 n.8, as Illinois notes, *see* Ill. Br. 41 n.10.

9

government's enforcement of the federal immigration laws, holding that the Sanctuary Policies—including Cook County's—make "it more difficult and dangerous for federal officials to quickly apprehend removable noncitizens, as contemplated by the INA." SA11. That should have been more than enough for the federal government to survive a motion to dismiss.

While the foregoing analysis is sufficient to find preemption, defendants provide no justification for the Sanctuary Policies' application to criminal aliens apart from frustrating federal law. This case is not about using state or local law enforcement to arrest aliens. *Contra* Cty. Br. 32. Yet many of the justifications which defendants provide—building trust between aliens and police, *see, e.g.*, Ill. Br. 6, or ensuring cooperation from "witnesses and victims," Chi. Br. 2 (quotations omitted)—would logically apply, if they apply at all, in contexts where the community at large engages with law enforcement, such as during the initial investigation of a crime. They do not apply after a criminal alien has been apprehended and is being released from state or local custody to federal custody.

Nor can the Policies be justified as allocating "limited" resources "to local affairs," Cty. Br. 31 (discussing commandeering), or as fixing "enforcement priorities," Ill. Br. 37.  When a state or locality has already exercised its enforcement discretion and determined that a criminal alien should be incarcerated, it is not entitled to override the federal government's enforcement discretion regarding that same individual. Nor is it plausible that honoring administrative warrants, detainers, and information requests would drain resources when the laws allow compliance with judicial warrants and cooperation other than on immigration matters. The only plausible explanation for all the Sanctuary Policies is Cook County's, whose Ordinance expressly states that it was motivated by disagreement with the statutory process for taking aliens into federal custody.  *See* Cook County, Ill., Code of Ordinances pmbl.  Regardless, defendants' policy aims are irrelevant; Congress set a comprehensive scheme, and if states and localities wish to imprison criminal aliens, they must accept the related obligations.

3.    The Sanctuary Policies' prohibitions on state and local officials or employees sharing information like release dates is also expressly preempted since that is "information regarding . . .

11

immigration status." 8 U.S.C. § 1373(a); *see also id.* § 1644; U.S. Br. 36-40. Although Illinois and Chicago invoke (Ill. Br. 17; Chi. Br. 33-34) savings clauses in their enactments, their cramped view of the scope of Sections 1373 and 1644 means they cannot seriously contend that they are complying with the federal government's understanding of that provision. Accordingly, the scope of "information regarding . . . immigration status" is properly before the Court.

And an alien's release date is "information regarding . . . immigration status." Criminal aliens cannot be removed until after they are released from state prison and must be immediately detained in certain circumstances. *See* 8 U.S.C. § 1231(a)(2), (4)(A). Other criminal aliens must be detained while their removability is adjudicated. *See id.* § 1226(c)(1). A criminal alien's release date thus determines the period when he may remain in the United States outside of federal custody, but not subject to removal—much like parole. *See id.* § 1182(d)(5)(A). And just as parole is relevant in determining an alien's immigration status— *see* 8 C.F.R. § 245.1(d)(1)(v) (aliens paroled into the United States have lawful immigration status)—so too is a release date. Illinois's suggestion (Ill. Br. 19) that an individual whom the federal government is prohibited

12

from removing from the United States is not "authorized to be present in the country" is a semantic game that in no respect undermines the fundamental connection between release date and immigration status.

Defendants' insistence that the date on which an alien is no longer entitled to remain in the United States is not "information regarding . . . immigration status" underscores that they intend to strip the word "regarding" of all meaning, instead reading the statute as if it merely referred to immigration status alone. *See* Ill. Br. 18-20; Chi. Br. 33, 36-37; Cty. Br. 15-16, 19-23. But "regarding" has "a broadening effect." U.S. Br. 38 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). The word's "broad common-sense meaning" dictates that information is "regarding" immigration status "if it has a connection with or reference to" that status. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987) (quotations omitted) (discussing "relate to"); *see Mullin v. Doe*, 2026 WL 1825840, at *7 (U.S. June 25, 2026) ("with respect to").

Defendants also have no explanation for why, in another subsection of the same provision, Congress referred to "the citizenship or immigration status of any individual" and not more broadly to "information regarding" immigration status. Illinois, like the district

13

court, contends that the absence of "regarding" in Section 1373(c) is "'semantic' only." Ill. Br. 20 (quoting SA27); *see id.* (relying on *United States v. California*, 921 F.3d 862, 892 (9th Cir. 2019)). There is no sound reason for rejecting "[t]he 'cardinal principle' of textual interpretation . . . to give effect, if possible, to every clause and word of the text." *United States v. Cohen*, 159 F.4th 1121, 1126 (7th Cir. 2025) (quotations omitted). And while Congress could have used different language—as it did elsewhere in the INA, *see* Ill. Br. 20 (gathering examples)—that does not justify disregarding the plain meaning of "regarding" in 8 U.S.C. §§ 1373(a) and 1644.

4.    Cook County alone retreats to a series of waiver and forfeiture arguments that amount to the extraordinary claim that the government has forfeited all of its preemption arguments. The federal government raised, and the district court passed on, the theories of preemption advanced here, and the County's insistence that the precise contours of the government's arguments have been adjusted in some particulars falls far short of establishing forfeiture. Even if the County could establish that the United States "did not marshal in support . . . all the relevant legislative provisions and history," that would not "work a forfeiture."

14

*Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993). Rather, "when a new argument supports a claim made before the district court, [the court] will usually address it." *Bew v. City of Chicago*, 252 F.3d 891, 895 (7th Cir. 2001). And even if there had been a forfeiture of some kind, this appeal involves "pure issues of law," and this Court "often exercise[s]" its discretion to address such arguments "for the first time on appeal." *Hively v. Ivy Tech. Cmty. Coll.*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc). Moreover, "[t]he issue [is] fully briefed" as to Illinois and Chicago, and will be addressed as to them, so "there is no reason to defer its resolution." *Amcast*, 2 F.3d at 750. And in any event, as discussed below, the federal government's arguments are not new.

a.     The County first contends that the United States has advanced only "an express-preemption theory premised on the language of sections 1373 and 1644." Cty. Br. 9; *see* Cty. Br. 23-27. That contention—unique among defendants—is wrong. The United States has consistently pressed an obstacle preemption claim throughout this litigation, explaining how the Sanctuary Policies were obstacles to Congress's goal of an "expedited" "detention and removal process." Dkt. No. 50, at 21; *see, e.g., id.* at 21-23 (citing 8 U.S.C. §§ 1226(a), (c), 1231)

15

(discussing the effect of the Sanctuary Policies on federal officials' ability to take custody of criminal aliens); *see also* GA32-36; U.S. Br. 31-33.

b.    Nor has the United States forfeited its express-preemption claim.  Cook County argues (Cty. Br. 9-13) that the United States failed to respond to its argument in district court that 8 U.S.C. § 1373(a) does not apply to the Cook County Ordinance because it is an internal regulation.  As the County concedes (Cty. Br. 11), the district court did not rely on this argument, and instead ruled on other grounds, addressed in the government's opening brief.  *See United States v. Brown*, 348 F.3d 1200, 1212-1213 (10th Cir. 2003) (arguments that "do not relate to the basis of the district court's ruling" need not be raised in the opening brief; "the appellant is entitled to respond in its reply brief").  Even apart from its merits, a forfeiture argument that the district court did not accept is quite a thin reed for affirmance of the district court's judgment on this point.

In any event, there was no forfeiture.  As noted above, claims (which the United States has consistently made), not arguments, are waived. *See, e.g., Bew*, 252 F.3d at 895.  The cases Cook County cites (Cty. Br. 11) involve effectively wholesale failures to respond to motions to dismiss.

16

*See Heyward v. Cooper*, 88 F.4th 648, 654 (6th Cir. 2023); *Alioto v. Town of Lisbon*, 651 F.3d 715, 719-721 (7th Cir. 2011); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999).  That is a far cry from what happened here.  To the contrary, the federal government strenuously argued that the County's ordinance was preempted.

Finally, the County's statutory position is insubstantial, which is likely why the district court did not accept it, and the County does not press the merits as an alternative basis for affirmance.  The County argues that Section 1373(a) merely "prohibit[s] one unit of government, or one official in that government, from prohibiting *another* unit of government or official of that other unit of government from making such a decision."  Dkt. No. 28, at 9.  But that is exactly what the Cook County Ordinance does: it involves "one unit of government, or one official in that government" (the County Board of Commissioners or supervisors) "prohibiting *another* unit of government or official of that other unit of government" (*e.g.*, the Sheriff or other employees) from providing information to the federal government.  *Id.*; *see* Cook County, Ill., Code of Ordinances § 46-37(a)-(c).

17

## II.    There Are No Anti-Commandeering Problems

Defendants fare no better in raising anti-commandeering arguments.  It is unsurprising that they feel the need to resort to those arguments; the Ninth Circuit's decision in *California*, on which defendants' heavily rely, concluded that "the anticommandeering rule distinguishe[d] th[at] case . . . from the preemption cases on which the United States relie[d]."  921 F.3d at 888.

1.    Defendants' anti-commandeering argument boils down to the extraordinary contention that even if Congress had expressly conditioned states' authority to incarcerate criminal aliens on agreeing to simple measures like allowing a smooth transfer of custody, the Tenth Amendment would prohibit such a condition.  That contention is wrong for the same reasons discussed above, as it follows from defendants' erroneous framing of the Sanctuary Policies as merely involving a decision to refrain from taking action.  Defendants are not standing by idly; they are regulating in a manner fundamentally inconsistent with the federal scheme.

Defendants are mistaken to insist that the INA does not involve a cooperative-federalism scheme in which states and localities are given a

18

choice about whether to participate. *See, e.g.*, Ill. Br. 43-44; Chi. Br. 27-29; Cty. Br. 37-39. That is precisely what the INA does. Congress authorized states and localities to prosecute and incarcerate criminal aliens who would otherwise be subject to immediate removal by the federal government, but only if they cooperate with the federal scheme.

Defendants' anti-commandeering arguments thus fail for the same reason as in other cooperative-federalism cases. As in those cases, "Congress could have" required that aliens convicted of certain crimes be immediately deported but instead "adopted a less intrusive scheme and allowed the States to" incarcerate criminal aliens, with federal agents taking custody upon release. *FERC v. Mississippi*, 456 U.S. 742, 765 (1982). Barring state and local officials from undermining Congress's goals by thwarting federal agents from taking custody of criminal aliens is not "invalid" under the Tenth Amendment, *id.*; *see Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, 452 U.S. 264, 290 (1981), any more than it would be if Congress had made state incarceration of criminal aliens expressly subject to a provision mandating the transfer of the alien to federal custody after his sentence was served, *see* U.S. Br. 55. Indeed, the United States could have

19

prescribed the procedures state and local officials would have to use to decide whether to accept that scheme. *See FERC*, 456 U.S. at 771. The more modest request here—that states and localities do not categorically bar all cooperation with federal immigration officials—is not the type of "federal command to the States" the Tenth Amendment bars. *Id.* at 762.

Chicago's suggestion (Chi. Br. 29) that it would be unreasonable to expect the city to refrain from arresting people who commit crimes merely underscores that this case involves the clash of two regulatory schemes rather than Chicago's effort to stand idly by. The pervasiveness of Chicago's regulation of the population in which the federal government also has a legitimate interest hinders, rather than advances, Chicago's argument that it would prefer to sit on the sidelines and is being forced to regulate against its will.

For the same reasons, the modest measures here are far different from requiring state and local officials "to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *see* U.S. Br. 52. The United States is not arguing that state or local law enforcement must arrest aliens, *but see* Chi. Br. 18-19; Cty. Br. 32, or even that they must prolong detention, *but*

20

*see* Ill. Br. 35; Chi. Br. 23; Cty. Br. 25 n.5.  Instead, this case depends on the far simpler proposition that states and localities who elect to assume custody of criminal aliens must do so on the terms contemplated by Congress.

2.    a.    Defendants are similarly mistaken to suggest that the relevant provisions of the INA do not regulate private parties but either federal officials (as to taking aliens into custody) or states (as to 8 U.S.C. §§ 1373(a) and 1644).  *See, e.g.*, Ill. Br. 21-28, 38-40; Chi. Br. 26-27, 31-32; Cty. Br. 15-19.  The Sanctuary Policies apply to criminal aliens who are in state custody, and the INA provisions the government relies upon also regulate those same aliens.  Defendants are not free to ignore federal provisions that impose rights and obligations on the same individuals that defendants are regulating through their own criminal laws by insisting, for example, that notwithstanding an administrative warrant and federal law directing that a criminal alien should be taken into federal custody, *see, e.g.*, 8 U.S.C. §§ 1226(a), (c), 1231(a)(2)(A), a criminal alien is to go free unless federal officials have a judicial warrant.  *See* SA4.  As the Supreme Court has explained, when state and federal laws "confer[] rights or impose[] restrictions" on private actors that conflict,

21

federal law preempts the conflicting state law. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

Similarly, Illinois's observation (Ill. Br. 39) that the Sanctuary Policies are directed at state and local officials ignores that the Policies direct officials who are engaged in the regulation of criminal aliens and have the effect of providing those aliens a right (the right to be free post-release) that is contrary to federal law (which provides for custody).[2] This is, again, semantics. The Massachusetts law held to be preempted in *Crosby*, for example, similarly barred "state entities from buying goods or services from" certain companies. 530 U.S. at 367.

---

[2]     Cook County claims that the federal government cannot constitutionally remove aliens before they are punished by state or local governments. *See* Cty. Br. 40-41. The County never explains why, and the cases it cites are inapposite. *See id.* Rather, "[w]hen the national government by . . . statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the . . . statute is the supreme law of the land." *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941). And indeed, mandatory federal custody of criminal aliens occurs notwithstanding any outstanding "noncustodial portions of a criminal sentence," *Nielsen*, 586 U.S. at 414, which are also not "reason[s] to defer removal," 8 U.S.C. § 1231(a)(4)(A).

22

b.    Defendants' position is equally meritless as to 8 U.S.C. §§ 1373(a) and 1644.  Like the Third Circuit,[3] *see Ocean County Board of Commissioners v. Attorney General*, 8 F.4th 176, 181-182 (2021), defendants make much of the phrasing of those laws, *see* Ill. Br. 22; Chi. Br. 31; Cty. Br. 15.  But courts must "look beyond the phrasing" of express preemption provisions because those provisions often "appear to operate directly on the States."  *Murphy*, 584 U.S. at 478.  As applied here, Sections 1373 and 1644 merely operate as part of a regulatory scheme governing criminal aliens.

Defendants' claim that the Second Circuit's rejection of a commandeering challenge in *City of New York* "does not survive *Murphy*," *e.g.*, Ill. Br. 23, n.6, was rejected by the Second Circuit itself.  While "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering[,] . . . the conclusion that § 1373, on its face, violates the Tenth Amendment does not follow."  *New York v. Department of Justice*, 951 F.3d 84, 113 (2d Cir. 2020).  Section 1373(a) (and Section 1644) is part of "the INA, which certainly confers

---

[3]    The district court cases defendants cite, *see* Ill. Br. 23; Cty. Br. 19, are not binding and are incorrect for the reasons set out in the United States' opening brief and here.

rights and places restrictions on . . . private persons." *Id.* at 114 n.27; *see* U.S. Br. 61. In the context of the INA generally, and to criminal aliens being released from state or local custody specifically, 8 U.S.C. §§ 1373(a) and 1644 help federal officials determine whether an alien should be taken into federal custody and so help determine an individual's privilege to remain in the United States. Indeed, because information-sharing assists federal officials in fulfilling their duties under the INA, the Sanctuary Policies' prohibitions on information-sharing would be obstacle-preempted even absent the express preemption provisions. *See* U.S. Br. 61-62. It makes no sense to conclude that there is a Tenth Amendment defect because Congress made the preemptive effect of those provisions express. *Id.*

But even if 8 U.S.C. §§ 1373(a) and 1644 regulate states, they are still valid because they require only the "provision of information," U.S. Br. 62 (quoting *Printz*, 521 U.S. at 918)—a point underscored by the fact the information is, in many cases, related to court cases, *see* U.S. Br. 62-65. Defendants argue that the United States' position is inconsistent with "the reasoning of the Supreme Court's anticommandeering opinions," Ill. Br. 26; *see* Cty. Br. 34, and relies on a question the Court

24

reserved in *Printz, see* Chi. Br. 39-40; Cty. Br. 35. But both points disregard that the Court reserved the issue because information-sharing directives "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program," *Printz*, 521 U.S. at 918. Thus, the Second Circuit correctly held that 8 U.S.C. §§ 1373(a) and 1644 do not compel "state and local governments to enact or administer any federal regulatory program." *City of New York v. United States*, 179 F.3d 29, 35 (1999).

*Haaland v. Brackeen*, 599 U.S. 255 (2023), underscores the point with respect to the information that is contained in judicial records, such as release dates. *See* U.S. Br. 64. Defendants do not dispute that 8 U.S.C. §§ 1373(a) and 1644 will often cover court records. Instead, they try to limit *Brackeen* to state courts and employees, arguing that the Sanctuary Policies do not apply to them, *see* Ill. Br. 27; Chi. Br. 40-41; Cty. Br. 33-34, and Chicago suggests that *Brackeen* applies only to "state courts enforcing provisions of a federal law," Chi. Br. 40. But the Court stated without limitation that "Congress may impose ancillary recordkeeping requirements related to state-court proceedings without violating the Tenth Amendment," *Brackeen*, 599 U.S. at 291, and that those

25

requirements extend to whatever state agency possesses the records, *id.* at 288 n.7.  Furthermore, the federal government may direct "the State to . . . provide [that] information to" it.  *Id.* at 291.

c.    The reasons why "adherence to the anticommandeering principle is important," *Murphy*, 584 U.S. at 473, do not help defendants. *Contra* Ill. Br. 44-45; Chi. Br. 29-30; Cty. Br. 30-32.  That states and localities cannot prevent federal officials from lawfully taking criminal aliens into custody enforces, rather than undermines, the division of "authority between federal and state governments," *Murphy*, 584 U.S. at 473 (quotations omitted).  The Sanctuary Policies' intrusion into this area blurs "political accountability," *see id.* at 474, by claiming authority to determine which aliens may remain outside federal custody.  And the federal government—not defendants—assumes "the costs of" detaining criminal aliens upon the termination of state and local custody.  *Id.*  Thus, finding the Sanctuary Policies preempted vindicates the constitutional structure, which vests authority over aliens in the federal government and declares federal law to be supreme; makes clear that the responsibility for holding aliens in custody pending their removal lies

26

solely with the federal government; and does not impose costs for running that program on the states.

Defendants' contentions that complying with the INA will impose costs in the form of "officer time and physical space," Chi. Br. 30, or in "responding to federal inquiries and enabling federal transfers," Ill. Br. 45, could be made in any case like this one. The Supremacy Clause sometimes imposes burdens on the states, and that alone has never been thought to violate the Tenth Amendment. As the Supreme Court has explained, "[t]hat a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Reno v. Condon*, 528 U.S. 141, 150–51, (2000) (quotations omitted); *see also id.* at 150 ("We agree with South Carolina's assertion that the DPPA's provisions will require time and effort on the part of state employees, but reject the State's argument that the DPPA violates the principles laid down in either *New York* or *Printz*.").

In any event, any costs at issue here are unlikely to be significant. States and localities merely need to provide basic information to the federal government and allow the orderly transfer of custody of criminal

27

aliens to federal officials. Nor is it logical to believe "immigrant communities," Ill. Br. 45, will refuse to assist state and local police because the federal government will take custody of criminal aliens upon their release from state or local confinement. Aliens who have already been incarcerated by states and localities are unlikely to pin their distrust of law enforcement on potential down-the-road immigration consequences. And defendants are willing to share information and cooperate in transfers with other states, localities, and federal agencies. The idea that such cooperation is uniquely burdensome on resources or community trust for immigration enforcement alone rings hollow.

d.    Defendants miss the forest for the trees when they dismiss the historical examples of sovereigns cooperating to transfer custody. *See* Ill. Br. 45-46; Chi. Br. 30; Cty. Br. 42-43. The relevant point is that the historical anomaly is one sovereign obstructing the transfer of custody to another sovereign that has a rightful claim. It is unsurprising that defendants provide no historical example of state or local laws similar to the Sanctuary Policies—that is, of state or local laws obstructing the transfer of custody of an individual in which the federal government and states and localities have an interest. That all agree there has been a

28

long history of voluntary transfers of prisoners from state and local custody to federal custody means the Sanctuary Policies are the historical anomaly and confirms that the Policies are conflict-preempted.[4]

Illinois and Chicago also misread the Act of July 6, 1798, ch. 66, §§ 2-3, 1 Stat. 577, 577-78.  Ill. Br. 45; Chi. Br. 30.  While Section 2 of the Act imposes duties on state court judges to adjudicate the removability of aliens, Section 3 provides that it is "the duty of the marshal of the district in which any alien enemy *shall be apprehended*, who . . . by order of any court . . . shall be required to depart . . . to execute such order."  1. Stat. 578 (emphasis added).  The passive voice shows that others besides federal officials—such as state and local officials—would apprehend aliens, which would necessitate transferring the alien to federal custody. It illustrates that from the beginning of the Republic, all understood

---

[4]     Cook County badly misunderstands (Cty. Br. 43) the Supreme Court's decision in *United States v. Mauro*, 436 U.S. 340, 363 (1978), which stated that the provision of the Interstate Agreement on Detainers Act at issue did *not* "augment the State's authority to dishonor" a particular type of writ so that if a State "never had authority to dishonor [the] writ," the Act "could not be read as providing such authority."  It did not remotely suggest a state was entitled, under the Supremacy Clause, to ignore a valid federal order.

Congress could enact laws whose premise is the transfer of aliens from state or local custody to federal custody.

## III. The Sanctuary Policies Discriminate Against The United States

Defendants do not persuasively challenge the United States' intergovernmental immunity argument. Many of their arguments rely on recasting the Sanctuary Policies as setting terms of state and local cooperation in immigration enforcement and re-packaging their anti-commandeering claims. *See* Ill. Br. 50-53; Chi. Br. 42-44; Cty. Br. 28-29. As the United States has explained, that framing is incorrect.

Defendants also defend the district court's view that the United States needed to put forth a comparator. But the Policies, by their terms, single out *federal* officials and impose unique burdens on them that no other official faces. *See* U.S. Br. 47-49. For example, a state or local officer's request for information does not face the same information blackout as a federal immigration official's request. "There is therefore no need to look for comparators; by their terms, the Policies impose a burden unique to the federal government." U.S. Br. 49.

Defendants strip from context this Court's conclusion in *McHenry* that a valid discrimination claim does not arise from state enactments

30

that simply "touch[] on an exclusively federal sphere." *McHenry*, 44 F.4th at 581; *see* Ill. Br. 47-50; Chi. Br. 41-42; Cty. Br. 29. In *McHenry*, this Court recognized that if a state declined to engage in a particular activity—there, housing immigration detainees—a valid discrimination claim could not lie merely because only the federal government engaged in that activity. A contrary conclusion would compel states to participate in a federal program.

Here, as noted, defendants are not themselves being asked to engage in immigration enforcement; instead, they are being asked to treat the federal government the same as other sovereigns who ask for similar cooperation under similar circumstances. This case is thus more like *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014), where the Ninth Circuit held that a state enactment that "single[d] out" a nuclear site owned by the federal government discriminated against the federal government. The federal government engages in a lot of unique activities, and it would be extraordinary to suggest that states can lawfully effectuate discrimination against the federal government and skirt around the Supremacy Clause simply by naming those activities rather than identifying the federal government specifically.

31

## IV. The United States Has Standing To Seek Relief Against Cook County

Cook County argues that the district court improperly held that the United States has standing. Cty. Br. 46-50.[5] This argument, made only by the County, is meritless, as the district court held. *See* SA10-13.

The County's argument again rests on its claim that the Cook County Ordinance does not prohibit transfers, just federal access to criminal aliens. Cty. Br. 46-47. But as described above, blocking access to County facilities blocks the "safe transfer" of criminal aliens to federal custody, GA21, and the Ordinance's information prohibitions are obstacles to federal agents taking custody of criminal aliens upon their release, *see* GA21, 31. The district court correctly concluded that "[t]he United States has alleged enough plausible facts to show that there is a real and imminent threat that it will be injured through [the County Ordinance's] continued implementation." SA10; *see* SA10-12; *Missouri*, 114 F.4th at 985.

---

[5] As the County notes (Cty. Br. 44-46), the United States is not appealing the district court's decision dismissing the individual County officers, or any other individual officer. *See* U.S. Br. 13 n.5.

The County further argues (Cty. Br. 47-50) that the United States has not alleged the existence of a redressable injury because an injunction barring enforcement of the County Ordinance, *see* GA38, will not result in County employees providing the requested information. The district court properly rejected (SA13 & n.8) this "draconic interpretation of the redressability requirement," which would require the United States to show it is "*certain*, ultimately, to receive" the information it seeks. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see id.* at 242-243 (finding redressability even though a state could impose the same harm through a different means). Indeed, just last year, the Supreme Court held that even though "a prosecutor might . . . find another reason . . . to deny a prisoner's request for DNA testing," the prisoner has standing to challenge state procedures for DNA testing of that evidence. *Gutierrez v. Saenz*, 606 U.S. 305, 320 (2025); *see FEC v. Akins*, 524 U.S. 11, 25 (1998) (explaining plaintiffs have standing to challenge exercises of agency discretion even though the agency "might later . . . reach the same result for a different reason").

The cases Cook County cites (Cty. Br. 49) are inapposite. *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), "applies to challenges to the . . .

33

exercise of enforcement discretion over whether to arrest or prosecute." *United States v. Texas*, 599 U.S. 670, 677 (2023). *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976), involved a challenge to an IRS ruling where the injury stemmed from "the independent action" of hospitals. Here, the United States' injury is "produced by [the Ordinance's] determinative or coercive effect upon" County officials and employees. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). And the County's addition, in a footnote, of a preenforcement standing case, *see* Cty. Br. 50 n.11 (referencing *Shirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010)), is unhelpful. To the extent such cases are relevant, they underscore that the United States need not show certainty to establish redressability. *See Shirmer*, 621 F.3d at 586 (noting the "uncertainty" involved in predicting the possibility of future prosecutions).

34

## CONCLUSION

The Court should reverse the district court's dismissal of the United States' complaint.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
MICHAEL E. TALENT
J. KAIN DAY

*/s/ Michael E. Talent*
Michael E. Talent
*Attorneys*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8976*
*Michael.Talent@usdoj.gov*

July 2026

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32 because it contains 6,920 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Michael E. Talent*
Michael E. Talent

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

/s/ Michael E. Talent
Michael E. Talent